1  **BARROWAY TOPAZ KESSLER**
   **MELTZER & CHECK, LLP**
2  RAMZI ABADOU  (Bar No. 222567)
   STACEY M. KAPLAN  (Bar No. 241989)
3  ERIK D. PETERSON  (Bar No. 257098)
   580 California Street, Suite 1750
4  San Francisco, CA 94104
   Tel:   (415) 400-3000
5  Fax:   (415) 400-3001
   rabadou@btkmc.com
6  skaplan@btkmc.com
   epeterson@btkmc.com
7
   -and-
8
   Sean M. Handler (PA Bar No. 86693)           **NIX, PATTERSON & ROACH, LLP**
9  Joseph H. Meltzer (PA Bar No. 80136)         Jeffrey J. Angelovich (TX Bar No. 00786988)
   Peter H. LeVan, Jr. (PA Bar No. 83456)       Brad E. Seidel (TX Bar No. 24008008)
10 Naumon A. Amjed (PA Bar No. 309520)          3600 N. Capital of Texas Hwy, Bldg. B, Ste. 350
   Ryan T. Degnan (PA Bar No. 309305)           Austin, TX 78746
11 280 King of Prussia Road                     Telephone:  (512) 328-5333
   Radnor, PA 19087                             Facsimile:  (512) 328-5335
12 Telephone:  (610) 667-7706                   jangelovich@npraustin.com
   Facsimile:  (610) 667-7056                   bradseidel@nixlawfirm.com
13 shandler@btkmc.com
   jmeltzer@btkmc.com
14 plevan@btkmc.com
   namjed@btkmc.com
15 rdegnan@btkmc.com

16              UNITED STATES DISTRICT COURT
              NORTHERN DISTRICT OF CALIFORNIA
17                  SAN JOSE DIVISION

18 RICK WOODS, Individually and On Behalf of | Case No.
   Others Similarly Situated,
19
                        Plaintiff,            | **CLASS ACTION COMPLAINT**
20
        v.                                    | DEMAND FOR JURY TRIAL
21
   GOOGLE INC.,
22
                        Defendant.
23

24

25

26

27

28

# **CONTENTS**

I. SUMMARY OF ACTION .................................................................................... 1

II. PARTIES .......................................................................................................... 6

III. JURISDICTION AND VENUE ........................................................................ 6

IV. FACTUAL BACKGROUND ............................................................................ 7

   A. The Google Business Model ................................................................ 7

      1. AdWords ................................................................................. 8

      2. AdSense .................................................................................. 12

   B. Google's Agreements with Class Members ...................................... 13

   C. Google's Obligations Concerning Ad Implementations .................. 15

   D. Google's Obligation to Monitor Compliance with Ad Policies
      and Filter Invalid Clicks ...................................................................... 22

   E. Google's Obligation to Apply "Smart Pricing" Discounts ............. 27

   F. Google's Secret Conspiracy with Special Partners ......................... 31

      1. Google's Agreements with Special Partners
         Demonstrate its Active Participation in the Conspiracy .......... 37

      2. Google's Knowledge of the Use of Banned Ad
         Implementations through its Own Actions .............................. 39

      3. Google's Knowledge of the Use of Banned Ad
         Implementations through Monitoring ..................................... 39

   G. Google's Unlawful Conduct and Violation of its Obligations ......... 42

      1. Hard Coded Direct Links ....................................................... 42

      2. Tool Bars ................................................................................ 47

      3. Shadow Websites .................................................................... 50

      4. Incentivized Search ................................................................ 52

      5. Ads on Mobile Apps ............................................................... 55

      6. Failure to "Smart Price" Clicks on Ads from Special
         Partners and Mobile Devices .................................................. 57

V. CLASS ALLEGATIONS ................................................................................ 62

VI. TOLLING AND FRAUDULENT CONCEALMENT ...................................... 65

VII. CAUSES OF ACTION ................................................................................... 66

VIII. JURY DEMAND ............................................................................................ 75

IX. PRAYER ........................................................................................................ 75

Plaintiff Rick Woods ("Woods" or "Plaintiff"), on behalf of himself and all others similarly situated, files this Class Action Complaint against Defendant Google Inc. ("Google" or "Defendant").  For his Class Action Complaint, Plaintiff alleges as follows:[1]

## I.      SUMMARY OF ACTION

1.      "Don't be evil."  These are the first three words of Google's Code of Conduct. The Code continues: "[E]verything we do in connection with our work at Google will be, and should be, measured against the ***highest possible standards of ethical business conduct***."  *See* Code of Conduct – Investors Relations – Google (emphasis added).[2]

2.      Google's business revolves around this policy and the trust of its advertising clients.  Indeed, Google readily concedes, "We take this trust seriously, and we know that [Google] AdWords couldn't exist without it." *See* Ad Traffic Quality Resource Center.[3]

3.      In fact, Google lures advertisers into a relationship of confidence and trust through, among other things, consistent reassurance that Google will protect them.  For example, Google's chief economist encourages advertisers to "confidently bid the maximum they are willing to pay" for all advertisements and let Google, through promised discounts, "take care of the rest."  *See* You Tube – AdSense Smart Pricing.[4]

4.      Through this omnipresent "anti-evil/trust-us" propaganda, Google has engendered the trust and loyalty of millions of advertising clients—as well as the public at large—who believe Google is committed to operating with the highest ethical standards.

5.      Google's advertisers believe these promises.  They view Google as their trusted business partner to whom they openly reveal, through their advertising budgets, the ***maximum*** amount of money they are willing to spend each day.  Why not?  Google repeatedly promises

---

[1]      Allegations concerning Plaintiff are based upon Plaintiff's personal knowledge. The remaining allegations are based upon information provided by Google and/or Plaintiff's information and belief.

[2]      http://investor.google.com/corporate/code-of-conduct.html.

[3]      http://www.google.com/adwords/adtrafficquality.

[4]      http://www.youtube.com/watch?v=O1BaOMqcyQY.

to protect them from invalid charges and other wrongs through "robust" monitoring systems and its "anti-evil/trust-us" policy. Moreover, Google touts a "responsibility to protect our AdWords advertisers from inflated costs due to invalid [click] activity." *See* How do disabled account to enable? If possible then how? - AdSense Help.[5] Thus, it is no surprise that Google's loyal, trusting and unsuspecting advertising clients have paid billions of dollars to Google in connection with online advertising.

6. However, standing in stark contrast to such self-promoted pristine virtues is the shadowy, secretive side of Google – a side that has been carefully shielded from public view and scrutiny. Through this dark side, Google and some of its closest partners—including IAC/InterActiveCorp ("IAC"), Infospace, Inc. ("Infospace"), Value Click, Inc. ("Value Click"), and Network Solutions LLC ("Network Solutions")—have devised, implemented and conducted a massive surreptitious click-laundering scheme to extract and share together in billions of dollars in advertising fees from the Class.

7. In furtherance of this scheme, Google quietly exempts these and other "Special Partners" from the very rules and policies Google created to protect advertisers. By virtue of these undisclosed exemptions, Google and its co-conspiring Special Partners have employed (and continue to employ) a series of "ad implementations" designed with one goal in mind: to artificially inflate the number of paying clicks on Google's advertisers' ads.

8. As a result of this unlawful scheme, Google and its Special Partners have methodically pilfered the advertising budgets of Google's unwary advertisers by charging for invalid click activity.

9. Rather than protecting its advertisers or avoiding evil as promised, Google has flagrantly offended the very trust it requested and breached its core obligations to its advertisers.

---

[5]

   http://www.google.com/support/forum/p/AdSense/thread?tid=0b7bf5f7bf5b632f&hl=en.

10.     In fact, Google has violated its express agreement to protect advertisers from invalid click activity, including its promises: (a) to prohibit its partners (*i.e.*, publishers of websites that display Google ads) from running ads in connection with Banned Ad Implementations;[6] (b) to prevent clicks occurring in connection with Banned Ad Implementations; (c) to monitor for clicks occurring in connection with Banned Ad Implementations; (d) to filter clicks occurring in connection with Banned Ad Implementations from its advertisers' accounts; (e) to not charge advertisers for clicks occurring in connection with Banned Ad Implementations; and (f) to refund all amounts charged to advertisers for clicks occurring in connection with Banned Ad Implementations, as well as for all clicks arising from partners (including the Special Partners) who employ Banned Ad Implementations.

11.     Additionally, Google has violated its express agreement to apply the promised "Smart Pricing" discount which, if applied, would automatically discount charges for all clicks originating from sites other than google.com.   The promised discount is based upon the likelihood of the click to "convert" into actual business results for advertisers (*e.g.*, online sale, registration, phone call, newsletter sign-up).   As explained in detail below, Google simply ignored this obligation for certain publishers, including the Special Partners, and other properties in the Google Network.

12.     Plaintiff's advertising account with Google reflects numerous examples of Google's breaches of its agreements with advertisers, including the following:

• Google promises not to place ads of its advertisers on shadow websites (*i.e.*, versions of websites different from the versions an end user would access by going

---

[6]     As explained in Section IV(C) below, Google's policies restrict how and where its partners display ads.  Google's policies also prohibit certain conduct of its partners and functionality of their websites displaying ads.  Google created these policies to protect its advertisers from invalid click activity.  Plaintiff refers to these restrictions and prohibitions as "Banned Ad Implementations."  Banned Ad Implementations include, without limitation: (i) using shadow websites; (ii) displaying ads having areas clickable other than the title of the ad; (iii) offering compensation to users for searching or clicking on ads, (iv) displaying ads in software, including mobile apps; (v) displaying ads as a result of searches on tool bars; and (v) embedding "direct links" in ads that take users to one or more "search results" pages.

directly to the websites), yet it charged Plaintiff for numerous clicks on his ads from the shadow websites of several Special Partners, including IAC, Infospace, and Network Solutions.

• Google promises not to serve ads in connection with any websites that compensate (or promise to compensate) users for viewing ads or performing searches, yet Google charged Plaintiff for clicks on his ads appearing on "search and win" sites such as iWon.com (owned by Special Partner IAC) and swagbucks.com (affiliated with Special Partner Infospace).

• Google promises it will not serve ads in response to "tool bar" searches, yet it charged Plaintiff for one or more clicks on his ads served in response to Special Partner IAC's "FunWebProducts" tool bar (which, incidentally, has been described by a Google employee as infectious "malware").

• Google promises not to serve Plaintiff's ads in software applications ("apps"), yet Google charged Plaintiff for *more* clicks on his ads appearing in mobile apps (466 out of a total of 780 clicks) than from any other source (314 out of a total of 780 clicks) from September 24, 2009 through February 28, 2011.  As one example, Plaintiff, an Arkansas attorney advertising his legal services, was charged for clicks originating from the Android "Slot Machine" mobile app.

• Google promises to apply a "Smart Pricing" discount based on the likelihood a click will convert into an actual business transaction, yet Google charged Plaintiff his **maximum (undiscounted) bid price** for clicks on his ads arising from Special Partners' websites and tool bars.

13.     Google orchestrated this unlawful scheme with its Special Partners for the sole purpose of lining its pockets, as well as the pockets of its Special Partners, with billions of dollars of ill-gotten gains from unsuspecting Google advertisers.  In essence, Google has treated the "daily budget" of its advertisers as its own bank account.  And, to avoid soiling its brand, Google quietly executed its strategy through its Special Partners by, among other things,

---

1    skewing quality scores, rigging ad rankings, manipulating ad targeting, and excusing them
2    from compliance with the very policies implemented to protect Google's advertisers.

3         14.    Through this scheme, Google has consistently boosted its advertising revenues
4    year after year – from $3.1 billion in 2004 to $28.2 billion in 2010.

5         15.    Apparently, Google succumbed to the "inherent conflict of interest" in pay-per-
6    click advertising identified in mid-2006 by Dr. Alexander Tuzhilin, an independent click fraud
7    expert who reviewed Google's click fraud systems and issued a report in connection with the
8    first Google click fraud case – *Lane's Gifts and Collectibles, LLC v. Yahoo! Inc,. et al.*, No.
9    Civ. 2005-J2-1 (Ark. Miller County Cir. Ct. filed Feb. 4, 2005) – which Google today uses to
10   promote its protection of advertisers.   Rather than avoiding the conflict and protecting
11   advertisers who depend upon Google's integrity, Google opted in favor of pocketing billions of
12   dollars from invalid click activity.

13        16.    Google's misconduct is reprehensible and pervasive.  As a further example of
14   the egregiousness of the conduct, Google charged Plaintiff—an Arkansas attorney advertising
15   his legal services—for clicks on his ad occurring on pornographic websites such as
16   www.skinonskin.org/hot-sex.html  and  www.acneer.com  in direct contravention of anti-
17   pornographic content restrictions.  While Plaintiff has not been able to capture an image of his
18   ad appearing on www.acneer.com (although he paid for an ad appearing on the site), the
19   following redacted image clearly demonstrates that Google served ads of lawyers and other
20   class members on this site devoted to pornography and acne remedies:



21        17.    This is hardly the "ethical" conduct one would expect from a company that
27   promotes a policy of "Don't be evil."

28

---

18.     Google's conduct constitutes a breach of its agreements with its advertisers, a breach of the duty of good faith and fair dealing implied in each of these agreements, and a violation of California's Unfair Competition Law.

19.     Plaintiff seeks to represent a class consisting of all persons impacted by this unlawful scheme since April 1, 2004 (the day Google promised to begin Smart Pricing all clicks on ads).

20.     Plaintiff seeks to recover for himself and the class (a) all amounts charged by Google for ads served in connection with Banned Ad Implementations; and (b) all amounts charged by Google for ads served to publishers (including Special Partners) who used Banned Ad Implementations.  For those click charges not subject to refund, Plaintiff further seeks to recover on behalf of himself and the class a sum of money that equals the Smart Pricing discounts that Google promised—but failed—to apply to all clicks.  Finally, Plaintiff seeks an injunction to ensure that the misconduct described above finally ends, without the threat of it reoccurring in the future.

## II.     PARTIES

21.     Plaintiff Woods is an individual who resides and operates a law practice in Fayetteville, Washington County, Arkansas.  Woods opened a Google AdWords account on or about September 24, 2009, for the purpose of advertising his law practice online.  Woods incurred losses and has been injured by the actions of Google described herein.

22.     Defendant Google is a Delaware corporation with its principal place of business located at 1600 Amphitheatre Parkway, Mountain View, California 94043.  Google can be served with process through its registered agent, Corporation Service Company, which is located at 2730 Gateway Oaks Drive, Suite 100, Sacramento, CA 95833.

## III.     JURISDICTION AND VENUE

23.     The Court has jurisdiction over this action pursuant to 28 U.S.C. §1332(d)(2). If a class is certified in this action, the amount in controversy will exceed $5,000,000.00, exclusive of interest and costs, and this is a class action in which at least one member of the class is a citizen of a state different from any defendant.  Although Google is located in

California, the principal injuries resulting from Google's conduct have been incurred throughout the world where class members are located.  On information and belief, greater than two-thirds of the members of the proposed class are citizens of states and jurisdictions other than California.

24.     This Court has general jurisdiction over Google.  Google engages in continuous and systematic activities within the State of California.  Indeed, Google's headquarters are located in Mountain View, California, which is within the jurisdiction of this Court.

25.     Venue is proper in this District pursuant to 28 U.S.C. §1391.  Specifically, as provided by 28 U.S.C. §1391(c), Google is a corporation that is deemed to reside in this District.  Moreover, a substantial part of the events and omissions giving rise to the claims alleged herein occurred in this District.

## IV.     FACTUAL BACKGROUND

### A.   The Google Business Model

26.     Google operates the most widely used Internet search engine in the world.

27.     It hosts and develops a number of Internet-based services and products, including its search engine.  Google runs over one million servers worldwide and processes over one billion search requests every day.

28.     Google generates revenue primarily from displaying the online advertisements ("ads") of its customers.  Google operates its advertising program through two units – "AdWords" and "AdSense."  In general, the AdWords program allows advertisers to display ads on search results pages and websites ("properties") of Google and third-parties ("partners" or "publishers").  AdWords advertisers pay each time their ad is "clicked."  The AdSense program allows Google's partners to display the AdWords ads on their websites and receive a share of the revenue generated by each click occurring on their websites.

29.     The following table sets forth the revenues Google generated through its advertising program for the period relevant to the claims in this litigation:

| Year | Approximate Revenue (in billions) |
|---|---|
| 2004 | $3.1 |
| 2005 | $6.1 |
| 2006 | $10.5 |
| 2007 | $16.4 |
| 2008 | $21.1 |
| 2009 | $22.9 |
| 2010 | $28.2 |

### 1. AdWords

30.     According to Google, the AdWords program helps advertisers "reach new potential customers with targeted, relevant advertising."  *See* Google's "Getting Started with Google AdWords" Email to Plaintiff dated September 30, 2009.

31.     Google's 2009 Form 10-K promotes the AdWords program as offering advertisers the "following additional benefits:"

Return on Investment.  Many advertising dollars are spent delivering messages in an untargeted fashion, and payment for these advertisements is not tied to performance.  ***AdWords shows ads only to users seeking information related to what the advertisers are selling***, and advertisers choose how much they want to pay when a user clicks on their ad.  Because we offer a simple ad format, advertisers can also avoid incurring significant costs associated with creating ads.  As a result, even small advertisers find AdWords cost-effective for connecting with potential customers.   In addition, advertisers can create many different ads, increasing the likelihood that an ad is suited to a user's search.  ***Users can find advertisements for what they are seeking, and advertisers can find users who want what they are offering***.

* * *

Access to the Google Search and Content Network.  We serve AdWords ads on Google properties, our syndicated search partners' ***web sites***, and the millions of third-party ***web sites*** that make up the Google Network.  As a result, we can offer extensive search and content inventory on which advertisers can advertise.  Apart from keyword-based ads targeted to search queries and Placement Targeting, we also offer advertisers an effective contextual advertising option—Content Targeting—that displays their ads on relevant content pages across our network of partner sites and products.  As a result, AdWords advertisers can target users on Google properties and ***on search and content sites across the web***.  This gives advertisers increased exposure to users who are likely to be interested in their offerings.  The Google Network significantly enhances our ability to attract interested advertisers.

32.     Google's AdWords Help page describes AdWords as follows:

**What is Google AdWords?**

With Google AdWords, you can create and run ads for your business, quickly and simply. Run your ads on Google and our advertising network -- no matter what your

budget, you'll only pay when people click your ads. Just visit www.adwords.google.com to get started.

AdWords ads are displayed along with search results when someone searches Google using one of your keywords. Ads appear under 'Sponsored links' in the side column of a search page, and may also appear in additional positions above the free search results. That way, you'll be advertising to an audience that's already interested in your business. You can also choose to display your ads on Display Network sites in the growing Google Network. And, you can choose the exact Display Network placements where you'd like your ad to appear, or you can let contextual targeting match your keywords to content.

*See* What is Google AdWords?[7]

33.    As described above, an AdWords customer can advertise on the "Search Network," the "Display Network" (formerly called the "Content Network"), or both. Google refers to both networks together as the "Google Network." In addition to the Google Network, advertisers can also advertise on Google itself (www.google.com). *See* Where will my ads appear? – AdWords Help.[8]

34.    The Google Network is the largest advertising network available online, reaching over 85% of Internet users worldwide. *See id.* According to Google's website, "[a]dvertisers have the option of running their ads on Google as well as the Google Network at no extra cost. AdWords ads are placed based *either on searches or website content*, so the Google Network has two components: the Search Network and the Display Network." *See* What is the Google Network – AdWords Help (emphasis added).[9]

35.    The Search Network consists of websites containing a Google search box, like www.google.com or www.aol.com. In the Search Network, ads can appear beside or above search results for keywords that advertisers select. Google describes the operation of the Search Network as follows:

These ads are targeted based on a user's search terms. For example, if you search for "Italian coffee" on a search engine powered by Google, such as AOL.com, you'll see related coffee ads next to the search results.

---

[7]    http://adwords.google.com/support/aw/bin/answer.py?hl=en&answer=6084.

[8]    http://adwords.google.com/support/aw/bin/answer.py?hl=en&answer=6119.

[9]    http://adwords.google.com/support/aw/bin/answer.py?hl=en&answer=6104.

1    In the Search Network, ads are shown on both Google search results pages (*e.g.*,

2    www.google.com) and the search results pages of other properties within the Search Network

3    (*e.g.*, www.aol.com).  *See* Google Search Network – AdWords Help.[10]

4        36.    In contrast, the Display Network consists of a collection of websites that have

5    partnered with Google (display partners) and specific Google properties that display AdWords

6    ads (such as YouTube and Gmail), as well as websites and search engines available on mobile

7    devices with full Internet browsers.  According to Google, ads placed on Display Network sites

8    are contextually "targeted" to the content and URL of each page.  *See* Google Display Network

9    – AdWords Help;[11] Where will my ads appear – AdWords Help.[12]

10       37.    Google's advertisers generally pay for their advertising on a "cost-per-click"

11   ("CPC") basis.  *See* Controlling costs – AdWords Help.[13]  Under this pricing model, an

12   advertiser places its bid for its keywords, which is the highest amount the advertiser is willing

13   to pay for each time someone clicks on the advertiser's ad.  *See id.*; Maximum Cost-per-Click

14   (Maximum CPC) – AdWords Help.[14]

15       38.    Using this bid amount and a "quality score," Google determines where on a

16   page Google can place the ad.  This process is known as an "ad auction."  *See* Introduction to

17   the Google Ad Auction.[15]

18       39.    According to Google's chief economist, Hal Varian, Google runs an ad auction

19   every time an ad is displayed, whether as a result of a query in the Search Network or

20   placement on a webpage in the Display Network.  *See id.*

21

22   _____

[10]    http://adwords.google.com/support/aw/bin/answer.py?hl=en&answer=90956.

23   [11]    http://adwords.google.com/support/aw/bin/answer.py?hl=en&answer=117120.

24   [12]    http://adwords.google.com/support/aw/bin/answer.py?hl=en&answer=6119.

[13]

25       http://adwords.google.com/support/aw/bin/static.py?hl=en&topic=21906&guide=21
26   899&page=guide.cs&answer=146300.

[14]    http://adwords.google.com/support/aw/bin/answer.py?hl=en&answer=6326.

27   [15]    http://www.youtube.com/watch?v=K7l0a2PVhPQ.

28

_____

40.    Varian explained that Google determines which ads appear on a given page and their position on that page based on the "Ad Rank" of the ad.  *See id.*

41.    Ad Rank, as described by Varian, is determined by multiplying an advertiser's maximum bid price for its ad by the "Quality Score."  *See id.*

42.    Purportedly, the Quality Score, a secret formula of Google, is computed from three components:  (i) click through rate on the ad; (ii) the relevancy of the keywords to the ad and to the user query; and (iii) the landing page quality score.  *See id.*

43.    Google asserts that the ad with the highest Ad Rank is placed first, with others following in order of their Ad Rank.  *See id.*

44.    Varian uses the following table to demonstrate how an Ad Auction works:

| Advertiser | Maximum Bid | Quality Score | Ad Rank | Position |
|---|---|---|---|---|
| 1 | $4.00 | 1 | 4 | 4 |
| 2 | $3.00 | 3 | 9 | 2 |
| 3 | $2.00 | 6 | 12 | 1 |
| 4 | $1.00 | 8 | 8 | 3 |

In this example, Advertiser 1 places a Maximum Bid for its ad of $4.00.  Advertisers 2, 3 and 4 place Maximum Bids for their ads of $3.00, $2.00 and $1.00, respectively.   Google then multiplies the Maximum Bid by the ad's Quality Score to determine Ad Rank.   As stated above, the Ad Rank then determines the ad's position on the page.  *See id.*

45.    When an ad is clicked, Google's Agreement with advertisers requires it to charge only the "minimum amount that is necessary to retain [the advertiser's] position" on the page – not necessarily the full price of the bid.  Thus, the advertiser whose ad is clicked (A1) is charged "just enough to beat" the advertiser in with the next highest Ad Rank (A2).  *See id.*

46.    The cost of the click, Google asserts, is calculated by dividing the Ad Rank of the advertiser with the next highest Ad Rank (A2) by the Quality Score of the advertiser whose ad is clicked (A1).  *See id.*

47.     Varian uses the following table to demonstrate the computation of the cost of a click.  In this example (unlike the above table), each advertiser places a maximum bid of $4.00.

| Advertiser | Maximum Bid | Quality Score | Ad Rank | Actual Cost |
|---|---|---|---|---|
| ■1 | $4 | 8 | 32 | 24/8=$3.00 |
| ■2 | $4 | 6 | 24 | 12/6 = $2.00 |
| ■3 | $4 | 3 | 12 | Min. price for that auction |

*See id.*

48.     According to its website, Google applies two discounts to the cost of the click.  The first is the "AdWords Discounter."  The AdWords Discounter, as described by Google, automatically reduces the cost for the click so that the actual cost charged is ***just one cent more than*** the minimum necessary to maintain the position of the ad on the page.  *See* Maximum Cost-per-Click (Maximum CPC) – AdWords Help.[16]

49.     The second discount results from "Smart Pricing."  According to Google, Smart Pricing is a feature that automatically reduces the price advertisers pay for a click where Google's data shows that a click is less likely to result in a conversion.  Stated differently, Google promises to discount the cost of a click based on the conversion rate of the publisher (website) from which the click originated.  *See* Google Ad Traffic Quality Resource Center – Glossary.[17]  Google's obligation to Smart Price is described in more detail in Section IV(E) below.

**2.  AdSense**

50.     Google's program for its partners who display the AdWords ads—whether in search results (*i.e.*, the Search Network) or on pages with related content (*i.e.*, the Display Network)—is called "AdSense."  *See* AdSense Overview – AdSense Help.[18]

51.     Google describes the AdSense program as follows:

---

[16]     http://adwords.google.com/support/aw/bin/answer.py?hl=en&answer=6326.

[17]     http://www.google.com/adwords/adtrafficquality/index.html.

[18]

http://www.google.com/adsense/support/bin/static.py?hl=en&page=guide.cs&guide=29574&from=29574&rd=2.

**What is AdSense?**

Google AdSense is a free, simple way for website publishers of all sizes to earn money by displaying targeted Google ads on their websites. AdSense also lets you provide Google search to your site users, while earning money by displaying Google ads on the search results pages.

*See id.*

52.     Google's AdSense partners generate revenue each time ads are clicked from their websites.   The revenue generated from these clicks is shared between Google and the AdSense partners.

### B.     Google's Agreements with Class Members

53.     Each Class Member, a current or former Google AdWords advertiser, has or had a contractual arrangement with Google.

54.     This contractual arrangement arose when each advertiser opened its AdWords account.   During the account opening process, the advertiser and Google agreed to certain terms and conditions governing their relationship (the "AdWords Program Terms").  *See, e.g.*, Google Inc. Advertising Program Terms (August 22, 2006).[19]   A copy of the AdWords Program Terms is attached hereto as Exhibit A.

55.     Each customer assented to the AdWords Program Terms via a "click" online, without physically signing the AdWords Program Terms.  Thus, the AdWords Program Terms constitutes a "click-through" agreement.

56.     As pertinent to Plaintiff's allegations, the AdWords Program Terms expressly incorporate by reference all Google and partner policies (the "Policies"), as well as the "frequently asked questions at www.google.com ('FAQ')."  *See* Google Inc. Advertising Program Terms, §1 (August 22, 2006)[20]  ("Program use is subject to all applicable Google and Partner policies, including without limitation the Editorial Guidelines  (adwords.google.com/select/guidelines.html)...and  Google  and  Partner  ad specification requirements."); *Id.* §2 (defining "FAQs" as the "applicable frequently asked

---

[19]     https://www.google.com/intl/en_us/adwords/select/TCUSbilling0806.html.

[20]     https://www.google.com/intl/en_us/adwords/select/TCUSbilling0806.html.

1  questions at www.google.com"); *Id.* §7 (stating that the AdWords customer shall "pay all

2  charges in accordance with the...Program FAQ"); *Id.* §7 ("Charges are solely based on

3  Google's measurements for the applicable Program," which are defined in the FAQs and/or

4  on www.google.com.).

5    57. Through the AdWords Program Terms, advertisers also grant Google a ***limited***

6  license to "distribute" and "display" their ads "in connection with this Agreement," which

7  necessarily requires Google to distribute and display ads consistent with—*i.e.,* subject to—all

8  incorporated "Google and Partner policies" and FAQs. *See id.* §4.

9    58. The Policies and FAQs incorporated into the AdWords Program Terms include,

10  *inter alia*, the "AdWords Help" and "AdSense Help" sites on www.google.com. *See* Page not

11  available – AdWords Help[21] ("Please try searching or browsing the AdWords Help Center for

12  answers to your AdWords questions."); Google E-mail "Your 'Auto Accident Attorney' ad

13  received 23 click(s)-3 steps to more clicks" dated February 16, 2011 (containing link labeled

14  "Find FAQs in our Help Center" which links to the main AdWords Help page at

15  http://adwords.google.com/support/aw/?hl=en).  In fact, the search box that appears in the

16  AdWords signup screen and on every page of Plaintiff's online account is the precise search

17  box for AdWords Help – the same help pages Google references as its FAQs.

18    59. Additionally, the AdWords Program Terms also incorporate additional policies

19  and terms on google.com through use of hyperlinks, such as the hyperlink to

20  adwords.google.com/select/guidelines.html appearing in Section 1.  *See* Google Inc.

21  Advertising Program Terms, §1.[22]  When this hyperlink is clicked, the user is taken to a page

22  on google.com that contains an "AdWords" search box and sets forth "Additional policies and

23  terms" with which Google must comply.  This search box and linked "Additional policies and

24  terms" allow a user to access every google.com page relied upon in this Complaint.  Through

25  the hyperlinks in the AdWords Program Terms, Google expressly incorporates not only those

26

27  [21]  http://adwords.google.com/support/aw/bin/answer.py?hl=en&answer=44012.

28  [22]  https://www.google.com/intl/en_us/adwords/select/TCUSbilling0806.html.

1    hyperlinked pages, but also incorporates all pages accessible via additional hyperlinks

2    embedded in those linked pages.

3         60.    Through its AdWords Program Terms and incorporated Policies, FAQs and

4    other statements, Google represented to its advertisers that it would protect them from invalid

5    click activity by, *inter alia*, (a) prohibiting its partners from running ads in connection with

6    Banned Ad Implementations; (b) preventing clicks occurring in connection with Banned Ad

7    Implementations; (c) monitoring for clicks occurring in connection with Banned Ad

8    Implementations; (d) filtering clicks occurring in connection with Banned Ad Implementations

9    from its advertisers' accounts; (e) not charging advertisers for clicks occurring in connection

10   with Banned Ad Implementations; and (f) refunding all amounts charged to advertisers for

11   clicks occurring in connection with Banned Ad Implementations, as well as for all clicks

12   arising from partners (including the Special Partners) who employ Banned Ad

13   Implementations.  *See* Section IV(C&D).

14        61.    Through its AdWords Program Terms, Policies, FAQs and other statements,

15   Google represented to its advertisers that it would automatically apply "Smart Pricing"

16   discounts to charges for every click on advertisers' ads on the Google Network, which includes

17   both the Search Network and Display Network.  *See* Section IV(E).

18        62.    These representations by Google through its AdWords Program Terms and

19   incorporated Policies, FAQs and other statements are material terms of Google's agreements

20   with its advertisers (the "Agreement(s)").

21        63.    Google's Agreements with its advertisers do not differ.  Each advertiser's

22   Agreement is identical to every other advertiser's Agreement.

23       **C.    Google's Obligations Concerning Ad Implementations**

24        64.    Google's Agreements expressly incorporate, and subject the AdWords Program

25   to, "all applicable Google and Partner Policies, including without limitation…Google and

26   Partner ad specification requirements."  *See, e.g.*, Google Inc. Advertising Program Terms, §1

27   (August 22, 2006).[23]

28   [23]    https://www.google.com/intl/en_us/adwords/select/TCUSbilling0806.html.

65.     These incorporated policies and ad specification requirements include (a) the Google AdSense Program Policies ("AdSense Program Policies");[24] and (b) the Google AdSense Online Standard Terms and Conditions ("AdSense Program Terms").[25]

66.     Both the AdSense Program Policies and the AdSense Program Terms mandate how and where Google's partners may display AdWords ads.  They also prohibit certain actions and conduct of the partners, ad implementations, and functionality of websites displaying ads.  *See* AdSense Program Policies – AdSense Help;[26] AdSense Program Terms.[27]

67.     These prohibitions are expressly designed to protect Google advertisers from accidental or meaningless clicks.  *See, e.g.*, AdSense Program Policies – AdSense Help[28] (stating that publishers may not use "any means to inflate impressions and/or clicks artificially, including manual methods"); Invalid Clicks Issues and Concerns - AdSense Help[29] ("As you may know, *in order to protect the interests* of our publishers as well as those *of our advertisers*, Google monitors clicks on Google ads to *prevent any abuse of the AdSense Program*.  Google's proprietary technology analyzes all ad clicks for any invalid click activity that is *intended to artificially drive up an advertiser's clicks* or a publisher's earnings.") (emphasis added); Disabled Account FAQ – AdSense Help[30] ("If we determine that an AdSense account may *pose a risk to our AdWords advertisers*, we may disable that account to protect our advertisers' interests.") (emphasis added); How do disabled account to enable? If possible then how? – AdSense Help[31] ("After reviewing our records, we've determined that your AdSense account poses a risk of generating invalid activity.  *Because we have a*

---

[24]     https://www.google.com/adsense/support/bin/answer.py?hl=en&answer=48182.

[25]     https://www.google.com/adsense/terms.

[26]     https://www.google.com/adsense/support/bin/answer.py?hl=en&answer=48182.

[27]     www.google.com/adsense/terms.

[28]     https://www.google.com/adsense/support/bin/answer.py?hl=en&answer=48182.

[29]     https://www.google.com/adsense/support/bin/answer.py?hl=en&answer=62472.

[30]     https://www.google.com/adsense/support/bin/answer.py?hl=en&answer=57153.

[31]     http://www.google.com/support/forum/p/AdSense/thread?tid=0b7bf5f7bf5b632f&hl=en.

*responsibility to protect our AdWords advertisers from inflated costs due to invalid activity*, we've found it necessary to disable your AdSense account….Please understand that we need to take such steps to maintain the effectiveness of Google's advertising system, particularly the advertiser-publisher relationship.") (emphasis added); Why can't I click the background of ads anymore? - AdSense Help[32] (stating that removing the clickable background feature of ads would "significantly reduce accidental clicks" and "increase advertiser campaign value and satisfaction by ensuring advertisers only pay for meaningful clicks").

68.     Indeed, Google recognizes that its advertisers rely on the relevance of their ads' placement and the quality of clicks their ads receive, both of which are addressed in the AdSense Program Policies and AdSense Program Terms:

> The relationship between Google and AdWords advertisers is built on trust. ***Advertisers rely on the relevance of our ad placement***, our reporting statistics, ***and the quality of the clicks their ads receive. We take this trust seriously, and we know that AdWords couldn't exist without it***.

*See* Ad Traffic Quality Resource Center (emphasis added).[33]

69.     Because the AdSense Program Policies and AdSense Program Terms are designed to protect Google's advertisers from accidental or meaningless clicks and because they relate directly to how an AdWords ad is displayed, these policies occupy a central and material role in Google's Agreements with advertisers.

70.     Therefore, it is no surprise that Google represents to advertisers that all partners will comply with the AdSense Program Policies.  *See* What is the Google Network? – AdWords Help[34] ("Other Google Network facts you might like to know:…All participating sites must adhere to Google AdSense policies."); Ad Traffic Quality Resource Center – Glossary[35] ("Publishers interested in being part of this [AdSense] program will have to comply with Adsense Program Policies.");  Anonymous Placements – AdWords Help[36] ("All [ad]

---

[32]     https://www.google.com/adsense/support/bin/answer.py?hl=en&answer=80390.

[33]     http://www.google.com/adwords/adtrafficquality/glossary.html.

[34]     http://adwords.google.com/support/aw/bin/answer.py?hl=en&answer=6104.

[35]     http://www.google.com/adwords/adtrafficquality/glossary.html#.

[36]     http://adwords.google.com/support/aw/bin/answer.py?hl=en&answer=162062.

placements…are required to adhere to Google AdSense Program Policies."); Google AdSense Program Policies – AdSense Help[37] ("Publishers participating in the AdSense program are required to adhere to the following [AdSense Program] policies, so please read them carefully.").  Further emphasizing this fact, Google repeatedly directs advertisers to the AdSense Program Policies via hyperlinks in the AdWords Policies.  *See, e.g.*, Anonymous Placements – AdWords Help;[38] What should I do if I see my ad on an inappropriate site in the Google Network? – AdWords Help;[39] How do you make sure there are no inappropriate sites in the Google Network? – AdWords Help.[40]

71.    Both the AdSense Program Policies and the AdSense Program Terms prohibit Partners from using "any means to inflate impressions and/or clicks artificially, including manual methods."  *See* AdSense Program Policies – AdSense Help;[41] *see also* AdSense Program Terms[42] (providing that a Partner shall not "directly or indirectly generate queries…or impressions of or clicks on any Ad…through any automated, deceptive, fraudulent or other invalid means").

72.    Google considers the result of such conduct to be "invalid click activity."  *See* How does Google prevent invalid clicks and impressions – AdSense Help[43] (describing invalid click activity as clicks that "fit a pattern of use that may artificially drive up an advertiser's costs or a publisher's earnings" or "activity that may pose a risk to our advertisers,…includ[ing] clicks or impressions generated by unethical users, automated robots and traffic sources, and publishers encouraging clicks on their ads"); Defining invalid clicks and click fraud – Inside AdSense[44] ("[I]nvalid clicks are generally any clicks that artificially

---

[37]    https://www.google.com/adsense/support/bin/answer.py?hl=en&answer=48182.

[38]    http://adwords.google.com/support/aw/bin/answer.py?hl=en&answer=162062.

[39]    http://adwords.google.com/support/aw/bin/answer.py?hl=en&answer=75392.

[40]    https://adwords.google.com/support/aw/bin/answer.py?hl=en&answer=9566.

[41]    https://www.google.com/adsense/support/bin/answer.py?hl=en&answer=48182.

[42]    https://www.google.com/adsense/terms.

[43]    http://www.google.com/adsense/support/bin/answer.py?hl=en&answer=1115997.

[44]    http://adsense.blogspot.com/2008/08/defining-invalid-clicks-and-click-fraud.html.

1   inflate advertiser cost or publisher revenue, regardless of their source….As a reminder, any

2   method that artificially generates clicks, impressions, or conversions is strictly prohibited by

3   our program policies [linked to AdSense Program Policy].").

4        73.    Google has determined that the ad implementations identified in the AdSense

5   Program Policies and listed below (each, a "Banned Ad Implementation") artificially inflate

6   impressions and/or clicks or, in other words, cause invalid click activity.  *See* How does

7   Google prevent invalid clicks and impressions? – AdSense Help[45] ("To prevent invalid clicks

8   in your account, ensure that your ad implementation complies with our program policies

9   [hyperlink to AdSense Program Policies]."); All About Reporting Discrepancies Common

10  Questions – AdSense Help[46] ("Significant levels of invalid activity are typically caused by

11  issues with…ad implementations.").

12       74.    Accordingly,   Google   prohibits   each   of   the   following   Banned   Ad

13  Implementations in the AdSense Program Policies or AdSense Program Terms or both:

14       •     **"Hard Coded Direct Links"** – Publishers may not create "direct links"

15       (including those embedded in ads) that, when clicked, automatically open a "search

16       results" page.  Rather, Google requires that all "[q]ueries must originate from [human]

17       users inputting data directly into the search box and cannot be modified."  Thus, Hard

18       Coded Direct Links that automatically open "search results" pages without requiring

19       the user to input a search query are prohibited.

20       •     **"Tool Bars"** – Publishers may not "[d]isplay Google ads, search boxes or

21       search results as a result of the actions of software applications such as tool bars" or

22       integrate ads into toolbars.

23       •     **"Ads on Mobile Apps"** – Publishers may not place AdWords ads in

24       "inappropriate places…such as software."  Stated differently, Google ads "may not

25       be…[i]ntegrated into a software application of any kind."  This prohibition extends to

26       apps on mobile devices.

27  [45]   http://www.google.com/adsense/support/bin/answer.py?hl=en&answer=1115997.

28  [46]   https://www.google.com/adsense/support/bin/answer.py?hl=en&answer=86250.

- **"Incentivized Search"** – Publishers "may not ask others to click their ads," "compensate users for viewing ads or performing searches, or promise compensation to a third party for such behavior."

- **"Shadow Websites"** – Publishers may not "provide a version of the Advertiser Page, Search Results Page, or Referral Page that is different from that page an end user would access by going directly to the Advertiser Page, Search Results Page, or Referral Page."

- **"Clickable Backgrounds"** – Publishers may not display ads that have clickable backgrounds – *i.e.*, ads where the area behind and around the ad blends into the remainder of the page.  Google expressly prohibits Publishers from "[f]ormat[ing] site content so that it is difficult to distinguish it from ads."

- **"Ad-only Pages"** – Publishers may not place ads "on pages published specifically for the purpose of showing ads."

- **"Graphical Gimmicks"** – Publishers may not "[d]irect user attention to the ads using arrows or other graphical gimmicks."

- **"Pre-populated Search Box"** – Publishers may not pre-populate search boxes. Rather, "[q]ueries must originate from users inputting data directly into the search box."

- **"New Browser Window"** – Publishers may not cause a click on an ad to "result in a new browser window being launched."

- **"Ads Over Photos"** – Publishers may not place ads over photographs.  In fact, Google expressly prohibits a publisher from placing "ads in floating box script" and placing ads "obscured by elements on a page."

*See* AdSense Program Policies – AdSense Help;[47] AdSense Program Terms.[48]  Not only does Google prohibit these Banned Ad Implementations, it also prohibits the display of AdWords

---

[47]   https://www.google.com/adsense/support/bin/answer.py?hl=en&answer=48182.

[48]   https://www.google.com/adsense/terms.

ads on pages containing pornography and other banned content.   *See* AdSense Program Policies – AdSense Help.[49]

75.     Google represents to all advertisers that it will not permit its partners in the Google Network to use Banned Ad Implementations on their websites:

> Google does not permit websites in the Google Network that feature content violating our program policies.   Several layers of automated and manual review uphold this standard.

*See* How do you make sure there are no inappropriate websites in the Google Network? – AdWords Help;[50] *see also* What should I do if I see my ad on an inappropriate site in the Google Network? – AdWords Help[51] ("The Google Network does not permit websites featuring content that violates our program policies.").

76.     In fact, Google does so to protect its advertisers because Google knows Banned Ad Implementations result in invalid clicks.  As one example, Google has prohibited Clickable Backgrounds to "significantly reduce accidental clicks."  *See* Why can't I click the background of ads anymore? - AdSense Help[52] (stating that removing the clickable background feature of ads would "significantly reduce accidental clicks" and "increase advertiser campaign value and satisfaction by ensuring advertisers only pay for meaningful clicks"); *see also* Two changes to how top ads are displayed - Inside AdWords[53] (providing that removing the clickable background feature will "help decrease the likelihood that a user will unintentionally click on an ad"); Accidental clicks fade into the background - Inside AdSense[54] (stating that, by removing the clickable background feature, Google "aim[s] to decrease accidental clicks, better aligning visitor behavior with their intent…the format change…further ensur[es] advertisers pay only for meaningful clicks").

---

[49]     https://www.google.com/adsense/support/bin/answer.py?hl=en&answer=48182.

[50]     https://adwords.google.com/support/aw/bin/answer.py?hl=en&answer=9566.

[51]     http://adwords.google.com/support/aw/bin/answer.py?hl=en&answer=75392.

[52]     https://www.google.com/adsense/support/bin/answer.py?hl=en&answer=80390.

[53]     http://adwords.blogspot.com/2007/04/two-changes-to-how-top-ads-are.html.

[54]     http://adsense.blogspot.com/2007/11/accidental-clicks-fade-into-background.html.

**D.** **Google's Obligation to Monitor Compliance with Ad Policies and Filter Invalid Clicks**

77.     Despite the prohibition on Banned Ad Implementations, Google recognizes that some of its partners will violate its policies for the purpose of generating artificial clicks. Google refers to this conduct as "click fraud."  *See* Video: About Invalid Clicks.[55]

78.     Click fraud, according to Google, occurs as a result of its partners' "unethical" efforts to inflate their revenues by displaying ads through prohibited means, including the Banned Ad Implementations.  *See* Video: About Invalid Clicks[56] (defining click fraud as the "act of generating artificial clicks on online ads…to inflate revenue for a website that is hosting AdWords ads.  This may be attempted by the owner of the website."); Tuzhilin, Alexander, *The Lane's Gifts v. Google Report* ("Tuzhilin Report") at 12[57] (stating the "main motivation of the AdSense unethical publishers is to enrich themselves through certain prohibited means").

79.     Accordingly, in or about 2007, Google established the Ad Traffic Quality Resource Center allegedly to help address issues surrounding click fraud and aggregate various resources on click fraud for its advertisers.  *See* Ad Traffic Quality Resource Center.[58]

80.     Here, among other places, Google readily concedes that click fraud and other invalid click activity result in artificial and/or meaningless clicks that harm its advertisers.  *See, e.g.*, How do disabled account to enable? If possible then how? – AdSense Help[59] ("[W]e have a responsibility to protect our AdWords advertisers from inflated costs due to invalid activity").

81.     For this reason, Google strictly prohibits conduct—such as the Banned Ad Implementations—likely to lead to click fraud and other invalid and injurious click activity.

---

[55]     http://adwords.google.com/support/aw/bin/answer.py?hl=en&answer=90448.

[56]     http://adwords.google.com/support/aw/bin/answer.py?hl=en&answer=90448.

[57]     http://googleblog.blogspot.com/pdf/Tuzhilin_Report.pdf.

[58]     http://www.google.com/adwords/adtrafficquality/index.html.

[59]

        http://www.google.com/support/forum/p/AdSense/thread?tid=0b7bf5f7bf5b632f&hl=en.

82.     Beyond this prohibition, Google takes a further step, promising its advertisers that it will protect them from invalid click activity occurring in connection with Banned Ad Implementations.  *See How Google Combats Invalid Clicks – AdWords Help*[60] ("The security of AdWords advertisers is of the utmost importance to Google.  We use a three-part system of both proactive and reactive review, which employs advanced technologies and a team of trained specialists, to protect advertisers from invalid clicks."); *How does Google detect Invalid Clicks? – AdWords Help*[61] ("[W]e have dedicated a number of resources to protect your account against invalid activity.").

83.     According to Google, it reviews ***every click*** on an AdWords ad to determine whether the click resulted from invalid click activity.  *See The Google AdWords Philosophy – AdWords Help*[62] ("[W]e automatically review every click that occurs on the AdWords system to ensure its validity."); *How does Google detect Invalid Clicks? – AdWords Help*[63] ("Each click on an AdWords ad is examined by our system.").

84.     In fact, Google touts a robust monitoring system—with both automatic and manual reviews—designed to identify all invalid click activity for the benefit of its advertisers.  *See How does Google prevent invalid clicks and impressions? – AdSense Help*[64] ("Our specialists carefully monitor clicks and impressions on Google ads in order to protect [the] interests…of our advertisers.  To do this, we use both automated systems and human reviews, analyzing ***all ad clicks*** and impressions ***for any invalid click activity*** that may artificially drive up an advertiser's costs or a publisher's earnings.") (emphasis added); Click Fraud: Anecdotes From the Front Line, September 14, 2007[65] (describing "[h]ow Google can help advertisers" by "[s]olid click-fraud prevention, detection, containment"); Tuzhilin Report at 13[66] ("All the

---

[60]     https://adwords.google.com/support/aw/bin/answer.py?hl=en&answer=152245.

[61]     http://adwords.google.com/support/aw/bin/answer.py?hl=en&answer=6114.

[62]     http://adwords.google.com/support/aw/bin/answer.py?hl=en&answer=45968&rd=1.

[63]     http://adwords.google.com/support/aw/bin/answer.py?hl=en&answer=6114.

[64]     http://www.google.com/adsense/support/bin/answer.py?hl=en&answer=1115997.

[65]     www.google.com/adwords/adtrafficquality/.../adfraud_anecdotes.pdf.

[66]     http://googleblog.blogspot.com/pdf/Tuzhilin_Report.pdf.

partner sites in the network are periodically reviewed and monitored to detect possible problems and assure advertisers that their ads are placed only on the sites that passed certain quality control standards.").

85.     Given Google's promises and self-promoted robust monitoring systems, Google concedes it has the ability to detect and prevent Banned Ad Implementations.  Indeed, Dr. Tuzhilin, the "independent" click fraud expert, concluded that Google has the ability to detect the existence of Banned Ad Implementations.  *See* Tuzhilin Report at 16, 18.[67]

86.     According to Google, when it detects a Banned Ad Implementation or other AdSense Program Policy violation, it will not serve any ads to pages violating those policies. *See* How do you make sure there are no inappropriate websites in the Google Network? – AdWords Help[68] ("If our system detects content that violates our policies, no ads will be served to that page.").

87.     Also according to Google, it will terminate the AdSense accounts of any partners found to be engaging in such invalid activity.  *See* How does Google monitor invalid clicks from the Display Network[69] ("The Click Quality Team also ensures that publishers found to be engaging in invalid activity have their AdSense accounts disabled and are not allowed further participation in the Google Network."); Disabled Account FAQ – AdSense Help[70] ("If we determine that an AdSense account may pose a risk to our AdWords advertisers, we may disable that account to protect our advertisers' interests."); Tuzhilin Report at 37[71] (confirming Google will terminate accounts using Banned Ad Implementations and has implemented an ***automatic*** termination scheme that detects "inappropriate behavior" of publishers and either terminates or warns the publisher who engaged in such behavior);

---

[67]     http://googleblog.blogspot.com/pdf/Tuzhilin_Report.pdf.

[68]     https://adwords.google.com/support/aw/bin/answer.py?hl=en&answer=9566.

[69]     http://adwords.google.com/support/aw/bin/answer.py?hl=en&answer=164565.

[70]     https://www.google.com/adsense/support/bin/answer.py?hl=en&answer=57153.

[71]     http://googleblog.blogspot.com/pdf/Tuzhilin_Report.pdf.

AdSense send me a Violation Email for Pixazza served Images – AdSense Help[72] (threatening termination of a publisher's account where Google determined the publisher was using a Banned Ad Implementation); A note on traffic exchange programs – Inside AdSense[73] ("But using third-party tools or service to increase your site traffic may lead to invalid clicks or impressions and result in your account being disabled.…As many of you already know, our program policies strictly prohibit any means of artificially generating ad impressions or clicks, including third-party services such as paid-to-click, paid-to-surf, auto-surf, and click-exchange programs.   These programs offer incentives for users to view web pages or click on ads, resulting in activity that is harmful to our advertisers.").

88.     Further, Google represents it will file charges against any publisher participating in invalid click activity or any related offense.  *See* How does Google respond to instances of invalid clicks? – AdWords Help[74] ("Any advertiser or publisher participating in invalid click activity or any related offense is subject to legal prosecution.").

89.     Google claims these actions are exclusively "for the protection of AdWords advertisers."  *See* How does Google respond to instances of invalid clicks? – AdWords Help.[75]

90.     Google deems *all* clicks arising from, or occurring in connection with, a partner's site that runs any Banned Ad Implementation to be invalid clicks.  The following forum posting of a Google employee (addressing the "Ads on Mobile Apps" Banned Ad Implementation) makes this point clear:

> Also, please confirm that you're using AdSense for mobile content in a mobile website, not a mobile app. This would render your clicks invalid.
>
> That comment was a little unclear: *if you're using mobile AdSense for Content in a mobile app, that would render your clicks invalid*.

*See* I have 8547 Page impressions with 88 Clicks, but my earning is 0$. What's going on? - AdSense Help (emphasis added).[76]

---

[72]     http://www.google.com/support/forum/p/AdSense/thread?tid=36491be90e0c2f7b&hl=en.

[73]     http://adsense.blogspot.com/2007/04/note-on-traffic-exchange-programs.html.

[74]     http://adwords.google.com/support/aw/bin/answer.py?hl=en&answer=6422.

[75]     http://adwords.google.com/support/aw/bin/answer.py?hl=en&answer=6422.

91.     Similarly, the same Google employee (also addressing the "Ads on Mobile Apps" Banned Ad Implementation) confirmed that *all* clicks arising from, or occurring in connection with, a partner's site that runs any Banned Ad Implementation are invalid clicks. This employee wrote:

> Keep in mind that if you're using mobile AdSense for content in a mobile application, *all of your clicks will be considered invalid*.

*See* Over $2800 in "Mobile" estimated earnings... no Tax ID prompt. - AdSense Help (emphasis added).[77]

92.     Google promises that it will not charge advertisers for invalid click activity and, where charged, will credit any such charged amounts. *See* Invalid Clicks – AdWords Help[78] (defining "Invalid Clicks" as "[c]licks that Google does not charge to your account because we determine they were generated by prohibited methods."); How does Google prevent invalid clicks and impressions – AdSense Help[79] ("advertisers are not charged for this [invalid click] activity"); Video: About Invalid Clicks[80] (stating Google will not charge for invalid click activity because such activity "has little or no value"); *id.* (promising that, where an advertiser is charged for invalid click activity, "you'll receive a credit for those clicks"); Invalid Clicks Issues and Concerns – AdSense Help[81] ("Google's proprietary technology analyzes all ad clicks for any invalid click activity that is intended to artificially drive up an advertiser's clicks or a publisher's earnings.  Clicks deemed by our monitoring system to be invalid will appear in your reports.  *However, since advertisers aren't charged for clicks deemed to be invalid, publishers don't receive any revenue for these clicks*.") (emphasis added); Tuzhilin Report at

---

[76]
    http://www.google.com/support/forum/p/AdSense/thread?tid=1f94e62fc4541b9d&hl=en.

[77]
    http://www.google.com/support/forum/p/AdSense/thread?tid=0e3af3baef866287&hl=en.

[78]    http://adwords.google.com/support/aw/bin/answer.py?hl=en&answer=42995.

[79]    http://www.google.com/adsense/support/bin/answer.py?hl=en&answer=1115997.

[80]    http://adwords.google.com/support/aw/bin/answer.py?hl=en&answer=90448.

[81]    https://www.google.com/adsense/support/bin/answer.py?hl=en&answer=62472.

18[82] ("The goal of the Click Quality team is to identify all these invalid clicks regardless of its nature and origin and make sure that advertisers do not pay for these invalid clicks."); *id.* at 26[83] ("[O]nce Google realizes that their filters missed invalid clicks, Google simply gives credits to the advertisers for these missed clicks and tries to fix the filters.").

93. Indeed, when charges for valid clicks are combined (*i.e.*, commingled) with charges for clicks occurring in connection with invalid click activity, Google's policy is to refund ***all*** amounts paid for ***all*** clicks originating from the partner who used the Banned Ad Implementation. *See id.* at 41[84] ("[W]hen Google terminates an AdSense publisher, ***all*** the clicks generated at that publisher's site over a certain time period (valid and invalid) are credited to the advertisers whose ads were clicked on that site."); AdSense Program Terms, §11[85] ("Google shall not be liable [to the AdSense publisher] for any payment based on…clicks co-mingled with a significant number of invalid clicks…or as a result of any breach of this Agreement"); *see, e.g.*, Over $2800 in "Mobile" estimated earnings... no Tax ID prompt. - AdSense Help[86] ("Keep in mind that if you're using mobile AdSense for content in a mobile application [a Banned Ad Implementation], ***all of your clicks will be considered invalid***.") (emphasis added).

**E.    Google's Obligation to Apply "Smart Pricing" Discounts**

94. Google's Agreements with advertisers also require Google to "Smart Price" the price advertisers pay for clicks based on the expected value of the clicks to the advertiser.  That is, Google promises to discount the cost of each click based on the conversion rate of the partner from which the click originated.  *See* Frequently asked questions regarding Google AdWords Conversion Data Usage - AdWords Help[87] ("Smart pricing uses conversion data to

---

[82]    http://googleblog.blogspot.com/pdf/Tuzhilin_Report.pdf.

[83]    http://googleblog.blogspot.com/pdf/Tuzhilin_Report.pdf.

[84]    http://googleblog.blogspot.com/pdf/Tuzhilin_Report.pdf.

[85]    https://www.google.com/adsense/terms.

[86]    http://www.google.com/support/forum/p/AdSense/thread?tid=0e3af3baef866287&hl=en.

[87]    http://adwords.google.com/support/aw/bin/answer.py?hl=en&answer=93148.

help determine if Search and Display Network partner sites are likely to convert at different rates and discounts advertiser bids accordingly."); Linking Campaign Performance to Conversions - AdWords Help[88] ("'Smart Pricing' – an algorithm that discounts pricing on clicks that are not likely to lead to conversions.").

95.     The conversion rate—a figure calculated by Google—predicts the likelihood a click "will turn into business results (e.g. online sale, registration, phone call, newsletter sign-up)." *See* Google Ad Traffic Quality Resource Center – Glossary;[89] *see also* 2004 AdWords Year in Review;[90] You Tube – AdSense Smart Pricing[91] ("What smart pricing does is allow our system to auto adjust the advertiser's bid across the sites according to the likelihood the click will deliver actual business results.").

96.     Google calculates and maintains conversion rates for every partner in the Google Network.  *See* Google Ad Traffic Quality Resource Center – Glossary[92] ("We are constantly analyzing data across our search and Display Network against a variety of factors."); *see also* Frequently asked questions regarding Google AdWords Conversion Data Usage - AdWords Help[93] ("At Google, we are aware of the importance and sensitivity of conversion data to our advertisers."); You Tube – AdSense Smart Pricing[94] (stating that Smart Pricing applies to entire Google Network, meaning Google maintains conversion data on every partner in the Google Network).

97.     Google calls this promised discount based on conversion rates "Smart Pricing." *See, e.g.*, Google Ad Traffic Quality Resource Center – Glossary.[95]

---

[88]     http://adwords.google.com/support/aw/bin/answer.py?hl=en&answer=172666.

[89]     http://www.google.com/adwords/adtrafficquality/glossary.html#.

[90]     http://www.google.com/adwordsreview04/index6.html.

[91]     http://www.youtube.com/watch?v=O1BaOMqcyQY.

[92]     http://www.google.com/adwords/adtrafficquality/glossary.html#.

[93]     http://adwords.google.com/support/aw/bin/answer.py?hl=en&answer=93148.

[94]     http://www.youtube.com/watch?v=O1BaOMqcyQY.

[95]     http://www.google.com/adwords/adtrafficquality/glossary.html#.

98.     Google introduced Smart Pricing to its advertisers on or about April 1, 2004.  At that time, Google described it as an enhanced pricing model that would "automatically adjust the price of clicks across the Google Network based on their expected value to the advertiser." *See* Google AdSense's New Update: "Better Ad Relevance" & "Smarter Pricing."[96]  Google further explained the newly launched Smart Pricing discount:

> Smart Pricing.   We analyze all of our data across our network, and if our data shows that a click is less likely to convert–less likely, that is, to turn into a desired business result–we reduce the price an advertiser pays for the click. As a result, advertisers are saved the guesswork of estimating the value of clicks from different keywords or sites (content vs. search, for example) and adjusting their bids.

*See* 2004 AdWords in Review.[97]

99.     During the last approximately six years, nothing has changed with respect to Google's obligation to Smart Price.  In fact, Google describes Smart Pricing the same way today:

> We are constantly analyzing data across our search and Display Network against a variety of factors.  If our data shows that a click is less likely to turn into business results (e.g., online sale, registration, phone call, newsletter sign up), we reduce the price you pay for that click.

*See* Google Ad Traffic Quality Resource Center – Glossary.[98]

100.    Similarly, another Google site describes it as follows:

> Your CPA for both search and display campaigns should be fairly similar as a result of "Smart Pricing" - an algorithm that discounts pricing on clicks that are not likely to lead to conversions.

*See* Linking Campaign Performance to Conversions - AdWords Help.[99]

101.    Google promotes Smart Pricing as a way to maximize value to the advertiser on clicks arising from both the Search and Display Networks:

> Finally, Google uses conversion data in aggregate for the overall benefit of advertisers and their ROI.  For example, aggregated conversion data is one factor used by our smart pricing feature to improve advertiser ROI.  *Smart pricing uses conversion data to help determine if Search and Display Network partner sites are likely to convert at different rates and discounts advertiser bids accordingly. This results in better performance and ROI* for advertisers on Search and Display Network sites.

---

[96]     http://www.seroundtable.com/archives/000300.html.

[97]     http://www.google.com/adwordsreview04/index6.html.

[98]     http://www.google.com/adwords/adtrafficquality/glossary.html#.

[99]     http://adwords.google.com/support/aw/bin/answer.py?hl=en&answer=172666.

*See* Frequently asked questions regarding Google AdWords Conversion Data Usage - AdWords Help (emphasis added).[100]

102.    Google's Chief Economist, Hal Varian, explains in a YouTube video that Smart Pricing is designed to encourage advertisers to "confidently bid the maximum amount they're willing to pay" and Google will "take care of the rest:"

> Smart pricing is designed to encourage advertisers to "confidently bid the maximum amount they're willing to pay" for clicks, which grows the advertising pie for everyone.
>
> * * *
>
> What smart pricing does is allow our system to auto adjust the advertiser's bid across the sites according to the likelihood the click will deliver actual business results.  An advertiser can then confidently bid the maximum they are willing to pay across all sites, and leave it to our system to take care of the rest.

*See* You Tube – AdSense Smart Pricing.[101]

103.    Smart Pricing uses google.com as the "gold standard" from which to judge the conversion rates of its partners' sites.  It discounts the costs of clicks from all sites that are expected to convert at a lower rate than google.com.

104.    Google's Agreements require it to apply the Smart Pricing discount to *all* clicks on both the Search and Display Networks, including ads displayed on mobile devices (which is part of the Display Network).  *See* You Tube – AdSense Smart Pricing[102] ("To address a common myth that we have heard, smart pricing is not applied to only specific publishers or accounts.  It is applied to *all* the ad auctions with keyword targeted cost per click ads.") (emphasis added); Does smart pricing apply to mobile ads? – AdWords Help[103] ("Smart pricing applies to ads that appear on mobile devices with full Internet browsers if the campaign is also targeted to desktop and laptop computers.").

105.    In sum, Google is obligated to Smart Price clicks on both the Search Network and the Display Network.  *See* Frequently asked questions regarding Google AdWords

---

[100]    http://adwords.google.com/support/aw/bin/answer.py?hl=en&answer=93148.

[101]    http://www.youtube.com/watch?v=O1BaOMqcyQY.

[102]    http://www.youtube.com/watch?v=O1BaOMqcyQY.

[103]    http://adwords.google.com/support/aw/bin/answer.py?hl=en&answer=29500.

1  Conversion Data Usage - AdWords Help[104] ("Smart pricing uses conversion data to help

2  determine if *Search and Display Network partner sites* are likely to convert at different rates

3  and discounts advertiser bids accordingly. This results in better performance and ROI for

4  *advertisers on Search and Display Network sites*.") (emphasis added).

5      106.  Google promises to apply Smart Pricing discounts automatically.

6      **F.    Google's Secret Conspiracy with Special Partners**

7      107.  Google, in concert with certain of its closest partners (the "Special Partners"),

8  has violated and continues to violate each of the obligations described above.

9      108.  Despite its obligations to protect advertisers from Banned Ad Implementations,

10 Google actively allows, encourages, and participates with its Special Partners to employ

11 Banned Ad Implementations and engage in other AdSense Program Policy violations.

12     109.  Likewise, despite its obligation to Smart Price, Google and its Special Partners

13 have agreements whereby Google does not apply Smart Pricing discounts to some or all of its

14 Special Partners.

15     110.  Google's Special Partners include the following companies, among others:

16  •    IAC/InterActiveCorp – operates ask.com, askkids.com, life123.com, gifts.com,

17       pronto.com, directhit.com, dictionary.com, thesaurus.com, and other sites

18       ("IAC").

19  •    Infospace, Inc. – operates webcrawler.com, dogpile.com, metacrawler.com,

20       webfetch.com, and other sites ("Infospace").

21  •    Value Click, Inc. – operates smarter.com, internetcorkboard.com, and

22       lowpriceshopper.com ("Value Click").

23  •    AOL, Inc. – operates mapquest.com ("AOL").

24  •    Network Solutions, LLC – operates monstermarketplace.com and other sites

25       ("Network Solutions").

26  •    Peeplo – operates peeplo.com.

27

28  ---
    [104]    http://adwords.google.com/support/aw/bin/answer.py?hl=en&answer=93148.

- Conduit – operates conduit.com.

111.    This is not a complete list of Google's Special Partners.  Google does not disclose the Special Partners that it has exempted from the AdSense Program Policies and the Smart Pricing discount.  In fact, Google hides the identity of several of its Special Partners by not naming the "Search Partners" in an advertiser's online search query report (for the Search Network), through references to "anonymous.google" in the placement reports (for the Display Network), and by preventing the transmission of referrer information to its advertisers' servers. Through these actions, Google's advertisers are unable to identify the sources of certain clicks on their ads and/or the identity of other Special Partners.

112.    Google's Special Partners generally employ Banned Ad Implementations (*e.g.*, Hard Coded Direct Links and Tool Bars) for the purpose of directing web traffic to their websites, which often contain multiple additional Banned Ad Implementations.

113.    Once a user "lands" on a Special Partner's website, the user is inundated with one or more additional Banned Ad Implementations such as Clickable Backgrounds and Ad-only Pages.  Through these Banned Ad Implementations, as Google itself recognizes, the Special Partners inflate the number of artificial clicks from their sites.

114.    For example, IAC runs ads for ask.com on www.google.com (see Figure 1 below).  These ads contain Hard Coded Direct Links that, when clicked, take the user to a Shadow Website of ask.com (compare Figure 2 with Figure 3).  This Shadow Website (see Figure 2) contains numerous additional Banned Ad Implementations including: Clickable Backgrounds, New Browser Windows, and Pre-populated Search Boxes.

**Figure 1**: Ask.com ad running on **www.google.com** containing a Hard Coded Direct Link.



**Figure 2**: Shadow Website of ask.com launched when ad clicked. This version contains Clickable Backgrounds (outline of ad in original), New Browser Windows, and Pre-populated Search Boxes, all of which are shown in this image.



**Figure 3**:  Original Version of ask.com users see when same search terms are manually inputted.



115.    As another example, Network Solutions also uses Hard Coded Direct Links to send traffic to monstermarketplace.com.  *See* Figure 4.  At monstermarketplace.com, Network Solutions runs the following Banned Ad Implementations: Graphical Gimmicks, Clickable Backgrounds, and New Browser Windows.   *See* Figure 5 (showing Graphical Gimmicks).  Ironically,  monstermarketplace.com uses  Graphical  Gimmicks  virtually  identical  to  the example of prohibited Graphical Gimmicks used by Google.  *See* Figure 6.

**Figure 4**:  monstermarketplace.com ad running on www.7search.com containing a Hard Coded Direct Link.



**Figure 5**:  monstermarketplace.com site showing Grapical Gimmicks.



**Figure 6**:   Google's example of an unacceptable implementation relating to Graphical Gimmicks.  *See* Encouraging users to click on ads or bringing excessive attention to ad units – AdSense Help.[105]



116.     Google is a knowing and willing participant with its Special Partners in this scheme to use Banned Ad Implementations to artificially, improperly, and illegally inflate the number of paying clicks.  Google uses its Special Partners as "cover" to avoid soiling its own virtuous image with abusive policy violations, while making money hand over fist.

117.     Indeed, as Google's "independent" click fraud expert recognized, Google has strong motivations to mastermind this conspiracy:  Google has an "inherent conflict of interest" with its advertisers because "the money from invalid clicks directly contribute[s] to the bottom line[]" of Google.  See Tuzhilin Report at 21.[106]

---

[105]      http://www.google.com/support/adsense/bin/answer.py?hl=en&answer=115985.

[106]      http://googleblog.blogspot.com/pdf/Tuzhilin_Report.pdf.

118.    And, this money is significant as demonstrated by the ad revenues generated from Google ads by Special Partner IAC as set forth in the following table (which reflects only the portion retained by the IAC *after* Google's cut):

| Year | Amount (in millions) |
|---|---|
| 2006 | $379.0 |
| 2007 | $568.1 |
| 2008 | $610.8 |
| 2009 | $564.8 |
| 2010 (Jan – Sept only) | $530.7 |
| TOTAL | $2653.40 |

119.    Google and its Special Partners each knew their conduct in furtherance of their conspiracy was wrongful.

### 1.    Google's Agreements with Special Partners Demonstrate Its Active Participation in the Conspiracy

120.    Google actively participates in this conspiratorial scheme as evidenced by the contracts it has executed with its Special Partners.

121.    For example, Google's contract with Special Partner Infospace expressly permits the use of an Infospace tool bar to generate ads.  *See* Amended and Restated Google Inc. Services Agreement, dated October 1, 2005, by and between InfoSpace Sales LLC and Google, Inc., §1.4.2.[107]  This agreement also contemplates ads being served in connection with other Infospace software applications.  *See id.* §2.6; *id.* Exhibit B, §1.2.  To avoid exposure of their scheme, Google and Infospace expressly agreed that no Google brand features would be displayed in connection with the Infospace tool bar or the results generated by the toolbar search.  *See id.* §1.4.2.

122.    As explained above, using Tool Bars and other software to generate ads is a Banned Ad Implementation plainly prohibited by Google's Agreements with its advertisers. *See* AdSense Program Policies – AdSense Help[108] ("[P]ublishers may not…display ads as the result of the action of any software application."); *id.* ("[S]ites displaying Google ads may

---

[107]
    http://www.sec.gov/Archives/edgar/data/1068875/000119312509042774/dex1037.htm.

[108]
    https://www.google.com/adsense/support/bin/answer.py?hl=en&answer=48182.

not:…[d]isplay ads, search boxes or search results as a result of the actions of software applications such as toolbars [or] be loaded by any software that can trigger pop-ups, redirect users to unwanted websites, modify browser settings or otherwise interfere with site navigation.").

123.    Given the express terms of its agreement with Infospace, Google is unquestionably participatory in the use of Banned Ad Implementations by Infospace.

124.    Google's conspiratorial agreements do not end with Infospace.

125.    Google and Special Partner IAC entered into an agreement whereby Google secretively approved IAC's use of certain Banned Ad Implementations.  *See* Google Services Agreement, effective January 1, 2008, by and between IAC/InterActiveCorp and Google, §21.2[109] ("Google shall not be liable for payment in connection with…impressions of Ads or clicks on Ads ***delivered through an implementation which is not initially approved by Google pursuant to this Agreement*** or subsequently fails to meet Google's implementation requirements and specifications") (emphasis added).

126.    Google's agreement with IAC also exempted IAC from Smart Pricing.   As reported in 2007 by Frank Schilling, President and Founder of Name Administration, Inc. (a domain name management company), Google and IAC (ask.com) have a special agreement whereby Google does not Smart Price any ads served by Ask.com:

> [B]ecause Ask's feed is not Smart-priced, there is a huge opportunity and inefficiency for those who know how to handle it.  Traffic can be sent to a parking co with an Ask deal, (where it subsequently flows to Google) skirting the Google smart-price filter that this same traffic would be subject to at the front door Google "Adsense for domain" (AFD) feed.

*See* Pink Houses « Seven Mile Blog.[110]  Similarly, in 2007, Donny Simonton, the President of Parked.com, reported that his company received Google ads to display on his company's websites through a syndication arrangement with IAC (ask.com).  According to Mr. Simonton,

---

[109]

http://www.sec.gov/Archives/edgar/data/891103/000104746909002040/a2190666zex-10_25.htm.

[110]    http://domainnamesales.com/sevenmile/2007-10/pink-houses.

the Google ads his company displayed on their websites *were not Smart Priced*.  *See* is parked better than sedo?[111]

127.    Moreover, while Google will allow advertisers to generally exclude their ads from appearing on certain sites, Google does not allow advertisers to invoke a "site exclusion" against any of its Special Partners.  This is further evidence of Google's coordination of the unlawful scheme with its Special Partners.

128.    As set forth above, Google has struck deals with its Special Partners to exempt them from the very policies it designed and implemented to protect advertisers.  This scheme has inflicted substantial harm upon Google's advertisers.

### 2. Google's Knowledge of the Use of Banned Ad Implementations through its Own Actions

129.    Google cannot deny its participation in the use of Banned Ad Implementations by Special Partners for yet another reason—it has created a system to allow these Special Partners to charge for invalid click activity without detection.

130.    Google hides the identity of several of its Special Partners in the advertisers' online search query report (for the Search Network), through references to "anonymous.google" in placement reports (for the Display Network), and by preventing the transmission of referrer information to its advertisers' servers.  Through these actions, Google's advertisers are unable to readily identify the sources of certain clicks on their ads and/or the identity of the Special Partners from whom the clicks originated.

### 3. Google's Knowledge of the Use of Banned Ad Implementations through Monitoring

131.    Google's participation in the conspiratorial scheme is further reflected through its monitoring efforts.

132.    Google represents that it reviews *all* partner sites for compliance with its policies.  Certainly, during such reviews, Google learned of the Special Partners' uses of Banned Ad Implementations.  *See* Tuzhilin Report at 13[112] ("*All* the partner sites in the

---

[111]    http://www.dnforum.com/f366/parked-better-than-sedo-3-thread-221221.html.

[112]    http://googleblog.blogspot.com/pdf/Tuzhilin_Report.pdf.

1  network are *periodically reviewed* and monitored to detect possible problems and assure

2  advertisers that their *ads are placed only on the sites that passed certain quality control*

3  *standards*." (emphasis added)).

4          133.    Further, as set forth above (Section IV(D)), Google employs a robust

5  monitoring system to detect invalid click activity, including invalid clicks activity occurring in

6  connection with  the use of Banned Ad Implementations.  Through this monitoring system,

7  Google is plainly aware that its Special Partners employ Banned Ad Implementations on their

8  websites and on www.google.com.  *See, e.g.*, Adsense send me a Violation Email for Pixazza

9  served Images - AdSense Help[113] (discussing Google's automatic termination warning to a

10  publisher where its filters determined the publisher was using Ads on Photos (floating box

11  script), one of the Banned Ad Implementations); How do disabled account to enable? If

12  possible then how? – AdSense Help[114] ("After reviewing our records, we've determined that

13  your AdSense account poses a risk of generating invalid activity.  Because we have a

14  responsibility to protect our AdWords advertisers from inflated costs due to invalid activity,

15  we've found it necessary to disable your AdSense account.") (emphasis added).

16          134.    This "robust" monitoring system would undoubtedly identify Banned Ad

17  Implementations contained in the code on partner websites.  For example, the monitoring

18  system would certainly detect Clickable Backgrounds, which are evident through html code on

19  partner websites.  This code reveals the precise dimensions (or, at minimum, the percentage of

20  the width of the screen) of the Clickable Background.  Thus, Google's filters can undoubtedly

21  detect Banned Ad Implementations.  The problem is that Google ignores this detection,

22  choosing instead to allow its Special Partners to continue violating its policies to the detriment

23  of its advertisers.

24

---

25  [113]
        http://www.google.com/support/forum/p/AdSense/thread?tid=36491be90e0c2f7b&h
26  l=en.
    [114]
27      http://www.google.com/support/forum/p/AdSense/thread?tid=0b7bf5f7bf5b632f&hl
28  =en.

135.     Even if the monitoring system failed to detect the Special Partners' improper conduct—something highly unlikely—Google's employees were informed of such Banned Ad Implementations on forum posts and in communications with Google.  *See* Ad Traffic Quality Resource Center[115] ("To stay on top of your concerns, we keep a close eye on online advertising journals and blogs.").

136.     In fact, in early 2007, a Google employee acknowledged a forum post reporting that Special Partner Infospace allowed its syndication partners (*i.e.*, those to whom it served ads) to display Google ads through Banned Ad Implementations.   An author of one of the postings wrote:

> Thus, where if I am going to use adsense as a publisher, I have to follow a whole bunch of google rules about how to display, etc…and google picks which ads appear on my page.  **If I use infospace for the same page, I can display them essentially however I want**….
>
> * * *
>
> Google has decided to use the back door to keep revenue from arbi[trage] sites.  **They impose a bunch of rules to prevent arbi with adsense publishers…but allow their "search partners" to violate every imaginable rule and syndicate the same ads**.

*See* Are 'Search Partners' starting to suck? / Excluding search partners Google AdWords forum at WebmasterWorld (emphasis added).[116]  The Google employee replied, "I'll certainly pass your feedback from this thread along to the right folks."  *Id.*

137.     Similarly, a September 2010 posting on the AdWords Help Forum detailed the Incentivized Search Banned Ad Implementation being used by Infospace in connection with its "Swag Bucks" campaign.  *See* Can someone keep clicking on my ads and running up the bill? – AdWords Help[117] ("[O]ne of Google['s] Search Partners called swagbucks…[is] rewarding people for clicking on google paid search results, based on my brief tests.  People can earn prizes, gift cards, sweepstakes entries and other things just for searching and clicking.").  Google closed the forum to new comments after this posting.

---

[115]     http://www.google.com/adwords/adtrafficquality.

[116]     http://www.webmasterworld.com/google_adwords/3250244.htm.

[117]     http://www.google.com/support/forum/p/AdWords/thread?tid=782d525a1eec1e15&hl=en.

138.   A number of additional Google forum posts contain references to Special Partners running Banned Ad Implementations.   Each of these posts involves a Google employee or has been closed, which can only be done by a Google employee.

139.   In short, Google has actual knowledge that its Special Partners use Banned Ad Implementations to inflate the number of clicks on ads.  More disturbing is the fact that Google is an active partner in these unlawful schemes.

140.   By acting in concert with its Special Partners to employ Banned Ad Implementations, Google has unjustly enriched itself with tremendous amounts of revenue by placing high paying ads on it Special Partners' sites, knowing the Banned Ad Implementations used on those sites will generate large volumes of artificial clicks.

**G.   Google's Unlawful Conduct and Violation of Its Obligations**

141.   Google, acting in concert with its Special Partners, violated its obligations to advertisers in numerous respects.

142.   Each of the following examples demonstrates how Google allowed, participated in, and/or directly caused violation of the AdWords Program Policies and AdSense Program Policies, both of which are expressly incorporated into Google's Agreements with advertisers.

143.   Google did and still does this for one reason – to improperly increase clicks on paying advertisements and unjustly line its pockets with its advertisers' money.

144.   Each of the following examples of violations can be proven with Google's own internal records.

**1.   Hard Coded Direct Links**

145.   Google's policies prohibit publishers from using Hard Coded Direct Links.

146.   Ads embedded with Hard Coded Direct Links to search results contain code that, when the ad is clicked, (i) automatically opens the Special Partner's website; and (ii) displays "search results" with ads, although there had been no user inputted "search query."

147.   Google prohibits Hard Coded Direct Links to search results because they artificially inflate impressions and clicks on Search Network ads that are not the result of a "search query."   Google's Agreements with its advertisers require it to place advertisers'

Search Network ads on search results pages that are displayed as the direct result of "search queries" typed by users into search boxes at google.com or the websites of search partners.  *See How AdWords Targets Audiences – AdWords Help*[118] ("Once you activate your account, your ads are eligible to appear.  That is, the AdWords system selectively matches **search queries** related to the keywords you've selected, then displays your ads to highly targeted audiences.  In short, you'd be advertising directly to *an audience already looking for you*.") (emphasis added); AdSense Program Policies[119] (requiring that all "[q]ueries must originate from users inputting data directly into the search box and cannot be modified"); *see also* Can I suggest to the user what to search for in the Google Custom Search – AdSense Help[120] (Stating that "suggested" search terms "would still be considered a type of pre-population.  Our search functions necessitate 100% natural, user initiated input in order to protect the integrity of our advertising programs."); How does Google target ads to AdSense for search queries? – AdSense Help.[121]

148.    Google defines "search query" as: "the exact word or set of words a user enters when searching on Google.com or one of our Search Network sites."  *See* Google AdWords Help Center: Search Query;[122] *see also* What is the difference between a search query and a keyword?– AdWords Help (same);[123]  AdSense Program Policies[124] ("Queries must originate from **users inputting data directly into the search box** and cannot be modified.  This includes pre-populating the search box with terms or hard-coding direct links to search results pages.") (emphasis added); AdSense Program Terms, §2[125] ("all search queries…must originate from

---

[118]    http://adwords.google.com/support/aw/bin/answer.py?hl=en&answer=151869.

[119]    https://www.google.com/adsense/support/bin/answer.py?hl=en&answer=48182.

[120]
    http://www.google.com/support/forum/p/AdSense/thread?tid=786d8bf8bc70b428&hl=en.

[121]    https://www.google.com/adsense/support/bin/answer.py?hl=en&answer=9883.

[122]    https://adwords.google.com/support/bin/answer.py?answer=68046&topic=29.

[123]    http://adwords.google.com/support/aw/bin/answer.py?hl=en&answer=68077.

[124]    https://www.google.com/adsense/support/bin/answer.py?hl=en&answer=48182.

[125]    https://www.google.com/adsense/terms.

*individual human end users inputting data* directly into a Search Box…*on Your Property*(ies).") (emphasis added); Interpreting Search Query Performance Reports – AdWords Help[126] (Describing the "Search Query reports" advertisers receive in their online accounts as showing "every search query that triggered your ad and received clicks.  Whether your ad is triggered depends on *the search term a user enters* when searching on a site within the Google Network and on your keyword matching settings.").

149.    The express ban on Hard Coded Direct Links to search results pages protects advertisers from clicks on their Search Network ads that are ***not*** the direct result of a "search query."  When a Publisher creates a Hard Coded Direct Link to a search page, for example by embedding it in an ad running on an internet advertising network, clicks on ads displayed on the resulting search page are considered invalid click activity because advertisers' ads are not showing as the result of a "search query."  Rather, they are showing as a result of a click on an "advertisement" with a Hard Coded Direct Link embedded within it.

150.    Google's prohibition on Hard Coded Direct Links exists for the benefit and protection of advertisers.

151.    Nonetheless, Google allows its Special Partners—including IAC, Infospace, Value Click, Network Solutions, and Peeplo—to run ads containing Hard Coded Direct Links on the Google Network and display ads in connection with those Hard Coded Direct Links.

152.    Plaintiff's account reflects one or more charges for clicks occurring in connection with Hard Coded Direct Links, including charges from Special Partners IAC and Peeplo.

153.    The clicks associated with the Hard Coded Direct Links are identifiable from Google's own records, as well as by unique characters contained in the "referrer" lines in Plaintiff's server log files.  The "referrer" indentifies the origin of the click.

154.    For example, on January 16, 2011, Plaintiff was charged for a click from ask.com.  Google did not report the origin of the click.  Rather, Google simply reported to

---

[126]    http://adwords.google.com/support/aw/bin/answer.py?hl=en&answer=152392.

Plaintiff that the search terms that generated the click were "accidental deaths in hospitals in usa 2009." However, Plaintiff has determined from his log file that the click originated from ask.com by analyzing his log file for a "gclid" (Google's unique identifier for clicks on AdWords ads) and matching search terms. Through this process, Plaintiff has determined the following referrer from Plaintiff's log file relates to the ask.com click:

> 24.248.210.25 - - [16/Jan/2011:13:38:24 -0700] "GET www.rickwoodslaw.com/auto-accidents.html?**gclid=CNjXqq_Kv6YCFUeW7QodL3t5Gw** HTTP/1.1" 200 9876 "http://**www.ask.com**/web?qsrc=2417&o=13753&**l=sem&q=accidental+deaths+in+h ospitals+in+usa+2009**" "Mozilla/4.0 (compatible; MSIE 8.0; Windows NT 6.0; Trident/4.0; GTB5; SLCC1; .NET CLR 2.0.50727; Media Center PC 5.0; .NET CLR 3.5.30729; .NET CLR 3.0.30618)"

As highlighted above, this referrer contains "l=sem" ("sem" in an acronym that stands for "search engine marketing") which demonstrates the click on Plaintiff's ad resulted from an IAC ad that was placed on an internet advertising network – not an organic search ("l=sem" is not in the URLs of organic search results pages displayed after doing a search directly at ask.com; it only appears in connection with Hard Coded Direct Links). Thus, when the IAC ad was clicked, it executed a Hard Coded Direct Link that automatically (without user input) returned search results containing Plaintiff's ad. Plaintiff's ad was clicked from among these search results.

155.    In another instance, on October 12, 2010, Plaintiff was charged for a click from ask.com. Google did not report the origin of the click. Rather, Google simply reported to Plaintiff that the search terms that generated the click were "cars disney." However, Plaintiff has determined from his log file that the click originated from ask.com by analyzing his log file for a gclid and matching search terms. The following referrer from Plaintiff's log file relates to the ask.com click:

> 99.73.176.51 - - [12/Oct/2010:12:06:41 -0700] "GET www.rickwoodslaw.com/auto-accidents.html?**gclid=CMndkeqCzqQCFYm8KgoddlaTDg** HTTP/1.1" 200 9876 "http://**www.ask.com**/web?qsrc=999&l=dis&ar_uid=0c9f99cac898657f9b8f2bb0175e5 e51207e8a59&siteid=15149&o=15149&**q=cars+disney&ifr=1**" "Mozilla/4.0 (compatible; MSIE 8.0; Windows NT 6.1; WOW64; Trident/4.0; SearchToolbar 1.1; SLCC2; .NET CLR 2.0.50727; .NET CLR 3.5.30729; .NET CLR 3.0.30729; Media Center PC 6.0; MDDC; .NET4.0C; AskTbFWV5/5.8.0.12304)"

As highlighted above, this referrer contains "l=dis" (IAC uses "dis" to reflect IAC's "distribution" scheme) which demonstrates that the click on Plaintiff's ad resulted from an IAC

1
2
3
4
5
6

ad that was placed on an internet advertising network – not an organic search ("l=dis" is not in the URLs of organic search results pages displayed after doing a search directly at ask.com; it only appears in connection with Hard Coded Direct Links).   Thus, when the IAC ad was clicked, it executed a Hard Coded Direct Link that automatically (without user input) returned search results containing Plaintiff's ad.  Plaintiff's ad was clicked from among these search results.

7
8
9
10
11
12

    156.    In another instance, on September 14, 2010, Plaintiff was charged for a click from www.best-price.com.   Google did not report the origin of the click.   Rather, Google simply reported to Plaintiff that the search terms that generated the click were "linns auto." However, Plaintiff has determined from his log file that the click originated from best-price.com by analyzing his log file for a gclid and matching search terms.   The following referrer for Plaintiff's log file relates to the best-price.com click:

13
14
15
16

> 173.202.88.180 - - [14/Sep/2010:20:45:19 -0700] "GET www.rickwoodslaw.com/auto-accidents.html?**gclid=CI_cysPCiKQCFZJl7AodMF9wHA**   HTTP/1.1"   200   9855 "http://**www.best-price.com**/search/landing/**query/linns+auto/s/yahoo**/altk/linn/cv/585433/koid/203134 05154/" "Mozilla/4.0 (compatible; MSIE 7.0; Windows NT 6.1; Trident/4.0; GTB6.5; SLCC2; .NET CLR 2.0.50727; .NET CLR 3.5.30729; .NET CLR 3.0.30729; Media Center PC 6.0)"

17
18
19
20
21

As highlighted above, this referrer contains "s/yahoo" which demonstrates that the click on the Plaintiff's ad resulted from a click on a Unister ad (the company that operates best-price.com) that was served on Yahoo.   Thus, when the Unister ad was clicked, it executed a Hard Coded Direct Link that automatically (without user input) returned search results containing Plaintiff's ad.  Plaintiff's ad was clicked from among these search results.

22
23
24
25
26
27

    157.    In another instance, on September 26, 2010, Plaintiff was charged for a click from Special Partner peeplo.com.   Google did not report the origin of the click.   Rather, Google simply reported to Plaintiff that the search terms that generated the click were "autos usados."   However, Plaintiff has determined from his log file that the click originated from peeplo.com by analyzing his log file for a gclid and matching search terms.   The following referrer from Plaintiff's log file relates to the peeplo.com click:

28

> 70.178.119.90 - - [26/Sep/2010:23:40:09 -0700] "GET www.rickwoodslaw.com/auto-accidents.html?**gclid=CMnx8f7_pqQCFcdd7Aod80FT6g**   HTTP/1.1"   200   9876

"http://us.**peeplo**.com/search/?**q=autos%20usados&type=web&from=adg11**"
"Mozilla/5.0 (iPod; U; CPU iPhone OS 3_1_3 like Mac OS X; es-es) AppleWebKit/528.18 (KHTML, like Gecko) Version/4.0 Mobile/7E18 Safari/528.16"

As highlighted above, this referrer contains "from=adg11" which demonstrates that the click on the Plaintiff's ad resulted from a Peeplo ad that was placed on an internet advertising network – not an organic search ("adg" means "ad group").  Thus, when the Peeplo ad was clicked, it executed a Hard Coded Direct Link that automatically (without user input) returned search results containing Plaintiff's ad.  Plaintiff's ad was clicked from among these search results.

158.    Google breached its obligations to Plaintiff and other Google advertisers by allowing publishers (including the Special Partners) to run ads in connection with Hard Coded Direct Links, failing to prevent clicks occurring in connection with Hard Coded Direct Links, failing to properly monitor for clicks occurring in connection with Hard Coded Direct Links, failing to filter clicks occurring in connection with Hard Coded Direct Links, charging Plaintiff and other advertisers for clicks occurring in connection with Hard Coded Direct Links, and failing to refund all amounts charged to Plaintiff and other advertisers for clicks occurring in connection with Hard Coded Direct Links.

159.    Clicks on ads displayed in connection with Hard Coded Direct Links are invalid, and the charges paid for such clicks should be refunded as required by Google's policies and obligations to its advertisers.

160.    Moreover, all clicks arising from publishers using Hard Coded Direct Links are invalid, and the charges paid for such clicks should be refunded as required by Google's policies and obligations to its advertisers.

### 2.  Tool Bars

161.    Google's policies prohibit publishers from "[d]isplay[ing] Google ads, search boxes or search results as a result of the actions of software applications such as tool bars." *See* AdSense Program Policies;[127] *see also* Can I put Google ads in a software application? –

---

[127]    https://www.google.com/adsense/support/bin/answer.py?hl=en&answer=48182.

AdSense Help[128] ("Currently, we don't permit Google ads or AdSense for search boxes to be distributed through software applications including, but not limited to toolbars, browser extensions, and desktop applications.").

162. Google's policies also prohibit publishers from integrating ads into Tool Bars. *See* AdSense Program Policies.[129]

163. This prohibition exists for the benefit and protection of advertisers.

164. Despite the blanket prohibition relating to Tool Bars, Google allows its Special Partners—including IAC and Conduit—to use Tool Bars on the Google Network and display ads in connection with Tool Bar searches.

165. These Special Partners install Tool Bars in users' browsers.

166. When the search function of a Tool Bar is utilized, the Special Partner returns Google search results along with a number of AdWords ads.

167. Plaintiff's account reflects one or more charges for clicks on ads occurring in connection with Tool Bar searches.

168. The clicks associated with Tool Bars are identifiable from Google's own records, as well as by unique characters contained in the referrer.

169. For instance, on October 29, 2010, Plaintiff was charged $4.86 for a click on his ad occurring in connection with a Tool Bar search on the term "video clips of Dale Earnhardt crash." While not disclosed by Google, Plaintiff has determined from his log file that this charge arose in connection with one of IAC's toolbar applications called FunWebProducts.[130] This information is evident from Plaintiff's billing records and server log files. The referrer in Plaintiff's log file associated with this click reveals the following information:

75.121.19.251 - - [29/Oct/2010:18:31:25 -0700] "GET www.rickwoodslaw.com/auto-accidents.html?**gclid=CPPXi8S4-aQCFate7AodfWK2hg**   HTTP/1.1"   200   9876 "http://search.**mywebsearch.com**/mywebsearch/GGmain.jhtml?**searchfor=Video+Clips+of+Dale+Earnhardt+Crash**&tpr=sbt&st=bar&ptnrS=ZLxdm092XIUS&ptb=Cgcs J5pMtoUAfhCcAMH4_g&si=&ss=sub&gcht=&n=77c0c34f&ps=Video+Clips+of+Dal

---

[128] https://www.google.com/adsense/support/bin/answer.py?hl=en&answer=113064.

[129] https://www.google.com/adsense/support/bin/answer.py?hl=en&answer=48182.

[130] This tool bar is provided by the IAC "search and win" website iWon.com, where users are offered compensation in exchange for searching with the tool bar.

e+Earnhardt+Crash"   "Mozilla/4.0   (compatible;   MSIE   7.0;   Windows   NT   6.0;
Trident/4.0; **FunWebProducts**; SLCC1; .NET CLR 2.0.50727; Media Center PC 5.0;
.NET CLR 3.5.30729; .NET CLR 3.0.30729; .NET4.0C)"

As demonstrated by the bolded text above, the click on Plaintiff's ad arose in connection with a

Tool Bar search for "video clips of Dale Earnhardt crash" in IAC's FunWebProducts tool bar.

The search on the FunWebProducts toolbar took the user to a search results page "powered by

iWon" that had large Clickable Backgrounds, only ads visible above the fold, and New

Browser Windows.   The following screen shot demonstrates these features visible to a user at

the URL listed in Plaintiff's log file:



170.    In another instance, on September 25, 2010, Plaintiff was charged $4.95 for a

click on his ad occurring in connection with a Tool Bar search on the term "parker motors inc

fayetteville ar."  While not disclosed by Google, Plaintiff has determined from his log file that

this charge arose in connection with one of IAC's toolbar applications called FunWebProducts.

This information is evident from Plaintiff's billing records and server log files. The referrer in Plaintiff's log file associated with this click reveals the following information:

> 166.183.58.253 - - [25/Sep/2010:12:18:14 -0700] "GET www.rickwoodslaw.com/auto-accidents.html?**gclid=CIq-jdqlo6QCFaxd7AodRRju3g** HTTP/1.1" 200 9876 "http://search.**mywebsearch.com**/mywebsearch/GGmain.jhtml?pg=GGmain&action=click&searchfor=**parker+motors+inc%2Ffayetteville+ar**&tpr=sc&n=77cf8d45&ss=sub&st=bar&ptb=QjmEv69LvS5sMEmY5mjxJA&ptnrS=RGxdm0073UUS&ct=sc" "Mozilla/4.0 (compatible; MSIE 8.0; Windows NT 6.1; Trident/4.0; **FunWebProducts**; SLCC2; .NET CLR 2.0.50727; .NET CLR 3.5.30729; .NET CLR 3.0.30729; Media Center PC 6.0)"

As demonstrated by the bolded text above, the click on Plaintiff's ad arose in connection with a Tool Bar search for "parker motors inc fayetteville ar" in IAC's FunWebProducts tool bar. The search on the FunWebProducts tool bar took the user to a search results page with large Clickable Backgrounds, only ads visible above the fold, and New Browser Windows.

171.   Google breached its obligations to Plaintiff and other Google advertisers by allowing publishers (including the Special Partners) to run ads in connection with Tool Bars, failing to prevent clicks occurring in connection with Tool Bars, failing to properly monitor for clicks occurring in connection with Tool Bars, failing to filter clicks occurring in connection with Tool Bars, charging Plaintiff and other advertisers for clicks occurring in connection with Tool Bars, and failing to refund all amounts charged to Plaintiff and other advertisers for clicks occurring in connection with Tool Bars.

172.   Clicks on ads displayed in connection with Tool Bars are invalid, and the charges paid for such clicks should be refunded as required by Google's policies and obligations to its advertisers.

173.   Moreover, all clicks arising from publishers using Tool Bars are invalid, and the charges paid for such clicks should be refunded as required by Google's policies and obligations to its advertisers.

### 3. Shadow Websites

174.   Google prohibits publishers from using shadow versions of websites. *See* AdSense Program Terms[131] (stating that publishers shall not "provide a version of the

---

[131]   https://www.google.com/adsense/terms.

Advertiser Page, Search Results Page, or Referral Page that is different from that page an end user would access by going directly to the Advertiser Page, Search Results Page, or Referral Page").

175.   This prohibition exists for the benefit and protection of advertisers.

176.   Nonetheless, Google allows its Special Partners—including IAC, Infospace, Value Click, Network Solutions, and Peeplo—to run Shadow Websites on the Google Network.

177.   The Shadow Websites of these Special Partners are not the same pages that a user would access by going directly to the Special Partners' sites and running an identical search.

178.   Moreover, these Shadow Websites contain numerous Banned Ad Implementations including, without limitation:

- Clickable Backgrounds
- Ad-Only Pages
- Graphical Gimmicks
- Pre-populated Search Boxes
- New Browser Window

179.   Google's Special Partners utilize Banned Ad Implementations (*e.g.*, Hard Coded Direct Links) to direct traffic to their Shadow Websites.

180.   These Shadow Websites, in turn, contain numerous additional Banned Ad Implementations.

181.   Google and its Special Partners violate Google's policies by the way they steer traffic to these Shadow Websites and the way they present ads once the traffic arrives on their Shadow Websites.

182.   Plaintiff's account reflects one or more charges for clicks on ads originating from Shadow Websites of Special Partners.

183.   The clicks associated with Shadow Websites are identifiable from Google's own records, as well as by unique characters contained in the referrer.

184.    The examples set forth in Section IV(G)(1) involve Shadow Websites.

185.    As a further example, on September 20, 2010, Plaintiff was charged for a click from:

> http://www.ask.com/web?q=accinte+++en+el+412+de+siloan+springs&o=15749**&l=dis**&qsrc=2871&alwb=y.

The referrer associated with this click contains "l=dis" which demonstrates the click on Plaintiff's ad resulted from an ad displayed on a Shadow Website.

186.    Google breached its obligations to Plaintiff and other Google advertisers by allowing publishers (including the Special Partners) to run ads in connection with Shadow Websites, failing to prevent clicks occurring in connection with Shadow Websites, failing to properly monitor for clicks occurring in connection with Shadow Websites, failing to filter clicks occurring in connection with Shadow Websites, charging Plaintiff and other advertisers for clicks occurring in connection with Shadow Websites, and failing to refund all amounts charged to Plaintiff and other advertisers for clicks occurring in connection with Shadow Websites.

187.    Clicks on ads displayed in connection with Shadow Websites are invalid, and the charges paid for such clicks should be refunded as required by Google's policies and obligations to its advertisers.

188.    Moreover, all clicks arising from publishers using Shadow Websites are invalid, and the charges paid for such clicks should be refunded as required by Google's policies and obligations to its advertisers.

### 4.  Incentivized Search

189.    Google prohibits publishers from asking users to click their ads, compensating users for viewing ads or performing searches, or promising compensation to third parties for such behavior. *See* AdSense Program Policies.[132]

190.    This prohibition exists for the benefit and protection of advertisers.

---

[132]    https://www.google.com/adsense/support/bin/answer.py?hl=en&answer=48182.

1    191.    Nonetheless, Google allows its Special Partners—including IAC and

2  Infospace—to syndicate ads to websites devoted to Incentivized Searches.

3    192.    For example, IAC places Google ads on iWon.com, a "search and win" website

4  which permits its users to sign up to "Search to Win:"

5        To enter the Search To Win Game, access the IWON web site at www.IWON.com (the
         "Website") and type a search word or term into the Ask Search field at the top of the
6        homepage. If this Search is randomly selected, you will receive a pop-up in addition to
         the search results. Within the pop-up window you will see the prize that you have won
7        and be prompted to fill out the claim form.

8  *See* iWon.com Official Rules.[133]   The site also encourages the download of a Tool Bar to play

9  the "Search to Win" game as shown in the following screenshot:



22    193.    In another example, Infospace distributes Google ads to a series of at least 115

23  "search and win" websites, including http://searchwithwillienelson.prodege.com ("Win

24  SwagBucks and *redeem* them), http://searchwithgodsmack.swagbucks.com ("Use Search with

25  Godsmack.    Earn    Swag    Bucks.    Redeem    Swag    Bucks    for    Prizes"),

26  http://searchwithkanyewest.prodege.com ("Every time you search the web you have a chance

27  _____

28  [133]      http://www.iwon.com/modules/pages/support/officialrules.jhtml.

to win Swag Bucks…that can be redeemed for prizes.").  Each site encourages the user to download a tool bar for additional "searching."

194.    These Incentivized Search websites encourage users to use their sites by promising compensation and/or rewards for searching and clicking on their sites.

195.    Plaintiff's account reflects one or more charges for clicks on ads occurring in connection with Incentivized Search sites.

196.    The clicks associated with Incentivized Search websites are identifiable from Google's own records, as well as by unique characters contained in the referrer.

197.    For example, on February 18, 2011, Plaintiff was charged $5.00 (his *maximum* bid price) for a click from ozzsearch.swagbucks.com.  Google's billing records did not reveal the origin of the click.  However, Plaintiff determined from his server's log files that the click came from swagbucks.com.  In fact, the referrer in Plaintiff's log files associated with this click contains the following information:

> 99.175.75.255 - - [18/Feb/2011:00:22:49 -0700] "GET www.rickwoodslaw.com/auto-accidents.html?**gclid=CIzmho2WkacCFYxL2god9mvFdw**  HTTP/1.1"  200  9876 "http://**ozzsearch.swagbucks.com**/?t=w&p=1&q=fayetteville+arkansas+accident+lawyer" "Mozilla/5.0 (Windows; U; Windows NT 5.0; en-US; rv:1.9.2.13) Gecko/20101203 Firefox/3.6.13"

This log file reveals that the click on Plaintiff's ad came from swagbucks.com, a notorious Incentivized Search website.   All the sites operated by swagbucks.com are pay-to-search programs of which Google is aware and to which Special Partner Infospace distributes ads. *See* Can someone keep clicking on my ads and running up the bill? – AdWords Help[134] (Containing a posting on the AdWords Help forum notifying Google that "one of Google['s] Search Partners called swagbucks…[is] rewarding people for clicking on google paid search results, based on my brief tests.  People can earn prizes, gift cards, sweepstakes entries and other things just for searching and clicking.").

198.    Google breached its obligations to Plaintiff and other Google advertisers by allowing publishers (including the Special Partners) to run ads in connection with Incentivized

---

[134]
   http://www.google.com/support/forum/p/AdWords/thread?tid=782d525a1eec1e15&hl=en.

Searches, failing to prevent clicks occurring in connection with Incentivized Searches, failing to properly monitor for clicks occurring in connection with Incentivized Searches, failing to filter clicks occurring in connection with Incentivized Searches, charging Plaintiff and other advertisers for clicks occurring in connection with Incentivized Searches, and failing to refund all amounts charged to Plaintiff and other advertisers for clicks occurring in connection with Incentivized Searches.

199.    Clicks on ads displayed in connection with Incentivized Searches are invalid, and the charges paid for such clicks should be refunded as required by Google's policies and obligations to its advertisers.

200.    Moreover, all clicks arising from publishers using Incentivized Searches are invalid, and the charges paid for such clicks should be refunded as required by Google's policies and obligations to its advertisers.

### 5. Ads on Mobile Apps

201.    Google prohibits publishers from placing AdWords ads on mobile apps.  *See* AdSense Program Policies[135] (prohibiting placement of AdSense code in "inappropriate places…such as software"); *id.* (stating that Google ads "may not be…[i]ntegrated into a software application of any kind").

202.    In fact, Google explains that AdWords ads can appear in only one of two places in connection with a mobile device: search results generated from searches run on mobile devices (*i.e.,* Search Network) *or* mobile websites (*i.e.,* Display Network).  *See* On what Google networks will my mobile ads appear? – AdWords Help.[136]  Regarding the mobile Display Network, Google states clearly that it is limited to *websites* (which do not include mobile apps):

> Display Network – Mobile ads appear on ***mobile websites***.  If you are already opted into the Display Network, your mobile ads will automatically start appearing on ***mobile websites***.

*Id.* (emphasis added).

---

[135]    https://www.google.com/adsense/support/bin/answer.py?hl=en&answer=48182.

[136]    http://adwords.google.com/support/aw/bin/answer.py?hl=en&answer=29491.

203.   An app is by definition a piece of software, not a website.

204.   Thus, any AdWords ad run on a mobile app is plainly prohibited and is a breach of Google's Agreement with advertisers. *See* AdSense for mobile content program policies – AdSense Help[137] ("AdSense for mobile content ad units may not be used in mobile applications. The use of AdSense for mobile content in a mobile application is a violation of AdSense policies.").

205.   Google's employees confirm that AdWords search and content ads cannot be placed in mobile apps:

> Also, implementing AdSense ads in any software has ***always*** been a violation of the AdSense program policies (see "Ad Placement" section under AdSense program policies linked below).

*See* Is the estimated earnings wrong today? - AdSense Help[138] (emphasis added); *see also* Over $2800 in "Mobile" estimated earnings... no Tax ID prompt. - AdSense Help[139] ("Keep in mind that if you're using mobile AdSense for content in a mobile application, *all of your clicks will be considered invalid*.") (emphasis added).

206.   The prohibition of ads running on mobile apps exists for the benefit and protection of advertisers.

207.   Nonetheless, Google has placed AdWords search and content ads on mobile apps.

208.   Plaintiff's account reflects one or more charges for clicks on ads occurring in connection with mobile apps.

209.   The clicks associated with Ads on Mobile Apps are identifiable in the Display Network Placement Report generated from Plaintiff's online AdWords account.

---

[137]   https://www.google.com/adsense/support/bin/answer.py?answer=71600.

[138]   http://www.google.com/support/forum/p/AdSense/thread?tid=4d2b94e1689954fa&hl=en.

[139]   http://www.google.com/support/forum/p/AdSense/thread?tid=0e3af3baef866287&hl=en.

210.    In the case of Plaintiff, his AdWords account contains only search and content ads.   However, he has been billed for numerous clicks occurring in connection with "adsenseformobileapps.com" and "nextmobileweb.com."   Both billing entries relate to charges for AdWords content and search ads served on mobile apps.

211.    In fact, from September 24, 2009 to February 28, 2011, Google charged Plaintiff for 780 clicks.   A majority of the clicks—466 of them—arose from mobile applications (billed through "adsenseformobileapps.com" and "nextmobileweb.com").

212.    Google breached its obligations to Plaintiff and other Google advertisers by allowing publishers (including the Special Partners) to run ads in connection with mobile apps, failing to prevent clicks occurring in connection with mobile apps, failing to properly monitor for clicks occurring in connection with mobile apps, failing to filter clicks occurring in connection with mobile apps, charging Plaintiff and other advertisers for clicks occurring in connection with mobile apps, and failing to refund all amounts charged to Plaintiff and other advertisers for clicks occurring in connection with mobile apps.

213.    Clicks on search and content ads occurring in connection with mobile apps are invalid, and the charges paid for such clicks should be refunded as required by Google's policies and obligations to its advertisers.

### 6.    Failure to "Smart Price" Clicks on Ads from Special Partners and Mobile Devices

214.    Google promises its advertisers that it will discount the price paid for clicks based on the likelihood the click will turn into business results, *i.e.*, the likelihood it will convert.  *See* Google Ad Traffic Quality Resource Center – Glossary.[140]

215.    Despite its express obligation to apply Smart Pricing discounts to all clicks from the Search and Display Networks, Google has failed to smart price clicks arising from its Special Partners and, until recently, clicks arising from mobile devices.

---

[140]    http://www.google.com/adwords/adtrafficquality/glossary.html#.

216.    On October 14, 2010, Google's Senior Vice President for Product Management, Jonathan Rosenberg, announced that Google had not been Smart Pricing clicks from mobile devices:

> This is Jonathan.   Nikes [Arora] can maybe give you more of a customer base perspective.  I think that some of you know we ***recently started smart pricing*** on the mobile devices and ***it is the case that the CPCs on the mobile devices are a good bit lower***.  It's primarily because there isn't the measurement--that there isn't that--there isn't as much of a consummation of a transaction on the mobile devices.  People don't have their credit cards in them; it's harder to type into them.  So, the mobile rates remain relatively lower.

*See* Google CEO Discusses Q3 2010 Results - Earnings Call Transcript - Seeking Alpha[141] (emphasis added).

217.    Plaintiff's billing records reveal that Google began Smart Pricing clicks arising from mobile devices on or about September 1, 2010.  As reflected in the following table, Plaintiff's average CPC from mobile device clicks before Smart Pricing was $1.05 and after Smart Pricing was $0.45.

| Time Period | No. of Clicks | Avg. CPC |
|---|---|---|
| 9/1/09 to 8/31/10 | 464 | $1.05 |
| 9/1/10 to 2/28/11 | 2 | $0.45 |

The only plausible explanation for such a significant decrease in the average CPC for mobile devices (at least 57%) after September 1, 2010 is Google's application of the promised Smart Pricing discount.

218.    Similarly, Google has not applied the promised Smart Pricing discount to its Special Partners and certain of Google's own properties.

219.    In 2007, Donny Simonton, the President of Parked.com, reported that his company received Google ads to display on his company's websites through a syndication arrangement with Special Partner IAC (ask.com).  According to Mr. Simonton, the Google ads his company displayed on their websites were not Smart Priced.  *See* is parked better than sedo?[142]

---

[141]    http://seekingalpha.com/article/230158-google-ceo-discusses-q3-2010-results-earnings-call-transcript?part=qanda.

[142]    http://www.dnforum.com/f366/parked-better-than-sedo-3-thread-221221.html.

220.    Similarly, Frank Schilling, President and Founder of Name Administration, Inc. (a domain name management company), reported in 2007 that Google and IAC (ask.com) had a special relationship whereby Google would not Smart Price any ads served by IAC (ask.com):

> [B]ecause Ask's feed is not Smart-priced, there is a huge opportunity and inefficiency for those who know how to handle it.  Traffic can be sent to a parking co with an Ask deal, (where it subsequently flows to Google) skirting the Google smart-price filter that this same traffic would be subject to at the front door Google "Adsense for domain" (AFD) feed.

*See* Pink Houses « Seven Mile Blog.[143]

221.    Finally, Plaintiff's account demonstrates Google's breach of its Smart Pricing obligation with respect to Special Partners.

222.    For example, on September 26, 2010, Google charged Plaintiff $5.00—his ***maximum*** bid price—for a click on his ad from a results page displayed by Special Partner peeplo.com.  The reported search terms used to generate the results containing Plaintiff's ad were "autos usados" (Spanish for "used cars").  Although Plaintiff's ad was set to display only to users searching or viewing content in English, Google apparently served his ad to peeplo.com in response to Spanish terms.  Nonetheless, while Google charged Plaintiff $5 for this click, Google estimated the average cost per click on google.com (the gold standard) for an ad targeting the Spanish terms "autos usados" at only $.30—some $4.70 cheaper:

---

[143]     http://domainnamesales.com/sevenmile/2007-10/pink-houses/.

**Figure 7**: Google estimated average CPC for certain terms.



223.    In another instance, on October 1, 2010, Google charged Plaintiff $5.00 – his **maximum** bid price–for a click on his ad from Special Partner Conduit.  Conduit used a banned Tool Bar to generate a results page for the search terms "ato irun" where Plaintiff's ad for "Auto Accident Attorney" was displayed and allegedly clicked on.  The phrase "ato irun" is nonsensical in English.  In fact, the only reference in Google.com to "ato irun" is that it is the name of a member of a foreign musical group.  As shown in Figure 7 above, Google does not even have advertisers bidding on the keyword "ato irun" – not even one bidding the minimum bid amount.  Nonetheless, Plaintiff was charged $5.00 for this click.

224.    The only plausible explanation for charging Plaintiff his $5 maximum bid price for nonsensical or irrelevant terms estimated to cost between $0 ("ato irun") and $0.30 ("autos

usados") is that, as Schilling and Simonton confirm, Google does not apply Smart Pricing to its Special Partners.

225.    This makes perfect sense.  As explained above, Special Partners use Banned Ad Implementations.  Banned Ad Implementations result in invalid click activity.  Invalid click activity does not lead to business results and, accordingly, will cause the Special Partners to have lower conversion rates than the gold standard – google.com.  Thus, Google should apply the Smart Pricing discount to every click originating from a Special Partner's site and not—as it did to Plaintiff—charge the advertiser his maximum bid price for clicks arising from a Special Partner's site.

226.    In another set of examples, clicks from google.com search results pages (which do not use any Banned Ad Implementations and only has the ad title clickable) resulted in charges to Plaintiff as low as $3.42 for clicks from a user search query for "fayetteville arkansas plaintiff attorney;" $3.98 for "lawyers in fayetteville Arkansas;" and $4.47 for "lawyers that deal with car accidents in bentonville arkansas."   Yet, Google charged the same amount or more for clicks on results pages from Special Partner IAC for the following search terms unrelated to Plaintiff's business:

| Search term | Source | Cost |
|---|---|---|
| video clips of dale earnhardt crash | Tool bar | $4.86 |
| parker motors inc fayetteville ar | Tool bar | $4.95 |
| cars disney | hard coded | $4.34 |
| details of actor james stacy's motorcycle accident | Tool bar | $4.22 |
| craig list cars | hard coded | $4.32 |
| chp tipton 99 fatality 12102010 | hard coded | $3.99 |
| ruby ridge incident | hard coded | $3.82 |
| autozone auto parts | Tool bar | $4.95 |
| salvage yards in northwest arkansas | hard coded | $4.44 |

227.    Remarkably, as shown in Figure 7 above, Google states that there is no competition (for terms "ruby ridge incident," "video clips of dale earnhardt crash" and "parker motors inc fayetteville ar") to at most medium competition (for terms "salvage yards in northwest arkansas" and "cars disney") for these search terms.  Google estimates costs for clicks on ads served in response to these search terms range from $.05 to $.64.  *See* Figure 7.

1    Clearly, by charging Plaintiff $3.82 or more for these clicks, Google did not apply the

2    promised Smart Pricing discount.

3    **V.      CLASS ALLEGATIONS**

4           228.    Plaintiff seeks to recover on behalf of himself and the class described below (a)

5    *all* amounts Google charged for clicks occurring in connection with Banned Ad

6    Implementations; and (b) *all* amounts Google charged for clicks occurring in connection with

7    publishers (including the Special Partners) where such publishers have used one or more

8    Banned Ad Implementation.

9           229.    Moreover, for the click charges not refunded, Plaintiff seeks to recover on

10   behalf of himself and the class described below a sum of money that equals the Smart Pricing

11   discounts that Google promised to apply to all such clicks.

12          230.    Finally, Plaintiff seeks an injunction to ensure that the misconduct described

13   above finally ends, without the threat of it reoccurring in the future.

14          231.    Plaintiff is not seeking to recover for charges for clicks occurring in connection

15   with parked domain and error pages, which Plaintiff believes is the subject of *In re Google*

16   *AdWords Litig.*, No. 08-cv-03369-JW (N.D. Cal. File July 11, 2008).

17          232.    Plaintiff brings this action as a class action pursuant to Federal Rule of Civil

18   Procedure 23(a) and (b)(3) on behalf of a proposed class consisting of the following:

19          All persons who advertised through Google's AdWords program and paid
            for clicks on their Google AdWords advertisement(s) at any time between
20          and including April 1, 2004 and the day the Court certifies this action as a
            class action, where such clicks occurred in connection with a Banned Ad
21          Implementation or where the Smart Pricing discount was not applied to the
            charges for the clicks originating from sites and properties other than
22          google.com (the "Class"). Excluded from the Class are Google and its
            affiliates, officers, and directors. Also excluded from the Class are the
23          members of the judiciary and their staff to whom this action is assigned.

24          233.    The members of the Class are so numerous that joinder of all members is

25   impracticable. Plaintiff believes that hundreds of thousands of people geographically dispersed

26   throughout the world have been damaged by Google's misconduct. The names and addresses

27   of the members of the Class are identifiable through documents maintained by Google and the

28

---

1    members of the Class may be notified of the pendency of this action by published, mailed,

2    and/or electronic notice.

3        234.    Plaintiff's claims are typical of the claims of all Class Members, as all Class

4    Members are similarly affected by Google's uniform wrongful conduct and their claims are

5    based on such conduct.   Further, Plaintiff's claims are typical of the claims of all Class

6    Members because his claims arise from the same underlying facts and are based on the same

7    factual and legal theories as the claims of all Class Members.  Plaintiff is no different in any

8    relevant respect from any other member of the Class.

9        235.    Plaintiff and his counsel will fairly and adequately protect the interests of the

10   members of the Class.  Plaintiff's interests do not conflict with the interests of the Class he

11   seeks to represent.   Plaintiff has retained counsel competent and experienced in class and

12   complex litigation.  Plaintiff and his counsel will prosecute this action vigorously.

13       236.    Class certification is warranted because common questions of law and fact exist

14   as to all Class Members and predominate over any questions affecting only individual Class

15   Members.  The questions of law and fact common to the Class include, without limitation:

16       •        Whether Google's Agreement with Class Members expressly or impliedly—

17   through the implied covenant of good faith and fair dealing or otherwise—requires

18   Google (i) to prohibit its publishers (including its Special Partners) from running ads in

19   connection with Banned Ad Implementations; (ii) to prevent clicks occurring in

20   connection with Banned Ad Implementations; (iii) to monitor for clicks occurring in

21   connection with Banned Ad Implementations; (iv) to filter clicks occurring in

22   connection with Banned Ad Implementations from its advertisers' accounts; (v) to not

23   charge its advertisers for clicks occurring in connection with Banned Ad

24   Implementations; (vi) to refund all amounts charged to Class Members for clicks

25   occurring in connection with Banned Ad Implementations; (vii) to refund all amounts

26   charged to Class Members for clicks arising from publishers (including the Special

27   Partners) who employ Banned Ad Implementations; and/or (viii) to apply the Smart

28   Pricing discount to all clicks from sites and properties other than google.com.

1      •      Whether Google falsely or deceptively represented it would (i) prohibit its

2 publishers (including its Special Partners) from running ads in connection with Banned

3 Ad Implementations; (ii) prevent clicks occurring in connection with Banned Ad

4 Implementations; (iii) monitor for clicks occurring in connection with Banned Ad

5 Implementations; (iv) filter clicks occurring in connection with Banned Ad

6 Implementations from its advertisers' accounts; (v) not charge its advertisers for clicks

7 occurring in connection with Banned Ad Implementations; (vi) refund all amounts

8 charged to Class Members for clicks occurring in connection with Banned Ad

9 Implementations; (vii) refund all amounts charged to Class Members for clicks arising

10 from publishers (including the Special Partners) who employ Banned Ad

11 Implementations; and/or (viii) apply the Smart Pricing discount to all clicks from sites

12 and properties other than google.com.

13      •      Whether, through the acts, omissions, and conduct alleged above, Google

14 violated its express or implied obligations to Class Members.

15      •      Whether, through the acts, omissions, and conduct alleged above, Google

16 violated California Business and Professions Code §17200, et seq. and §17500, et seq.

17      •      Whether Plaintiff and the Class have been damaged by the wrongs alleged

18 herein, and if so, the measure of those damages and the nature and extent of other relief

19 that should be afforded.

20      •      Whether Google should be enjoined from engaging in the misconduct and

21 unlawful practices alleged above.

22      237.      A class action is superior to all other available methods for the fair and efficient

23 adjudication of this controversy because joinder of all members is impracticable. Even if

24 individual Class Members had the resources to pursue individual litigation, it would be unduly

25 burdensome to the courts in which the individual litigation would proceed. Individual

26 litigation magnifies the delay and expense to all parties in the court system of resolving the

27 controversies engendered by Google's common course of conduct. The class action device

28 allows a single court to provide the benefits of unitary adjudication, judicial economy, and the

fair and equitable handling of all Class Members' claims in a single forum. The conduct of the action as a class action conserves resources of the parties and of the judicial system, and protects the rights of the Class Members. Furthermore, for many, if not most Class Members, a class action is the only feasible mechanism that allows them an opportunity for legal redress and justice. There will be no difficulty in the management of this action as a class action.

## VI.   TOLLING AND FRAUDULENT CONCEALMENT

238.   The applicable limitations period in this case has been tolled because Google: (a) concealed its misconduct such that Plaintiff and other Class Members could not discover the misconduct through the exercise of reasonable diligence; and (b) committed the misconduct pursuant to a conspiracy, the last act of which has not yet occurred.

239.   Plaintiff and the Class did not discover, and could not have discovered through the exercise of reasonable diligence, the existence of Google's conduct alleged herein until January 12, 2010 when an article appearing in *Forbes* detailed Google's willingness to ignore schemes run through its Special Partners – such as Infospace. *See* Andy Greenberg, "Google Faces The Slickest Click Fraud Yet," *Forbes* (Jan. 12, 2010) ("Those tangled arrangements…should lead Google to cut its ties with Infospace."). Additional details about Google's breaches surfaced on October 14, 2010, when Google first announced that it had not been applying Smart Pricing discounts to clicks from mobile devices. Prior to this time, neither Plaintiff nor any Class Member could have discovered the conduct alleged herein through the exercise of reasonable diligence.

240.   In fact, Google carefully concealed its unlawful conduct by, *inter alia*, executing its breaches in a manner that precluded their detection. For instance, the reports Google provided to Plaintiff and other Class Members did not contain any information revealing Google's misconduct. Indeed, Google concedes that its advertisers do not possess all relevant information and must exclusively rely on Google's "reporting statistics" to ensure advertisements are properly placed and priced. *See* Ad Traffic Quality Resource Center[144]

---

[144]     http://www.google.com/adwords/adtrafficquality/.

("Advertisers rely on the relevance of our ad placement, our reporting statistics, and the quality of the clicks their ads receive.").

241.    In short, a reasonable person under the circumstances would not have been alerted to investigate Google's misconduct until at least January 2010, when Google's relationship with Infospace was publicly exposed in *Forbes* – especially when Google affirmatively promises it will not engage in the misconduct made the subject of this Complaint.

242.    As a result of Google's fraudulent concealment, the running of any statute of limitations has been tolled with respect to the claims of Plaintiff and the Class.

243.    In addition to fraudulent concealment, the applicable limitations period is tolled because Google's misconduct was committed pursuant to a civil conspiracy as set forth above. Therefore, the limitations period does not begin to run until the completion of the last act of the conspiracy.   That last act in furtherance of the conspiracy has yet to occur because Google's conspiracy continues today.

## VII.    CAUSES OF ACTION

### COUNT I
### Breach of Contract

244.    Plaintiff hereby incorporates by reference all preceding paragraphs as if fully set forth herein.

245.    As set forth in Section IV(B) above, Google and all Class Members are or were parties to a uniform Agreement that governs their advertising relationship.

246.    The Agreement was drafted by Google and is uniform as to every Class Member.

247.    Pursuant to the Agreement, Google represented and promised that it would, *inter alia*, prohibit its publishers (including the Special Partners) from running ads in connection with Banned Ad Implementations, prevent clicks occurring in connection with Banned Ad Implementations, monitor for clicks occurring in connection with Banned Ad Implementations, filter clicks occurring in connection with Banned Ad Implementations, not charge Plaintiff and other Class Members for clicks occurring in connection with Banned Ad Implementations, and refund all amounts charged to Plaintiff and other Class Members for

clicks occurring in connection with Banned Ad Implementations as well as for all clicks arising from publishers (including the Special Partners) who employ Banned Ad Implementations. These are material terms of the Agreement.

248.    Additionally, pursuant to the Agreement, Google represented and promised that it would apply the Smart Pricing discount to all clicks, except those clicks made on google.com.  This is a material term of the Agreement.

249.    Plaintiffs and the Class performed all conditions, covenants, and promises required to be performed by Plaintiffs and the Class in accordance with the terms of the Agreement.

250.    As set forth in Section IV above, Google breached the Agreement by charging Plaintiff and the Class for invalid click activity occurring in connection with the use of Banned Ad Implementations.

251.    Additionally, as set forth in Section IV above, Google breached the Agreement by failing to apply Smart Pricing discounts to clicks charged to Plaintiff and the Class.

252.    Google's breach of the Agreement, and continued breach of the Agreement, has benefitted, and continues to benefit, Google.  Likewise, Google's breach of the Agreement, and continued breach of the Agreement, has damaged, and continues to damage, Plaintiff and the Class.

253.    Google's breach is the direct, proximate, and producing cause of damages to Plaintiff and the Class.

254.    Because of Google's breach of contract alleged herein, Plaintiff and the Class should be made whole for all amounts Google charged for clicks occurring in connection with Banned Ad Implementations and for all clicks originating from publishers (including Special Partners), where such publishers have used one or more Banned Ad Implementations.  Such amounts include both Google's share of the ad revenue generated from such clicks as well as the publisher's share.

255.     Further, because of Google's breach of contract alleged herein, Plaintiff and the Class should be made whole for all amounts that Google over charged them by failing to apply the promised Smart Pricing discount.

## COUNT II
### Breach of Implied Covenant of Good Faith and Fair Dealing

256.     Plaintiff hereby incorporates by reference all preceding paragraphs as if fully set forth herein.

257.     The Agreement includes the implied covenant of good faith and fair dealing.

258.     Pursuant to this implied covenant, Google has a duty not to commit acts that would improperly deprive Plaintiff and the Class of the intended benefits of the Agreement.

259.     A principal benefit for which Plaintiff and the Class contracted was to receive cost-effective, relevant, and targeted advertising that was optimized by Google's Smart Pricing discount and AdSense Program Policies.

260.     The implied covenant prohibits Google from engaging in a conspiracy with its Special Partners to allow them to utilize Banned Ad Implementations.

261.     Moreover, the implied covenant prohibits Google from exempting its Special Partners from the Smart Pricing discount.

262.     Finally, in the alternative to the breach of contract allegations set forth above, the implied covenant requires Google to prohibit its publishers (including the Special Partners) from running ads in connection with Banned Ad Implementations, prevent clicks occurring in connection with Banned Ad Implementations, monitor for clicks occurring in connection with Banned Ad Implementations, filter clicks occurring in connection with Banned Ad Implementations, not charge Plaintiff and other Class Members for clicks occurring in connection with Banned Ad Implementations, and refund all amounts charged to Plaintiff and other Class Members for clicks occurring in connection with Banned Ad Implementations as well as for all clicks arising from publishers (including its Special Partners) who employ Banned Ad Implementations.

263. Google, however, entered into partnerships and agreements with certain publishers—including the Special Partners—to allow these publishers exemptions from prohibitions against the use of Banned Ad Implementations and from the Smart Pricing discounts.

264. As a result of Google's agreements and partnerships with certain publishers, Plaintiff and the Class have suffered, and continue to suffer, economic losses and are entitled to recover these losses.

265. Google's breach of the implied covenant is the direct, proximate, and producing cause of damages to Plaintiff and the Class.

266. Because of Google's breach of the implied covenant, Plaintiff and the Class should be made whole for all amounts Google charged for clicks that occurred in connection with Banned Ad Implementations and for all clicks originating from publishers (including Special Partners), where such publishers have used one or more Banned Ad Implementations. Such amounts include both Google's share of the ad revenue generated from such clicks as well as the publisher's share.

267. Further, because of Google's breach of the implied covenant, Plaintiff and the Class should be made whole for all amounts that Google over charged them by failing to apply the promised Smart Pricing discount.

## COUNT III
### Violation of Cal. Bus. & Prof. Code §§ 17200 *et seq.*

268. Plaintiff hereby incorporates by reference all preceding paragraphs as if fully set forth herein.

269. Google's acts and business practices, as alleged herein, constitute unlawful, unfair, and fraudulent business practices in violation of California Business & Professions Code § 17200.

270. Plaintiff brings this cause of action on behalf of himself and the Class of similarly situated advertisers. Plaintiff has standing to pursue this claim as Plaintiff suffered

injury in fact, relied upon Google's representations, and lost money or property as a result of Google's actions.

271.   Prior to contracting with Google for advertising, Plaintiff reviewed and relied upon statements made by Google such as:

• Google would comply with all "Google and Partner policies" and "Google and partner ad specification requirements," which include, *inter alia*, the limitations on Banned Ad Implementations contained in the AdSense Program Policies.[145]

• Google's acceptance of a limited license from Plaintiff to "display" and "distribute" ads consistent with (*i.e.*, subject to) all "Google and Partner policies," which includes the limitations on Banned Ad Implementations contained in, *inter alia*, the AdSense Program Policies.[146]

• Google would not charge advertisers for invalid click activity, including click activity occurring in connection with Banned Ad Implementations.[147]

• Google's charges to advertisers would be based on "Google's measurements for the applicable Program," which requires, *inter alia*, Google to apply the applicable Smart Pricing discount.[148]

• Google's charges to advertisers would be in accordance with the AdWords "Program FAQ[s]," which requires, *inter alia*, Google to apply the applicable Smart Pricing discount.[149]

• Google's statement during the AdWords signup and ad creation processes that, when an advertiser selects the first radio button under the "Networks" heading, Google places ads on "all available *sites*." (emphasis added).

---

[145]   *See* Google, Inc. Advertising Program Terms (August 22, 2006), §1 (https://www.google.com/intl/en_us/adwords/select/TCUSbilling0806.html.)

[146]   *See id.* §4.

[147]   *See* Section IV(D).

[148]   *See* Google, Inc. Advertising Program Terms (August 22, 2006), §7 (https://www.google.com/intl/en_us/adwords/select/TCUSbilling0806.html).

[149]   *See* Google, Inc. Advertising Program Terms (August 22, 2006), §§2&7 (https://www.google.com/intl/en_us/adwords/select/TCUSbilling0806.html).

- Google's statement during the AdWords signup and ad creation processes that Google places ads on "Google and other search *sites*" and "*websites* that have partnered with Google."  *See* Figure 8 below (emphasis added).

**Figure 8**:  Image of AdWords signup screen with "?" selected for "Networks."



- Google's statement during the AdWords signup and ad creation processes that, with respect to mobile devices, Google will serve ads only to "those using Google *web search* on a mobile device with a full browser."  *See* Figure 9 (emphasis added).

**Figure 9**:  Image of AdWords signup screen with "?" selected for "Devices."



1
2

272.   As set forth above, Google breached each of the foregoing promises and representations.

3
4
5
6
7
8
9
10
11

273.   Based upon these promises and representations of Google, Plaintiff reasonably believed that account statements received from Google would reflect fees in a manner consistent with Google's stated policies.   Plaintiff relied on the accuracy of Google's account statement and remitted funds to Google throughout the Class Period.   Plaintiff's reliance on the accuracy of the accounting statements and other representations set forth above (i.e., by paying the assessed fees) was reasonable and fully consistent with Plaintiff's obligations under the Agreement.   Plaintiff had no decision to make when he received accounting statements from Google as he—like all Class members—was required to pay the amount demanded by the accounting statement or have the distribution of his ads suspended by Google for non-payment.

12
13
14
15
16
17
18

274.   Google's acts and business practices, as alleged herein, are unfair in violation of § 17200 because they offend established public policy and/or are immoral, unethical, oppressive, unscrupulous and/or substantially injurious to consumers in that consumers are not informed that Google charges for invalid click activity that occurs in connection with Banned Ad Implementations and does not apply Smart Pricing as represented.   Moreover, Google systematically breached its Agreement with Class Members.   Google's systematic breach of contract is unfair under § 17200.

19
20

275.   Google's acts and business practices, as alleged herein, are unlawful in violation of § 17200 because they constitute a breach of contract.

21
22
23
24
25

276.   Google's acts and business practices, as alleged herein, are fraudulent in violation of § 17200 because they are likely to deceive (or confuse) members of the public into believing that Google will apply Smart Pricing to all sites across Google's Network (except google.com) and that Google will not charge advertisers for invalid click activity occurring in connection with Banned Ad Implementations.

26
27
28

277.   Google's acts and business practices, as alleged herein, constitute false advertising in violation of § 17500 because they are likely to deceive members of the public into believing that Google will apply Smart Pricing to all sites across Google's Network and

that Google will not charge advertisers for invalid click activity occurring in connection with Banned Ad Implementations.

278. Despite representations to the contrary, Google failed to properly apply Smart Pricing, and Google charged advertisers for invalid click activity occurring in connection with Banned Ad Implementations.

279. Google's acts and business practices, as alleged herein, have caused injury to Plaintiff and the Class.

280. Google maintains its headquarters and principal places of operations in California. The unfair, unlawful, and fraudulent acts and business practices of Google, as set forth above, emanate from Google's California headquarters. Google's wrongful conduct originated from California, and therefore, Google is subject to § 17200.

281. Because Google violated California Business & Professions Code § 17200 et seq., Plaintiff and the Class should be made whole for all amounts Google charged for clicks displayed in connection with Banned Ad Implementations and for all clicks originating from publishers (including Special Partners), where such publishers have used one or more Banned Ad Implementations. Such amounts include both Google's share of the ad revenue generated from such clicks as well as the publisher's share.

282. Further, because Google violated California Business & Professions Code § 17200 et seq., Plaintiff and the Class should be made whole for all amounts that Google over charged them by failing to apply the promised Smart Pricing discount.

283. Plaintiff, on behalf of himself and the Class, seeks an order of this Court awarding restitution, disgorgement, injunctive relief, and all other relief allowed under § 17203.

**COUNT IV**
**Violation of Cal. Bus. & Prof. Code §§ 17500 *et seq.***

284. Plaintiff hereby incorporates by reference all preceding paragraphs as if fully set forth herein.

285. As detailed herein, Google engaged in untrue and misleading advertising in violation of California Business & Professions Code § 17500 *et seq.*

286.   Plaintiff brings this cause of action on behalf of himself and the Class of similarly situated advertisers.

287.   Google's advertisements and promotions have the capacity, likelihood and tendency to deceive or confuse the public into believing that the Company would act consistently with its statements identified in Count III (§ 17200 count).  In fact, as explained above, Plaintiff relied upon—and was deceived and confused by—these statements.  Based on these statements among others, Plaintiff opened his AdWords account and paid for advertising through that AdWords account.

288.   Google's advertisements in violation of California Business & Professions Code § 17500 are generally available to the public and are accessible through Google's website.

289.   Google's representations were false, misleading and deceptive as set forth more fully herein.  Contrary to Google's representations, the Company engaged in the unlawful conduct alleged herein with the intent to directly or indirectly induce the Plaintiff and the Class to retain Google's services in order to place advertisements.  Google's advertisements also induced Plaintiff and the Class to continue paying fees based on the improper conduct pled herein.

290.   At the time it made and disseminated the statements alleged herein, Google knew or should have known that the statements were untrue or misleading, and in violation of Business and Professions Code § 17500 *et seq.*

291.   Because of Google's violation of California Business & Professions Code § 17500 *et seq.*, Plaintiff and the Class should be made whole for all amounts Google charged for clicks displayed in connection with Banned Ad Implementations and for all clicks originating from publishers (including Special Partners), where such publishers have used one or more Banned Ad Implementations.  Such amounts include both Google's share of the ad revenue generated from such clicks as well as the publisher's share.

292.   Further, because of Google's violation of California Business & Professions Code § 17500 *et seq.*, Plaintiff and the Class should be made whole for all amounts that Google over charged them by failing to apply the promised Smart Pricing discount.

293.   Plaintiff seeks restitution and all other relief allowable under Business and Professions Code § 17500 *et seq.*

## VIII.   JURY DEMAND

294.   Plaintiff demands a trial by jury as to all issues so triable.

## IX.   PRAYER

FOR THE FOREGOING REASONS, Plaintiff, individually and on behalf of the Class, respectfully requests that the Court certify this action as a class action, with Plaintiff as class representative and the undersigned counsel as class counsel, and enter an order of judgment against Google in favor of the Class that, *inter alia*:

a)   declares that Google has breached its contractual obligations to Class Members;

b)   awards actual damages to Class Members to fully compensate them for losses sustained as a direct, proximate, and/or producing cause of Google's breaches and unlawful conduct;

c)   awards restitution and disgorgement of all monies Google derived from Class Members through the misconduct alleged above;

d)   awards pre-judgment and post-judgment interest at the maximum allowable rates;

e)   awards Plaintiff's reasonable attorneys' fees and costs;

f)   temporarily and permanently enjoins Google from engaging in the unlawful practices alleged herein; and

g)   orders any such other and further relief as the Court deems just and proper to correct the wrongs done unto the Class.

Dated: March 15, 2011

BARROWAY TOPAZ KESSLER MELTZER & CHECK, LLP

Ramzi Abadou
Stacey M. Kaplan
Erik D. Peterson
580 California Street, Suite 1750
San Francisco, CA 94104
Telephone: (415) 400-3000
Facsimile: (415) 400-3001

-and-

Sean M. Handler
Joseph H. Meltzer
Peter H. LeVan, Jr.

1

Naumon A. Amjed
Ryan T. Degnan

2

280 King of Prussia Road
Radnor, PA 19087

3

Telephone:  (610) 667-7706
Facsimile:  (610) 667-7056

4

**NIX, PATTERSON & ROACH, LLP**

5

Jeffrey J. Angelovich
Brad E. Seidel

6

3600 N. Capital of Texas Hwy, Bldg. B, Ste. 350
Austin, TX 78746

7

Telephone:  (512) 328-5333
Facsimile:  (512) 328-5335

8

9

*Counsel for Plaintiff and the Proposed Class*

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# EXHIBIT A

# Google Inc. Advertising Program Terms

These Google Inc. Advertising Program Terms ("**Terms**") are entered into by, as applicable, the customer signing these Terms or any document that references these Terms or that accepts these Terms electronically ("**Customer**") and Google Inc. ("**Google**"). These Terms govern Customer's participation in Google's advertising program(s) ("**Program**") and, as applicable, any insertion orders or service agreements ("**IO**") executed by and between the parties and/or Customer's online management of any advertising campaigns. These Terms and any applicable IO are collectively referred to as the "**Agreement**." Google and Customer hereby agree and acknowledge:

**1    Policies.** Program use is subject to all applicable Google and Partner policies, including without limitation the Editorial Guidelines (adwords.google.com/select/guidelines.html), Google Privacy Policy (www.google.com/privacy.html) and Trademark Guidelines (www.google.com/permissions/guidelines.html), and Google and Partner ad specification requirements (collectively, "**Policies**"). Policies may be modified at any time. Customer shall direct only to Google communications regarding Customer ads on Partner Properties. Some Program features are identified as "**Beta**," "**Ad Experiment**," or otherwise unsupported ("**Beta Features**"). To the fullest extent permitted by law, Beta Features are provided "**as is**" and at Customer's option and risk. Customer shall not disclose to any third party any information from Beta Features, existence of non-public Beta Features or access to Beta Features. Google may modify ads to comply with any Policies.

**2    The Program**. Customer is solely responsible for all: (a) ad targeting options and keywords (collectively "**Targets**") and all ad content, ad information, and ad URLs ("**Creative**"), whether generated by or for Customer; and (b) web sites, services and landing pages which Creative links or directs viewers to, and advertised services and products (collectively "**Services**"). Customer shall protect any Customer passwords and takes full responsibility for Customer's own, and third party, use of any Customer accounts. Customer understands and agrees that ads may be placed on (y) any content or property provided by Google ("**Google Property**"), and, unless Customer opts out of such placement in the manner specified by Google, (z) any other content or property provided by a third party ("**Partner**") upon which Google places ads ("**Partner Property**"). Customer authorizes and consents to all such placements. With respect to AdWords online auction-based advertising, Google may send Customer an email notifying Customer it has 72 hours ("**Modification Period**") to modify keywords and settings as posted. The account (as modified by Customer, or if not modified, as initially posted) is deemed approved by Customer in all respects after the Modification Period. Customer agrees that all placements of Customer's ads shall conclusively be deemed to have been approved by Customer unless Customer produces contemporaneous documentary evidence showing that Customer disapproved such placements in the manner specified by Google. With respect to all other advertising, Customer must provide Google with all relevant Creative by the due date set forth in that Program's applicable frequently asked questions at www.google.com ("**FAQ**") or as otherwise communicated by Google. Customer grants Google permission to utilize an automated software program to retrieve and analyze websites associated with the Services for ad quality and serving purposes, unless Customer specifically opts out of the evaluation in a manner specified by Google. Google may modify any of its Programs at any time without liability. Google also may modify these Terms at any time without liability, and Customer's use of the Program after notice that these Terms have changed constitutes Customer's acceptance of the new Terms. Google or Partners may reject or remove any ad or Target for any or no reason.

**3    Cancellation**. Customer may cancel advertising online through Customer's account if online cancellation functionality is available, or, if not available, with prior written notice to Google, including without limitation electronic mail. AdWords online auction-based advertising cancelled online will cease serving shortly after cancellation. The cancellation of all other advertising may be subject to Program policies or Google's ability to re-schedule reserved inventory or cancel ads already in production. Cancelled ads may be published despite cancellation if cancellation of those ads occurs after any applicable commitment date as set forth in advance by the Partner or Google, in which case Customer must pay for those ads. Google may cancel immediately any IO, any of its Programs, or these Terms at any time with notice, in which case Customer will be responsible for any ads already run. Sections 1, 2, 3, 5, 6, 7, 8, and 9 will survive any expiration or termination of this Agreement.

**4    Prohibited Uses; License Grant; Representations and Warranties.** Customer shall not, and shall not authorize any party to: (a) generate automated, fraudulent or otherwise invalid impressions, inquiries, conversions, clicks or other actions; (b) use any automated means or form of scraping or data extraction to access, query or otherwise collect Google advertising related information from any Program website or property except as expressly permitted by Google;

or (c) advertise anything illegal or engage in any illegal or fraudulent business practice. Customer represents and warrants that it holds and hereby grants Google and Partners all rights (including without limitation any copyright, trademark, patent, publicity or other rights) in Creative, Services and Targets needed for Google and Partner to operate Programs (including without limitation any rights needed to host, cache, route, transmit, store, copy, modify, distribute, perform, display, reformat, excerpt, analyze, and create algorithms from and derivative works of Creative or Targets) in connection with this Agreement (**"Use"**). Customer represents and warrants that (y) all Customer information is complete, correct and current; and (z) any Use hereunder and Customer's Creative, Targets, and Customer's Services will not violate or encourage violation of any applicable laws, regulations, code of conduct, or third party rights (including without limitation intellectual property rights). Violation of the foregoing may result in immediate termination of this Agreement or customer's account without notice and may subject Customer to legal penalties and consequences.

**5    Disclaimer and Limitation of Liability.** To the fullest extent permitted by law, GOOGLE DISCLAIMS ALL WARRANTIES, EXPRESS OR IMPLIED, INCLUDING WITHOUT LIMITATION FOR NONINFRINGEMENT, SATISFACTORY QUALITY, MERCHANTABILITY AND FITNESS FOR ANY PURPOSE. To the fullest extent permitted by law, Google disclaims all guarantees regarding positioning, levels, quality,  or timing of: (i) costs per click; (ii) click through rates; (iii) availability and delivery of any impressions, Creative, or Targets on any Partner Property, Google Property, or section thereof; (iv) clicks; (v) conversions or other results for any ads or Targets; (vi) the accuracy of Partner data (e.g. reach, size of audience, demographics or other purported characteristics of audience); and (vii) the adjacency or placement of ads within a Program. Customer understands that third parties may generate impressions or clicks on Customer's ads for prohibited or improper purposes, and Customer accepts the risk of any such impressions and clicks.  Customer's exclusive remedy, and Google's exclusive liability, for suspected invalid impressions or clicks is for Customer to make a claim for a refund in the form of advertising credits for Google Properties within the time period required under Section 7 below.  Any refunds for suspected invalid impressions or clicks are within Google's sole discretion.  EXCEPT FOR INDEMNIFICATION AMOUNTS PAYABLE TO THIRD PARTIES HEREUNDER AND CUSTOMER'S BREACHES OF SECTION 1, TO THE FULLEST EXTENT PERMITTED BY LAW: (a) NEITHER PARTY WILL BE LIABLE FOR ANY CONSEQUENTIAL, SPECIAL, INDIRECT, EXEMPLARY, OR PUNITIVE DAMAGES (INCLUDING WITHOUT LIMITATION LOSS OF PROFITS, REVENUE, INTEREST, GOODWILL, LOSS OR CORRUPTION OF DATA OR FOR ANY LOSS OR INTERRUPTION TO CUSTOMER'S BUSINESS) WHETHER IN CONTRACT, TORT (INCLUDING WITHOUT LIMITATION NEGLIGENCE) OR ANY OTHER LEGAL THEORY, EVEN IF ADVISED OF THE POSSIBILITY OF SUCH DAMAGES AND NOTWITHSTANDING ANY FAILURE OF ESSENTIAL PURPOSE OF ANY LIMITED REMEDY; AND (b) EACH PARTY'S AGGREGATE LIABILITY TO THE OTHER IS LIMITED TO AMOUNTS PAID OR PAYABLE TO GOOGLE BY CUSTOMER FOR THE AD GIVING RISE TO THE CLAIM. Except for payment obligations, neither party is liable for failure or delay resulting from a condition beyond the reasonable control of the party, including without limitation to acts of God, government, terrorism, natural disaster, labor conditions and power failures.

**6    Agency.** Customer represents and warrants that (a) it is authorized to act on behalf of and has bound to this Agreement any third party for which Customer advertises (a **"Principal"**), (b) as between Principal and Customer, the Principal owns any rights to Program information in connection with those ads, and (c) Customer shall not disclose Principal's Program information to any other party without Principal's consent.

**7    Payment.** Customer shall be responsible for all charges up to the amount of each IO, or as set in an online account, and shall pay all charges in U.S. Dollars or in such other currency as agreed to in writing by the parties. Unless agreed to by the parties in writing, Customer shall pay all charges in accordance with the payment terms in the applicable IO or Program FAQ.  Late payments bear interest at the rate of 1.5% per month (or the highest rate permitted by law, if less). Charges are exclusive of taxes. Customer is responsible for paying (y) all taxes, government charges, and (z) reasonable expenses and attorneys fees Google incurs collecting late amounts. To the fullest extent permitted by law, Customer waives all claims relating to charges (including without limitation any claims for charges based on suspected invalid clicks) unless claimed within 60 days after the charge (this does not affect Customer's credit card issuer rights). Charges are solely based on Google's measurements for the applicable Program, unless otherwise agreed to in writing. To the fullest extent permitted by law, refunds (if any) are at the discretion of Google and only in the form of advertising credit for only Google Properties. Nothing in these Terms or an IO may obligate Google to extend credit to any party.  Customer acknowledges and agrees that any credit card and related billing and payment information that Customer provides to Google may be shared by Google with companies who work on Google's behalf, such as payment processors and/or credit agencies, solely for the purposes of checking credit, effecting payment to Google and servicing Customer's account. Google may also provide information in response to valid legal process, such as subpoenas, search warrants and court orders, or to establish or exercise its legal rights or defend against legal

claims. Google shall not be liable for any use or disclosure of such information by such third parties.

**8    Indemnification.** Customer shall indemnify and defend Google, its Partners, agents, affiliates, and licensors from any third party claim or liability (collectively, **"Liabilities"**), arising out of Use, Customer's Program use, Targets, Creative and Services and breach of the Agreement.  Partners shall be deemed third party beneficiaries of the above Partner indemnity.

**9    Miscellaneous.** THE AGREEMENT MUST BE CONSTRUED AS IF BOTH PARTIES JOINTLY WROTE IT AND GOVERNED BY CALIFORNIA LAW EXCEPT FOR ITS CONFLICTS OF LAWS PRINCIPLES.  ALL CLAIMS ARISING OUT OF OR RELATING TO THIS AGREEMENT OR THE GOOGLE PROGRAM(S) SHALL BE LITIGATED EXCLUSIVELY IN THE FEDERAL  OR  STATE COURTS OF SANTA CLARA COUNTY, CALIFORNIA, USA, AND GOOGLE AND CUSTOMER CONSENT TO PERSONAL JURISDICTION IN THOSE COURTS. The Agreement constitutes the entire and exclusive agreement between the parties with respect to the subject matter hereof, and supersedes and replaces any other agreements, terms and conditions applicable to the subject matter hereof. No statements or promises have been relied upon in entering into this Agreement except as expressly set forth herein, and any conflicting or additional terms contained in any other documents (e.g. reference to a purchase order number) or oral discussions are void. Each party shall not disclose the terms or conditions of these Terms to any third party, except to its professional advisors under a strict duty of confidentiality or as necessary to comply with a government law, rule or regulation.  Customer may grant approvals, permissions, extensions and consents by email, but any modifications by Customer to the Agreement must be made in a writing executed by both parties. Any notices to Google must be sent to Google Inc., Advertising Programs, 1600 Amphitheatre Parkway, Mountain View, CA 94043, USA, with a copy to Legal Department, via confirmed facsimile, with a copy sent via first class or air mail or overnight courier, and are deemed given upon receipt. A waiver of any default is not a waiver of any subsequent default. Unenforceable provisions will be modified to reflect the parties' intention and only to the extent necessary to make them enforceable, and remaining provisions of the Agreement will remain in full effect. Customer may not assign any of its rights hereunder and any such attempt is void. Google and Customer and Google and Partners are not legal partners or agents, but are independent contractors.  In the event that these Terms or a Program expire or is terminated, Google shall not be obligated to return any materials to Customer. Notice to Customer may be effected by sending an email to the email address specified in Customer's account, or by posting a message to Customer's account interface, and is deemed received when sent (for email) or no more than 15 days after having been posted (for messages in Customer's AdWords interface).

*August 22, 2006*

JS 44 (Rev. 12/07) (CAND Rev 1/10)

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. (SEE INSTRUCTIONS ON PAGE TWO OF THE FORM.)

## I. (a) PLAINTIFFS
Rick Woods,
on behalf of himself and all others similarly situated

## DEFENDANTS
Google Inc.

(b) County of Residence of First Listed Plaintiff  Washington County, AR
(EXCEPT IN U.S. PLAINTIFF CASES)

County of Residence of First Listed Defendant    Santa Clara County, CA
(IN U.S. PLAINTIFF CASES ONLY)
NOTE:  IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE LAND INVOLVED.

(c) Attorney's (Firm Name, Address, and Telephone Number)
Ramzi Abadou
Barroway Topaz Kessler Meltzer & Check, LLP
580 California Street, Suite 1750
San Francisco, CA 94104
(415) 400-3000

Attorneys (If Known)

E-filing

## II. BASIS OF JURISDICTION (Place an "X" in One Box Only)

- [ ] 1 U.S. Government Plaintiff
- [ ] 2 U.S. Government Defendant
- [ ] 3 Federal Question (U.S. Government Not a Party)
- [X] 4 Diversity (Indicate Citizenship of Parties in Item III)

## III. CITIZENSHIP OF PRINCIPAL PARTIES (Place an "X" in One Box for Plaintiff and One Box for Defendant)
(For Diversity Cases Only)

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | [ ] 1 | [X] 1 | Incorporated or Principal Place of Business In This State | [ ] 4 | [X] 4 |
| Citizen of Another State | [X] 2 | [ ] 2 | Incorporated and Principal Place of Business In Another State | [ ] 5 | [ ] 5 |
| Citizen or Subject of a Foreign Country | [ ] 3 | [ ] 3 | Foreign Nation | [ ] 6 | [ ] 6 |

## IV. NATURE OF SUIT (Place an "X" in One Box Only)

### CONTRACT
- [ ] 110 Insurance
- [ ] 120 Marine
- [ ] 130 Miller Act
- [ ] 140 Negotiable Instrument
- [ ] 150 Recovery of Overpayment & Enforcement of Judgment
- [ ] 151 Medicare Act
- [ ] 152 Recovery of Defaulted Student Loans (Excl. Veterans)
- [ ] 153 Recovery of Overpayment of Veteran's Benefits
- [ ] 160 Stockholders' Suits
- [ ] 190 Other Contract
- [ ] 195 Contract Product Liability
- [ ] 196 Franchise

### REAL PROPERTY
- [ ] 210 Land Condemnation
- [ ] 220 Foreclosure
- [ ] 230 Rent Lease & Ejectment
- [ ] 240 Torts to Land
- [ ] 245 Tort Product Liability
- [ ] 290 All Other Real Property

### TORTS
**PERSONAL INJURY**
- [ ] 310 Airplane
- [ ] 315 Airplane Product Liability
- [ ] 320 Assault, Libel & Slander
- [ ] 330 Federal Employers' Liability
- [ ] 340 Marine
- [ ] 345 Marine Product Liability
- [ ] 350 Motor Vehicle
- [ ] 355 Motor Vehicle Product Liability
- [ ] 360 Other Personal Injury

**PERSONAL INJURY**
- [ ] 362 Personal Injury— Med. Malpractice
- [ ] 365 Personal Injury— Product Liability
- [ ] 368 Asbestos Personal Injury Product Liability

**PERSONAL PROPERTY**
- [ ] 370 Other Fraud
- [ ] 371 Truth in Lending
- [ ] 380 Other Personal Property Damage
- [ ] 385 Property Damage Product Liability

### CIVIL RIGHTS
- [ ] 441 Voting
- [ ] 442 Employment
- [ ] 443 Housing/ Accommodations
- [ ] 444 Welfare
- [ ] 445 Amer. w/Disabilities - Employment
- [ ] 446 Amer. w/Disabilities - Other
- [ ] 440 Other Civil Rights

### PRISONER PETITIONS
- [ ] 510 Motions to Vacate Sentence
  Habeas Corpus:
- [ ] 530 General
- [ ] 535 Death Penalty
- [ ] 540 Mandamus & Other
- [ ] 550 Civil Rights
- [ ] 555 Prison Condition

### FORFEITURE/PENALTY
- [ ] 610 Agriculture
- [ ] 620 Other Food & Drug
- [ ] 625 Drug Related Seizure of Property 21 USC 881
- [ ] 630 Liquor Laws
- [ ] 640 R.R. & Truck
- [ ] 650 Airline Regs.
- [ ] 660 Occupational Safety/Health
- [ ] 690 Other

### LABOR
- [ ] 710 Fair Labor Standards Act
- [ ] 720 Labor/Mgmt. Relations
- [ ] 730 Labor/Mgmt.Reporting & Disclosure Act
- [ ] 740 Railway Labor Act
- [ ] 790 Other Labor Litigation
- [ ] 791 Empl. Ret. Inc. Security Act

### IMMIGRATION
- [ ] 462 Naturalization Application
- [ ] 463 Habeas Corpus – Alien Detainee
- [ ] 465 Other Immigration Actions

### BANKRUPTCY
- [ ] 422 Appeal 28 USC 158
- [ ] 423 Withdrawal 28 USC 157

### PROPERTY RIGHTS
- [ ] 820 Copyrights
- [ ] 830 Patent
- [ ] 840 Trademark

### SOCIAL SECURITY
- [ ] 861 HIA (1395ff)
- [ ] 862 Black Lung (923)
- [ ] 863 DIWC/DIWW (405(g))
- [ ] 864 SSID Title XVI
- [ ] 865 RSI (405(g))

### FEDERAL TAX SUITS
- [ ] 870 Taxes (U.S. Plaintiff or Defendant)
- [ ] 871 IRS—Third Party 26 USC 7609

### OTHER STATUTES
- [ ] 400 State Reapportionment
- [ ] 410 Antitrust
- [ ] 430 Banks and Banking
- [ ] 450 Commerce
- [ ] 460 Deportation
- [ ] 470 Racketeer Influenced and Corrupt Organizations
- [ ] 480 Consumer Credit
- [ ] 490 Cable/Sat TV
- [ ] 810 Selective Service
- [ ] 850 Securities/Commodities/ Exchange
- [ ] 875 Customer Challenge 12 USC 3410
- [ ] 890 Other Statutory Actions
- [ ] 891 Agricultural Acts
- [ ] 892 Economic Stabilization Act
- [ ] 893 Environmental Matters
- [ ] 894 Energy Allocation Act
- [ ] 895 Freedom of Information Act
- [ ] 900 Appeal of Fee Determination Under Equal Access to Justice
- [ ] 950 Constitutionality of State Statutes

## V. ORIGIN (Place an "X" in One Box Only)
- [X] 1 Original Proceeding
- [ ] 2 Removed from State Court
- [ ] 3 Remanded from Appellate Court
- [ ] 4 Reinstated or Reopened
- [ ] 5 Transferred from another district (specify)
- [ ] 6 Multidistrict Litigation
- [ ] 7 Appeal to District Judge from Magistrate Judgment

## VI. CAUSE OF ACTION
Cite the U.S. Civil Statute under which you are filing (Do not cite jurisdictional statutes unless diversity):
28 U.S.C. §1332(d)(2) and 28 U.S.C. §1391
Brief description of cause:
Breach of contract, breach of good faith and fair dealing, and violation of Cal. Bus. & Prof. Code §§ 17200 & 17500.

## VII. REQUESTED IN COMPLAINT:
- [X] CHECK IF THIS IS A CLASS ACTION UNDER F.R.C.P. 23
- DEMAND $ Not less than $5M.
- CHECK YES only if demanded in complaint:
- JURY DEMAND: [X] Yes [ ] No

## VIII. RELATED CASE(S) IF ANY
PLEASE REFER TO CIVIL L.R. 3-12 CONCERNING REQUIREMENT TO FILE "NOTICE OF RELATED CASE".

## IX. DIVISIONAL ASSIGNMENT (CIVIL L.R. 3-2)
(PLACE AND "X" IN ONE BOX ONLY)
- [ ] SAN FRANCISCO/OAKLAND
- [X] SAN JOSE
- [ ] EUREKA

DATE
March 15, 2011

SIGNATURE OF ATTORNEY OF RECORD