1

2                                                              **E-Filed 8/10/2011**

3

4

5

6

7

8

9

10                    **IN THE UNITED STATES DISTRICT COURT**

11                 **FOR THE NORTHERN DISTRICT OF CALIFORNIA**

12                              **SAN JOSE DIVISION**

13

| | |
|---|---|
| RICK WOODS, Individually and On Behalf of All Others Similarly Situated,<br><br>                         Plaintiff,<br><br>            v.<br><br>GOOGLE INC.,<br><br>                         Defendant. | Case Number 05:11-cv-1263-JF<br><br>ORDER[1] GRANTING MOTION TO DISMISS WITH LEAVE TO AMEND<br><br>[Document No. 41] |

21         Plaintiff Rick Woods brings this putative class action on behalf of advertisers enrolled in

22 Google's AdWords program, alleging breach of contract; breach of the implied covenant of good

23 faith and fair dealing; violation of the California Unfair Competition Law (UCL), Cal. Bus. &

24 Prof. Code § 17200; and the California False Advertising Law (FAL), Cal. Bus. & Prof. Code

25 § 17500.  Google moves to dismiss Woods' complaint pursuant to Fed. R. Civ. P. 12(b)(6) for

26 failure to state a claim upon which relief may be granted.  The Court has considered the moving

27

28 _____

          [1]  This disposition is not designated for publication in the official reports.

1  and responding papers and the oral argument of counsel presented at the hearing on July 8, 2011.

2  For the reasons discussed below, the motion will be granted, with leave to amend.

3  **I.  BACKGROUND**

4  **A.     AdWords and AdSense**

5         Google offers two advertising products: AdWords and AdSense.  AdWords allows

6  advertisers to display advertisements on Google.com's search results pages and on the sites of

7  Google's third-party partners. ( Compl. ¶ 28.)  Advertisers pay each time their ad is "clicked."

8  AdSense allows third parties, known as publishers or partners, to provide advertising space on

9  their websites for AdWords advertisers.  (*Id.*)  These publishers receive a share of the revenue

10 Google receives for each click on an AdWords advertisement that appears on their websites.

11 (*Id.*)

12        Advertisers join the AdWords program online by clicking through and accepting the

13 Google Inc. Advertising Program Terms (Agreement).  (*Id.* ¶ 53-54, ex. A.)  The Agreement

14 states that it "constitutes the entire and exclusive agreement between the parties with respect to

15 the subject matter" thereof, and that "[n]o statements or promises have been relied upon in

16 entering into this Agreement except as expressly set forth" and "any conflicting or additional

17 terms contained in any other document . . . or oral discussions are void." (*Id.* ex. A § 9.)  It also

18 states that "[p]rogram use is subject to all applicable Google and Partner policies."  (*Id.* ex. A

19 § 1.)  Under the Agreement, advertisers agree that their ads "may be placed on . . . any content or

20 property provided by Google."  (*Id.* ex. A § 2.)  Advertisers also may choose to have their

21 advertisements placed the sites of Google's AdSense partners, and in doing so they agree that the

22 advertisements may be placed on "any other content or property provided by a third party

23 ("Partner") upon which Google places ads."  (*Id.*) The Agreement states expressly that the

24 advertiser "authorizes and consents to all such placements." (*Id.*)  It also provides that "[t]o the

25 fullest extent permitted by law, Google disclaims all guarantees regarding positioning, levels,

26 quality, or timing of" clicks and the adjacency or placement of ads within a program.  (*Id.* ex. A §

27 5.)

28

Case No. 5:11-cv-1263 JF
ORDER GRANTING MOTION TO DISMISS WITH LEAVE TO AMEND
(JFLC3)

1    **B.    Click Fraud and Invalid Clicks**

2         Because AdWords advertisers are charged by the click, Google maintains policies to

3    prevent "click fraud"–which it defines as clicks generated with malicious or fraudulent intent–by

4    not charging advertisers for what it has identified as "invalid clicks."  The "Google Ad Traffic

5    Quality Resource Center" defines "invalid clicks" as "clicks on AdWords ads that Google

6    suspects may constitute click fraud."[2]   The AdWords Help Center page entitled, "Invalid Clicks"

7    defines such events as "[c]licks that Google does not charge to your account because we

8    determine they were generated by prohibited methods."  (Degnan Decl., ex. 12.)  Google detects

9    invalid clicks through a combination of filters, offline analysis, and investigations prompted by

10   advertiser inquiries.  (Compl. ¶ 82; Resource Center.)  The "AdWords Help Center" indicates

11   that "[r]eal-time systems filter out activity fitting a profile of invalid behavior (such as repetitive

12   clicks)," and that "[c]licks and impressions from known sources of invalid activity are

13   automatically discarded."  (Degnan Decl., ex. 12.)

14        Section 5 of the Agreement states that the"[c]ustomer's exclusive remedy, and Google's

15   exclusive liability, for suspected invalid impressions or clicks is for [c]ustomer to make a claim

16   for a refund in the form of advertising credits."  (Compl. ex. A § 5.)  Section 7 of the Agreement

17   states that "[t]o the fullest extent permitted by law, Customer waives all claims relating to

18   charges (including without limitation any claim for charges based on suspected invalid clicks)

19   unless claimed within 60 days after the charge."  (*Id.* ex. A § 7.)

20        Separately, in its agreement with AdSense publishers, Google prohibits a variety of

21   advertisement implementations identified in AdSense Program Policies.  (Compl. ¶ 74.)  The

22   complaint labels these policies as Banned Ad Implementations.  (*Id.*)  Google also prohibits the

23   ──────────────────

24        [2]  The Google Ad Traffic Quality Resource Center, while not referenced as an exhibit, is
     mentioned repeatedly in the complaint.  (*See, e.g.*, Compl. ¶ 79-80.)  The page appears to contain
25   the fullest discussion of invalid clicks on one page.  Accordingly, the Court takes judicial notice
     of the statements on that URL: http://www.google.com/adwords/adtrafficquality/index.html ("Ad
26   Traffic Resource Center").  *See Branch v. Tunnell*, 14 F.3d 449, 454 (9th Cir. 1994), *overruled
     on other grounds by Galbraith v. County of Santa Clara*, 307 F.3d 1119, 1127 (9th Cir.  2002)
27   (holding that "documents whose contents are alleged in a complaint and whose authenticity no
     party questions, but which are not physically attached to the pleading, may be considered in
28   ruling on a Rule 12(b)(6) motion to dismiss").

Case No. 5:11-cv-1263 JF
ORDER GRANTING MOTION TO DISMISS WITH LEAVE TO AMEND
(JFLC3)

display of advertisements on pages containing pornography and other banned content.  The AdWords Help Center page entitled, "How does Google monitor invalid clicks form the Display Network?" states that Google's Click Quality Team "ensures that publishers found to be engaging in invalid activity have their AdSense accounts disabled and are not allowed further participation in the Google Network."  (Compl. ¶ 87.)

**C.     Smart Pricing**

The AdWords Help Center webpage entitled, "AdWords Costs and Payments" states that AdWords includes an automatic pricing discount feature called Smart Pricing, "a feature that automatically reduces the price advertisers pay for clicks if [Google's] data shows that a click from a Display Network page is less likely to result in a conversion."  (Degnan Decl. ex. 5; Compl. ¶ 94.)  According to the complaint, this means that Google promises to discount the cost of a click from particular websites based on the likelihood that a click from that site will "convert" to an actual business result.  (Compl. ¶ 49.)

**D.     "Special Partners"**

The complaint alleges that Google entered into secret agreements with certain AdSense publishers, which the complaint refers to as "Special Partners."  Allegedly, these agreements allow Special Partners to place advertisements in ways that are prohibited to other AdSense publishers, allowing them to generate what Woods contends are invalid clicks on the AdWords advertisements placed on those sites.  (Compl. ¶¶107-140.)  AdWords advertisers do not receive the same Smart Pricing discount on these sites that they would receive if their ads were placed on the sites of other publishers.

Woods, a practicing attorney, enrolled in the AdWords Program in September 2009.  As a part of his enrollment, he assented to the Agreement.  (Compl. ¶ 21.)  He filed the instant class action complaint March 17, 2011.

## II.  LEGAL STANDARD

A complaint may be dismissed for failure to state a claim upon which relief may be granted if a plaintiff fails to proffer "enough facts to state a claim to relief that is plausible on its face."  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).  Allegations of material fact must

4

1   be taken as true and construed in the light most favorable to the nonmoving party.  *Cahill v.*

2   *Liberty Mut. Ins. Co.*, 80 F.3d 336, 337-38 (9th Cir. 1997).  However, the Court need not accept

3   as true allegations that are conclusory, unwarranted deductions of fact, or unreasonable

4   inferences.  *See Sprewell v. Golden State Warriors,* 266 F.3d 979, 988 (9th Cir. 2001).  *See also*

5   *Twombly*, 550 U.S. at 561 ("a wholly conclusory statement of [a] claim" will not survive a

6   motion to dismiss).

7         On a motion to dismiss, the Court's review is limited to the face of the complaint and

8   matters judicially noticeable.  *MGIC Indem. Corp. v. Weisman*, 803 F.2d 500, 504 (9th Cir.

9   1986)*; N. Star Int'l v. Ariz. Corp. Comm'n*, 720 F.2d 578, 581 (9th Cir. 1983).  However, under

10  the "incorporation by reference" doctrine, the Court also may consider documents which are

11  referenced extensively in the complaint and which are accepted by all parties as authentic.  *In re*

12  *Silicon Graphics, Inc. Sec. Litig.*, 183 F.3d 970, 986 (9th Cir. 1999).

13        Finally, although their claims arise under state law, Plaintiffs' allegations are subject to

14  the Federal Rules of Civil Procedure.  *Kearns v. Ford Motor Co.*, 567 F.3d 1120, 1125 (9th Cir.

15  2009) (quoting *Vess v. Ciba-Geigy Corp. USA*, 317 F.3d 1097, 1102 (9th Cir. 2003)) ("[T]he

16  Federal Rules of Civil Procedure apply in federal court, 'irrespective of the source of the subject

17  matter jurisdiction, and irrespective of whether the substantive law at issue is state or federal.'").

18  Specifically, allegations sounding in fraud are subject to the heightened pleading requirements of

19  Fed. R. Civ. P. 9(b).  *See Ciba-Geigy*, 317 F.3d at 1103-04 (if "the claim is said to be 'grounded

20  in fraud' or to 'sound in fraud,' [then] the pleading of that claim as a whole must satisfy the

21  particularity requirement of Rule 9(b).");  *Kaplan v. Rose*, 49 F.3d 1363, 1370 (9th Cir.1994)

22  (claims based in fraud "must state precisely the time, place, and nature of the misleading

23  statements, misrepresentations, and specific acts of fraud.").

24                    **IV.  DISCUSSION**

25  **A.    Breach of contract**

26        Woods alleges that Google breached the parties' Agreement by failing to offer Smart

27  Pricing discounts for AdWords advertisers and by charging advertisers for invalid clicks

28  occurring in connection with what he claims are Banned Ad Implementations on the sites of

5

1    Google's Special Partners.

2         **1.**      **Invalid clicks**

3         In an action for breach of a written contract, a plaintiff must allege the specific provisions

4 in the contract creating the obligation the defendant is said to have breached. *Miron v. Hermalife*

5 *Int'l, Inc.*, 11 Fed. Appx. 927, 929 (9th Cir. 2001). Woods does not allege that the Agreement

6 itself contains language that obligates Google not to charge for particular clicks. Instead, he

7 claims that the Agreement incorporates language from the AdWords Help Center that allegedly

8 contains promises by Google. The complaint fails to explain adequately why this language

9 should be deemed to be incorporated into the Agreement. Moreover, even if the Court were to

10 assume that the statements were incorporated into the Agreement, Woods has not pled

11 adequately that the language created legal obligations that Google is alleged to have breached.

12        **a.**      **Whether Google's invalid click policy is incorporated into the Agreement**

13         "Under California law, a contract may validly incorporate the terms of another document.

14 The contract need not recite that it incorporates another document so long as it guides the reader

15 to the incorporated document." *Maersk-Sealand v. Eurocargo Express, LLC*, No. 20-cv-3230,

16 2004 U.S. Dist. LEXIS 13391, at *19 (C.D. Cal. Apr. 8, 2004) (quoting *Shaw v. Regents of*

17 *University of California*, 58 Cal. App. 4th 44, 45 (1997). "For the terms of another document to

18 be incorporated into the document executed by the parties the reference must be [1] clear and

19 unequivocal, the [2] reference must be called to the attention of the other party and he must

20 consent thereto, and [3] the terms of the incorporated document must be known or easily

21 available to the contracting parties." *Troyk v. Farmers Group, Inc.*, 171 Cal. App. 4th 1305,

22 1331 (2009). "[E]ach case must turn on its facts." *Id.*

23         Section 1 of the Agreement states, "[p]rogram use is subject to all applicable Google and

24 Partner policies, including without limitation the Editorial Guidelines [hyperlink], Google

25 Privacy Policy [hyperlink], and Trademark Guidelines [hyperlink], and Google and Partner ad

26 specification requirements." (*Id.* Ex. A § 1.) The hyperlink next to Editorial Guidelines leads to

27 an AdWords Help Center page entitled "Advertising Policies" that directs advertisers to "[p]lease

28 carefully review all the advertising policies described in these pages and make sure that [their]

Case No. 5:11-cv-1263 JF
ORDER GRANTING MOTION TO DISMISS WITH LEAVE TO AMEND
(JFLC3)

ads, keywords, website, and account comply." (Degnan Decl., ex. 11.)  On that page, under

"[a]dditional policies and terms," there is a link entitled "Invalid Clicks," which states that

invalid clicks are "[c]licks that Google does not charge to your account because we determine

they were generated by prohibited methods." (*Id.*)  It includes links to three other pages in the

AdWords Help Center including one entitled "How does Google respond to invalid click?"  (*Id.*)

This page states that clicks that Google determines to be invalid are filtered automatically from

advertiser's reports, and that Google "will apply the following policies for the protection of

AdWords advertisers:"

- •    If we find that invalid clicks have escaped automatic detection [the advertiser will] receive a credit for those clicks.
- •    Any advertiser or publisher participating in invalid click activity or any related offense is subject to legal prosecution. [Google] will also take the appropriate action on the related account.

(Degnan Decl. ex. 12.)  The same page in turn links to the Ad Traffic Quality Resource Center,

which describes Google's three-step process for detecting invalid clicks, including its proactive

measures and investigation of complaints by advertisers.  (Resource Center.)  The Agreement

itself indicates that an advertiser's "exclusive remedy" for suspected invalid clicks is for the

advertiser to make a claim for a refund within sixty days. (Compl. ex. A §§ 5,7.)

While the reference in the Agreement to incorporation of all applicable Google policies is

clear and unequivocal, it is not apparent that the terms of Google's invalid clicks policy in the

AdWords Help Center are "known or easily available to the contracting parties."  The complaint

refers to more than a dozen pages in both the AdWords Help Center and AdSense Help Center

that allegedly identify Google's obligations under the invalid clicks policy, including a video clip

and an expert report from another lawsuit, both of which are linked to the AdWords Help Center.

(*See* Compl. ¶¶ 77-93.)  The fact that statements about invalid clicks are spread across a variety

of pages in a variety of formats make it difficult to identify the terms of any actual and

unambiguous contractual obligations.  This stands in sharp contrast to other Google policies,

which include clear terms.  At least as they are described in the current complaint, the terms of

the invalid click policy are not articulated adequately to be deemed incorporated into the

Agreement.

7

1    Moreover, even if the Court were to consider Google's statements in the AdWords Help

2    Center as part of the Agreement, Woods has not shown that Google breached an actual promise.

3    Google defines "invalid clicks" as those "that [*Google*] suspects may constitute click fraud,"

4    (Resource Center), and states that it will not charge advertisers for clicks from sources that

5    *Google* has prohibited, (Degnan Decl. ex. 14.).  In addition, the "Google Ad Traffic Resource

6    Center" indicates that Google's policy with respect to invalid clicks includes both automated

7    filtering and responsive investigations based on advertisers' complaints, (*id.*), and the Agreement

8    itself indicates that an advertiser's "exclusive remedy" for suspected invalid clicks is for the

9    advertiser to make a claim for a refund within sixty days. (Compl. ex. A §§ 5, 7).

10   Woods has not alleged facts that would support a conclusion that Google acted beyond its

11   discretion in administering its invalid clicks policy.  Although the complaint alleges that Google

12   permitted its Special Partners to generate clicks in ways that were prohibited for other publishers,

13   it fails to explain why Google was obligated to consider these clicks invalid.  Nor has Woods

14   alleged adequately that the Agreement prohibited Google from excluding certain publishers from

15   policies it applies to others, or that it had an independent obligation to enforce its policies against

16   particular publishers.  The allegations themselves suggest that the ad placements at issue were

17   not prohibited by Google but in fact were *endorsed* by Google as part of the alleged conspiracy

18   between Google and its Special Partners.  Finally, Woods does not allege that he attempted to

19   seek a refund–as required by the Agreement–for charges relating to clicks he suspected were

20   invalid.

21   ## 2.    Smart Pricing discount

22   Woods also asserts that Google promised to apply its Smart Pricing discount to all

23   advertisements generated from its AdSense publishers.  As with invalid clicks, the complaint

24   does not allege that there is express language in the Agreement articulating such a promise;

25   rather, Woods claims that because the AdWords Help Center contains language to that effect,

26   such language is incorporated into the Agreement.  Woods argues that the Smart Pricing policy is

27   incorporated both through § 1, which states that program use is subject to all Google policies,

28   and through § 7, which states that customers shall pay all charges in accordance with "the

8

1    payment terms in the . . . Program FAQ."

2         Google's Smart Pricing discount is not listed on its "Advertising Policies" webpage, and

3    is not referred to as a "policy" within the AdWords Help Center.  Section 1 of the Agreement

4    refers to advertisers' *use* of the AdWords program, and the "Advertising Policies" page instructs

5    users to "review all of the advertising policies in these pages to make sure [their] ads, keywords,

6    website, and account comply."  Statements in the Help Center about the Smart Pricing discount,

7    which relate to Google's billing practices rather than advertisers' "use" of the program, are not

8    "clearly and unequivocally" incorporated into § 1.

9         Section 7 of the Agreement states that "[c]ustomer shall pay all charges in accordance

10   with the payment terms in the applicable IO [Insertion Order] or *Program FAQ*." (Compl. ex. A

11   (emphasis added).)  The same section also states that the advertiser "shall be responsible for all

12   charges . . . set in an online account," and that "charges are solely based on Google's

13   measurements for the applicable Program, unless otherwise agreed to in writing."  Woods

14   contends that because Google directs advertisers to the AdWords Help Center for frequently

15   asked questions, statements on those pages with respect to the charges for advertisements are

16   incorporated into the Agreement.  However, the AdWords Help Center page entitled "AdWords

17   Costs and Payments" is located in separate sections entitled, "AdWords costs," which describes

18   Google's charges for the program, and "AdWords Payments," which describes advertisers'

19   payment options such as prepay and post-pay.  (Degnan Decl. ex. 5.)  Google contends that the

20   reference to the "Program FAQ" is limited to statements about payment options and does not

21   extend to statements in the AdWords Help Center with respect to how Google calculates its

22   charges.  The fact that the Agreement addresses "charges" and "payment terms" separately

23   supports this reading.

24        Even if the Court were to conclude that the language in the AdWords Help Center with

25   respect to Smart Pricing discounts were incorporated into the Agreement, the complaint does not

26   allege adequately that Google undertook on an obligation to apply the discount in a particular

27   way to all advertisements.  The Agreement states unequivocally that charges are based solely on

28   Google's measurements unless otherwise agreed in writing, and that advertisers agree to waive

1    "all claims relating to charges . . . unless claimed within 60 days after the charge."

2    **B.    Breach of the implied covenant of good faith and fair dealing**

3        Google contends that Woods' claimed breach of California's implied covenant of good

4    faith and fair dealing is redundant to his breach of contract claim because it involves the same

5    conduct.  This appears to be an incorrect reading of the complaint, as Woods alleges that

6    irrespective of whether it breached its contractual obligations directly, Google sought to avoid its

7    obligations and deprive Woods and other advertisers of the benefits of the Agreement.  That said,

8    the complaint does not allege adequately that Google deprived Woods of a benefit to which he

9    was entitled under the Agreement.

10        Under California law, "there is implied in every contract a covenant by each party not to

11    do anything which will deprive the other parties thereto of the benefits of the contract."  *Harm v.*

12    *Frasher*, 181 Cal. App. 2d 405, 417 (Cal. Ct. App. 1960).  The "implied covenant of good faith

13    is read into contracts in order to protect the express covenants or promises in the contract, not to

14    protect some general public policy interest not directly tied to the contract's purpose."  *Schulken*

15    *v. Wash. Mut. Bank*, No. C. 09-02708 JW, 2009 U.S. Dist. LEXIS 114030, at *16 (N.D. Cal.

16    Nov. 9, 2009).  To state a claim for breach of the implied covenant, a plaintiff must show "that

17    the conduct of the defendant, whether or not it also constitutes a breach of a consensual contract

18    term, demonstrates a failure or refusal to discharge contractual responsibilities."  *Careau & Co.*

19    *v. Security Pacific Business Credit, Inc.*, 22 Cal. App. 3d 1371, 1395 (Cal. Ct. App. 1990).  "If

20    the allegations in a breach of implied covenant claim do not go beyond the statement of a mere

21    contract breach and, relying on the same alleged acts, simply seek the same damages or other

22    relief already claimed in a companion contract cause of action, they may be disregarded as

23    superfluous as no additional claim is actually stated."  *Malcolm v. JP Morgan Chase Bank, N.A.*,

24    No. 09-4496-JF, 2010 U.S. Dist. LEXIS 23770, at *7(N.D. Cal. Mar. 15, 2010) (quoting

25    *Schulken v. Wash. Mut. Bank*, No. C. 09-02708 JW, 2009 U.S. Dist. LEXIS 114030 (N.D. Cal.

26    Nov. 19, 2009)).

27        As the previous discussion makes clear, the Agreement gives Google wide latitude in

28    administering its AdWords program.  At the same time, such discretion is bounded by Google's

10

1   obligation to carry out its responsibilities in good faith.  Woods' allegations that Google entered

2   into secret agreements with its Special Partners to generate invalid clicks and failed to apply

3   discounts to particular ad placements are sufficient at the pleading stage to suggest bad faith.

4   However, Woods has failed to allege that Google undertook a specific duty that it failed

5   to discharge.  The complaint alleges that a "principal benefit" of the Agreement was that

6   advertisers would "receive cost-effective, relevant, and targeted advertising that was optimized

7   by Google's Smart Pricing discount and AdSense Program Policies."  Compl. ¶ 259.  As

8   discussed above, Woods has not shown that Google promised advertisers that it would not enter

9   into any agreements with publishers with terms that were different from those of the basic

10  AdSense Agreement or that Google had any independent obligation to enforce the AdSense

11  Agreement against publishers.  Similarly, Woods has not explained why Google's Smart Pricing

12  discount feature required it to provide particular discounts to each ad placements.

13  **C.    UCL and FAL claims**

14  The UCL prohibits any "unlawful, unfair or fraudulent business practices." Cal. Bus. &

15  Prof. Code § 17200, *see also Cel-Tech Commc'ns, Inc. v Los Angeles Cellular Tel. Co.*, 20 Cal.

16  4th 163, 180 (1999). Because the statute is written in the disjunctive, it applies separately to

17  business practices that are (1) unlawful, (2) unfair, or (3) fraudulent. *See Pastoria v. Nationwide*

18  *Ins.*, 112 Cal. App. 4th 1490, 1496 (2003). Woods contend that Google's conduct has violated all

19  three prongs.

20  **1.    Unlawful Business Practices**

21  "By proscribing 'any unlawful' business practice, [the UCL] 'borrows' violations of other

22  laws and treats them as unlawful practices that the unfair competition law makes independently

23  actionable." *Cel-Tech*, 20 Cal. 4th at 180.  The only unlawful activities alleged in the complaint

24  are Google's alleged breach of contract and breach of the implied covenant of good faith and fair

25  dealing.  Because Woods has not pled either of those claims adequately, he has failed to state a

26  claim under this prong of the UCL.

27  **2.    Unfair Business Practices**

28  "An act or practice is unfair if the consumer injury [1] is substantial, [2] is not

11

outweighed by any countervailing benefit to consumers or to competition, and [3] is not an injury the consumers themselves could reasonably have avoided." *Daugherty v. Am. Honda Motor Co.*, 144 Cal. App. 4th 824 (Cal. Ct. App. 2006). Plaintiffs must allege facts to support all three elements of a UCL unfair business practice claim. *Id.* Woods contends that Google's alleged practices of not applying Smart Pricing discounts as represented and charging for invalid clicks in connection with so-called Banned Ad Implementations are unfair.  He argues that advertisers reasonably could not have avoided incurring the injury caused by Google's alleged agreements with its Special Partners because the practices were undisclosed and the AdWords program does not allow advertisers to opt out selectively from having their advertisements displayed on Special Partners' websites.  Woods also alleges that there is no countervailing benefit to the practice. However, unless Woods can explain why he and other advertisers had a legal right to the Smart Pricing discounts on the ad placements at issue or not to be charged for clicks from so-called Banned Ad Implementations, he cannot show any cognizable injury.

### 3.  Fraudulent Business Practices and False Advertising

Google asserts that Woods' UCL and FAL claims premised on fraudulent misrepresentations are insufficient both because Woods lacks standing to raise them and because the complaint fails to satisfy the particularity requirements of Fed. R. Civ. P. 9(b).

### a.  Particularity requirements of Rule 9(b)

Rule 9(b) requires a plaintiff to be "specific enough to give defendants notice of the particular misconduct which is alleged to constitute the fraud charged so that they can defend against the charge and not just deny that they have done anything wrong." *Swartz v. KPMG LLP*, 476 F.3d 756, 764 (9th Cir. 2007) (internal quotation marks and citation omitted).  "In the context of a fraud suit involving multiple defendants, a plaintiff must, at a minimum, identify the role of each defendant in the alleged fraudulent scheme." *Swartz*, 476 F.3d  at 765 (internal quotation marks and citation omitted).  The plaintiff not only must set forth more than the neutral facts necessary to identify the transaction but also must explain why the statement or omission complained of was false or misleading. *In re GlenFed, Inc. Securities Litigation*, 42 F.3d 1541, 1548 (9th Cir. 1994).

1    The representations that Woods claims are fraudulent are included in a series of eight

2    bullet points in paragraph 271 of the complaint.  Six of the bullet points contain quotations from

3    the Agreement itself; the last two refer to images from the AdWords sign up screen.  Google

4    contends that Woods has not met Rule 9(b)'s requirement that he explain why the statements or

5    omissions are false and misleading.  The complaint states that based on Google's promises and

6    representations, Woods "reasonably believed that account statements received from Google

7    would reflect fees in a manner consistent with Google's stated policies," and concludes that

8    Google's business practices are fraudulent because they are "likely to deceive (or confuse)

9    members of the public into believing that Google will apply Smart Pricing to all sites across

10   Google's Network (except google.com) and that Google will not charge advertisers for invalid

11   click activity occurring in connection with Banned Ad Implementations."  (Compl. ¶ 273.)

12   To satisfy Rule 9(b), Woods must identify both the particular statements he claims are

13   fraudulent and why he claims that the statements are fraudulent.  Here, it appears that Woods

14   merely quotes language from the Agreement, along with two additional screenshots, and reasserts

15   his theory of breach of contract.  To the extent that Woods' claim of fraud is dependent on his

16   breach of contract claim, it is insufficient for the reasons described earlier.  To the extent that his

17   theory of fraud is distinguishable from his contract claim, Woods must explain with greater

18   particularity why the statements provide a basis for a claim of fraud.

19   **b.      Standing to assert UCL and FAL claims**

20   Google also contends that Woods has failed to establish standing for his

21   misrepresentation claims.  To establish standing as a class representative for a misrepresentation

22   claim under the UCL or FAL, a plaintiff must show he personally lost money or property because

23   of his own actual and reasonable reliance on the allegedly untrue or misleading statements.  *See*

24   *In re Tobacco II Cases*, 46 Cal. 4th 298, 326-28 (2009); *see also Kwikset Corp. v. Superior*

25   *Court*, 51 Cal. 4th 310, 326 N.9 (2011) (applying the same actual reliance standard to a FAL

26   claim).  Google contends that Woods cannot have actually or reasonably relied on any statements

27   outside the scope of the AdWords Agreement because the Agreement itself expressly states that

28   "[n]o statements or promises have been relied upon in entering into this Agreement except as

13

1   expressly set forth herein," and that "any conflicting or additional terms contained in any other

2   documents . . . are void." (Compl. ex. A § 9.)  Google contends that as a practicing attorney,

3   Woods was a sophisticated party in a position to understand that the Agreement into which he

4   was entering contained a no-reliance clause.

5          Woods argues that the language in the Agreement is insufficient to disclaim reliance on

6   extraneous statements, because Google uses the AdWords Help Center explain the AdWords

7   program to advertisers.  However, Woods does not explain how Google's use of the AdWords

8   Help Center to explain its program to advertisers prevented him from understanding the clear

9   language in the Agreement excluding any reliance on extraneous statements or promises.

10          Woods also notes that UCL liability may exist "where one of the parties to the contract

11   makes contradictory or misleading representations in order to obfuscate or obscure the actual

12   terms of the contract."  *In re Facebook PPC Adver. Litig*, No. 09-cv-03043, 2010 U.S. Dist.

13   LEXIS 136505, *18 (N.D. Cal. Dec. 15, 2010).  Woods argues that Google made misleading

14   statements designed induce reliance and obscure its own lack of obligations under the

15   Agreement.  However, the issue is whether "a reasonable jury could find" that Woods was

16   reasonable in relying upon the extraneous statements notwithstanding an unambiguous

17   disclaimer.  *See id.*  In light of Woods' sophistication as an attorney and the complaint's lack of

18   particularity with respect to the statements that were alleged to have induced his reliance, the

19   Court concludes that Woods has not alleged facts sufficient to support such a claim.

20                                          **V.  DISPOSITION**

21          The motion will be granted, with leave to amend.  Any amended complaint shall be filed

22   within thirty (30) days of the date of this order.[3]

23   IT IS SO ORDERED.

24

25   DATED: 8/10/2011

     JEREMY FOGEL
26   United States District Judge

27

─────────────────

28       [3]  Google's motion for a stay of discovery will be heard by the Court on August 12, 2011,
     and will be the subject of a separate order.