**KESSLER TOPAZ**
**MELTZER & CHECK, LLP**
Ramzi Abadou   (Bar No. 222567)
Stacey M. Kaplan  (Bar No. 241989)
Erik D. Peterson   (Bar No. 257098)
580 California Street, Suite 1750
San Francisco, CA 94104
Telephone: (415) 400-3000
Facsimile: (415) 400-3001
rabadou@ktmc.com
skaplan@ktmc.com
epeterson@ktmc.com

-and-

Sean M. Handler (*pro hac vice*)
Joseph H. Meltzer (*pro hac vice*)
Peter H. LeVan, Jr. (*pro hac vice*)
Naumon A. Amjed (*pro hac vice*)
Ryan T. Degnan (*pro hac vice*)
280 King of Prussia Road
Radnor, PA 19087
Telephone: (610) 667-7706
Facsimile: (610) 667-7056
shandler@ktmc.com
jmeltzer@ktmc.com
plevan@ktmc.com
namjed@ktmc.com
rdegnan@ktmc.com

**NIX, PATTERSON & ROACH, LLP**
Jeffrey J. Angelovich (*pro hac vice*)
Brad E. Seidel (*pro hac vice*)
3600 N. Capital of Texas Hwy, Bldg. B, Ste. 350
Austin, TX 78746
Telephone: (512) 328-5333
Facsimile: (512) 328-5335
jangelovich@npraustin.com
bradseidel@nixlawfirm.com

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
SAN JOSE DIVISION

| | |
|---|---|
| RICK WOODS, Individually and On Behalf of Others Similarly Situated,<br><br>                                  Plaintiff,<br><br>        v.<br><br>GOOGLE INC.,<br><br>                                  Defendant. | Case No. 11-cv-01263<br><br>**FIRST AMENDED**<br>**CLASS ACTION COMPLAINT**<br><br>DEMAND FOR JURY TRIAL |

# TABLE OF CONTENTS

I.    INTRODUCTION ...................................................................................... 1

II.   SUMMARY OF ACTION ......................................................................... 4

III.  PARTIES .................................................................................................. 5

IV.   JURISDICTION AND VENUE ................................................................ 5

V.    PART I – SMART PRICING ..................................................................... 6

    A.  FACTUAL BACKGROUND RELATING TO SMART
        PRICING ........................................................................................ 6

    B.  CLAIMS RELATING TO SMART PRICING ................................ 11

        COUNT I – Breach of Contract .................................................... 11

        COUNT II – Breach of the Implied Covenant of Good Faith
           and Fair Dealing ...................................................................... 13

        COUNT III – Violation of Cal. Bus. & Prof. Code §§17200 *et
           seq.* ......................................................................................... 15

        COUNT IV – Violation of Cal. Bus. & Prof. Code §§17500 *et
           seq.* ......................................................................................... 20

VI.   PART II – NON-COMPLIANT SITES ...................................................... 21

    A.  FACTUAL BACKGROUND RELATING TO NON-
        COMPLIANT SITES .................................................................... 21

    B.  CLAIMS RELATING TO NON-COMPLIANT SITES .................... 28

        COUNT V – Breach of Contract .................................................. 28

        COUNT VI – Breach of Implied Covenant of Good Faith and
           Fair Dealing ............................................................................ 30

        COUNT VII – Violation of Cal. Bus. & Prof. Code §§17200
           *et seq.* ..................................................................................... 31

        COUNT VIII – Violation of Cal. Bus. & Prof. Code §§17500
           *et seq.* ..................................................................................... 35

VII.  PART III – LOCATION TARGETING ...................................................... 36

---

FIRST AMENDED CLASS ACTION COMPLAINT
11-cv-01263-JF                                                                                                    -i-

A. FACTUAL BACKGROUND RELATING TO LOCATION TARGETING ...................................................................... 36

B. CLAIM RELATING TO LOCATION TARGETING.......................................... 38

COUNT IX - Violation of Cal. Bus. & Prof. Code §§17200 *et seq*.......................................................................................... 38

VIII.   CLASS ALLEGATIONS ................................................................ 41

IX.   DISCOVERY RULE, TOLLING, AND FRAUDULENT CONCEALMENT ................................................................... 43

X.   JURY DEMAND ............................................................................ 46

XI.   PRAYER ........................................................................................ 46

Plaintiff Rick Woods ("Woods" or "Plaintiff"), on behalf of himself and all others similarly situated, files this First Amended Class Action Complaint (the "Complaint") against Defendant Google Inc. ("Google" or "Defendant"). For his Complaint, Woods alleges as follows:

## I.      INTRODUCTION

1.      Google's AdWords Program ("AdWords") is a cost-per-click advertising program offered by Google to advertisers who wish to have Google display their ads on the Internet.[1] Through AdWords, advertisers pay only when an Internet user clicks on their ads.

2.      Participation in AdWords is governed by the Google Inc. Advertising Program Terms (the "Agreement").[2]

3.      During September 2009, Woods researched AdWords to determine whether to advertise his Fayetteville, Arkansas law practice through Google.

4.      Based on this research, Woods learned that Google promotes AdWords as an advertising program designed to provide cost-effective, targeted cost-per-click advertising on high quality websites.

5.      Specifically, through his research, Woods learned that Google promises to "Smart Price" *all* clicks on ads (described herein as "Smart Pricing"). According to Google, Smart Pricing is a feature that automatically reduces the price advertisers pay for clicks based on the likelihood the ad will result in a business result. Google explains that clicks are automatically discounted where Google's data shows the clicks are less likely to result in a conversion (*i.e.*, a business result) than clicks from google.com, which serves as the benchmark for Smart Pricing discounts. In other words, if the "conversion rate" for a particular website is lower than the "conversion rate" for google.com, Google automatically reduces the price of each click from that website according to the following formula:

---

[1] Google displays AdWords ads on google.com, certain other Google properties (*e.g.*, YouTube and Gmail), and websites and properties of third parties ("partners") who enroll in Google's AdSense Program ("AdSense"). For clicks on ads from AdSense partner properties, Google and its partners split the revenues generated from such clicks.

[2] *See* Exhibit A.

FIRST AMENDED CLASS ACTION COMPLAINT

Smart Pricing discount = Price of Click x (1 – Conversion Score)

Smart Pricing discounts are applicable to ads shown on all websites (other than google.com), including sites accessed through mobile devices.

6.    Woods' research also revealed Google's promise to apply "rigorous standards" to "all web sites" upon which Google places ads.  Google promises advertisers that ads will "appear only on high-quality sites and products."  According to Google, it places ads only on sites that comply with its rigorous standards, including the AdSense Program Policies that are designed to protect advertisers from accidental and meaningless clicks.[3]

7.    During his research, Woods also learned that he could limit the geographic distribution of his ads.  That is, Google promises to limit the distribution of ads to users located in the specific geographic location(s) selected by advertisers.  This was important to Woods because he wanted to limit his advertising to people located in and around the Fayetteville, Arkansas area—the people most likely to use his services.

8.    Based on this research, Woods opened an AdWords account.  Woods began advertising with Google and accepted (by "clicking through") the Agreement on September 30, 2009.  Woods continued advertising with Google until March 8, 2011, shortly after he learned that Google (a) had not Smart Priced his ads as promised, and (b) knowingly placed his ads on sites that Google exempted from its "rigorous standards" including the AdSense Program Policies.

9.    Indeed, Woods learned that he was overcharged as a result of Google's failure to Smart Price clicks arising from mobile devices.  Similarly, he learned that Google exempted certain of its partners (the "Special Partners") from Smart Pricing all together.[4]  He also learned that Google exempted these Special Partners from complying with Google's "rigorous

---

[3] In this Complaint, Woods refers to sites that do not comply with the AdSense Program Policies as "Non-Compliant Sites."

[4] On information and belief, Google's Special Partners include, among others, IAC/InterActiveCorp ("IAC"), InfoSpace, Inc. ("InfoSpace"), Value Click, Inc. ("Value Click"), Network Solutions LLC ("Network Solutions"), Peeplo.com, Conduit, and Xacti.  On information and belief, the Special Partners have agreements with Google whereby clicks from their websites are not Smart Priced and they are exempted from the AdSense Program Policies.

FIRST AMENDED CLASS ACTION COMPLAINT
11-cv-01263-JF                                                                           -2-

standards" and the AdSense Program Policies.   In short, Woods discovered that Google deprived him of the benefit of his bargain by cutting preferential secretive deals with Special Partners to Woods' detriment.   As a result, Google significantly overcharged Woods for worthless advertising and clicks, which had a value far less than the price Google charged for them.   Woods believes he has been overcharged by *at least* 35% during the course of his 17-month relationship with Google.   Woods believes discovery will demonstrate the actual amount he was overcharged is substantially higher.

10.   On March 15, 2011, Woods filed his original Class Action Complaint seeking to recover damages, restitution, and other relief relating to Google's breach of its obligations and deceptive misconduct.

11.   After filing his original Class Action Complaint, Woods discovered that Google had harmed him in an additional way.  Google had not limited the distribution of his ads to the geographic locations he selected as Google had represented it would do(discussed herein as "Location Targeting").   In his AdWords account, Woods selected to have his ads appear only to users located in Ft. Smith, Fayetteville, Springdale, and Rogers, Arkansas.  However, Woods recently discovered that he paid for clicks from users located in Scranton, Pennsylvania, Lubbock, Texas, and Kilgore, Texas.   These clicks also included a click originating *from a Japanese website*.  Compounding matters, Woods also discovered that Google lied about the geographic origin of these clicks.  In each case, Google informed Woods the clicks came from users in Ft. Smith, Fayetteville, Springdale, and Rogers, Arkansas.

## II.    SUMMARY OF ACTION

12.    Google consummated the prototypical bait and switch:

| Google's Representations "The Bait" | Reality "The Switch" |
|---|---|
| Google automatically applies Smart Pricing to *all* clicks on the Google Network, including clicks from mobile devices. | Google did not Smart Price clicks from mobile devices or clicks from its Special Partners' websites. |
| Google displays ads *only* on sites that comply with Google's rigorous standards – the AdSense Program Policies. | Google knowingly served and displayed ads on websites of its Special Partners and mobile publishers, both of whom Google exempted from such standards. |
| Google displays ads *only* to users located in the geographic location the advertiser selects. | Google displayed ads to users located far beyond advertisers' selected geographic location(s). |

13.    This conduct constitutes a breach of Google's Agreement, breach of the implied covenant of good faith and fair dealing, violation of California Business and Professions Code §§17200 *et seq.* ("UCL"), and violation of California Business and Professions Code §§17500 *et seq.* ("FAL").

14.    Woods brings this action seeking relief for Google's misconduct on behalf of himself and a class consisting of:

> All persons and entities located within the United States who advertised through Google's AdWords program and paid for clicks on their Google AdWords advertisement(s) at any time between and including April 1, 2004 and the day the Court certifies this action as a class action, where such clicks were not Smart Priced, originated from a mobile application or a Special Partner's website or property, or originated from a geographic location other than the location selected by the advertiser (the "Class"). Excluded from the Class are Google and its affiliates, officers, and directors. Also excluded from the Class are the members of the judiciary and their staff to whom this action is assigned.

15.    For himself and the Class, Woods seeks (a) a declaration that Google breached its contractual obligations to Class members, (b) actual damages to fully compensate for losses sustained as a direct, proximate, and/or producing cause of Google's breaches and unlawful

conduct, (c) restitution and disgorgement of all monies Google derived from Class members through the misconduct described herein, (d) pre-judgment and post-judgment interest, (e) attorneys' fees, (f) injunctive relief to ensure that the misconduct described herein finally ends, without the threat of it reoccurring in the future, and (g) any such other and further relief as the Court deems just and proper.

16.     Google's conduct with respect to Smart Pricing is addressed in Part I, Non-Compliant Sites is addressed in Part II, and Location Targeting is addressed in Part III of this Complaint.

## III.   PARTIES

17.     Plaintiff Woods is an individual who resides and operates a law practice in Fayetteville, Washington County, Arkansas. Woods began advertising through Google on or about September 30, 2009. Woods incurred losses and has been injured by the actions of Google described herein.

18.     Defendant Google is a Delaware corporation with its principal place of business located at 1600 Amphitheatre Parkway, Mountain View, California 94043. Google can be served with process through its registered agent, Corporation Service Company, which is located at 2730 Gateway Oaks Drive, Suite 100, Sacramento, CA 95833. Google has appeared in this action for all purposes. Additional service is not necessary.

## IV.   JURISDICTION AND VENUE

19.     The Court has jurisdiction over this action pursuant to 28 U.S.C. §1332(d)(2). If a class is certified in this action, the amount in controversy will exceed $5,000,000.00, exclusive of interest and costs, and this is a class action in which at least one member of the Class is a citizen of a state different from any defendant. Although Google is located in California, the principal injuries resulting from Google's conduct have been incurred throughout the United States where Class members are located. On information and belief, greater than two-thirds of the members of the proposed Class are citizens of states other than California.

20.     This Court has general jurisdiction over Google.  Google engages in continuous and systematic activities within the State of California.  Indeed, Google's headquarters are located in Mountain View, California, which is within the jurisdiction of this Court.

21.     Venue is proper in this District pursuant to 28 U.S.C. §1391.  Specifically, as provided by 28 U.S.C. §1391(c), Google is a corporation that is deemed to reside in this District.  Moreover, a substantial part of the events and omissions giving rise to the claims alleged herein occurred in this District.

## V.     PART I – SMART PRICING

### A.     FACTUAL BACKGROUND RELATING TO SMART PRICING

22.     Google states that Smart Pricing is an "*automatic* pricing discount feature"[5] that applies to the cost of *all* clicks on the Google Network, including both the Search Network and the Display Network.[6]

23.     According to Google, if a click on an ad from a website is less likely to result in a "conversion" than a click from google.com, Google *automatically reduces* the price of that click.  Google defines a conversion as a click resulting in an actual business result (e.g., online sale, registration, phone call, or newsletter sign-up).

24.     Google promotes Smart Pricing as having at least two primary benefits to advertisers.  *First*, Google represents to advertisers that Smart Pricing will increase their return on investment (ROI) of advertising dollars.[7]  Indeed, Google's Chief Economist describes

---

[5] *See* Exhibit B ("AdWords includes *two automatic pricing discount features*: Smart Pricing – a feature that *automatically reduces the price advertisers pay for clicks* if our data shows that a click from a Display Network page is less likely to result in a conversion…." (emphasis added)); *see also* Exhibits C-E; Google AdSense Smart Pricing   Video   featuring   Google's   Chief   Economist   Hal   Varian, http://www.youtube.com/watch?v=O1BaOMqcyQY (hereinafter, "Varian Video") ("What Smart Pricing does is allow our system to *auto-adjust the advertiser's bid* across the sites according to the likelihood the click will deliver actual business results.  An advertiser can then *confidently bid the maximum* they are willing to pay across all sites and *leave it to our system to take care of the rest*."(emphasis added)).

[6] The "Google Network" consists of two components:  the "Search Network" and the "Display Network."  The Search Network consists of websites, like www.google.com or www.aol.com, that contain a Google search box.  In contrast, the Display Network consists of websites that partner with Google (like www.mapquest.com and www.nytimes.com), specific Google properties (like YouTube and Gmail), and websites and search engines available on mobile devices with full Internet browsers.  According to Google, Smart Pricing applies to clicks on ads occurring on both the Search and Display Networks.

[7] *See* Exhibit C.

FIRST AMENDED CLASS ACTION COMPLAINT
11-cv-01263-JF                                                                                          -6-

Smart Pricing as a way to ensure that profitability and value are delivered to advertisers.[8]  And, Google tells advertisers that Smart Pricing "works all the time" to "*automatically reduce your cost*" of clicks and "*maximize your value.*"[9]

25.    *Second*, Google touts Smart Pricing as a way to alleviate burdens on advertisers and avoid "guesswork."[10]  Google actively encourages advertisers to "*confidently bid the maximum they are willing to pay*" across *all* websites and properties in the Google Network (in both the Search and Display Networks) and trust Google's Smart Pricing system to downwardly adjust the prices of clicks based on the likelihood that clicks from the website at issue will convert into a business result.[11]

26.    In other words, Google tells its advertisers not to worry about site-specific bidding (*i.e.*, setting specific bids for specific websites or properties) because Google will reduce the cost of the click based on the conversion score[12] of the website generating the click.

27.    Google measures and maintains conversion scores (also called conversion rates) for all websites and properties in the Google Network that display AdWords ads.

28.    Smart Pricing works as follows.  For clicks arising from websites having conversion scores less than google.com, Google discounts the price of all the clicks.  The total amount of the discount is equal to the price of that click multiplied by (1 minus the conversion score for the website or property originating the click).  The Smart Pricing formula is expressed as follows:

Smart Pricing discount = Price of Click x (1 – Conversion Score)

---

[8] *See* Varian Video, http://www.youtube.com/watch?v=O1BaOMqcyQY ("Smart Pricing helps to ensure that profitability and value is delivered to advertisers and they continue to spend on AdSense sites in the long run.").

[9] *See* Exhibit F.

[10] *See* Exhibit G ("As a result [of Smart Pricing], advertisers are saved the guesswork of estimating the value of clicks from different keywords or sites (content vs. search, for example) and adjusting their bids.").

[11] *See* Varian Video, http://www.youtube.com/watch?v=O1BaOMqcyQY.

[12] The conversion score is Google's measurement of the likelihood that clicks from a particular website will result in a business transaction.

29.     As set forth in Google's recent Court filings in *In re Google AdWords*, the conversion score for IAC websites and properties[13] is 0.9069.[14]  In other words, a click from an IAC website or property is, according to Google's data, only 90.69% as likely to convert as a click from google.com.  Thus, the Smart Pricing discount for clicks arising from IAC websites and properties is 9.31% as demonstrated below:

Step 1: Smart Pricing discount = Price of Click * (1 − Conversion Score)
Step 2: Smart Pricing discount = Price of Click * (1 − 0.9069)
Step 3: Smart Pricing discount = Price of Click * (0.0931)

30.     In those same Court filings, Google revealed that it has not Smart Priced any clicks on advertisements from IAC websites or properties.  Specifically, Google's litigation expert, Dr. Randolph E. Bucklin, concluded that one of the plaintiffs in that case was overcharged $37.88 for 51 clicks arising from Ask Jeeves (IAC) websites—none of which were Smart Priced.[15]  Dr. Bucklin's conclusion reveals that Google has not Smart Priced any clicks from IAC websites or properties.

31.     Statements of two Internet industry authorities in 2007 confirm Dr. Bucklin's conclusion that Google has not Smart Priced clicks from IAC websites and properties.  Frank Schilling, President and Founder of Name Administration, Inc. (a domain name management company), reported in 2007 that Google and IAC have a special agreement whereby Google does not Smart Price any ads served by IAC.[16]  Similarly, Donny Simonton, President of Parked.com, stated in 2007 that his company received Google ads through IAC that were not Smart Priced.[17]

---

[13] IAC/InterActiveCorp (IAC) operates ask.com (formerly known as Ask Jeeves).  The conversion score reported for ask.com applies to all IAC-operated websites and properties.

[14] *See* Rebuttal Expert Report of Randolph E. Bucklin dated Nov. 2, 2010, filed in *In re Google AdWords Litigation,* pending in the United States District Court for the Northern District of California, Case No. 5:08-cv-03369-EJD, Dkt. No. 281-2 at 32-33 and Exhibit 19 (filed May 13, 2011) (hereinafter, "Bucklin Rebuttal Report").

[15] *See* Bucklin Rebuttal Report at 32-33 and Exhibit 19.

[16] *See* http://domainnamesales.com/sevenmile/2007-10/pink-houses.

[17] *See* http://www.dnforum.f366/parked-better-than-sedo-3-thread-221221.html.

FIRST AMENDED CLASS ACTION COMPLAINT
11-cv-01263-JF                                                                          -8-

32.     Additionally, the following sampling of clicks from Woods' AdWords account conclusively establishes that Google failed to apply Smart Pricing to clicks from IAC:

| Date | IAC Site | Actual Charge to Woods | Maximum Charge to Woods if Google applied Smart Pricing discount |
|------|----------|------------------------|------------------------------------------------------------------|
| 10/29/10 | mywebsearch.com | $4.86 | $4.53 |
| 10/21/10 | ask.com | $4.90 | $4.53 |
| 10/9/10 | mywebsearch.com | $4.95 | $4.53 |
| 9/25/10 | mywebsearch.com | $4.95 | $4.53 |

33.     Had Google applied the promised Smart Pricing, it would have discounted the cost of each click by 9.31% according to Google's litigation expert, Dr. Bucklin. As applied to Woods, who set his *maximum bid price* for each click at $5.00, this discount would have amounted to $0.47 if his *maximum bid price* was charged ($5.00 * 0.0931). Thus, the *maximum* amount Woods could have been charged for a Smart Priced click arising from IAC websites is $4.53 ($5.00 – $0.47). Each of the clicks identified above exceed this amount, further demonstrating Google has not Smart Priced any clicks from IAC websites and properties.

34.     Google's failure to Smart Price clicks does not end with IAC.

35.     Indeed, Google failed to Smart Price clicks from mobile devices until the Third Quarter of 2010. This fact was first disclosed in Google's October 14, 2010 earnings call. During that call, Google's Senior Vice President for Product Management, Jonathan Rosenberg, revealed that Google had not been Smart Pricing clicks from mobile devices:

> This is Jonathan. Nikes [Arora] can maybe give you more of a customer base perspective. I think that some of you know we *recently started smart pricing* on the mobile devices and *it is the case that the CPCs on the mobile devices are a good bit lower*. It's primarily because there isn't the measurement--that there isn't that--there isn't as much of a consummation of a transaction on the mobile devices. People don't have their credit cards in them; it's harder to type into them. So, the mobile rates remain relatively lower.[18]

36.     Woods' billing records confirm that Google began Smart Pricing clicks from mobile devices on or about September 1, 2010. *See* ¶39, *infra*.

---

[18]*See* Google CEO Discusses Q3 2010 Results - Earnings Call Transcript (http://seekingalpha.com/article/230158-google-ceo-discusses-q3-2010-results-earnings-call-transcript?part=qanda) (emphasis added).

37.     Despite representations that it would apply Smart Pricing discounts to *all* clicks from the Search and Display Networks (including clicks from mobile devices), Google failed to Smart Price clicks as promised.

38.     Woods was injured as a result.

39.     For clicks arising from mobile devices alone, Woods paid 61% more than he should have paid had Google applied the promised Smart Pricing discounts.  As reflected in the following table, Woods' average cost per click (CPC) from mobile devices before Smart Pricing was $1.06 and after Smart Pricing was $0.41.

| Time Period | No. of Clicks | Total Cost | Avg. CPC |
|---|---|---|---|
| 9/1/09 to 8/31/10 | 464 | $489.88 | $1.06 |
| 9/1/10 to 3/15/11 | 3 | $1.24 | $0.41 |
| **Total** | **467** | **$491.12** | |

40.     The only plausible explanation for such a significant decrease in the average CPC for mobile devices (61%) after September 1, 2010 is Google's application of the promised Smart Pricing discount as described by Google's Senior Vice President.

41.     Similarly, as an additional example, Google failed to apply the promised Smart Pricing discount to the following clicks from IAC during the two months prior to Woods' filing of the original Complaint:

| Date | IAC Site | Charge to Woods | Smart Pricing Discount (9.31%) that Google should have applied |
|---|---|---|---|
| 2/22/11 | reference.com | $1.88 | $0.17 |
| 2/3/11 | reference.com | $2.20 | $0.20 |
| 1/25/11 | ask.com | $3.50 | $0.33 |
| 1/16/11 | ask.com | $3.26 | $0.30 |

42.     Google keeps conversion rates secret (with the exception of the one discussed recently by Dr. Bucklin).  On information and belief, Google failed to Smart Price clicks from other Special Partners and publishers in addition to IAC.  The Special Partners and additional publishers who were given special non-Smart Pricing deals include, without limitation, Peeplo.com, Conduit, InfoSpace, and Xacti.  These websites and, in general, the websites of all Special Partners, convert at rates lower than google.com because, unlike google.com, they utilize ad implementations which generate accidental and meaningless clicks, such as using

clickable backgrounds and ad only pages.  Accordingly, Google should have Smart Priced all charges for clicks arising from these websites.  Woods believes clicks from these publishers were not Smart Priced because he was charged $5.00 (his *maximum bid* price) for clicks arising from their websites.[19]

43.   The above-described clicks are examples from Woods' account that demonstrate how he was injured by Google's failure to apply the promised Smart Pricing. These clicks should not be construed as the universe of all clicks in his account that were not Smart Priced, as Woods continues to review his account without the benefit of discovery from Google.

### B.   CLAIMS RELATING TO SMART PRICING

### COUNT I – Breach of Contract

### (Failure to Smart Price)

44.   Woods hereby incorporates by reference all paragraphs of this Complaint as if fully set forth herein.

45.   Woods brings this cause of action on behalf of himself and the Class.

46.   Google and all Class members are or were parties to an Agreement that governs their AdWords advertising relationship.

47.   The Agreement was drafted by Google and is uniform as to every Class member.[20]

48.   In Section 7 of the Agreement, Google expressly agrees that "[c]harges are solely based on Google's *measurements* for the applicable Program, *unless otherwise agreed to in writing.*"[21]

---

[19] These $5.00 clicks occurred on September 26, 2010 (Peeplo.com), October 1, 2010 (Conduit), February 18, 2011 (InfoSpace/swagbucks.com), and March 6, 2011 (Xacti/inbox.com).

[20] Google presents the Agreement to advertisers at the end of the AdWords sign-up and ad creation process. Advertisers have no ability to modify the terms of the Agreement.  Advertisers have no bargaining power thereby resulting in a one-sided (in Google's favor) agreement.  Woods had no other alternative but to agree to the terms of the Agreement.  The Agreement is a contract of adhesion.

[21] *See* Exhibit A (emphasis added).

49.     Smart Pricing is one of the *measurements* Google uses to calculate charges for clicks.   Indeed, Google represents that "AdWords includes [an] automatic pricing discount feature[]:  Smart pricing – a feature that *automatically reduces* the price advertisers pay for clicks *if our data shows* that a click from a Display Network Page is *less likely to result in a conversion*."[22]

50.     Thus, pursuant to the Agreement, Google had a legal obligation to apply the Smart Pricing discount (its "measurement" of the value of the click) to all clicks that are less likely to result in a conversion than clicks from google.com.  This is a material term of the Agreement.

51.     To the extent Google disputes this meaning of "measurement," extrinsic evidence demonstrates the Agreement is reasonably susceptible to Woods' reading.[23]  Further, discovery as to the meaning of "measurement" would be appropriate under such circumstances.

52.     Even if the Smart Pricing formula were not a "measurement," Google has "otherwise agreed in writing" to apply Smart Pricing to all clicks in the Google Network as conclusively demonstrated in Exhibits B through F.[24]

53.     When Smart Pricing is not applied, Google ignores its "measurements" and, as a result, artificially inflates the price of clicks.  In other words, Google does not price "solely based on Google's measurements" when it fails to Smart Price.  This constitutes a breach of contract.

54.     Woods and the Class performed all conditions, covenants, and promises required to be performed by Woods and the Class in accordance with the terms of the Agreement.

55.     As set forth above, Google breached the Agreement by not applying Smart Pricing discounts to clicks charged to Woods and the Class.

---

[22] *See* Exhibit B (emphasis added); *see also* Exhibits C-F.

[23] *See, e.g.,* Exhibit B-F.

[24] *See e.g.* E, Exhibit F ("There are two ways Google *automatically reduces your costs*: the AdWords Discounter and *Smart Pricing*.").

56.     Google's breach is the direct, proximate, and producing cause of damages to Woods and the Class.

57.     Because of Google's breach of contract alleged herein, Woods and the Class should be made whole for all amounts Google overcharged them by failing to apply the promised, and contracted-for, Smart Pricing discount.

**COUNT II – Breach of the Implied Covenant of Good Faith and Fair Dealing**

**(Failure to Smart Price – Pled in the Alternative)**

58.     Woods hereby incorporates by reference all paragraphs of this Complaint as if fully set forth herein.

59.     Woods brings this cause of action on behalf of himself and the Class.

60.     Woods brings this Count for Breach of the Implied Covenant of Good Faith and Fair Dealing in the alternative to Count I.

61.     The Agreement includes the implied covenant of good faith and fair dealing.

62.     Pursuant to this implied covenant, Google has a duty not to commit acts that would improperly deprive Woods and the Class of the intended benefits of the Agreement.

63.     The principal benefit and purpose for which Woods and the Class contracted was cost-effective, relevant, and targeted cost-per-click advertising.  As it relates to this Count, Woods and the Class specifically contracted for the benefit of being charged for clicks based on the value of those clicks to an advertiser.  As explained above, Smart Pricing is "Google's measurement" of the value of clicks to an advertiser.  The implied covenant imposes a duty on Google to apply these measurements in good faith.

64.     Google acted in bad faith and contrary to fair dealing by failing to apply its Smart Pricing measurements to clicks appearing in the accounts of Woods and the Class.  This resulted in Woods and the Class being charged more for clicks than Google's own data revealed the clicks were worth.  That is, Google charged Woods and the Class an inflated price for clicks that Google knew had a lesser value.  Google knew the value of these clicks because it measures and maintains conversion scores for all websites and properties displaying

FIRST AMENDED CLASS ACTION COMPLAINT

11-cv-01263-JF                                                                                                        -13-

AdWords ads.  Google's conduct deprived Woods and the Class of one of the intended benefits of the Agreement—being charged for clicks based on the value of the click to an advertiser.

65.     Additionally, the implied covenant prohibits Google from selectively applying Smart Pricing to certain websites and properties while exempting others from Smart Pricing. Google cannot, consistent with the implied covenant of good faith and fair dealing, refuse to apply Smart Pricing to clicks from mobile devices, clicks from IAC websites, and clicks from other Special Partners' websites and properties because Google knows such clicks are of lower click quality and less likely than google.com to result in a conversion.  Google has frustrated the rights of Woods and the Class members by entering into secretive, preferential deals with Special Partners.   These furtive deals resulted in Woods and the Class members being overcharged for clicks that were not Smart Priced while allowing Google and its Special Partners each to unfairly pocket such overcharges.

66.     Moreover, even if the Agreement does not contain an express pricing term requiring the application of Smart Pricing, which Woods believes it does, California law requires Google to set charges consistent with its duty of good faith and fair dealing.  This requires Google to set objectively reasonable prices.  Smart Pricing is the objectively reasonable price, given that Google represented to advertisers that Smart Pricing is Google's measurement of the value of clicks.

67.     By not applying Smart Pricing to clicks from certain websites and mobile devices, Google is disregarding its "measurements" to determine the charges for such clicks resulting in artificially inflated charges.  Certainly, by disregarding Smart Pricing (Google's measurement of the value of clicks), Google is not applying an objectively reasonable price.

68.     Compounding matters, Google is the sole actor in the "ad auction"—the process of determining which ads will be displayed on websites and at what prices.  Google is given complete discretion to determine the charges per click and complete discretion to apply the advertiser's *maximum bid price*.  Thus, advertisers, like Woods and the Class, depend solely on Google to deal with them fairly and honestly.  Google betrayed this trust, acted in bad faith,

and did not deal fairly or honestly with Woods and the Class by knowingly charging them more for clicks than they were worth.

69.     The foregoing facts constitute a violation of the covenant of good faith and fair dealing.

70.     As a result of such conduct, Woods and the Class have been deprived of the intended benefits of the Agreement (cost-effective cost-per-click advertisements based on the value of clicks) and have suffered, and continue to suffer, economic losses.

71.     Google's breach of the implied covenant is the direct, proximate, and producing cause of damages to Woods and the Class.

72.     Because of Google's breach of the implied covenant, Woods and the Class should be made whole for all amounts Google overcharged them by not applying the promised Smart Pricing discount.

**COUNT III – Violation of Cal. Bus. & Prof. Code §§17200 *et seq*.**

**(Failure to Smart Price)**

73.     Woods hereby incorporates by reference all paragraphs of this Complaint as if fully set forth herein.

74.     Google's acts and business practices, as alleged herein, constitute unlawful, unfair, and fraudulent business practices in violation of California Business & Professions Code §§17200 *et seq*.

75.     Woods brings this cause of action on behalf of himself and the Class of similarly situated advertisers.  Woods has standing to pursue this claim as Woods has suffered injury in fact, relied upon Google's deceptive representations, and lost money or property as a result of Google's actions and/or inactions.

76.     Prior to contracting with Google to join the AdWords program, Woods reviewed and relied upon statements issued by Google to advertise and explain the AdWords program.  Specifically, Woods reviewed and reasonably relied upon, without limitation, the following statements:

FIRST AMENDED CLASS ACTION COMPLAINT

- "*AdWords includes two automatic pricing discount features*: Smart Pricing – a feature that *automatically reduces the price advertisers pay for clicks* if our data shows that a click from a Display Network page is less likely to result in a conversion."[25]

- "There are two ways Google *automatically reduces your costs*:  the AdWords Discounter and Smart Pricing."[26]

- "'Smart Pricing' *works all the time to adjust your bids when you advertise keyword-targeted* ads on the Google Network.  *Y*ou set your CPC bid, and if your click is less *likely to turn into a conversion, such as a sale or signup, Google automatically reduces your bid for that page*."[27]

- "Using smart pricing, AdWords *automatically adjusts the cost of clicks* for keyword-targeted ads that appear on content network pages.  While you set one CPC bid, *if our data shows that a click from a content page is less likely to turn into actionable business results—such as online sales, registrations, phone calls, or newsletter signups—we reduce that price you pay for that click*."[28]

- "Smart pricing adjustments are automatically reflected in the Average CPC column in your account."[29]

- By charging you less per click, Smart Pricing helps "*you maximize your value*."[30]

- "Less likely to convert … *Google reduces price*."[31]

- "Google *keeps your costs down* with … Smart Pricing."[32]

All of the foregoing statements appeared in Google's AdWords Help Center website and were reviewed by Woods prior to Woods advertising with Google.

77.     Similarly, Woods reviewed and reasonably relied upon Google's representation in the Agreement that "*charges are solely based on Google's measurements* for the applicable Program, unless otherwise agreed to in writing."[33]     Woods understood "Google's measurements" upon which charges were based to include the Smart Pricing discount.  Woods also understood from reviewing the information described in Paragraph 76 that Google "agreed … in writing" to apply Smart Pricing to all clicks.

---

[25] *See, e.g.*, Exhibit B (emphasis added).

[26] *See* Exhibit F (emphasis added).  Exhibit F is a presentation appearing on Google's website that Woods reviewed and relied upon.  It contains audio and "presenter notes."  Each pertinent screen of the presentation is displayed in Exhibit F, along with the text of the pertinent audio and "presenter notes."

[27] *See* Exhibit F (emphasis added).

[28] *See* Exhibit F (emphasis added).

[29] *See* Exhibit F (emphasis added).

[30] *See* Exhibit F (emphasis added).

[31] *See* Exhibit F (emphasis added).

[32] *See* Exhibit F (emphasis added).

[33] *See* Exhibit A (emphasis added).

FIRST AMENDED CLASS ACTION COMPLAINT
11-cv-01263-JF                                                                                                    -16-

78.     Woods reviewed and reasonably relied upon the foregoing statements in September 2009 prior to choosing to advertise with Google, opening his AdWords account, advertising through the AdWords program, and paying for advertising as charged by Google. The foregoing statements induced Woods to advertise with Google.  Had Woods known these statements were not true, he would not have advertised with Google.

79.     In fact, prior to September 2009, Woods had a limited presence on the Internet through Yahoo!'s Local Listings.  In September 2009, Woods decided to expand his Internet presence.  He researched both Google and Yahoo! to determine which Internet advertising service would best serve his needs.  While researching Google in September 2009, Woods reviewed the statements set forth above.  He determined from these statements that Google offered cost-effective, cost-per-click advertising because Google promised to discount the costs of his clicks based on their value—*i.e.,* their likelihood to convert into actual business results. Thus, Woods selected Google as his Internet advertising agent and opened his AdWords account, relying upon—and being deceived and confused by—Google's foregoing statements.

80.     Woods also relied upon each of the foregoing statements in another way.  In reliance on these statements, Woods increased his Internet advertising budget from approximately $8 per month to over $150 per month ($5 per day).  Reasonably relying upon— and being deceived and confused by—Google's foregoing statements, Woods chose to spend approximately an additional $150 per month on Internet advertising with Google.

81.     Given that Google promised Smart Pricing was "automatic" and was "reflected in the Average CPC column in your account,"[34] Woods also reasonably believed that the account statements he received from Google would reflect fees in a manner consistent with Google's stated promise to Smart Price.  Woods remitted funds to Google during the Class Period based on such reasonable reliance, deception, and confusion.  Had Google disclosed the truth (*i.e.*, revealed in its account statements that Smart Pricing was not applied), Woods would not have paid for non-Smart Priced ads.

---

[34] *See* Exhibit F.

FIRST AMENDED CLASS ACTION COMPLAINT
11-cv-01263-JF                                                                    -17-

82.     The statements upon which Woods relied appeared in Google's AdWords Help Center website—the very place Google expects its advertisers to turn for information about the AdWords Program.  Woods' reliance on such representations was reasonable, as confirmed by Google's statements in *In re AdWords* where Google argued to Judge Davila that the plaintiffs (each AdWords advertisers and at least one of whom is an attorney) could not "ignore the[] disclosures" contained in the "AdWords Help Center (the Google web pages specifically targeted at advertisers to explain the AdWords program)."[35]

83.     The foregoing statements were also accessible during the AdWords sign-up process and ad creation process.  Google made these statements to Woods in an effort to induce his enrollment in AdWords, induce his creation of ads, and induce his payment of ad charges.  Moreover, Google continues to make these representations today on its website (the AdWords Help Center) and in Woods' online AdWords account.  Additionally, Woods received emails after his enrollment in AdWords directing him to the AdWords Help Center for answers to any of his questions.  Woods' reliance on such statements was unquestionably reasonable.

84.     Google's representations were fraudulent in violation of §17200 because they were likely to deceive advertisers into believing that Google would apply Smart Pricing to *all* clicks that were less likely to convert than clicks from google.com.  Moreover, Google failed to disclose throughout the Class Period to advertisers, including Woods and the Class, that:

- Google would overcharge Woods and the Class for clicks from mobile devices, clicks from IAC websites, and clicks from other websites and properties (including those of the Special Partners who had secretive, preferential deals with Google exempting them from Smart Pricing).

- Google would not apply its "measurements" to all charges appearing in Woods and the Class' AdWords accounts.  Specifically, Google failed to disclose that it would not apply its Smart Pricing measurement to all clicks on Woods and the Class' ads.

- Google exempted certain websites and properties (including those of its Special Partners) from Smart Pricing.

- Google would artificially inflate charges—by not using its "measurements"—from certain websites and properties (including those of its Special Partners) displaying Woods and the Class' ads.

---

[35] *See* Defendant Google Inc.'s Opposition to Plaintiffs' Motion for Class Certification Pursuant to F.R.C.P. Rule 23 filed in *In re Google AdWords Litigation*, in the United States District Court for the Northern District of California, Case No. 5:08-cv-03369, Dkt. No. 272 at 7 (filed May 12, 2011).

These were material omissions that, if disclosed, would have caused Woods to not advertise (or quit advertising) with Google.

85.     Contrary to its representations, Google failed to properly apply Smart Pricing and did not apply Smart Pricing to all sites across the Google Network.[36]

86.     As a result of Google's fraudulent conduct, Woods and the Class expended money on advertising with Google that they otherwise would not have spent had Google not made these misrepresentations and omissions.

87.     Google's acts and business practices, as alleged herein, are also unfair in violation of §17200 because they offend established public policy and/or are immoral, unethical, oppressive, unscrupulous and/or are substantially injurious to consumers.  There is no countervailing benefit of these acts and practices to consumers or competition.  These acts and practices caused injuries that Woods and the Class members could not have reasonably avoided because they were not informed that Google does not apply Smart Pricing as represented.

88.     Moreover, Google systematically breached its Agreement with Woods and other Class Members.  *See* ¶¶44-57.  Google's systematic breach of contract and breach of the implied covenant of good faith and fair dealing is unfair under §17200.

89.     Google's breach of contract is also unlawful in violation of §17200.

90.     Google's breach of the implied covenant of good faith and fair dealing is also unlawful in violation of §17200.

91.     Google's acts and business practices, as alleged herein, have caused injury to Woods and the Class.

---

[36] Google breached its legal obligations set forth in Paragraph 48-50 above.  Specifically, Google overcharged Woods by 61% for clicks arising from mobile devices.  *See* ¶¶39-40.  Google also overcharged Woods approximately 10% for clicks arising from IAC websites.  *See* ¶41.  Likewise, Google did not apply Smart Pricing to the $5.00 clicks and other clicks arising from its Special Partner websites.  *See* ¶¶32 & 42.  These overcharges resulted from Google's failure to apply Smart Pricing as it was legally obligated to do under the Agreement.

92. Google maintains its headquarters and principal place of operations in California. The unfair, unlawful, and fraudulent conduct detailed herein emanates from Google's California headquarters. As such, Google is subject to §17200.

93. Because Google violated California Business & Professions Code §§17200 *et seq.*, Woods and the Class should be made whole for all amounts that Google overcharged them by failing to apply the promised Smart Pricing discount.

94. Woods, on behalf of himself and the Class, seeks an order of this Court awarding restitution, disgorgement, injunctive relief, and all other relief allowed under §17200.

**COUNT IV – Violation of Cal. Bus. & Prof. Code §§17500 *et seq*.**

**(Failure to Smart Price)**

95. Woods hereby incorporates by reference all paragraphs of this Complaint as if fully set forth herein.

96. As detailed herein, Google engaged in untrue and misleading advertising in violation of California Business & Professions Code §§17500 *et seq*.

97. Woods brings this cause of action on behalf of himself and the Class of similarly situated advertisers.

98. Google's advertisements and promotions have the capacity, likelihood and tendency to deceive or confuse the public into believing Google would act consistently with its statements identified in Count III.

99. In fact, as explained above, Woods reasonably relied upon—and was deceived and confused by—Google's statements. Based on these statements, among others, Woods opened his AdWords account, advertised with Google, and paid for such advertising.

100. Google's marketing and advertising materials were generally available to the public on Google's AdWords website throughout the Class Period.

101. Google's marketing and advertising materials were false, misleading, and deceptive, in that consumers were not informed that Google does not apply Smart Pricing to all clicks that are less likely to convert than a click from google.com.

102.   At the time Google made and disseminated the marketing and advertising materials alleged herein, Google knew or should have known that the statements were untrue or misleading, and thus in violation of §17500.

103.   Because of Google's violation of California Business & Professions Code §§17500 *et seq.*, Woods and the Class should be made whole for all amounts Google overcharged them by failing to apply the promised Smart Pricing discount.

104.   Woods, on behalf of himself and the Class, seeks an order of this Court awarding restitution, disgorgement, injunctive relief, and all other relief allowed under §17500.

## VI.   PART II – NON-COMPLIANT SITES

### A.   FACTUAL BACKGROUND RELATING TO NON-COMPLIANT SITES

105.   Google represents to AdWords advertisers that "*[a]ll web sites and products are reviewed and monitored according to Google's rigorous standards*, so as the network grows, *your AdWords ads will continue to appear only on high-quality sites and products*."  Google publishes a number of statements on its website explaining that the rigorous standards applied to all publishers' sites are the AdSense Program Policies.[37]

106.   The Agreement also requires Google to apply Google and Partner policies—including the AdSense Program Polices—in connection with an advertiser's use of the AdWords program.  Specifically, the Agreement states that:

> Program use is subject to *all applicable Google and Partner policies*, including without limitation the Editorial Guidelines [hyperlink], Google Privacy Policy [hyperlink] and Trademark Guidelines [hyperlink], and Google and Partner ad specification requirements (collectively, "Policies"). (emphasis added)[38]

---

[37] *See, e.g.,* What is the Google Network? – http://adwords.google.com/support/aw/bin/answer.py?hl=en&answer=6104 ("All participating sites must adhere to the Google AdSense policies" and "Participating websites must adhere to Google AdSense standards"); Exhibit H ("Publishers participating in the AdSense program are required to adhere to the following policies, so please read them carefully.  If you fail to comply with these policies we reserve the right to disable ad serving to your site and/or disable your AdSense account at any time.").

[38] *See* Exhibit A.

107.   According to Google, the AdSense Program Policies mandate how and where Google's publishers may display AdWords ads.  The AdSense Program Policies prohibit certain conduct such as the display of ads in connection with incentivized searching, tool bars, mobile applications, and clickable backgrounds.[39]

108.   The AdSense Program Policies are designed to protect Google's advertisers from accidental or meaningless clicks and relate directly to how an AdWords ad is displayed. Thus, the AdSense Program Policies occupy a central and material role in Google's Agreements with advertisers.

109.   Indeed, Google recently admitted in its answer in *In re AdWords* that it requires all sites in the Google Network "to comply with Google's AdSense Program Policies."[40]

110.   Google recognizes that its advertisers rely on Google to protect them. According to Google:

> The relationship between Google and AdWords advertisers is built on trust. *Advertisers rely on the relevance of our ad placement*, our reporting statistics, *and the quality of the clicks their ads receive*.  We take this trust seriously, and we know that AdWords couldn't exist without it.[41]

111.   Under the AdSense Program Policies, publishers are prohibited from utilizing the following ad implementations, among others, to display AdWords ads:

- Incentivized Searching – "Publishers may not ask others to click their ads [by] offering compensation to users for viewing ads or performing searches[.]"
- Tool Bars – "Google ads, search boxes or search results may not be … [i]ntegrated into a software application of any kind, including toolbars."
- Ads on Mobile Applications – "AdSense code may not be placed in inappropriate places such as … software."  Moreover, "Google ads, search boxes or search results may not be … [i]ntegrated into a software application of any kind[.]"  This prohibition extends to mobile applications.
- Clickable Backgrounds – Google expressly prohibits Publishers from "[f]ormat[ing] site content so that it is difficult to distinguish it from ads."  Publishers may not display ads

---

[39] *See* Exhibit H.

[40] *See* Defendant Google Inc.'s Answer to Plaintiffs' Third Amended Complaint, and Separate Affirmative Defenses, filed in *In re Google AdWords Litigation*, in the United States District Court for the Northern District of California, Case No. 5:08-cv-03369, Dkt. No. 238 at ¶¶69 & 70 (filed March 31, 2011).

[41] *See* Ad Traffic Quality Resource Center - http://www.google.com/adwords/adtrafficquality/index.html.

that have clickable backgrounds – *i.e.*, ads where a user may click on the white space behind and around the ad text.[42]

112.     According to Google, it will not serve ads to websites when it detects a publisher is not complying with the AdSense Program Policies because non-compliance results in accidental and meaningless clicks for which an advertiser should not pay.[43]

113.     Notwithstanding these obligations and representations, Google secretly entered into preferential agreements with its Special Partners whereby the Special Partners were expressly or implicitly exempted from compliance with the AdSense Program Policies. Google then knowingly served (i.e. distributed) ads to such Special Partners for display on their Non-Compliant Sites.  Google also knowingly served ads to mobile publishers in violation of the AdSense Program Policies.  Clearly, these acts of Google fall short of any "rigorous" standard.  All such acts were done without the knowledge of Google's advertisers, including Woods, and were in violation of the express terms of the Agreement.

114.     By affirmatively allowing Special Partners and mobile publishers to display ads in a manner inconsistent with and expressly prohibited by the AdSense Program Policies, advertisers' ads are displayed on websites that do not comport with the rigorous standards which Google touts as necessary to ensure that "AdWords ads will continue to appear only on high-quality sites and products."  As a result, advertisers pay for accidental and meaningless clicks that are worth less than what Google charged for them.

115.     Additionally, through its scheme with its Special Partners, Google secretly inflates the number of paying clicks by displaying ads on websites and properties that do not

---

[42] *See* Exhibit H; *see also* Why can't I click the background of ads anymore? - http://www.google.com/adsense/support/bin/answer.py?hl=en&answer=80390 (stating that removing the clickable background feature of ads would "significantly reduce accidental clicks" and "increase advertiser campaign value and satisfaction by ensuring advertisers only pay for meaningful clicks");   Accidental clicks fade into the background - http://adsense.blogspot.com/2007/11/accidental-clicks-fade-into-background.html (stating that, by removing the clickable background feature, Google "aim[s] to decrease accidental clicks, better aligning visitor behavior with their intent … the format change … further ensur[es] advertisers pay only for meaningful clicks").

[43] *See* How do you make sure there are no inappropriate websites in the Google Network? - http://adwords.google.com/support/aw/bin/answer.py?hl=en&answer=9566 ("If our system detects content that violates our policies, no ads will be served to that page.").

comply with the AdSense Program Policies—ad displays that, if disclosed, would not have been approved by its AdWords advertisers such as Woods and the Class.

116. Google's active participation in this scheme is evident from the contracts it has executed with its Special Partners.

117. For example, Google's contract with Special Partner InfoSpace expressly permits the use of an InfoSpace tool bar to generate ads.[44] This agreement also contemplates ads being served in connection with other InfoSpace software applications.[45] To avoid exposure of their scheme, Google and InfoSpace expressly agreed that no Google brand features would be displayed in connection with the InfoSpace tool bar or the results generated by the tool bar search.[46]

118. As explained above, the use of tool bars and other software to generate ads is expressly prohibited by the AdSense Program Policies.

119. Google's participation in this scheme is further illustrated by its creation of a system whereby Google conceals Special Partners' non-compliance with the AdSense Program Policies.

120. Specifically, Google hides the identity of several of its Special Partners in the advertisers' online search query report (for the Search Network), through references to "anonymous.google" in placement reports (for the Display Network), and by preventing the transmission of referrer information to its advertisers' servers. Through these actions, Google's advertisers are unable to readily identify the Special Partners and their websites from which the clicks originated.

---

[44] *See* Exhibit I, Amended and Restated Google Inc. Services Agreement, dated October 1, 2005, by and between InfoSpace Sales LLC and Google, Inc. §1.4.2 ("…is permitted to display Search and/or Advertising Results on a Results Page generated by Customer's *toolbar* Client Application …" (emphasis added)).

[45] *See* Exhibit I, §2.6 ("Customer's Client Application(s) set forth on the cover page(s) of the Order Form are hereby approved by Google for purposes of sending Queries for Search Services and/or AdSense Services …"); *id.* at Ex. B, §1.2 ("…in the case of Applications that access Google's WebSearch and/or AdSense for Search Services …").

[46] *See* Exhibit I, §1.4.2 ("…acknowledges and agrees that at no time shall any Google Brand Features be displayed in or on the [*] Toolbar or on any Results Page generated by the [*] Toolbar without Google's prior written consent.").

FIRST AMENDED CLASS ACTION COMPLAINT
11-cv-01263-JF                                                                    -24-

121.   <u>Incentivized Searching</u>: Google's AdSense Program Policies prohibit publishers from "ask[ing] others to click their ads [by] offering compensation to users for viewing ads or performing searches."[47]

122.   This prohibition exists for the benefit and protection of advertisers.

123.   Despite the unequivocal prohibition on incentivized searching, Google knowingly serves ads to its Special Partners who display ads on sites offering compensation in exchange for performing searches and clicking on ads.   For example, Special Partner IAC places Google ads on iWon.com, a "search and win" website which permits its users to sign up to "Search to Win."[48]

124.   In another example, Special Partner InfoSpace distributes Google ads to a series of at least 115 "search and win" websites, including http://searchwithwillienelson.prodege.com ("Win SwagBucks and redeem them"), http://searchwithgodsmack.swagbucks.com ("Use Search with Godsmack. Earn Swag Bucks. Redeem Swag Bucks for Prizes"), http://searchwithkanyewest.prodege.com ("Every time you search the web you have a chance to win Swag Bucks … that can be redeemed for prizes.").

125.   These incentivized searching websites encourage users to use their sites by promising compensation and/or rewards for searching and clicking on their sites.

126.   Woods' online account statements reflect one or more charges for clicks on ads occurring in connection with Special Partners' incentivized searching websites.  For example, on February 18, 2011, Woods was charged $5.00 (his *maximum* bid price) for a click from ozzsearch.swagbucks.com.  Google's billing statements did not reveal the origin of the click. However, Woods determined from his server's log files that the click came from swagbucks.com, a notorious incentivized searching website.   All of the sites operated by swagbucks.com are incentivized search programs of which Google is aware and to which Special Partner InfoSpace distributes ads.

---

[47] *See* Exhibit H.

[48] *See* iWon.com Official Rules - http://www.iwon.com/modules/pages/support/officialrules.jhtml

FIRST AMENDED CLASS ACTION COMPLAINT
11-cv-01263-JF                                                                                    -25-

127.   Google breached its representations and obligation to Woods and other Google advertisers by exempting Special Partners from the AdSense Program Policies which prohibited the use of incentivized searching by publishers displaying AdWords ads and serving ads to such Special Partners.

128.   <u>Tool Bars</u>: Google's AdSense Program Policies prohibit publishers from "[d]isplay[ing] Google ads, search boxes or search results as a result of the actions of software applications such as tool bars."[49]

129.   This prohibition exists for the benefit and protection of advertisers.

130.   Despite the unequivocal prohibition on tool bars, Google knowingly serves ads to its Special Partners who use tool bars to display such ads.

131.   Woods' online account statements reflect one or more charges for clicks on ads occurring in connection with Special Partners' use of tool bars to display ads.  For instance, on October 29, 2010, Woods was charged $4.86 for a click on his ad occurring in connection with a tool bar search for the term "video clips of Dale Earnhardt crash."  While not disclosed by Google, Woods has determined from his log file that this charge arose in connection with one of IAC's toolbar applications called FunWebProducts.

132.   Google breached its representations and obligation to Woods and other Google advertisers by exempting Special Partners from the AdSense Program Policies which prohibited the use of tool bars by publishers displaying AdWords ads and by serving ads to such Special Partners.

133.   <u>Mobile Applications</u>: Google's AdSense Program Policies provide that "Google ads, search boxes or search results may not be … [i]ntegrated into a software application of any kind[.]"[50]  This prohibition extends to software such as mobile applications.

134.   This prohibition exists for the benefit and protection of advertisers.

---

[49]   *See* Exhibit H; *see also* Can I put Google ads in a software application? - http://www.google.com/adsense/support/bin/answer.py?answer=113064 ("Currently, we don't permit Google ads or AdSense for search boxes to be distributed through software applications including, but not limited to toolbars, browser extensions, and desktop applications.").

[50]   *See* Exhibit H.

135.    Despite the unequivocal prohibition on displaying ads in mobile applications, Google knowingly serves ads to mobile applications.

136.    Woods' online account statements reflect one or more charges for clicks on ads occurring in connection with mobile applications.  For example, Woods has been billed for numerous clicks occurring in connection with "adsenseformobileapps.com" and "nextmobileweb.com."  Both billing entries relate to charges for AdWords ads served on mobile applications.

137.    In fact, from September 24, 2009 to March 15, 2011, 467 clicks out of the 787 total clicks billed to Woods arose from mobile applications.  These clicks resulting from mobile applications cost Woods $491.12.

138.    Clearly, Google breached its representations and obligation to Woods and other Google advertisers by knowingly serving ads to mobile applications.

139.    <u>Clickable Backgrounds</u>: Google's AdSense Program Policies prohibit publishers from "[f]ormat[ting] site content so that it is difficult to distinguish it from ads" including displaying ads in connection with clickable backgrounds.[51]

140.    This prohibition exists for the benefit and protection of advertisers.

141.    Despite the unequivocal prohibition on displaying ads in connection with clickable backgrounds, Google knowingly serves ads to its Special Partners who display such ads in connection with clickable backgrounds.

142.    Woods' online account statements reflect numerous charges for clicks on ads occurring in connection with Special Partners' use of clickable backgrounds.  For example, the October 29, 2010 click discussed in Paragraph 131 occurred in connection with a Special Partner website utilizing clickable backgrounds.  This is just one of many examples of clicks arising from Google's complicity with Special Partners implementing clickable backgrounds (*e.g.*, all of the IAC clicks referenced in Paragraphs 39 and 41 arose from websites displaying Woods' ads with clickable backgrounds).

---

[51] *See* Exhibit H.

FIRST AMENDED CLASS ACTION COMPLAINT
11-cv-01263-JF                                                                        -27-

143.   Google breached its representations and obligation to Woods and other Google advertisers by exempting Special Partners from the AdSense Program Policies which prohibited the use of clickable backgrounds and knowingly serving ads to such Special Partners.

144.   Each of the foregoing examples demonstrates how Google allowed and enabled Special Partners and mobile publishers to display ads in a manner prohibited by the AdSense Program Policies.

145.   Google's exemption of its Special Partners and mobile publishers from compliance with the AdSense Program Policies has led to Woods and the Class being billed for clicks that were not permitted under the "Google and Partner policies."   Accordingly, Woods and the Class should be made whole for the costs of all clicks originating from Special Partner websites and mobile applications that were exempted from the AdSense Program Policies.

146.   The above-described clicks are examples from Woods' account that demonstrate how he was injured by Google's exemption of Special Partners and mobile publishers from compliance with the AdSense Program Policies and its rigorous standards. These clicks should not be construed as the universe of all clicks in his account from publishers exempted from compliance with the AdSense Program Policies and Google's rigorous standards, as Woods continues to review his account without the benefit of discovery from Google.

## B.   CLAIMS RELATING TO NON-COMPLIANT SITES

### COUNT V – Breach of Contract

### (Non-Compliant Sites)

147.   Woods hereby incorporates by reference all paragraphs of this Complaint as if fully set forth herein.

148.   Woods brings this cause of action on behalf of himself and the Class.

149.   Google and all Class Members are or were parties to an Agreement that governs their AdWords advertising relationship.

150. The Agreement was drafted by Google and is uniform as to every Class member.[52]

151. In Section 1 of the Agreement, Google represented and promised that "Program use is subject to all *applicable Google and Partner policies*[.]"[53]

152. One such "Google and Partner polic[y]" is the AdSense Program Policies. Google specifically identifies it as one of its "policies."  It is clearly applicable because it mandates where and how ads may be placed.

153. Accordingly, Google was contractually obligated to apply the AdSense Program Policies to websites and properties upon which Woods' and the Class' ads were placed.

154. The AdSense Program Policies require that all sites displaying ads must adhere to the requirements contained therein and that ads should be displayed in accordance with those requirements.[54]

155. Woods and the Class performed all conditions, covenants, and promises required to be performed by Woods and the Class in accordance with the terms of the Agreement.

156. As set forth above, Google breached the Agreement by exempting Special Partners and mobile publishers from compliance with the AdSense Program Policies, serving ads to sites that Google knew were exempted (and knew did not comply with the AdSense Program Policies), and subsequently charging Woods and the Class for clicks on ads that were displayed in violation of the AdSense Program Policies.

157. Google's breach is the direct, proximate, and producing cause of damages to Woods and the Class.

158. Because of Google's breach of contract alleged herein, Woods and the Class should be made whole for all amounts Google charged for clicks that resulted from the display

---

[52] *See supra* at fn. 20.

[53] *See* Exhibit A (emphasis added).

[54] *See* Exhibit H.

FIRST AMENDED CLASS ACTION COMPLAINT
11-cv-01263-JF                                                                                    -29-

of ads on websites and properties that were not subject to (and were exempted from) the AdSense Program Policies. Such amounts include both Google's share of the ad revenue generated from such clicks as well as the publisher's share.

### COUNT VI – Breach of Implied Covenant of Good Faith and Fair Dealing
### (Non-Compliant Sites - Pled in the Alternative)

159.    Woods hereby incorporates by reference all paragraphs of this Complaint as if fully set forth herein.

160.    Woods brings this cause of action on behalf of himself and the Class.

161.    Woods brings this Count for Breach of the Implied Covenant of Good Faith and Fair Dealing in the alternative to Count V.

162.    The Agreement includes the implied covenant of good faith and fair dealing.

163.    Pursuant to this implied covenant, Google has a duty not to commit acts that would improperly deprive Woods and the Class of the intended benefits of the Agreement.

164.    The principal benefit and purpose for which Woods and the Class contracted was to receive cost-effective, relevant, and targeted cost-per-click advertising with ads that would appear only on high-quality sites that were rigorously monitored by Google. Woods also contracted for having his ads placed on sites that comply with the AdSense Program Policies. Specifically, Woods contracted for the benefit of targeted advertising—that is, receiving clicks from Internet users interested in his services.

165.    The implied covenant prohibits Google from entering into secretive, preferential deals with its Special Partners whereby the Special Partners were expressly or implicitly exempted from the AdSense Program Policies and permitted to utilize ad implementations that were likely to result in accidental or meaningless clicks. Further, the implied covenant prohibits Google from exempting mobile publishers from compliance with the AdSense Program Policies. Such exemptions frustrate the purpose of the Agreement.

166.    As a result of Google's secret exemption of the Special Partners and mobile publishers from compliance with the AdSense Program Policies, Google knowingly served and

displayed Woods and the Class' ads on websites and properties that utilized ad implementations that were likely to result in accidental or meaningless clicks that are worth less than what Google charged for them.

167. Google's conduct resulted in the display of Woods' and the Class' ads on websites and properties in a manner that was significantly inferior to the manner promised to Woods and the Class in the Agreement, Google's website, and the AdSense Program Policies.

168. As a result of Google's secret agreements and partnerships with the Special Partners and exemptions for mobile publishers, Woods and the Class have suffered, and continue to suffer, economic losses and are entitled to recover those losses.

169. Google has frustrated the rights of Woods and the Class Members by entering into secretive, preferential deals with Special Partners. These deals result in the exemption of the Special Partners from compliance with the AdSense Program Policies. These deals also result in ads of Woods and Class members being placed on sites that do not comply with Google's policies and that are likely to result in accidental and meaningless clicks.

170. Google's breach of the implied covenant is the direct, proximate, and producing cause of damages to Woods and the Class.

171. Because of Google's breach of the implied covenant alleged herein, Woods and the Class should be made whole for all amounts Google charged for clicks that resulted from the display of ads on websites and properties that were not subject to the AdSense Program Policies. Such amounts include both Google's share of the ad revenue generated from such clicks as well as the publisher's share.

**COUNT VII – Violation of Cal. Bus. & Prof. Code §§17200 *et seq*.**

**(Non-Compliant Sites)**

172. Woods hereby incorporates by reference all paragraphs of this Complaint as if fully set forth herein.

173.   Google's acts and business practices, as alleged herein, constitute unlawful, unfair, and fraudulent business practices in violation of California Business & Professions Code §§17200 *et seq*.

174.   Woods brings this cause of action on behalf of himself and the Class of similarly situated advertisers.  Woods has standing to pursue this claim as Woods has suffered injury in fact, reasonably relied upon Google's deceptive representations, and lost money or property as a result of Google's actions and/or inactions.

175.   Prior to contracting with Google to join the AdWords program, Woods reviewed and relied upon statements issued by Google to advertise and explain the AdWords program.   Specifically, Woods reviewed and reasonably relied upon, without limitation, Google's statement that assured advertisers that "[a]ll web sites and products are reviewed and monitored according to Google's rigorous standards, so as the network grows, your AdWords ads will continue to appear only on high-quality sites and products."  The foregoing statement appeared on Google's AdWords Help Center website and was reviewed by Woods prior to Woods advertising with Google.

176.   Similarly, Woods reviewed and reasonably relied upon Google's representation in the Agreement that his "Program use is subject to all applicable Google and Partner policies[.]"[55]

177.   Woods understood the foregoing statements to mean Google would not serve ads to sites that Google knew did not comply with the AdSense Program Policies—its rigorous standards for publishers who display ads.

178.   As set forth in Paragraph 78, Woods reasonably relied upon these promises and representations in September 2009 prior to choosing to advertise with Google, opening his AdWords account, advertising through the AdWords program, and paying for advertising as charged by Google.   Indeed, Google has conceded that reliance on the statements in the AdWords Help Center—such as the statement at issue here—is reasonable.  *See* ¶82.

---

[55] *See* Exhibit A.

179.     The statements were also accessible during the AdWords sign-up process and ad creation process.  Google made these statements to Woods in an effort to induce his enrollment in AdWords.  Moreover, Google continues to make these representations today on its website (the AdWords Help Center) and in Woods' online AdWords account.  Additionally, Woods received emails after his enrollment in AdWords directing him to the AdWords Help Center for answers to any of his questions.  Woods' reliance on such statements was unquestionably reasonable.

180.     The foregoing statements induced Woods to advertise with Google.  Had Woods known these statements were not true, he would not have advertised with Google.

181.     Woods reasonably believed that his ads would be displayed only on websites and properties that complied with the AdSense Program Policies.

182.     Google's representations were fraudulent in violation of §17200 because they were likely to deceive advertisers into believing that Google would apply the AdSense Program Policies to *all* websites on which AdWords advertisers' ads are displayed.  Moreover, Google failed to disclose to advertisers, including Woods and the Class, that Google's Special Partners and mobile publishers were governed by non-rigorous standards and were allowed to display ads in manners that were likely to generate accidental or meaningless clicks—implementations expressly prohibited by the AdSense Program Policies.

183.     Contrary to its representations, Google exempted its Special Partners and mobile publishers from compliance with the rigorous standards set forth in the AdSense Program Policies and allowed and/or expressly authorized these Special Partners and mobile publishers to engage in conduct that undermined a stated purpose of the AdWords program—displaying advertisements "only on high-quality sites and products."  Google knowingly served ads to sites it knew (because of these exemptions) did not comply with the AdSense Program Policies.

184.   As a result of Google's fraudulent conduct, Woods and the Class expended money on advertising with Google that they otherwise would not have spent had Google not made these misrepresentations and omissions.

185.   Google's acts and business practices, as alleged herein, are also unfair and thus in violation of §17200 because they offend established public policy and/or are immoral, unethical, oppressive, unscrupulous and/or substantially injurious to consumers.  There is no countervailing benefit of these acts and practices to consumers or competition.  These acts and practices caused injuries that Woods and the Class members could not have reasonably avoided because they were not informed that Google exempts Special Partners and mobile publishers from compliance with the AdSense Program Policies.

186.   Moreover, Google systematically breached its Agreement with Woods and other Class Members.  *See* ¶¶147-158.  Google's systematic breach of contract and breach of the implied covenant of good faith and fair dealing is unfair in violation of §17200.

187.   Google's breach of contract is also unlawful in violation of §17200.

188.   Google's breach of the implied covenant of good faith and fair dealing is also unlawful in violation of §17200.

189.   Google's acts and business practices, as alleged herein, have caused injury to Woods and the Class.

190.   Google maintains its headquarters and principal place of operations in California.  The unfair, unlawful, and fraudulent conduct detailed herein emanates from Google's California headquarters.  As such, Google is subject to §17200.

191.   Because Google violated California Business & Professions Code §§17200 *et seq.*, Woods and the Class should be made whole for all amounts Google charged for clicks on ads that were displayed on Special Partner websites and mobile applications that were not subject to the AdSense Program Policies.  Such amounts include both Google's share of the ad revenue generated from such clicks as well as the revenue Google shared with its Special Partners and mobile publishers.

192.   Woods, on behalf of himself and the Class, seeks an order of this Court awarding restitution, disgorgement, injunctive relief, and all other relief allowed under §17200.

## COUNT VIII – Violation of Cal. Bus. & Prof. Code §§17500 *et seq.*

### (Non-Compliant Sites)

193.   Woods hereby incorporates by reference all paragraphs of this Complaint as if fully set forth herein.

194.   As detailed herein, Google engaged in untrue and misleading advertising in violation of California Business & Professions Code §§17500 *et seq.*

195.   Woods brings this cause of action on behalf of himself and the Class of similarly situated advertisers.

196.   In the course of marketing and advertising the AdWords program, Google represented to consumers that "[a]ll web sites and products are reviewed and monitored according to Google's rigorous standards, so as the network grows, your AdWords ads will continue to appear only on high-quality sites and products."  These marketing and advertising statements have the capacity, likelihood, and tendency to deceive or confuse the public into believing that Google would apply the AdSense Program Policies to *all* websites where AdWords advertisers' ads are displayed and will not serve ads to any Non-Compliant site.

197.   In fact, as explained above, Woods reasonably relied upon—and was deceived and confused by—these statements.  Based on these statements, among others, Woods opened his AdWords account, advertised with Google, and paid for advertising through that AdWords account.

198.   Google's marketing and advertising materials were generally available to the public on Google's AdWords website throughout the Class Period.

199.   Google's marketing and advertising materials were false, misleading, and deceptive, as set forth more fully herein, in that consumers were not informed that Google exempts Special Partners and mobile publishers from compliance with the AdSense Program Policies.

200.   At the time Google made and disseminated the marketing and advertising materials alleged herein, Google knew or should have known that the statements were untrue or misleading, and in violation of §17500.

201.   Because of Google's violation of California Business & Professions Code §§17500 *et seq*., Woods and the Class should be made whole for all amounts Google charged for clicks that resulted from the display of ads on Special Partner websites and mobile applications that were not subject to the AdSense Program Policies.  Such amounts include both Google's share of the ad revenue generated from such clicks as well as the revenue Google shared with its Special Partners.

202.   Woods, on behalf of himself and the Class, seeks an order of this Court awarding restitution, disgorgement, injunctive relief, and all other relief allowed under §17500.

## VII.   PART III – LOCATION TARGETING

### A.   FACTUAL BACKGROUND RELATING TO LOCATION TARGETING

203.   During the sign-up and ad creation process, Google provides advertisers with the option to specify the geographic location(s) in which they want their ads to appear.

204.   Specifically, advertisers are presented with the following question in the sign-up and ad creation process:

> Locations [help link]     In what geographical locations do you want your ads to appear?[56]

205.   The help link embedded in the foregoing question, when clicked, opens a text box stating:

> **Location targeting**
> You can target your ads to almost any set of locations, including countries, territories, regions, cities and custom areas.  For example, you could target specific regions within the United States and a few large English-speaking cities in Europe.  You can view or edit your targeting options from the **Settings** tab for your campaign.
> Learn more about location targeting options.  [hyperlink][57]

---

[56] *See* Exhibit J.

[57] *See* Exhibit K.

206.   During the sign-up and ad creation process, Woods selected "Metro area: Ft. Smith-Fayetteville-Springdale-Rogers AR, US" in response to this question.

207.   By making this selection, Woods reasonably expected that his ads would be shown only to users in Ft. Smith, Fayetteville, Springdale, and Rogers, Arkansas.

208.   Woods recently discovered that Google distributed his ads to users outside of his designated geographical location.

209.   The following table shows exemplary clicks charged to Woods that occurred outside of his designated geographical location.   Each of the six clicks identified in the table originated from users located far beyond Ft. Smith, Fayetteville, Springdale, and Rogers, Arkansas.   In fact, the click designated in bold with an adjacent asterisk ("*") originated from a user located outside of Woods' designated geographical location clicking on his ad from a Japanese website.

| Date | Location of Person Clicking Ad | Location Reported by Google | Cost |
|------|-------------------------------|-----------------------------|------|
| 3/6/2011 | Lubbock TX | Ft. Smith-Fayetteville-Springdale-Rogers AR | $5.00 |
| 2/8/2011 | Dallas TX | [blank] | $2.89 |
| 1/8/2011 | Scranton PA | Ft. Smith-Fayetteville-Springdale-Rogers AR | $3.75 |
| 12/21/2010 | Wichita KS | Ft. Smith-Fayetteville-Springdale-Rogers AR | $3.99 |
| 12/9/2010 | Scranton PA | Ft. Smith-Fayetteville-Springdale-Rogers AR | $3.72 |
| **9/12/2010** | **Kilgore TX** | **Ft. Smith-Fayetteville-Springdale-Rogers AR** | **$3.93\*** |

210.   In an apparent attempt to conceal its misconduct, Google *falsely* reported to Woods that these clicks originated from users located in Ft. Smith, Fayetteville, Springdale, and Rogers, Arkansas.

211.   Unaware of Google's misconduct, Woods paid the posted amount of charges for each of these clicks.   Woods was injured by paying for clicks from users outside of his designated geographic location—charges that should not have been applied to his account.

212.   The above-described clicks are examples from Woods' account that demonstrate how he was injured by Google's failure to limit the geographic distribution of

Woods' ads to the locations Woods selected.  These clicks should not be construed as the universe of all clicks in his account that arose from outside Woods' designated geographic locations, as Woods continues to review his account without the benefit of discovery from Google.

**B.      CLAIM RELATING TO LOCATION TARGETING**

**COUNT IX - Violation of Cal. Bus. & Prof. Code §§17200 *et seq*.**

**(Location Targeting)**

213.    Woods hereby incorporates by reference all paragraphs of this Complaint as if fully set forth herein.

214.    Google's acts and business practices, as alleged herein, constitute unlawful, unfair, and fraudulent business practices in violation of California Business & Professions Code §§17200 *et seq*.

215.    Woods brings this cause of action on behalf of himself and the Class of similarly situated advertisers.  Woods has standing to pursue this claim as Woods has suffered injury in fact, reasonably relied upon Google's deceptive representations, and lost money or property as a result of Google's actions and/or inactions.

216.    During the ad creation process on September 30, 2009, Woods reviewed and reasonably relied upon statements issued by Google to explain the AdWords program. Specifically, Woods reviewed and reasonably relied upon, without limitation, the following statements:

- "Locations [help link] In what geographical locations do you want your ads to appear?"[58]
- "You can target your ads to almost any set of locations, including countries, territories, regions, cities and custom areas.  For example, you could target specific regions within the United States and a few large English-speaking cities in Europe.  You can view or edit your targeting options from the **Settings** tab for your campaign."[59]

---

[58] *See* Exhibit J.

[59] *See* Exhibit K.

Google made, and Woods reviewed, the foregoing statements on the sign-up and ad creation screens at the time Woods signed up for AdWords and created his first ad on September 30, 2009.

217.    Woods understood from reviewing the foregoing statements (and designating his local geographic area in response to the question) that his ads would only appear to users located in Ft. Smith, Fayetteville, Springdale, and Rogers, Arkansas.

218.    Woods reviewed and reasonably relied upon the foregoing statements in September 2009 when placing his ads and subsequently paying for advertising as charged by Google.

219.    The foregoing statements induced Woods to advertise with Google.  Had Woods known these statements were not true, he would not have advertised with Google.

220.    Woods also reasonably relied upon each of the foregoing statements in another way.  In reliance on these statements, Woods increased his Internet advertising budget from approximately $8 per month to over $150 per month ($5 per day).  Relying upon—and being deceived and confused by—the foregoing statements, Woods chose to spend approximately an additional $150 per month on Internet advertising with Google.

221.    Woods also reasonably believed that the account statements he received from Google would reflect charges in an accurate manner.  He did not expect Google to falsely report the geographic origin of clicks.  As a result, Woods remitted funds to Google during the Class Period based on such reasonable reliance, deception, and confusion.  Had Google disclosed the truth (*i.e.*, revealed in its account statements that location targeting was not applied), Woods would not have paid for clicks originating from beyond his designated geographic distribution area.

222.    Woods' reliance was reasonable.  The statements upon which he relied appeared on the AdWords sign-up and ad creation screens.  Google made these statements to Woods in an effort to induce his enrollment in AdWords, induce his creation of ads, and induce his

payment of ad charges. Moreover, Google continues to make these representations today in Woods' online account. Reliance on such statements is unquestionably reasonable.

223. These representations were fraudulent in violation of §17200 because they were likely to deceive advertisers into believing that Google would limit the distribution of ads to users located in the geographic locations designated by advertisers. Moreover, Google failed to disclose throughout the Class Period to advertisers, including Woods and the Class, that:

- Google would distribute ads to users beyond the geographic locations designated by advertisers.
- Google would charge advertisers for clicks on their ads originating outside the designated geographic locations.
- Google would *falsely* report the geographic location of users in its online reports to advertisers.

224. Contrary to its representations, Google failed to properly limit the distribution of ads to users in the geographic locations designated by advertisers.

225. As a result of Google's fraudulent conduct, Woods and the Class expended money on advertising with Google that they otherwise would not have spent had Google not made these misrepresentations and omissions.

226. Google's acts and business practices, as alleged herein, are also unfair in violation of §17200 because they offend established public policy and/or are immoral, unethical, oppressive, unscrupulous and/or substantially injurious to consumers. There is no countervailing benefit of these acts and practices to consumers or competition. These acts and practices caused injuries that Woods and the Class members could not have reasonably avoided because they were not informed that Google does not limit the distribution of ads to users in the geographic locations designated by advertisers as represented.

227. Google's acts and business practices, as alleged herein, have caused injury to Woods and the Class.

228. Google maintains its headquarters and principal place of operations in California. The unfair, unlawful, and fraudulent conduct detailed herein emanates from Google's California headquarters. As such, Google is subject to §17200.

FIRST AMENDED CLASS ACTION COMPLAINT

229.   Because Google violated California Business & Professions Code §§17200 *et seq.*, Woods and the Class should be made whole for all amounts that Google overcharged them by failing to limit the distribution of ads to users in the geographic locations designated by advertisers as represented.

230.   Woods, on behalf of himself and the Class, seeks an order of this Court awarding restitution, disgorgement, injunctive relief, and all other relief allowed under §17200.

## VIII.   CLASS ALLEGATIONS

231.   Woods seeks to recover on behalf of himself and the Class *all* amounts Google charged for clicks that resulted from the display of ads on websites and properties of Special Partners and mobile publishers that were exempted from the AdSense Program Policies.  Such amounts include both Google's share of the ad revenue generated from such clicks as well as the revenue Google shared with its publishers.

232.   Moreover, for the click charges not refunded, Woods seeks to recover on behalf of himself and the Class a sum of money that equals the Smart Pricing discounts that Google promised to apply to all such clicks.

233.   Woods also seeks to recover on behalf of himself and the Class *all* amounts Google charged for clicks originating from users located outside of the geographic location(s) specified by Woods and the Class members.

234.   Finally, Woods seeks an injunction to ensure that the misconduct described above finally ends, without the threat of it reoccurring in the future.

235.   Woods is not seeking to recover charges for clicks occurring in connection with parked domain and error pages, which Woods believes is the subject of *In re Google AdWords Litig.*, No. 08-cv-03369-JW (N.D. Cal. filed July 11, 2008).

236.   Woods brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a proposed class consisting of the following:

> All persons and entities located within the United States who advertised
> through Google's AdWords program and paid for clicks on their Google
> AdWords advertisement(s) at any time between and including April 1, 2004

and the day the Court certifies this action as a class action, where such clicks were not Smart Priced, originated from a mobile application or a Special Partner's website or property, or originated from a geographic location other than the location selected by the advertiser (the "Class"). Excluded from the Class are Google and its affiliates, officers, and directors. Also excluded from the Class are the members of the judiciary and their staff to whom this action is assigned.

237. Woods reserves the right to amend this class definition and, if deemed appropriate, to subdivide the Class into subclasses.

238. The members of the Class are so numerous that joinder of all members is impracticable. Woods believes that hundreds of thousands of people geographically dispersed throughout the United States have been damaged by Google's misconduct alleged herein. The names and addresses of the members of the Class are readily identifiable through documents maintained by Google. Members of the Class may be notified of the pendency of this action by published, mailed, and/or electronic notice.

239. Woods' claims are typical of the claims of all Class members, as all Class members are similarly affected by Google's uniform wrongful conduct and their claims are based on such conduct. Further, Woods' claims are typical of the claims of all Class members because his claims arise from the same underlying facts and are based on the same factual and legal theories as the claims of all Class members. Woods is no different in any relevant respect from any other member of the Class.

240. Woods and his counsel will fairly and adequately protect the interests of the members of the Class. Woods' interests do not conflict with the interests of the Class he seeks to represent. Woods has retained counsel competent and experienced in class and complex litigation. Woods and his counsel have prosecuted, and will continue to prosecute, this action vigorously.

241. Class certification is warranted because common questions of law and fact exist as to all Class members and predominate over any questions affecting only individual Class members. The questions of law and fact common to the Class include, without limitation:

▪ Whether Google's Agreement with Class members expressly or impliedly—through the implied covenant of good faith and fair dealing or otherwise—requires Google (a) to

apply Smart Pricing to all clicks and (b) to apply rigorous standards and the AdSense Program Policies to all sites to which it delivers ads.

- Whether Google falsely or deceptively represented it would (a) apply Smart Pricing to all clicks, b) apply rigorous standards and the AdSense Program Policies to all sites to which it delivers ads, and (c) not distribute ads to users located outside the geographical location(s) specified by AdWords advertisers.

- Whether, through the acts, omissions, and conduct alleged above, Google violated its express or implied obligations to Class members.

- Whether, through the acts, omissions, and conduct alleged above, Google violated California Business and Professions Code §§17200, *et seq.* and §§17500, *et seq.*

- Whether Woods and the Class have been damaged by the wrongs alleged herein, and if so, the measure of those damages and the nature and extent of other relief that should be afforded.

- Whether Google should be enjoined from engaging in the misconduct and unlawful practices alleged above.

242.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy because joinder of all members is impracticable. Even if individual Class members had the resources to pursue individual litigation, it would be unduly burdensome to the courts in which the individual litigation would proceed.  Individual litigation magnifies the delay and expense to all parties in the court system of resolving the controversies engendered by Google's common course of conduct.  The class action device allows a single court to provide the benefits of unitary adjudication, judicial economy, and the fair and equitable handling of all Class members' claims in a single forum.  The conduct of the action as a class action conserves resources of the parties and of the judicial system, and protects the rights of the Class members.  Furthermore, for many, if not most Class members, a class action is the only feasible mechanism that allows them an opportunity for legal redress and justice.  There will be no difficulty in the management of this action as a class action.

## IX.    DISCOVERY RULE, TOLLING, AND FRAUDULENT CONCEALMENT

243.    The applicable limitations period in this case has been tolled because Google (a) concealed its misconduct such that Woods and other Class members could not discover the misconduct through the exercise of reasonable diligence; and (b) committed the misconduct pursuant to a conspiracy, the last act of which has not yet occurred.

244.    On January 12, 2010, *Forbes* published an article detailing Google's willingness to ignore schemes run through its Special Partners, such as InfoSpace. *See* Andy Greenberg, "Google Faces The Slickest Click Fraud Yet," *Forbes* (Jan. 12, 2010) ("Those tangled arrangements…should lead Google to cut its ties with Infospace."). Similarly, on October 14, 2010, Google disclosed in an earnings call that it had not been applying Smart Pricing discounts to clicks from mobile devices. However, Google never corrected any of the misrepresentations on its website or otherwise informed Woods of its misconduct. Thus, while information about Google's misconduct first began to surface in 2010, Woods and the Class could not have discovered the conduct alleged herein through the exercise of reasonable diligence at that time.

245.    Woods did not discover, and could not have discovered through the exercise of reasonable diligence, the existence of Google's conduct alleged herein until after he engaged counsel in February 2011 to investigate suspected fraudulent clicks in his AdWords account and reasons why Woods' account was not generating the advertising results Woods expected. Prior to this time, Woods reasonably trusted Google's representations made to him regarding Smart Pricing and Non-Compliant Sites. It was only after Woods engaged counsel that he learned of Google's misconduct regarding Smart Pricing and Non-Compliant Sites. Woods filed the Original Complaint within 60 days of learning of Google's misconduct.

246.    Similarly, Woods did not discover, and could not have discovered through the exercise of reasonable diligence, the existence of Google's misconduct regarding location targeting. Indeed, Google concealed that it displayed ads outside of Woods' selected geographic area(s) by *falsely* reporting the origin of clicks (Google reported clicks came from within the designated area(s) when, in fact, the clicks came from outside such area(s)). Woods filed this Complaint within 30 days of learning of this misconduct.

247.    Google carefully concealed its unlawful conduct by, *inter alia*, executing its breaches in a manner that precluded their detection and providing *false* information in reports to its advertisers. For instance, the reports Google provided to Woods and other Class

members did not contain any information revealing Google's misconduct.  Indeed, Google concedes that its advertisers do not possess all relevant information and must exclusively rely on Google's "reporting statistics" to ensure advertisements are properly placed and priced.[60] Similarly, the reports Google provided contained false information about the geographic origin of clicks, precluding Woods' detection that he was paying for clicks originating outside of the geographic area(s) he selected for ad distribution.

248.   In short, a reasonable person under the circumstances would not have been alerted to investigate Google's misconduct until at least January 2010 when Google's relationship with InfoSpace was publicly exposed in *Forbes*.  Even then, it is not reasonable that such a person would understand the intricacies of Google's scheme sufficient to file a claim against Google.  It was not until Woods engaged counsel that he learned of Google's actionable misconduct.

249.   Accordingly, the discovery rule applies and prevents the running of all applicable statutes of limitations.

250.   Further, as a result of Google's fraudulent concealment, the running of any statute of limitations has been tolled with respect to the claims of Woods and the Class.

251.   In addition to fraudulent concealment, the applicable limitations period is tolled because Google's misconduct was committed pursuant to a civil conspiracy with its Special Partners as described above.  Therefore, the limitations period does not begin to run until the completion of the last act of the conspiracy.  That last act in furtherance of the conspiracy has yet to occur because Google's conspiracy continues today.

252.   In March 2011 and again in September 2011, Woods made claims against Google for the wrongs alleged herein.  Said claims were made within 60 days of his discovery of such wrongs.  Google has denied owing Woods any obligations.

---

[60] *See* Ad Traffic Quality Resource Center - http://www.google.com/adwords/adtrafficquality/ ("Advertisers rely on the relevance of our ad placement, our reporting statistics, and the quality of the clicks their ads receive.").

**X.      JURY DEMAND**

253.    Woods demands a trial by jury as to all issues so triable.

**XI.     PRAYER**

FOR THE FOREGOING REASONS, Woods, individually and on behalf of the Class, respectfully requests that the Court certify this action as a class action, with Woods as class representative and the undersigned counsel as class counsel, and enter an order of judgment against Google in favor of the Class that, *inter alia*:

a)  declares that Google has breached its contractual obligations to Class members;

b)  awards actual damages to Class members to fully compensate them for losses sustained as a direct, proximate, and/or producing cause of Google's breaches and unlawful conduct;

c)  awards restitution and disgorgement of all monies Google derived from Class members through the misconduct alleged above;

d)  awards pre-judgment and post-judgment interest at the maximum allowable rates;

e)  awards reasonable attorneys' fees and costs;

f)  temporarily and permanently enjoins Google from engaging in the unlawful practices alleged herein; and

g)  orders any such other and further relief as the Court deems just and proper to correct the wrongs done unto the Class.

Dated: September 9, 2011              Respectfully submitted,

/s/ *Brad E. Seidel*
**NIX, PATTERSON & ROACH, LLP**
Jeffrey J. Angelovich
Brad E. Seidel
3600 N. Capital of Texas Highway
Building B, Suite 350
Austin, TX 78746
Telephone: (512) 328-5333
Facsimile: (512) 328-5335

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**KESSLER TOPAZ**
**MELTZER & CHECK, LLP**
Ramzi Abadou
Stacey M. Kaplan
Erik D. Peterson
580 California Street, Suite 1750
San Francisco, CA 94104
Telephone: (415) 400-3000
Facsimile: (415) 400-3001

-and-

Joseph H. Meltzer
Sean M. Handler
Peter H. LeVan, Jr.
Naumon A. Amjed
Ryan T. Degnan
280 King of Prussia Road
Radnor, PA 19087
Telephone: (610) 667-7706
Facsimile: (610) 667-7056

*Interim Co-Class Counsel*

## CERTIFICATE OF SERVICE

I hereby certify that on September 9, 2011, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the e-mail addresses denoted on the attached Electronic Mail Notice List.

I certify under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.  Executed on September 9, 2011.

/s/ *Brad E. Seidel*

FIRST AMENDED CLASS ACTION COMPLAINT
11-cv-01263-JF