1   MAYER BROWN LLP
    Edward D. Johnson (SBN 189475)
2   wjohnson@mayerbrown.com
    Donald M. Falk (SBN 150256)
3   dfalk@mayerbrown.com
    John M. Neukom (SBN 275887)
4   jneukom@mayerbrown.com
    Hamsa M. Murthy (SBN 274745)
5   hmurthy@mayerbrown.com
    Two Palo Alto Square, Suite 300
6   3000 El Camino Real
    Palo Alto, CA  94306-2112
7   Telephone:  (650) 331-2000
    Facsimile:  (650) 331-2060
8
9
    Attorneys for Defendant Google Inc.
10

11              **UNITED STATES DISTRICT COURT**

12            **NORTHERN DISTRICT OF CALIFORNIA**

13                  **SAN JOSE DIVISION**

14
    RICK WOODS, Individually and On Behalf of          CASE NO.  5:11-CV-01263-EJD
15  Others Similarly Situated,
                                                        **MOTION TO DISMISS FIRST**
16                          Plaintiff,                  **AMENDED COMPLAINT**

17  v.                                                  **Hearing Date: January 13, 2012**
                                                        **Time: 9 a.m.**
18  GOOGLE INC.,                                        **Before:  Honorable Edward J. Davila**

19                          Defendant.                  Initial Complaint filed:  March 15, 2011

20

21

22

23

24

25

26

27

28

---

1

**TABLE OF CONTENTS**

2

3   NOTICE OF MOTION AND MOTION ...................................................................1

4   STATEMENT OF ISSUE TO BE DECIDED.........................................................1

5   MEMORANDUM OF POINTS AND AUTHORITIES ........................................1

6   STATEMENT OF FACTS ......................................................................................3

7         A.      Google's Separate AdWords and AdSense Programs .............................3

8         B.      Woods' AdWords Agreement With Google..............................................4

9         C.      The Court Dismisses Woods' Initial Complaint......................................6

10        D.      Woods' First Amended Complaint ...........................................................7

11        E.      AdWords Help Center ...............................................................................7

12  ARGUMENT ..........................................................................................................8

13  I.      WOODS HAS NOT PLEADED A BREACH OF ANY CONTRACT
            OBLIGATION THAT RELATES TO SMART PRICING (Count I)..................9
14
          A.      The Agreement Contains No Smart Pricing Obligation. .........................9
15
          B.      Woods' Selection Of Internet Materials Should Not Even Be Considered. ...........9
16
                  1.      The Agreement does not incorporate Exhibits B-F by reference. ............9
17
                  2.      Exhibits B-F are not extrinsic evidence of the Agreement's terms........11
18
                  3.      Exhibits B-F are not separate, supplemental agreements.......................12
19
          C.      The FAC's Exhibits Contain No Smart Pricing Obligation................12
20
                  1.      Exhibits B-F expressly limit Smart Pricing to clicks on the
21                        "Display Network," not every web site. ..................................................12

22                3.      Exhibits B-F do not guarantee universal Smart Pricing of every
                          click on every website. .........................................................................13
23
                  3.      Other Internet materials—referenced extensively in the FAC—
24                        also make clear that Smart Pricing does not apply to all clicks. ...........14

25  II.     WOODS HAS NOT PLEADED A BREACH OF ANY CONTRACT
            OBLIGATION THAT RELATES TO AD PLACEMENT (Count V). .........................15
26
          A.      The Agreement Expressly Disavows Any Guarantees Regarding Ad
27                Placement..................................................................................................15

28

B. Woods Cannot Salvage His Ad-Placement Contract Claim By Incorporating AdSense Policies..............................................................16

C. Woods Is Barred From Asserting Contract Claims Based On Ad Placement Allegations. ...........................................................................17

III. WOODS' IMPLIED COVENANT CLAIMS (Counts II and VI) ARE SUPERFLUOUS AND FAIL TO IDENTIFY ANY SPECIFIC DUTY THAT GOOGLE FAILED TO DISCHARGE..................................................................18

IV. WOODS' UCL AND FAL CLAIMS (Counts III, IV, VII and VIII) SHOULD BE DISMISSED FOR LACK OF STANDING, SUBSTANCE AND PARTICULARITY.........................................................................................19

A. Woods Has Not Pleaded Any Injury Resulting From Supposedly "Unfair" Business Practices. ..................................................................................19

B. Woods Has Not Pleaded "Unlawful" Conduct. ...................................20

C. Woods Has Not Pleaded Fraud-Based UCL or FAL Claims And Cannot Do So. ....................................................................................................20

1. Woods has not alleged any misrepresentations, let alone fraud. ............20

2. Woods still has not satisfied the particularity requirement. ...................21

3. Woods could not "reasonably rely" on extraneous statements beyond the four corners of an integrated, written agreement.................22

V. WOODS HAS NOT PLEADED A UCL CLAIM FOR LACK OF "GEOGRAPHIC TARGETING." ..................................................................23

VI. FURTHER AMENDMENT WOULD BE FUTILE...........................................24

CONCLUSION..............................................................................................................24

1

## TABLE OF AUTHORITIES

2

**Cases**

3

*Ashcroft v. Iqbal*, 129 S. Ct. 1937 (2009) ...............................................................8

4

*Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007) ...............................................8

5

*Branch v. Tunnell*, 14 F.3d 449 (9th Cir. 1994).......................................................14

6

*Clegg v. Cult Awareness Network*, 18 F.3d 752 (9th Cir. 1994) ..............................8

7

*Galbraith v. County of Santa Clara*, 307 F.3d 1119 (9th Cir. 2002)......................14

8

*Goddard v. Google*, 640 F. Supp. 2d 1193 (N.D. Cal. 2009) ............................4, 16

9

*Guido v. Koopman*, 1 Cal. App. 4th 837 (1991) .....................................................23

10

*Kaplan v. Rose*, 49 F.3d 1363 (9th Cir. 1994) .......................................................21

11

*Kearns v. Ford Motor Co.*, 567 F.3d 1120 (9th Cir. 2009) .....................................21

12

*Kwikset Corp. v. Superior Court*, 51 Cal. 4th 310 (2011) ......................................22

13

*Maersk-Sealand v. Eurocargo Express, LLC*, No. 20-cv-3230, 2004 U.S. Dist.
LEXIS 13391 (C.D. Cal. Apr. 8, 2004) ...................................................................10

14

*Malcolm v. JP Morgan Chase Bank, N.A.*, No. 09-4496-JF, 2010 U.S. Dist.
LEXIS 23770 (N.D. Cal. Mar. 15, 2010)..................................................................19

15

16

*Mendiondo v. Centinela Hosp. Med. Ctr.*, 521 F.3d 1097 (9th Cir. 2008)...............8

17

*Moreing v. Weber*, 3 Cal. App. 14 (1906) ..........................................................10-11

18

*Nielsen v. Swanberg*, 99 Cal. App. 270 (1929)......................................................11

19

*Racine & Laramie, Ltd. v. Dep't of Parks & Recreation*, 11 Cal. App. 4th 1026
(1992)........................................................................................................................19

20

21

*Schulken v. Wash. Mut. Bank*, No. C. 09-02708 JW, 2009 U.S. Dist. LEXIS
114030 (N.D. Cal. Nov. 19, 2009)............................................................................19

22

*Scognamillo v. Credit Suisse First Boston LLC*, No. C03-2061, 2005 WL 645446
(N.D. Cal. Mar. 21, 2005).........................................................................................23

23

24

*Shaw v. Regents of University of California*, 58 Cal. App. 4th 44 (1997)................10

*Sprewell v. Golden State Warriors*, 266 F.3d 979 (9th Cir. 2001) ....................13 n.2

25

*Stirlen v. Supercuts, Inc.*, 51 Cal. App. 4th 1519 (1997) .......................................12

26

*Superior Dispatch, Inc. v. Insurance Corp. of New York*, 97 Cal. Rptr. 3d 533
(Cal. Ct. App. 2009)....................................................................................................8

27

28

*Sybersound Records, Inc. v. UAV Corp.*, 517 F.3d 1137 (9th Cir. 2008)................20

-iii-

*In re Tobacco II Cases*, 46 Cal. 4th 298 (2009)...................................................................22

*Troyk v. Farmers Group, Inc.*, 171 Cal. App. 4th 1305 (2009)........................................10

*Valley Const. Co. v. City of Calistoga*, 72 Cal. App. 2d 839 (1946)................................ 10-11, 17

*Wade v. Diamond A Cattle Co.*, 44 Cal. App. 3d 453 (1975).........................................12

*Warren v. Fox Family Worldwide, Inc.*, 328 F.3d 1136 (9th Cir. 2003).........................11

*Zenger-Miller, Inc. v. Training Team, GmbH*, 757 F. Supp. 1062 (N.D. Cal. 1991)....................11

*Zepeda v. PayPal, Inc.*, 777 F. Supp. 2d 1215 (N.D. Cal. 2011).....................................8

**<u>Other</u>**

*American Heritage Dictionary of the English Language* (3d ed. 1992)........................14

*Williston on Contracts* § 30:25 (4th ed. 2011).................................................................10

MOTION TO DISMISS FAC—CASE NO. 5:11-CV-03613-EJD

**NOTICE OF MOTION AND MOTION**

TO PLAINTIFF AND HIS ATTORNEYS OF RECORD:

PLEASE TAKE NOTICE that on January 13, 2012, at 9 a.m., before the Honorable Edward J. Davila, Defendant Google Inc. will and hereby does move to dismiss with prejudice Plaintiff's First Amended Complaint (FAC) (Dkt. 68).  Google's motion is based on this notice, the accompanying memorandum of points and authorities, arguments of counsel and any other matters that the Court deems appropriate.

**STATEMENT OF ISSUE TO BE DECIDED**

Whether the First Amended Complaint cures the pleading deficiencies identified in this Court's Order Granting Motion To Dismiss With Leave To Amend (Dkt. 64).

**MEMORANDUM OF POINTS AND AUTHORITIES**

Plaintiff Rick Woods is an Arkansas trial lawyer who alleges that he briefly promoted his law practice using Google's online advertising service, AdWords.  In March 2011, he brought this action professing to represent a class of millions of AdWords advertisers for supposed wrongs spanning almost a decade.  In particular, he complained that Google placed his ads on various web sites he did not expect and did not provide him a particular discount ("Smart Pricing") that he said that he expected to receive for every click on his Internet ads.  Dkt. 1.

Judge Fogel dismissed Woods's original Complaint because it failed to state a claim. In his Dismissal Order (Dkt. 64) (Order), Judge Fogel held (among other things):

- Woods complained about contractual obligations that did not exist and were not breached;

- Woods had not identified with particularity any actionable unfair competition or false advertising by Google; and

- In any event, Woods lacked standing to pursue claims under the California Unfair Competition Law (UCL) and False Advertising Act.

Woods' First Amended Complaint (FAC) (Dkt. 68) has not cured the deficiencies that Judge Fogel identified, and should be dismissed with prejudice.

*Count I*: Woods claims that Google breached a contract to provide him a "Smart Pricing" discount on all clicks on all of his ads on all web sites at all times.  Yet Woods' only contract

with Google is the short, plainly written AdWords agreement.  That agreement never mentions *any* discounts, let alone promises to apply a particular Smart Pricing discount on every click.  To paper over this deficiency, Woods asks the Court to consider as part of the AdWords agreement a handful of Internet web pages that he annexes as exhibits to the FAC.  Those Internet materials are not part of the written agreement and may not be considered in construing it.  In any event, Woods' chosen materials *contradict* his theory of contract breach.  While Woods' exhibits to the FAC do not include any statements that Google would Smart Price all clicks, they do show that only some clicks are eligible for that discretionary discount.  Because Woods has not established any obligation by Google to apply Smart Pricing to every click on all of his AdWords ads on all web sites, he has not alleged that Google breached any obligation.

*Count V*: Woods claims that Google also breached the contract by placing his ads on third party web sites that did not comply with the "Ad*Sense*" policies—policies that do not apply to Ad*Words* advertisers like Woods, but relate to the agreements between Google and certain web sites that *display* ads that Google places.  As a result, Woods alleges, his Internet ads were placed on web pages he did not expect.  This second claim for breach of contract also is inadequately pleaded.  *First*, as Judge Fogel recognized, the written Ad*Words* agreement between Woods and Google does not obligate Google to apply Ad*Sense* policies to third parties.  Woods' attempt to show otherwise relies (yet again) on a legally untenable effort to incorporate disparate Internet materials into his written agreement with Google.  *Second*, Woods' claim is defeated by the plain language of the AdWords agreement, which he has attached to the FAC.  In that contract, Woods expressly agrees to and authorizes the exact ad placements he complains about now.  *Third*, if Woods' allegations are true, he has already breached his written agreement with Google by failing to report such issues, and so cannot enforce the contract to his benefit after the fact.

*Counts II and VI*: For each of his two contract claims, Woods adds a twin claim for breach of the implied covenant of good faith and fair dealing.  Those implied covenant claims are superfluous to his (deficient) contract claims:  Woods alleges the *exact same* conduct and asks for the *exact same* damages for each type of breach.  Well-established law requires dismissal of these redundant implied-covenant claims.  Moreover, Woods has not alleged any

1    implied duty that Google failed to discharge.

2         *Counts III, IV, VII and VIII*: Woods yet again repackages his grievances about Smart

3    Pricing and AdSense policies as claims under the UCL and California's false advertising laws

4    (FAL).  Yet Woods has identified neither a violation nor an injury supporting any of these

5    claims.  At best, he complains that Google did not satisfy contractual obligations it did not owe.

6    Woods tries to recast these deficient claims as allegations of fraudulent conduct, but he has not

7    identified any false or misleading statements to support these claims, much less pleaded them

8    (and their misleading nature) with particularity sufficient to satisfy Fed. R. Civ. P. 9(b).  And in

9    any event, because he could not reasonably rely on materials that the Agreement expressly

10   excluded, he lacks standing to pursue his misrepresentation claims.

11        *Count IX*: Finally, Woods adds a UCL claim based on his complaint that his Internet ads

12   were not targeted geographically as he understood they would be—for example, only to

13   individuals located in particular areas of Arkansas.  This claim, too, fails for lack of any

14   misleading conduct or any cognizable injury.

15        Woods cannot cure the deficiencies Judge Fogel identified or meet the minimum pleading

16   standards.  Because further amendment would be futile, the FAC should be dismissed with

17   prejudice.

18                          **STATEMENT OF FACTS**

19   **A.    Google's Separate AdWords and AdSense Programs**

20        Google's online advertising business includes two services known as AdWords and

21   AdSense.   FAC ¶¶ 1 & 107.   AdWords and AdSense are separate services with different

22   purposes.  AdWords allows advertisers like Woods to display advertisements on Google.com and

23   other web sites across the Internet.  FAC ¶ 1.  AdWords advertisers typically pay Google each

24   time their ad is "clicked."  *Id.*  Advertisers such as Woods can join the AdWords program by

25   clicking-through and accepting the Google Inc. Advertising Program Terms—the "Agreement"

26   between Woods and Google attached to the FAC as Exhibit A.  *See* FAC ¶¶ 2 & 8.

27        AdSense, by contrast, allows third parties to host or "publish" Google ads on their web

28   sites.  *Id.* ¶ 1 n.1.  These web site owners are known as AdSense "partners" or "publishers."

                                    -3-

1    When an AdSense partner hosts an AdWords ad, and the ad receives a click, Google typically
2    shares a percentage of the revenue (received from the AdWords advertiser) with the AdSense
3    partner. *Id.* AdSense partners are not parties to the AdWords Agreement and AdWords
4    advertisers are not parties to AdSense agreements. Instead, AdSense partners enter into their
5    own, separate agreements with Google. Woods has not alleged that he signed any AdSense
6    agreement, or that any AdSense agreement is the basis for a contract claim in this case. *See*
7    *generally* Order 2 (explaining the difference between AdWords and AdSense).

8          **B.    Woods' AdWords Agreement With Google**

9          Woods alleges that he accepted the Agreement and opened an AdWords account on
10   September 30, 2009. FAC ¶ 8. The Agreement that Woods accepted is just over two pages long,
11   in large font, and includes an introduction followed by nine numbered paragraphs. In the
12   introduction, the Agreement expressly incorporates by reference "any insertion orders or service
13   agreements ('IO')" that an AdWords advertiser may have agreed to separately. The introduction
14   clearly provides that "[t]hese Terms and any applicable IO are collectively referred to as the
15   'Agreement.'" *Id.*

16         The Agreement imposes certain obligations on advertisers in exchange for Google's
17   agreement to provide AdWords services. In Section 1, for example, the Agreement states that an
18   advertiser's use of Google's AdWords program (defined as "Program") is "subject to all
19   applicable Google and Partner policies" and that such policies "may be modified at any time."
20   In *Goddard v. Google*, Judge Fogel held that this section imposed requirements on advertisers,
21   but not on Google:

22         Google's Advertising Terms and incorporated Content Policy constituted a promise
           by Google's advertising customers to Google in exchange for participation in
23         Google's advertising service. Neither agreement contains any promise by Google to
           enforce its terms or use or otherwise to remove noncompliant advertisements.
24
25   640 F. Supp. 2d 1193, 1201 (N.D. Cal. 2009). Similarly, in dismissing Woods' initial complaint,
26   Judge Fogel found that "Section 1 of the Agreement refers to advertisers' use of the AdWords
27   program." Order 9 (rejecting Woods' incorporation argument because it did not relate to
28   "advertisers' 'use' of the program").

-4-

Section 2 of the Agreement requires an advertiser to provide Google "with all relevant Creative," i.e., information about the ads it wishes to display, by the due date "set forth in that Program's applicable frequently asked questions at www.google.com ('FAQ')."  Section 2 also contains an express agreement that AdWords ads:

> may be placed on (y) any content or property provided by Google ("Google Property"), and, unless Customer opts out of such placement in the manner specified by Google, (z) any other content or property provided by a third party ("Partner") upon which Google places ads ("Partner Property").  Customer authorizes and consents to all such placements.

*See also* Order 2 (quoting this passage).

Section 5 of the Agreement is titled "Disclaimer and Limitation of Liability."  It provides that a "Customer's exclusive remedy, and Google's exclusive liability for suspected invalid impressions or clicks is for *Customer to make a claim for refund* in the form of advertising credits for Google Properties within the time period required under Section 7" of the Agreement. (Emphasis added.)  As the Court noted in its prior Order, Section 5 also provides that "'[t]o the fullest extent permitted by law, Google disclaims all guarantees regarding positioning, levels, quality, or timing of clicks and the adjacency or placement of ads within a program."  Order 2.

Section 7 of the Agreement sets forth an advertiser's payment obligations, stating that the "Customer shall be responsible for all charges up to the amount of each IO" and "shall pay all charges in accordance with the payment terms in the applicable IO or Program FAQ."  Under this section, an advertiser also expressly "waives all claims relating to charges (including without limitation any claims for charges based on suspected invalid clicks) unless claimed within 60 days after the charge."  This section further provides that "[c]harges are solely based on Google's measurements for the applicable Program, unless otherwise agreed to in writing."

Finally, as the Court has recognized, Section 9 contains "clear language … excluding any reliance on extraneous statements or promises."  Order 14.  Specifically, Section 9 states:

> The Agreement constitutes the entire and exclusive agreement between the parties with respect to the subject matter hereof. No statements or promises have been relied upon in entering into this Agreement except as expressly set forth herein, and any conflicting or additional terms contained in any other documents (e.g., reference to a purchase order number) or oral discussions are void.

Other than (i) the insertion orders and service agreements referenced in the Introduction, (ii) the

"Google and Partner policies" referenced in Section 1, and (iii) the specific AdWords FAQs referenced in Sections 2 and 7 (pertaining to due dates for ad content and terms of payment), the Agreement does not mention any other outside materials.

### C. The Court Dismisses Woods' Initial Complaint

Rick Woods is an attorney from Arkansas who signed up for AdWords to advertise his law practice. FAC ¶ 17. His initial complaint alleged that, when he was an AdWords advertiser, Google placed his ads on third-party web pages in ways that were inconsistent with Internet statements about Google's separate *AdSense* program, and that he did not receive a "Smart Pricing" discount for every click on his ads. Dkt. 1. Based on those allegations, he asserted four claims against Google: (i) breach of contract; (ii) breach of the implied covenant of good faith and fair dealing; (iii) violation of California's UCL; and (iv) violation of California's FAL. *Id.*

On Google's motion, the Court dismissed all claims in Woods' initial complaint. The Court dismissed the contract claim on multiple independent bases:

- The Court rejected Woods' attempt to "incorporate by reference" dozens of Internet materials into the short, written AdWords Agreement. Order 6-7, 9.

- The Court held that "[e]ven if" those Internet materials were "incorporated into the Agreement, the complaint does not allege adequately that Google undertook an obligation to apply the [Smart Pricing] discount" (*id.* at 9) or made "an actual promise" to avoid "invalid clicks" through application of AdSense policies against third parties (*id.* at 8).

- The Court found that Woods could not sue for breach of contract because he had not performed the necessary conditions under the Agreement: "Woods does not allege that he attempted to seek a refund—as required by the Agreement[.]" *Id.*

The Court dismissed Woods' implied-covenant claim for similar reasons: "Woods has failed to allege that Google undertook a specific duty that it failed to discharge." *Id.* at 11. And the Court dismissed Woods' UCL and FAL claims multiple times over. Most notably, the Court found that (i) Woods failed to allege any fraudulent statements to support UCL or FAL claims with the level of particularity required under federal pleading standards; and (ii) Woods' status as a practicing attorney deprived him standing for UCL or FAL claims. *Id.* at 12-14.

### D.     Woods' First Amended Complaint

The FAC divides Woods' original four claims—contract, implied covenant, UCL, and FAL—into eight by pleading four separate claims addressing Smart Pricing and four separate claims addressing ad placement.  Woods also adds a new UCL claim alleging that Google represented it would (and then did not) show his ads only to Internet users located physically inside in the geographical locations he had selected.

In place of the 149 footnotes that referenced dozens of Internet pages that Woods initially sought—and failed (Order 6-9)—to have incorporated by reference into the Agreement, the FAC attaches a handful of printouts of specific web pages.  Woods alleges that these specific web pages include statements, or "agreements," by Google that "all clicks" on all AdWords ads on all web sites will always receive a "Smart Pricing" discount.  FAC ¶¶ 5, 12, 22 & 37; *id.* Exs. B-F. The exhibits, however, show that Google would apply a discretionary Smart Pricing discount only to *some* clicks, such as clicks on ads published on the "Display Network," which is only a part of Google's larger advertising network.  In particular:

- Exhibit B defines Smart Pricing as "a feature that automatically reduces the price advertisers pay for clicks if our data shows that a click from a *Display Network* page is less likely to result in a conversion." (Emphasis added.)

- Exhibit C states: "Smart Pricing is a feature that automatically reduces the price advertisers pay for clicks if our data shows *that a click from a Display Network* page is less likely to result in a conversion."  (Emphasis added.)

- Exhibit D, a "Glossary" entry for "Smart pricing," explains that Google is "constantly analyzing data across our search and *Display Network* … You may notice a *reduction in the cost of clicks from Display Network sites*."  (Emphasis added.)

- Exhibit F states that Smart Pricing does not apply to the Search Network: "*Content clicks* [Display Network] *may be priced differently than search clicks.* Using smart pricing, AdWords automatically adjusts the costs of clicks for keyword-targeted ads that appear on *content network* [Display Network] pages."  (Emphasis added.)

### E.     AdWords Help Center

Exhibits B through K include Internet statements by Google that Woods appears to have selected carefully.  Exhibits B, C and E, for example, purport to be printouts of certain web pages within the AdWords Help Center.  Exhibit D purports to be a print-out of a web page within the "Ad Traffic Quality Resource Center."   Woods alleges that Exhibit F is a

-7-

1   "presentation appearing on Google's website."  FAC ¶ 76 n.26.  Exhibit G purports to be an

2   "AdWords Year in Review" publication.  Exhibit H purports to be a print-out of a web page from

3   the Ad*Sense* (not Ad*Words*) Help Center.  Exhibit I indicates it is a copy of an agreement

4   between Google and InfoSpace.  Woods alleges that Exhibits J and K are screen shots he

5   reviewed when signing up for his AdWords account.  FAC ¶¶ 204 n.56 & 205 n.57.  The FAC

6   does not allege how or why these particular web pages were selected and why other pages on the

7   very same topics were not.[1]  And nowhere does the FAC explain how or why the AdWords

8   Agreement incorporates certain of these pages but not others.

9                                        **ARGUMENT**

10          The FAC should be dismissed if it "lacks a cognizable legal theory or sufficient facts to

11   support a cognizable legal theory."  *Mendiondo v. Centinela Hosp. Med. Ctr.*, 521 F.3d 1097,

12   1104 (9th Cir. 2008).  Each of Woods' claims fails on either or both of these grounds.  The Court

13   must "accept" the allegations "as true," and afford Woods the benefit of "reasonable

14   inference[s]," but "[a] pleading that offers 'labels and conclusions' or 'a formulaic recitation of

15   the elements of a cause of action will not do.'"  *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949 (2009)

16   (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007)).

17          Because "contract interpretation is a matter of law and solely a judicial function," the

18   Court should not defer to Woods' allegations about what a contract says or means.  *Zepeda v.*

19   *PayPal, Inc.*, 777 F. Supp. 2d 1215, 1219 (N.D. Cal. 2011) (citing *Superior Dispatch, Inc. v.*

20   *Insurance Corp. of New York*, 97 Cal. Rptr. 3d 533, 548 (Cal. Ct. App. 2009)).  The Court also

21   need not accept as true conclusory allegations, unreasonable inferences, legal characterizations,

22   or unwarranted deductions of fact.  *Clegg v. Cult Awareness Network*, 18 F.3d 752, 754-55 (9th

23   Cir. 1994).  Because Woods has not alleged a "plausible claim for relief" under any theory, the

24   FAC should be dismissed.  *Iqbal*, 129 S. Ct. at 1950.

25

26

_____

27   [1]  For example, Woods could have selected Help Center pages that discuss how Smart Pricing
     applies only to "certain pages" in the Google Network; only "Display Network" pages; and
28   "does not apply" to certain ad formats.  *See, e.g.*, Neukom Decl. Exs. 1-3.

**I.    WOODS HAS NOT PLEADED A BREACH OF ANY CONTRACT OBLIGATION THAT RELATES TO SMART PRICING (Count I).**

Woods alleges that Google breached the Agreement by failing to apply a "Smart Pricing" discount for all clicks on all AdWords ads on all web sites at all times.  FAC ¶¶ 5 ("all clicks"), 12 (same); 22 (same).   The Court rejected this claim already, holding that the Agreement contains no such obligation.  Order 6.  Try as he might to change its character, Woods is stuck with the same Agreement, and still cannot identify any contractual obligation for Google to apply Smart Pricing to every click on every ad.

**A.    The Agreement Contains No Smart Pricing Obligation.**

The Agreement is just over two pages long, in large font.  The Agreement does not even *mention* Smart Pricing—or any other discount program—and it certainly does not obligate Google to apply a particular Smart Pricing discount to *every* click on *every* AdWords ad presented on *every* web page connected to Google in *any* way.

Woods recognizes that the face of the Agreement has nothing to say about Smart Pricing.  For that reason, he asks the Court to consider Exhibits B through F—Internet statements that Google allegedly made separately from the Agreement.  Those exhibits cannot sustain Count I against a motion to dismiss.

**B.    Woods' Selection Of Internet Materials Should Not Even Be Considered.**

To begin with, the extraneous Internet materials in Exhibits B-F should not be considered at all.   Neither those documents, nor Woods' theories about them, add to the Agreement an obligation to apply Smart Pricing to every click on every one of Woods' ads on every website.

**1.    The Agreement does not incorporate Exhibits B-F by reference.**

In dismissing Woods' initial complaint, the Court properly rejected Woods' efforts to incorporate various Internet materials into the Agreement by relying on language in Sections 1 and 7.  Order 6-9.  Woods' new approach is equally unsound.  He now contends that the word "measurements" in Section 7 of the Agreement somehow incorporates numerous and disparate Internet postings about "Smart Pricing" into the written contract.  FAC ¶ 48.  Woods' theory of incorporation is wrong on at least two counts.

-9-

*First*, Section 7 cannot incorporate Exhibits B-F because it contains no clear and unequivocal reference to them.  Under long-settled law, a contract does not incorporate an extraneous document by reference unless the reference is "clear and unequivocal."  Order 6 (quoting *Troyk v. Farmers Group, Inc.*, 171 Cal. App. 4th 1305, 1331 (2009)).  The "clear reference" to an external document must be "in such terms that its identity may be ascertained beyond doubt." *Williston on Contracts* § 30:25 (4th ed. 2011).  As this Court put it in dismissing Woods' initial complaint, for the Agreement to incorporate an extraneous Internet statement as a contractual term it must "guide[] the reader" to the specific web page(s) and statement(s) that Woods asserts are contractual obligations.  Order 6 (quoting *Maersk-Sealand v. Eurocargo Express, LLC*, No. 20-cv-3230, 2004 U.S. Dist. LEXIS 13391, at *19 (C.D. Cal. Apr. 8, 2004), and *Shaw v. Regents of University of California*, 58 Cal. App. 4th 44, 45 (1997)).

Section 7 does not identify the Internet materials in Exhibits B-F at all, much less guide a reader to them with a "clear and unequivocal" reference.  Section 7 does not hyperlink to *any* separate web pages, and does not address any discounts, let alone a particular "Smart Pricing" discount.  Section 7 does not even refer to underlying concepts that Woods alleges are relevant to Smart Pricing, such as click values and conversion rates.  FAC ¶ 5.

Woods nonetheless seizes on one sentence in Section 7:  "Charges are solely based on Google's measurements for the applicable Program."  And, within that one sentence, Woods seizes on one word: "measurements." He alleges that the Agreement's mention of "measurements" somehow incorporates Exhibits B-F and converts the statements on those web pages into contractually binding promises.  But neither that sentence in Section 7 nor the word "measurements" refers to the web pages Woods claims are incorporated, or "guides the reader" to them.  Order 6.

*Second*, Section 7 cannot incorporate Exhibits B-F for another, independent reason: Section 7 has a specified purpose that excludes Woods' reliance on them.  Under an "elementary" rule of California law, *Moreing v. Weber*, 3 Cal. App. 14, 20 (1906), if a written contract references an external document only for a specific purpose, then the document may be incorporated for that specific purpose *only* and remains foreign to the contract for all other

1  purposes. *Valley Const. Co. v. City of Calistoga*, 72 Cal. App. 2d 839, 841 (1946); *Nielsen v.*

2  *Swanberg*, 99 Cal. App. 270, 279 (1929).

3        The specified purpose of Section 7 is to impose payment obligations on the advertiser,

4  not to impose discount or pricing obligations on Google.  This is clear from the Section's title—

5  "Payment"—and from any fair reading of the entire paragraph, which enumerates a series of

6  obligations on the *advertiser*, not Google.  Agreement § 7 ("Customer shall be responsible …";

7  "[customer] shall pay …"; "Customer shall pay …"; "Customer is responsible …"; "Customer

8  waives …"; "Customer acknowledges and agrees … Google shall not be liable").  To incorporate

9  Exhibits B-F into the Agreement by virtue of Section 7 would improperly use a paragraph

10  imposing payment obligations on the payor to force "discount" obligations on the payee.  That

11  would be contrary to California law and any fair reading of Section 7 of the Agreement.

12        **2.**      **Exhibits B-F are not extrinsic evidence of the Agreement's terms.**

13        Woods contends in the alternative that the Court should consider Exhibits B-F as

14  extrinsic evidence of what the term "measurements" means in Section 7 of the Agreement.  To

15  do so, however, would violate California law.  In California, extrinsic evidence may not be used

16  to add new terms to a written contract or to impose duties on contracting parties that are not

17  contemplated in the contract. *Zenger-Miller, Inc. v. Training Team, GmbH*, 757 F. Supp. 1062,

18  1067 (N.D. Cal. 1991).  Extrinsic evidence also may not be used to contradict the contract's

19  express terms. *Warren v. Fox Family Worldwide, Inc.*, 328 F.3d 1136, 1142 (9th Cir. 2003).

20        Yet that is what Woods tries here.  As discussed above, Section 7 imposes payment

21  obligations on the advertiser (who "shall be responsible for all charges" and "shall pay" those

22  charges).  To construe Section 7's use of the term "measurements" to impose any discounting

23  obligation on Google—much less promise to apply a particular Smart Pricing discount in a

24  particular way—would create a new, affirmative obligation that conflicts with (and is not even

25  contemplated by) the underlying contractual text.  Woods seeks to transform this sentence in the

26  Agreement:

27            Charges are solely based on Google's measurements for the applicable Program,
             unless otherwise agreed to in writing.

28

into this one, as formulated in the FAC:

> Google had a *legal obligation* to *apply the Smart Pricing discount* (its "measurement" of the value of the click) *to all clicks* that are less likely to result in a conversation than clicks from google.com.

FAC ¶ 50 (emphasis added).

That is contract drafting, not contract interpretation, and impermissibly tries to "add to" *and* "vary the terms of" the underlying agreement. *Zenger-Miller*, 757 F. Supp. at 1067.

### 3. Exhibits B-F are not separate, supplemental agreements.

In yet another alternative, Woods alleges that the Court should consider Exhibits B-F as the sort of separate "agree[ments] in writing" that Section 7 contemplates—presumably supplemental agreements or amendments to the Agreement—which would then be binding on Google. FAC ¶ 52. This contention is frivolous. Settled California precedent establishes that supplemental agreements in writing that modify or amend an integrated contract must (i) be signed by the party to be charged, and (ii) communicate an intent to be bound. *See Stirlen v. Supercuts, Inc.*, 51 Cal. App. 4th 1519, 1535-36 (1997); *Wade v. Diamond A Cattle Co.*, 44 Cal. App. 3d 453, 457 (1975). Woods alleges nothing of the sort, and cannot do so.

### C. The FAC's Exhibits Contain No Smart Pricing Obligation.

Even if the Court were to consider Exhibits B-F for some purpose, Count I still should be dismissed for at least three reasons: (i) Exhibits B-F state that Smart Pricing is applied to the "Display Network," only a *portion* of the Google Network that hosts AdWords ads, and therefore cannot obligate Google to Smart Price clicks outside of the Display Network; (ii) Exhibits B-F mention only "automatic" Smart Pricing, not universal or uniform Smart Pricing, and therefore cannot obligate Google to apply Smart Pricing to every click on every web page; and (iii) other publicly available Internet materials adjacent to Exhibits B-F—material that Woods referenced in the FAC but chose not to disclose—further contradict Woods' theory of contract breach.

### 1. Exhibits B-F expressly limit Smart Pricing to clicks on the "Display Network," not every web site.

Although Woods alleges that Exhibits B-F provide that Google will Smart Price all clicks, the exhibits themselves contradict that allegation by providing—repeatedly—that Google

-12-

1    may Smart Price only certain clicks on the "Display Network." *See* p. 7, *supra* (quoting Exs. B-

2    F).

3          Because the cherry-picked Internet materials indicate (at most) an obligation to Smart

4    Price clicks on ads published on web sites that are part of the "Display Network," to plead a

5    breach of that obligation, Woods would have needed to allege that Google failed to Smart Price

6    one or more clicks on ads published on a web site that is part of that network.  He has not done

7    so.  Instead:

8        • Woods alleges that Google failed to Smart Price clicks on web sites operated by
           Google partner IAC (FAC ¶¶ 29-34, 41), but does not allege that IAC or the IAC
9          web sites at issue are part of the Display Network.[2]

10       • Woods alleges that Google failed to Smart Price clicks on web sites operated by
           Google partners Peeplo.com, Conduit, InfoSpace and Xacti (*id.* ¶ 42), but does not
11         allege that these partners or the cited web sites are part of the Display Network.

12       • Woods alleges that Google failed to Smart Price "clicks from mobile devices" (*id.*
           ¶ 39), but does not allege that any such clicks "from mobile devices" were made on
13         web properties in the Display Network.

14         Count I cannot survive this pleading deficiency. Woods has asked the Court to consider

15    Exhibits B-F to impose a universal Smart Pricing obligation on Google, but the exhibits provide

16    only that Google would Smart Price clicks on the "Display Network." Woods has alleged no

17    breach of that supposed obligation.

18              **2.    Exhibits B-F do not guarantee universal Smart Pricing of every
                         click on every website.**
19

20         Even if considered by the Court, Exhibits B-F do not guarantee universal or uniform

21    Smart Pricing of all clicks on all web sites. Those materials provide at most that Smart Pricing is

22    "automatic." *See* FAC, Exs. B ("automatically"); C ("automatically"); F ("automatically").

23    Woods asks the Court to construe "automatic" to mean universal or uniform—to support the

24    theory that Google violated these Internet statements by not Smart Pricing all clicks on all ads on

25    all web pages.

      _____

26    [2]  Although allegations are deemed true for purposes of a motion to dismiss, Woods'
      representations to this Court in Paragraphs 29-33 may be disregarded because they are
      contradicted by the publicly available documents he cites as support. *Sprewell v. Golden State*
27    *Warriors*, 266 F.3d 979, 988 (9th Cir. 2001). Those documents demonstrate on their face that
      Google did not disclose Smart Pricing or conversion ratios for IAC, as Woods alleges, nor did
28    Google's expert opine about those figures.

But that is not what "automatic" means.  If a software or Internet service feature is "automatic," that means only that—when applied or available—it operates without any proactive conduct by the user.  That is the dictionary definition.  *American Heritage Dictionary of the English Language* 125 (3d ed. 1992) ("operating in a manner essentially independent of external influence or control"; "acting or done as if by machine").[3]

Any materials providing that Smart Pricing is an "automatic" feature cannot be construed to mean that Google was obliged to apply the discount universally to all clicks.  Those materials could mean (at most) that Google represented the discount would be applied, or not, with "no action required" by the AdWords advertiser.  There is no allegation in the FAC that Google violated any such representation.

### 3. Other Internet materials—referenced extensively in the FAC— also make clear that Smart Pricing does not apply to all clicks.

If this Court were to consider Exhibits B-F—either as incorporated into the Agreement or as extrinsic evidence—the Court should also consider other Smart Pricing postings located in Google's AdWords Help Center.  The FAC refers to the AdWords Help Center extensively, FAC ¶¶ 76, 82, 83, 175, 178 & 179, and quotes from, and includes printouts of, portions of it.  *Id.* at Exs. B, C & E.  The Court is therefore entitled at the pleadings stage to consider other portions of the AdWords Help Center if it believes Exhibits B-F are relevant to the motion to dismiss. *Branch v. Tunnell*, 14 F.3d 449, 454 (9th Cir. 1994) (holding that a defendant may attach to a motion to dismiss documents that are referenced in a complaint) (overruled in part on other grounds in *Galbraith v. County of Santa Clara*, 307 F.3d 1119, 1127 (9th Cir. 2002)).

Those other Internet materials make even more clear that Google has disclosed that it does not apply a Smart Pricing discount to "all" clicks, but rather only to "certain" clicks, from

---

[3]   Tellingly, this is also reflected in the Help Center pages referenced in the FAC but not included as exhibits.  *See, e.g.,* Neukom Decl. Ex. 1 (explaining that "Google's smart pricing feature *automatically* reduces … bids for *certain* pages in the Google Network," so that "[t]here's *no action required* for you [the AdWords advertiser] to take advantage of this enhanced pricing model") (emphasis added).  No reasonable customer who consulted the pertinent Help Center pages, or even Google's online dictionary service, could have mistaken the common meaning of "automatic."  *See* www.google.com (search for "define: automatic") (defining "automatic" to mean "(of a device or process) Working by itself with little or no direct human control" or "operating with minimal human intervention").

1  certain web pages, and even then with the result that Google "may" apply a discount. *See* p. 8

2  n.1, *supra* (quoting from Neukom Decl., Exs. 1-3).

3     If Woods wishes for this Court to consider "Smart Pricing" postings in the AdWords

4  Help Center as part of the Agreement—which the Court should not do—Woods cannot ask the

5  Court to look only at the specific web pages he finds useful to his case. The Court should look at

6  all such postings. Doing so makes clear that Google has made no representation—let alone

7  assumed an obligation—to Smart Price "all" clicks. Because Google has made no such

8  representation or promise, Woods has no Smart Pricing contract claim.

9  **II.   WOODS HAS NOT PLEADED A BREACH OF ANY CONTRACT**
       **OBLIGATION THAT RELATES TO AD PLACEMENT (Count V).**
10

11     Woods' Count V largely duplicates Count I in the initial Complaint, and should be

   dismissed for the same reasons as its predecessor.
12

13     **A.   The Agreement Expressly Disavows Any Guarantees Regarding Ad**
            **Placement.**

14     Woods alleges that Google violated the Agreement by permitting third parties to display

15  ads for his law practice in ways he did not expect. In particular, Woods alleges that Google

16  promised him it would apply *AdSense* policies uniformly to all *third parties* publishing AdWords

17  ads, but did not do so. FAC ¶ 105. But the face of the Agreement imposes no such obligation on

18  Google. As the Court has already held, nothing in the Agreement requires Google to restrict the

19  placement or manner of Woods' ads on others' websites, or "obligates Google not to charge for

20  particular clicks." Order 6. To the contrary, the Agreement expressly provides that Woods:

21
        understands and agrees that ads may be placed on (y) any content or property
22      provided by Google … and, unless [Woods] opts out of such placement … (z) any
        other content or property provided by a third party … upon which Google places ads
23      … [Woods] authorizes and consents to all such placements.

24
   Agreement § 2; *see also* Order 2 (reciting additional provisions of the Agreement disavowing
25
   any Google obligation or guarantee regarding the placement of AdWords ads). Woods does not
26
   allege that he opted out. As a consequence, he has already "authorize[d] and consent[ed] to all
27
   … placements" he complains about now (Agreement § 2) and has no claim.
28

-15-

### B. Woods Cannot Salvage His Ad-Placement Contract Claim By Incorporating AdSense Policies.

Taking a familiar course, Woods suggests that the *AdWords* Agreement incorporates certain *AdSense* policies by reference—even though AdWords and AdSense are distinct products and services with distinct parties and wholly separate contracts.  As his basis for incorporating AdSense policies, and imposing new obligations on Google, FAC ¶¶ 151-53, Woods relies on Section 1 of the Agreement, which states that "[p]rogram use is subject to all applicable Google and Partner policies."  Woods tried the same tack with Count I in his initial Complaint, but Judge Fogel rejected that argument and dismissed that claim.  Order 6-7.

The specified purpose of Section 1 is to define participation requirements for AdWords advertisers, not to impose duties on Google.  Section 1's preamble language—"*Program use* is subject to …"—makes this clear.  AdWords advertisers *use* the AdWords progam; Google *provides* it. And in providing the AdWords program, Google imposes some basic requirements on advertisers.  For example, Section 1 provides that AdWords advertisers may not misuse Google's own trademarks in the content of their ads.  *Id.* (citing the "Trademark Guidelines").

In *Goddard*, Judge Fogel held that the very language that Woods invokes here does not impose *any* contractual duties on Google.  The plaintiffs in *Goddard* argued that (i) Google's Content Policies were incorporated into the Agreement by virtue of Section 1 of the same AdWords Agreement at issue here; (ii) Google "breached" those Policies by permitting fraudulent ads; and (iii) the plaintiffs (who were consumers rather than advertisers) were third-party victims of this "breach."  640 F. Supp. 2d  at 1199-1200; *see also* Dkt. 1, *Goddard v. Google*, No. 5:08-cv-0273-JF (N.D. Cal. filed May 30, 2008) (attaching Agreement with the same Internet URL as FAC Ex. A).

As Judge Fogel explained in rejecting that theory:

> Google's Advertising Terms and incorporated Content Policy constituted a promise by Google's advertising customers to Google in exchange for participation in Google's advertising service.  Neither agreement contains any promise by Google to enforce its terms or use or otherwise to remove noncompliant advertisements.

640 F. Supp. 2d at 1201.  As the court recognized, Google does not "use" its own AdWords program; advertisers do.  As such, Section 1 establishes only that an advertiser's ongoing "use"

-16-

of the AdWords program depends upon the advertiser's own compliance with Google's applicable policies (such as those forbidding the advertiser to post inappropriate ad content, compromise privacy interests of Internet users, or abuse Google trademarks). Nothing in Section 1 obligates Google, and any reference in Section 1 to extraneous documents could not do so either. *Valley Const. Co.*, 72 Cal. App. 2d at 841.

Additionally, even if Section 1 did not have a specified purpose that conflicted with the imposition of obligations on Google, the Court has held that Section 1's reference to "policies" refers only to *AdWords* policies, not *AdSense* policies. Order 6 (interpreting Section 1's reference to "policies" to mean "Advertising" or AdWords policies). For that reason, and because "[t]he fact that statements about invalid clicks are spread across a variety of pages in a variety of formats make[s] it difficult to identify the terms of any actual and unambiguous contractual obligations," the Court already has rejected Woods' effort to incorporate AdSense materials into the AdWords contract. Order 7. That holding requires dismissal of FAC Count V.

### C.    Woods Is Barred From Asserting Contract Claims Based On Ad Placement Allegations.

Woods' Count V should be dismissed for the additional, independent reason that he has not performed all conditions and promises required of him under the Agreement. Section 5 of the Agreement provides that:

> Customer's exclusive remedy, and Google's exclusive liability for suspected invalid impressions or clicks is for *Customer to make a claim for refund* in the form of advertising credits for Google Properties within the time period required under Section 7 below.

(Emphasis added). Section 7 of the Agreement likewise provides that:

> Customer waives all claims relating to charges (including without limitation any claims for charges based on suspected invalid clicks) *unless claimed within 60 days after the charge*[].

(Emphasis added).

These provisions create an incurable problem for Count V. Taking as true his allegation that he has discovered charges for improper clicks over a protracted period of time, Woods has violated the Agreement by failing to make his claims within 60 days and, therefore, has waived them.

1    The Court identified this failure as one of its many reasons for rejecting Woods' contract

2    claim in the initial complaint.  The Court observed that "Woods does not allege that he attempted

3    to seek a refund—*as required by the Agreement*—for charges relating to clicks he suspected

4    were invalid."  Order 8 (emphasis added).  Woods tries to plead around the issue in the FAC,

5    alleging that "[i]n March 2011 and again in September 2011, Woods made claims against Google

6    for the wrongs alleged herein.  Said claims were made within 60 days of his discovery of such

7    wrongs."  FAC ¶ 252.  But those are the dates that Woods filed his class action lawsuit (and then

8    the FAC) *in federal court*, not the "claim for refund" contractually required to be presented to

9    *Google* and to be satisfied, if valid, "in the form of advertising credits."  Agreement § 5.  This

10   timely-claim provision in the Agreement serves an important purpose.  Because Google is

11   constantly updating and improving its AdWords program, it is critical that Google know as soon

12   as possible of any erroneous charges that may result from the program's operation, so that any

13   errors in performance may be corrected with the least effect on other customers.  Woods' evasion

14   of his duty to make a timely claim has real consequences.  This basis for the Court's previous

15   dismissal of Woods' contract claim remains valid, and the claim should be dismissed again.

16   **III.    WOODS' IMPLIED COVENANT CLAIMS (Counts II and VI) ARE
17            SUPERFLUOUS AND FAIL TO IDENTIFY ANY SPECIFIC DUTY THAT
             GOOGLE FAILED TO DISCHARGE.**

18        Woods repackages his deficient contract claims with allegations that, by engaging in the

19   very same conduct, Google breached the implied covenant of good faith and fair dealing.  FAC

20   ¶¶ 64 & 169.  Woods' implied-covenant claims should be dismissed for at least two reasons.

21        *First*, Woods' implied-covenant claims do no more than rehash his untenable contract

22   claims.  The allegations of breaching conduct, and resulting damages, are *identical* between these

23   claims.  *Compare* FAC ¶¶ 55 & 57 (breach and relief for Count I), *with id.* ¶¶ 64 & 72 (same for

24   Count II); *compare id.* ¶¶ 156 & 158 (breach and relief for Count V), *with id.* ¶¶ 165 & 171

25   (same for Count VI).  Implied-covenant claims of that sort should be dismissed, as Judge Fogel

26   held when dismissing Woods' initial complaint:

27        If the allegations in a breach of implied covenant claim do not go beyond the
          statement of a mere contract breach and, *relying on the same alleged acts*, simply
28        *seek the same damages or other relief* already claimed in a companion contract cause

                                        -18-

of action, they may be disregarded as superfluous as no additional claim is actually stated.

Order 10 (emphasis added) (quoting *Malcolm v. JP Morgan Chase Bank, N.A.*, No. 09-4496-JF, 2010 U.S. Dist. LEXIS 23770, at *7 (N.D. Cal. Mar. 15, 2010), and *Schulken v. Wash. Mut. Bank*, No. C. 09-02708 JW, 2009 U.S. Dist. LEXIS 114030 (N.D. Cal. Nov. 19, 2009)).

*Second*, Woods' implied-covenant claims should be dismissed for the additional reason that Woods has again failed to identify any "specific duty that [Google] failed to discharge." Order 11. When the parties have "a contractual relationship[,] … the implied covenant is limited to assuring compliance with the express terms of the contract, and cannot be extended to create obligations not contemplated in the contract." *Racine & Laramie, Ltd. v. Dep't of Parks & Recreation*, 11 Cal. App. 4th 1026, 1032 (1992). The Court dismissed Woods' implied-covenant claim in his initial Complaint consistent with that precedent:

> Woods has not shown that Google promised advertisers that it would not enter into any agreements with publishers with terms that were different from those of the basic AdSense Agreement or that Google had any independent obligation to enforce the AdSense Agreement against publishers. Similarly, Woods has not explained why Google's Smart Pricing discount feature required it to provide particular discounts to each ad placements.

Order 11. Nothing has changed. Because Woods cannot show any *contractual obligation* to AdWords advertisers to Smart Price all clicks or to enforce AdSense policies uniformly against third parties, Google's alleged failures in these respects did not breach any implied covenant.

## IV.   WOODS' UCL AND FAL CLAIMS (Counts III, IV, VII and VIII) SHOULD BE DISMISSED FOR LACK OF STANDING, SUBSTANCE AND PARTICULARITY.

The Court should dismiss Woods' UCL and FAL claims based on his dissatisfaction with Smart Pricing and charges for clicks on "non-compliant sites." Woods has not adequately pleaded either his own standing or any conduct that is unfair, unlawful or fraudulent.

### A.   Woods Has Not Pleaded Any Injury Resulting From Supposedly "Unfair" Business Practices.

Woods alleges that Google's failure to apply Smart Pricing universally, and Google's placement of his ads with "non-compliant" third-party websites that were not subject to the standard online AdSense policies, constitute "unfair" business practices. FAC at ¶¶ 87-88, 185.

-19-

But Woods' "unfair" claim must show—as Woods concedes (*id.*)—some injury to Woods and others. As the Court previously held, however, "unless Woods can explain why he and other advertisers had a legal right to the Smart Pricing discounts on the ad placements at issue," or "why he and other advertisers had a legal right not to be charged for clicks from so-called Banned Ad Implementations, he cannot show any cognizable injury." Order 12. Woods did not do that in his initial Complaint, and he has not done so in the FAC.

### B.      Woods Has Not Pleaded "Unlawful" Conduct.

Woods alleges that Google's conduct in failing to apply Smart Pricing to every click and in charging him for clicks on "Non-Compliant Sites" is "unlawful" under California's UCL because it constitutes a breach of contract and the implied covenant of good faith and fair dealing. FAC at ¶¶ 89-90. As explained above, however, Woods has pleaded no breach of any kind. Even if he had, Woods may not support a UCL claim simply by alleging that Google breached a contract with him; he must also plead that the "breaches of contract are *independently* unfair, unlawful, or fraudulent." *Sybersound Records, Inc. v. UAV Corp.*, 517 F.3d 1137, 1152 (9th Cir. 2008) (emphasis added). He has not done that.

### C.      Woods Has Not Pleaded Fraud-Based UCL or FAL Claims And Cannot Do So.

Woods also has failed to plead UCL or FAL claims based on fraudulent conduct, for three independent reasons.

#### 1.      Woods has not alleged any misrepresentations, let alone fraud.

Woods alleges that Google is liable for fraudulent misrepresentations under California's UCL and FAL laws because Google represented that it would "apply Smart Pricing to *all clicks*." FAC ¶ 77 (emphasis added). But Woods' own pleading materials disprove that allegation. Nowhere did Google represent that it would apply Smart Pricing to "all clicks." As explained above, Google represented only that it would apply a Smart Pricing discount "automatically" to some—but not all—clicks, and even then only for clicks emanating from the "Display Network." Because Woods has not alleged that any of these representations were false—for example, that Google has *not* been applying a Smart Pricing discount to *some* clicks on the *Display Network*—

1    he has not alleged any misrepresentations.

2        Likewise, Woods has not alleged any representation by Google that it would not place

3    Woods' ads on what he calls "non-compliant" websites.  To the contrary, Google retained

4    discretion about where ads would be placed, and Woods himself signed a contract agreeing to

5    Google's discretion to do that.  *See* Agreement § 1; *see* p. 15, *supra*.

6        **2.    Woods still has not satisfied the particularity requirement.**

7        To support UCL or FAL claims with allegations of fraudulent conduct, Woods must

8    satisfy the heightened pleading requirements of Fed. R. Civ. P. 9(b).  As the Court explained

9    when dismissing Woods' fraud-based claims in the initial complaint, "Woods must identify both

10   the particular statements he claims are fraudulent and why he claims that the statements are

11   fraudulent."  Order 12-13; *see also Kearns v. Ford Motor Co*., 567 F.3d 1120, 1125 (9th Cir.

12   2009) (applying Rule 9(b) standards to UCL claim).  To satisfy that requirement, Woods "must

13   state precisely the time, place, and nature of the misleading statements, misrepresentations, and

14   specific acts of fraud."  *Kaplan v. Rose*, 49 F.3d 1363, 1370 (9th Cir. 1994).

15       Woods' allegations do not satisfy this standard.  To begin with, as to Google's alleged

16   representations about Smart Pricing (FAC ¶¶ 76-77), Woods never pleads with particularity *how*

17   or *why* those representations were false or misleading.  Rather, he alleges that they were

18   misleading only because these representations were contractual promises that Google later

19   breached.  These were statements on a Help Center page, not contractual promises, and Google

20   did not behave inconsistently with them. More important, as the Court has already held in this

21   case, Woods cannot support a fraud claim simply by alleging a contract breach: "To the extent

22   that his theory of fraud is distinguishable from his contract claim, Woods must explain with

23   greater particularity why the statements provide a basis for a claim of fraud."  Order 13.  Woods

24   still has not done so.

25       The only "misrepresentation" about "non-compliant sites" that Woods identifies is in

26   FAC ¶ 175, which alleges that Google stated that it monitors "[a]ll web sites and products" so

27   that "AdWords ads will continue to appear only on high-quality sites and products."  That

28   statement is not in the Agreement or in any exhibit to the FAC.  Woods does not explain where

-21-

or when that representation was made—for example, on what web site. Woods does not even allege with particularity why the challenged statement was untrue. Woods repeatedly suggests he is relying on other alleged "statements" for this fraud claim, *see, e.g.*, FAC ¶ 180 ("the foregoing statements"), but does not identify them. This pleading does not satisfy Rule 9(b).

### 3. Woods could not "reasonably rely" on extraneous statements beyond the four corners of an integrated, written agreement.

Woods' UCL and FAL misrepresentation claims fail for the additional, independent reason that he lacks standing to pursue them. To establish standing as a class representative for a UCL or FAL misrepresentation claim, Woods must show his own reasonable reliance on the allegedly untrue or misleading statements. Order 13 (citing *In re Tobacco II Cases*, 46 Cal. 4th 298, 328 (2009) ("actual reliance" required for a UCL claim based on alleged misstatements), and *Kwikset Corp. v. Superior Court*, 51 Cal. 4th 310, 326 n.9 (2011) (same requirement for a FAL claim)). Whether an individual's reliance was actual and reasonable, for UCL and FAL purposes, is based on "well-settled principles regarding the element of reliance in ordinary fraud actions." *Tobacco II*, 46 Cal. 4th at 306.

The Court previously held that Woods had not sufficiently alleged reliance as he failed to explain how, as a practicing attorney, he could have reasonably relied on statements outside of the AdWords Agreement despite "clear language in the Agreement excluding any reliance on extraneous statements or promises." Order 14. Specifically, Section 9 of the Agreement states that "[n]o statements or promises have been relied upon in entering into this Agreement except as expressly set forth herein." Woods also agreed that any statements beyond the Agreement would have no effect: "any conflicting or additional terms contained in any other documents … are void." Agreement § 9.

Although the Court already held that Woods lacked standing to pursue his fraud-based claims, the FAC repeats these claims without any further allegations explaining how or why Woods, as a practicing attorney, reasonably could have relied on extraneous materials even though he signed a short, plain, written contract containing a clear "no reliance" clause. As a matter of law, an attorney who has signed an integrated contract cannot plead reasonable reliance

on statements outside it. *See Guido v. Koopman*, 1 Cal. App. 4th 837, 843-44 (1991) (holding that an attorney could not reasonably rely on oral statements contrary to a written release she signed); *see also Scognamillo v. Credit Suisse First Boston LLC*, No. C03-2061, 2005 WL 645446, at *5 (N.D. Cal. Mar. 21, 2005) (observing that allegations by sophisticated businessmen and lawyers that they relied on oral statements of defendants beyond the terms of a prospectus "appear to be unreasonable"). This Court should reach the same conclusion as before. *See* Order 13-14.

## V.    WOODS HAS NOT PLEADED A UCL CLAIM FOR LACK OF "GEOGRAPHIC TARGETING."

Finally, Woods has based a brand-new UCL claim (Count IX) on a *question* Google asked him about his ad campaign: "In what geographical locations do you want your ads to appear?" FAC ¶¶ 204-05 & Exs. J & K. Woods alleges that, because he answered the question in a certain way—indicating his preference for certain areas inside Arkansas—and because some of his ads appeared outside those areas, Google has run afoul of the UCL. FAC ¶¶ 213-30. Woods does not even try to tether these allegations to a breach of contract or plead that they are independently unlawful. And like Woods' other UCL claims rooted in unfair or fraudulent conduct, Count IX fails to identify any misrepresentations, any legal rights that Google may have compromised, or any cognizable injuries. *See* Order 12 (rejecting Plaintiff's previous UCL claims on similar grounds).

Woods does not allege that Google made any representations, guarantees, or other commitments that all of his ads would appear within only certain areas of Arkansas at all times and under all circumstances. Instead, Woods asks this Court to infer a misrepresentation from the question Google asked—without alleging *anything* about what Google told him about the *answer* to that question. In particular, Woods does not tell the Court whether he clicked on the link on the left-hand side of Exhibit J entitled "What geographical location targeting options do I have?," nor does he disclose the information he would have learned if he had clicked there. Similarly, Woods does not allege whether he clicked on the link in Exhibit K entitled "Learn more about location targeting options," and he says nothing about the information contained

1   behind that link, either.  If he had alleged the contents behind those links, he would have had to
2   disclose how Google explains that an Internet user outside of Fayetteville, Arkansas, who
3   searches for "Fayetteville lawyer" may see one of Woods' ads, even though Woods expressed a
4   "preference" for his ad to appear only within the physical confines of Fayetteville.

5       At most, Woods has alleged that Google asked a question about geo-targeting preferences
6   and provided Help links to explain what the question meant and how Woods' answer would be
7   implemented.  There is nothing false,  misleading, or harmful about this routine element of the
8   set-up process for Woods' ad campaign.  And in any event, Woods does not (and cannot) allege
9   any legally cognizable injury from a handful of clicks that resulted in users visiting his website
10  and possibly retaining his services.  *See* Order 12.  Count IX should be dismissed accordingly.

11  **VI.     FURTHER AMENDMENT WOULD BE FUTILE.**

12      Woods has twice failed to plead his claims.  The Court's instructions in the first dismissal
13  order have proved beyond his capabilities for compliance.  Because the Agreement remains the
14  same, there is no reason to believe that another effort at amendment would succeed.  The FAC
15  should be dismissed with prejudice.

16                                  **CONCLUSION**

17      For the foregoing reasons, the Complaint should be dismissed without leave to amend.

18  Dated:  October 8, 2011                      MAYER BROWN LLP
19
20                                               By:  ___/s/_Edward D. Johnson_____
21                                                     Edward D. Johnson
                                                      Donald M. Falk
22                                                    John M. Neukom
                                                      Hamsa M. Murthy
23
                                                 Attorneys for Defendant
24                                               Google Inc.
25
26
27
28

-24-