**KESSLER TOPAZ**
**MELTZER & CHECK, LLP**
Ramzi Abadou   (Bar No. 222567)
Stacey M. Kaplan  (Bar No. 241989)
Erik D. Peterson   (Bar No. 257098)
580 California Street, Suite 1750
San Francisco, CA 94104
Telephone: (415) 400-3000
Facsimile: (415) 400-3001
rabadou@ktmc.com
skaplan@ktmc.com
epeterson@ktmc.com

-and-

| | |
|---|---|
| Sean M. Handler (*pro hac vice*) | **NIX, PATTERSON & ROACH, LLP** |
| Joseph H. Meltzer (*pro hac vice*) | Jeffrey J. Angelovich (*pro hac vice*) |
| Peter H. LeVan, Jr. (*pro hac vice*) | Brad E. Seidel (*pro hac vice*) |
| Naumon A. Amjed (*pro hac vice*) | 3600 N. Capital of Texas Hwy, Bldg. B, Ste. 350 |
| Ryan T. Degnan (*pro hac vice*) | Austin, TX 78746 |
| 280 King of Prussia Road | Telephone: (512) 328-5333 |
| Radnor, PA 19087 | Facsimile: (512) 328-5335 |
| Telephone: (610) 667-7706 | jangelovich@npraustin.com |
| Facsimile: (610) 667-7056 | bradseidel@nixlawfirm.com |
| shandler@ktmc.com | |
| jmeltzer@ktmc.com | |
| plevan@ktmc.com | |
| namjed@ktmc.com | |
| rdegnan@ktmc.com | |

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
SAN JOSE DIVISION

| | |
|---|---|
| RICK WOODS, Individually and On Behalf of Others Similarly Situated, | Case No. 11-cv-01263-EJD |
| Plaintiff, | **SECOND AMENDED CLASS ACTION COMPLAINT** |
| v. | |
| GOOGLE INC., | DEMAND FOR JURY TRIAL |
| Defendant. | |

## TABLE OF CONTENTS

I.      INTRODUCTION ........................................................................................... 1

II.     THE COURT'S AUGUST 24, 2012 ORDER AND THIS COMPLAINT .................... 3

III.    SUMMARY OF ACTION ................................................................................. 6

IV.     PARTIES ..................................................................................................... 7

V.      JURISDICTION AND VENUE .......................................................................... 7

VI.     PART I – SMART PRICING ............................................................................ 8

        A.  FACTUAL BACKGROUND RELATING TO SMART PRICING ..................... 8

        B.  CLAIMS RELATING TO SMART PRICING ........................................... 13

                COUNT I – Breach of Contract .................................................... 13

                COUNT II – Breach of the Implied Covenant of Good Faith
                    and Fair Dealing ................................................................. 15

                COUNT III – Violation of Cal. Bus. & Prof. Code §§17200 *et seq.* ............. 18

                COUNT IV – Violation of Cal. Bus. & Prof. Code §§17500 *et seq.* ............. 23

VII.    PART II – LOCATION TARGETING ................................................................. 24

        A.  FACTUAL BACKGROUND RELATING TO LOCATION
            TARGETING .................................................................................. 24

        B.  CLAIM RELATING TO LOCATION TARGETING .................................... 26

                COUNT V - Violation of Cal. Bus. & Prof. Code §§17200 *et seq.* ............... 26

VIII.   CLASS ALLEGATIONS ................................................................................. 29

IX.     DISCOVERY RULE, TOLLING, AND FRAUDULENT
        CONCEALMENT ......................................................................................... 31

X.      JURY DEMAND .......................................................................................... 33

XI.     PRAYER .................................................................................................... 33

Plaintiff Rick Woods ("Woods" or "Plaintiff"), on behalf of himself and all others similarly situated, files this Second Amended Class Action Complaint (the "Complaint") against Defendant Google Inc. ("Google" or "Defendant").  For his Complaint, Woods alleges as follows:

## I.    INTRODUCTION

1.    Google's AdWords Program ("AdWords") is a cost-per-click advertising program offered by Google to advertisers who wish to have Google display their ads on the Internet.[1]  Through AdWords, advertisers pay only when an Internet user clicks on their ads.

2.    Participation in AdWords is governed by the Google Inc. Advertising Program Terms (the "Agreement").[2]

3.    During September 2009, Woods researched AdWords to determine whether to advertise his Fayetteville, Arkansas law practice through Google.

4.    Based on this research, Woods learned that Google promotes AdWords as an advertising program designed to provide cost-effective, targeted cost-per-click advertising on high quality websites.

5.    Specifically, through his research, Woods learned that Google promises to "Smart Price" *all* clicks on ads originating from the Display Network[3] (described herein as "Smart Pricing").  According to Google, Smart Pricing is a feature that automatically reduces the price advertisers pay for clicks based on the likelihood the click will result in a business result.  Google explains that clicks are automatically discounted where Google's data shows the clicks are less likely to result in a conversion (*i.e.*, a business result) than clicks from google.com, which serves as the benchmark for Smart Pricing discounts.  In other words, if the "conversion rate" for a particular website is lower than the "conversion rate" for google.com,

---

[1] Google displays AdWords ads on google.com, certain other Google properties (*e.g.*, YouTube and Gmail), and websites and properties of third parties ("partners") who enroll in Google's AdSense Program ("AdSense").  For clicks on ads from AdSense partner properties, Google and its partners split the revenues generated from such clicks.

[2] *See* Exhibit A.

[3] The "Display Network" is described below at note 9.

Google automatically reduces the price of each click from that website according to the following formula:

Smart Pricing discount = Price of Click x (1 – Conversion Score)

The Smart Pricing measurement is applicable to ads shown on all websites and properties in the Display Network, including mobile applications ("mobile apps") and Display Network websites and properties accessed through mobile devices with full Internet browsers.[4]

6.   During his research, Woods also learned that he could limit the geographic distribution of his ads.  That is, Google promises to limit the distribution of ads to users located in the specific geographic location(s) selected by advertisers.  This was important to Woods because he wanted to limit his advertising to people located in and around the Fayetteville, Arkansas area—the people most likely to use his services.

7.   Based on this research, Woods opened an AdWords account.  Woods began advertising with Google and accepted (by "clicking through") the Agreement on September 30, 2009.  Woods continued advertising with Google until March 8, 2011, shortly after he learned that Google had not Smart Priced his ads as promised.

8.   Indeed, Woods learned that he was overcharged as a result of Google's failure to Smart Price Display Network clicks arising from mobile devices.  Similarly, he learned that Google exempted certain of its partners (the "Special Partners") from Smart Pricing all together.[5]   In short, Woods discovered that Google deprived him of the benefit of his bargain

---

[4] In this Complaint, Woods references Google's promise and obligation to Smart Price clicks on ads originating from the Display Network.  Where he does so, Woods alleges that Google's Smart Pricing measurement (the measurement of whether a click is less likely than google.com to convert into a business result and should be discounted) automatically applies to all clicks on the Display Network, while the Smart Pricing discount (the actual reduction in the cost of a click that is less likely to convert) automatically applies to reduce the cost of a click when the Smart Pricing measurement reveals a click is less likely to convert.

Thus, Smart Pricing—as alleged herein by Woods—does not result in each and every Display Network click being discounted.  Rather, Smart Pricing results in a discount for the subset of Display Network clicks that are less likely than google.com to convert into a business result, as determined by Google's measurements.

[5] On information and belief, Google's Special Partners include, among others, IAC/InterActiveCorp ("IAC"), InfoSpace, Inc. ("InfoSpace"), AOL, Inc., Value Click, Inc. ("Value Click"), Network Solutions LLC ("Network Solutions"), Peeplo.com, Conduit, and Xacti.  On information and belief, the Special Partners have agreements with Google whereby clicks from their websites are not Smart Priced.

by cutting preferential secretive deals with Special Partners to Woods' detriment.  As a result, Google significantly overcharged Woods for worthless advertising and clicks, which had a value far less than the price Google charged for them.  Woods has been overcharged for *at least* 60% of clicks (471 of 787 total clicks) his ads received during the course of his 17-month relationship with Google.  Woods believes discovery will demonstrate that he was overcharged on substantially more clicks.

9.     On March 15, 2011, Woods filed his original Class Action Complaint seeking to recover damages, restitution, and other relief relating to Google's breach of its obligations and deceptive misconduct.

10.     After filing his original Class Action Complaint, Woods discovered that Google had harmed him in an additional way.  Google had not limited the distribution of his ads to the geographic locations he selected as Google had represented it would do(discussed herein as "Location Targeting").  In his AdWords account, Woods selected to have his ads appear only to users located in Ft. Smith, Fayetteville, Springdale, and Rogers, Arkansas.  However, Woods recently discovered that he paid for clicks from users located in Scranton, Pennsylvania, Lubbock, Texas, and Kilgore, Texas.  These clicks also included a click originating *from a Japanese website*.  Compounding matters, Woods also discovered that Google lied about the geographic origin of these clicks.  In each case, Google informed Woods the clicks came from users in Ft. Smith, Fayetteville, Springdale, and Rogers, Arkansas.

## II.     THE COURT'S AUGUST 24, 2012 ORDER AND THIS COMPLAINT

11.     On August 24, 2012, the Court issued its Order Granting-in-Part and Denying-in-Part Motion to Dismiss First Amended Complaint (the "Order").  *See* Dkt. No. 85.

12.     In the Order, the Court denied Google's motion to dismiss Woods' claim pertaining to Location Targeting.  *See* Order at 15-16.  Accordingly, Woods reasserts without modification that claim herein as Count V.  *See* ¶¶114-141 *infra*.

13.     In the Order, the Court dismissed Woods' four claims pertaining to Non-Compliant Sites.  *See* Order at 10-15.  While the dismissal is without prejudice and with leave

to amend, Woods is not at this time reasserting claims pertaining to Non-Compliant Sites. However, Woods reserves the right to assert claims arising from such previously alleged conduct at a later date, if warranted.

14.    Finally, the Court dismissed, without prejudice and with leave to amend, Woods' four claims pertaining to Smart Pricing.  *See* Order at 6-10, 12-15.  The Court found certain terms in the Agreement ambiguous, *see* Order at 7-8, 14, and concluded extrinsic evidence supports Woods' interpretation that the Smart Pricing measurement applies to all clicks on the Display Network.  *See* Order at 8 ("The exhibits, however, do support the interpretation that … Google must base the charges for Display Network clicks, at least in part, on the Smart Pricing formula."); *see also* Order at 7-8 ("These exhibits indicate that the Smart Pricing formula is one of the measurements Google uses to calculate charges for clicks, is included in the AdWords program, and is applied to Display Network clicks.").  Nonetheless, the Court dismissed Woods' Smart Pricing claims concerning the Display Network for the sole reason that Woods failed to "plead[] that any of the clicks that Google failed to Smart Price were from the Display Network."  *See* Order at 10; *see also* Order at 12, 13, 15.[6]

15.    In this amended Complaint, Woods corrects the pleading deficiencies cited by the Court.  He now provides specific allegations of Google's failure to Smart Price clicks originating from the Display Network, identifying the date and website/device on which each non-Smart Priced Display Network click occurred.

16.    As relevant to the clicks described below, the Display Network includes websites that partner with Google (like reference.com), mobile apps (which Google identifies on its billing reports as adsenseformobileapps.com and nextmobileweb.com), and websites that

---

[6] The Court also dismissed (without prejudice) Woods' claims concerning Smart Pricing the Search Network based on its conclusion that the exhibits attached to the First Amended Complaint "do not show that the 'measurements' clause is reasonably susceptible to Woods' interpretation that Smart Pricing applies to all clicks." *See* Order at 8.  As previously alleged, Google failed to Smart Price numerous clicks originating from the Search Network, including clicks from IAC, Peeplo, Conduit, InfoSpace, and Xacti (all of which were Search Network clicks).  Nevertheless, at this time and pursuant to the Court's Order, Woods limits his allegations concerning Smart Pricing to Google's failure to apply its Smart Pricing measurement to clicks on Display Network ads.  Woods, however, reserves the right to assert claims arising from Google's failure to apply its Smart Pricing measurement to clicks on Search Network ads at a later date.

appear on mobile devices with full Internet browsers (like savysoda.com).  Each of the clicks described below (from reference.com, adsenseformobileapps.com, nextmobileweb.com, and savysoda.com) are Display Network clicks and appeared in Woods' online AdWords account on Display Network reports generated by Google.

17.     Woods alleges Google failed to Smart Price clicks arising from Google Special Partners' websites in the Display Network.  Specifically, Google failed to Smart Price at least six clicks from the reference.com website operated by Google Special Partner IAC.  The reference.com website is part of Google's Display Network.  The following six Display Network clicks were not Smart Priced:

| Date | IAC Site | Actual Charge to Woods | IAC Smart Pricing Discount (9.31%) | Amount Woods should have paid |
|------|----------|------------------------|-------------------------------------|-------------------------------|
| 02/17/10 | Reference.com | $0.99 | $0.09 | $0.90 |
| 05/24/10 | Reference.com | $1.29 | $0.12 | $1.17 |
| 05/27/10 | Reference.com | $1.60 | $0.14 | $1.46 |
| 06/07/10 | Reference.com | $1.29 | $0.12 | $1.17 |
| 12/09/10 | Reference.com | $1.48 | $0.13 | $1.35 |
| 02/22/11 | Reference.com | $1.88 | $0.17 | $1.71 |

See ¶¶39-42 *infra*.

18.     Likewise, Google failed to Smart Price clicks from mobile apps.  All mobile apps are part of the Display Network.  According to one of Google's Senior Vice Presidents, Google failed to Smart Price 464 clicks in Woods' account that originated from mobile apps during the period of September 1, 2009 to August 31, 2010.  *See* ¶¶44-46 *infra*.

19.     Similarly, Google failed to Smart Price Display Network clicks from mobile devices with full Internet browsers.  Google's Smart Pricing obligation applies to Display Network ads that appear on mobile devices with full Internet browsers.  Google failed to Smart Price a $3.08 click originating from savysoda.com, a Display Network property, made from an iPhone on August 4, 2010.[7]  An iPhone is unquestionably a mobile device with a full Internet browser.

---

[7] On information and belief, neither Woods' ads nor savysoda.com utilize the WAP mobile ad format.

20.     This Complaint corrects all deficiencies cited by the Court concerning Smart Pricing of Display Network clicks.

**III.     SUMMARY OF ACTION**

21.     Google consummated the prototypical bait and switch:

| Google's Representations<br>"The Bait" | Reality<br>"The Switch" |
| --- | --- |
| Google automatically applies Smart Pricing to *all* clicks on the Display Network, including clicks from mobile apps. | Google did not Smart Price Display Network clicks, including clicks from mobile apps or clicks from its Special Partners' websites on the Display Network. |
| Google displays ads *only* to users located in the geographic location the advertiser selects. | Google displayed ads to users located far beyond advertisers' selected geographic location(s). |

22.     Google's conduct constitutes a breach of the Agreement, breach of the implied covenant of good faith and fair dealing, violation of California Business and Professions Code §§17200, *et seq.* ("UCL"), and violation of California Business and Professions Code §§17500, *et seq.* ("FAL").

23.     Woods brings this action seeking relief for Google's misconduct on behalf of himself and a class consisting of:

> All persons and entities located within the United States who advertised through Google's AdWords program and paid for clicks on their Google AdWords advertisement(s) at any time between and including April 1, 2004 and the day the Court certifies this action as a class action, where such clicks originated from Google's Display Network and were not Smart Priced, or originated from a geographic location other than the location selected by the advertiser (the "Class").  Excluded from the Class are Google and its affiliates, officers, and directors.  Also excluded from the Class are the members of the judiciary and their staff to whom this action is assigned.

24.     For himself and the Class, Woods seeks (a) a declaration that Google breached its contractual obligations to Class members, (b) actual damages to fully compensate for losses sustained as a direct, proximate, and/or producing cause of Google's breaches and unlawful conduct, (c) restitution and disgorgement of all monies Google derived from Class members

1   through the misconduct described herein, (d) pre-judgment and post-judgment interest,

2   (e) attorneys' fees, (f) injunctive relief to ensure that the misconduct described herein finally

3   ends, without the threat of it reoccurring in the future, and (g) any such other and further relief

4   as the Court deems just and proper.

5       25.     Google's conduct with respect to Smart Pricing is addressed in Part I and

6   Location Targeting is addressed in Part II of this Complaint.

7   **IV.     PARTIES**

8       26.     Plaintiff Woods is an individual who resides and operates a law practice in

9   Fayetteville, Washington County, Arkansas.  Woods began advertising through Google on or

10  about September 30, 2009.  Woods incurred losses and has been injured by the actions of

11  Google described herein.

12      27.     Defendant Google is a Delaware corporation with its principal place of business

13  located at 1600 Amphitheatre Parkway, Mountain View, California 94043.  Google has

14  appeared in this action for all purposes.  Additional service is not necessary.

15  **V.     JURISDICTION AND VENUE**

16      28.     The Court has jurisdiction over this action pursuant to 28 U.S.C. §1332(d)(2).

17  If a class is certified in this action, the amount in controversy will exceed $5,000,000.00,

18  exclusive of interest and costs, and this is a class action in which at least one member of the

19  Class is a citizen of a state different from any defendant.  Although Google is located in

20  California, the principal injuries resulting from Google's conduct have been incurred

21  throughout the United States where Class members are located.  On information and belief,

22  greater than two-thirds of the members of the proposed Class are citizens of states other than

23  California.

24      29.     This Court has general jurisdiction over Google.  Google engages in continuous

25  and systematic activities within the State of California.  Indeed, Google's headquarters are

26  located in Mountain View, California, which is within the jurisdiction of this Court.

27

28

30.     Venue is proper in this District pursuant to 28 U.S.C. §1391.  Specifically, as provided by 28 U.S.C. §1391(c), Google is a corporation that is deemed to reside in this District.  Moreover, a substantial part of the events and omissions giving rise to the claims alleged herein occurred in this District.

## VI.     PART I – SMART PRICING

### A.     FACTUAL BACKGROUND RELATING TO SMART PRICING

31.     Google states that Smart Pricing is an "*automatic* pricing discount feature"[8] that applies to *all* clicks on the Display Network such that those Display Network clicks that are less likely to convert are discounted.[9]

32.     According to Google, if a click on an ad from a website is less likely to result in a "conversion" than a click from google.com, Google *automatically reduces* the price of that click.  Google defines a conversion as a click resulting in an actual business result (*e.g.*, online sale, registration, phone call, or newsletter sign-up).

33.     Google promotes Smart Pricing as having at least two primary benefits to advertisers.  First, Google represents to advertisers that Smart Pricing will increase their return on investment (ROI) of advertising dollars.[10]  Indeed, Google's Chief Economist describes Smart Pricing as a way to ensure that profitability and value are delivered to advertisers.[11]

---

[8] *See* Exhibit B ("AdWords includes *two automatic pricing discount features*: Smart Pricing – a feature that *automatically reduces the price advertisers pay for clicks* if our data shows that a click from a Display Network page is less likely to result in a conversion…." (emphasis added)); *see also*  Exhibits C-E; Google AdSense Smart Pricing Video featuring Google's Chief Economist Hal Varian, http://www.youtube.com/watch?v=O1BaOMqcyQY (hereinafter, "Varian Video") ("What Smart Pricing does is allow our system to *auto-adjust the advertiser's bid* across the sites according to the likelihood the click will deliver actual business results.  An advertiser can then *confidently bid the maximum* they are willing to pay across all sites and *leave it to our system to take care of the rest*."(emphasis added)).

[9] The "Google Network" consists of two components:  the "Search Network" and the "Display Network."  The Search Network consists of websites, like www.google.com or other search sites powered by Google, where users input search terms in a Google search box and ads appear alongside the search results.  In contrast, the Display Network consists of websites that partner with Google (like www.mapquest.com and www.nytimes.com), specific Google properties (like YouTube and Gmail), and mobile apps.  According to Google, Smart Pricing applies, at a minimum, to clicks on ads occurring on the Display Network.  Additionally, according to Google, Smart Pricing applies to ads that appear on mobile devices with full Internet browsers.  *See* Exhibit L.

[10] *See* Exhibit C.

[11] *See* Varian Video, http://www.youtube.com/watch?v=O1BaOMqcyQY ("Smart Pricing helps to ensure that profitability and value is delivered to advertisers and they continue to spend on AdSense sites in the long run.").

And, Google tells advertisers that Smart Pricing "works all the time" to "*automatically reduce your cost*" of clicks and "*maximize your value*."[12]

34.     Second, Google touts Smart Pricing as a way to alleviate burdens on advertisers and avoid "guesswork."[13]   Google actively encourages advertisers to "*confidently bid the maximum they are willing to pay*" and trust Google's Smart Pricing system to downwardly adjust the prices of Display Network clicks based on the likelihood that clicks from the website at issue will convert into a business result.[14]

35.     In other words, Google tells its advertisers not to worry about site-specific bidding (*i.e.*, setting specific bids for specific websites or properties) because Google will reduce the cost of the click based on the conversion score[15] of the website generating the click.

36.     Google measures and maintains conversion scores (also called conversion rates) for all websites and properties in the Google Network that display AdWords ads.

37.     Smart Pricing works as follows.   For Display Network clicks arising from websites and properties having conversion scores less than google.com, Google discounts the price of all such clicks.   The total amount of the discount is equal to the price of that click multiplied by (1 minus the conversion score for the website or property originating the click). The Smart Pricing formula is expressed as follows:

Smart Pricing discount = Price of Click x (1 – Conversion Score)

38.     As the Court previously determined, "the Smart Pricing formula is one of the measurements Google uses to calculate charges for clicks, is included in the AdWords program, and is applied to Display Network clicks."  Order at 7:26-8:2, 8:16-19.

39.     As set forth in Google's Court filings in *In re Google AdWords*, the conversion score for IAC websites and properties[16] is 0.9069.[17]   In other words, a click from an IAC

---

[12] *See* Exhibit F.

[13] *See* Exhibit G ("As a result [of Smart Pricing], advertisers are saved the guesswork of estimating the value of clicks from different keywords or sites (content vs. search, for example) and adjusting their bids.").

[14] *See* Varian Video, http://www.youtube.com/watch?v=O1BaOMqcyQY.

[15] The conversion score is Google's measurement of the likelihood that clicks from a particular website will result in a business transaction.

website or property is, according to Google's data, only 90.69% as likely to convert as a click from google.com.  Thus, the Smart Pricing discount for clicks arising from IAC websites and properties is 9.31% as demonstrated below:

Step 1: Smart Pricing discount = Price of Click * (1 – Conversion Score)
Step 2: Smart Pricing discount = Price of Click * (1 – 0.9069)
Step 3: Smart Pricing discount = Price of Click * (0.0931)

40.     In those same Court filings, Google revealed that it has not Smart Priced any clicks on advertisements from IAC websites or properties.  Specifically, Google's litigation expert, Dr. Randolph E. Bucklin, concluded that one of the plaintiffs in that case was overcharged $37.88 for 51 clicks arising from Ask Jeeves (IAC) websites—none of which were Smart Priced.[18]  Dr. Bucklin's calculation reveals that Google has not Smart Priced any clicks from IAC websites or properties.

41.     Statements of two Internet industry authorities in 2007 confirm that Google has not Smart Priced clicks from IAC websites and properties.  Frank Schilling, President and Founder of Name Administration, Inc. (a domain name management company), reported in 2007 that Google and IAC have a special agreement whereby Google does not Smart Price any ads served by IAC.[19]  Similarly, Donny Simonton, President of Parked.com, stated in 2007 that his company received Google ads through IAC that were not Smart Priced.[20]

42.     The following clicks originating from IAC's reference.com, a Display Network site, were not Smart Priced:

---

[16] IAC/InterActiveCorp (IAC) operates ask.com (formerly known as Ask Jeeves).  The conversion score reported for ask.com applies to all IAC-operated websites and properties.

[17] *See* Rebuttal Expert Report of Randolph E. Bucklin dated Nov. 2, 2010, filed in *In re Google AdWords Litigation,* pending in the United States District Court for the Northern District of California, Case No. 5:08-cv-03369-EJD, Dkt. No. 281-2 at 32-33 and Exhibit 19 (filed May 13, 2011) (hereinafter, "Bucklin Rebuttal Report").

[18] *See* Bucklin Rebuttal Report at 32-33 and Exhibit 19.

[19] *See* http://domainnamesales.com/sevenmile/2007-10/pink-houses.

[20] *See* http://www.dnforum.com/f366/parked-better-than-sedo-3-thread-221221.html.

| Date | IAC Site | Actual Charge to Woods | IAC Smart Pricing Discount (9.31%) | Amount Woods should have paid |
|---|---|---|---|---|
| 02/17/10 | Reference.com | $0.99 | $0.09 | $0.90 |
| 05/24/10 | Reference.com | $1.29 | $0.12 | $1.17 |
| 05/27/10 | Reference.com | $1.60 | $0.14 | $1.46 |
| 06/07/10 | Reference.com | $1.29 | $0.12 | $1.17 |
| 12/09/10 | Reference.com | $1.48 | $0.13 | $1.35 |
| 02/22/11 | Reference.com | $1.88 | $0.17 | $1.71 |

*See* Exhibit H (screenshots of Woods' online AdWords account showing Display Network clicks on reference.com).[21]  By not Smart Pricing these six clicks, Google overcharged Woods for such clicks.  Had Google applied the promised Smart Pricing, it would have discounted the cost of each click as shown above.

43.     Google's failure to Smart Price clicks does not end with IAC.

44.     Indeed, Google failed to Smart Price clicks on the Display Network from mobile devices until the Third Quarter of 2010.  This fact was first disclosed in Google's October 14, 2010 earnings call.  During that call, Google's Senior Vice President for Product Management, Jonathan Rosenberg, revealed that Google had not been Smart Pricing clicks from mobile devices:

> This is Jonathan.  Nikes [Arora] can maybe give you more of a customer base perspective.  I think that some of you know we *recently started smart pricing* on the mobile devices and *it is the case that the CPCs on the mobile devices are a good bit lower*.   It's primarily because there isn't the measurement--that there isn't that--there isn't as much of a consummation of a transaction on the mobile devices.  People don't have their credit cards in them; it's harder to type into them.  So, the mobile rates remain relatively lower.[22]

45.     Woods' billing records confirm that Google began Smart Pricing Display Network clicks from mobile devices on or about September 1, 2010.  In particular, Woods' bills for clicks originating from mobile apps demonstrate Woods paid 61% (approximately $300) more than he should have paid had Google applied the promised Smart Pricing

---

[21] The screenshots in Exhibit H were taken from Woods' online AdWords account.  They are Display Network reports that identify each of the above-listed clicks as originating from the Display Network.

[22] *See* Google CEO Discusses Q3 2010 Results - Earnings Call Transcript (http://seekingalpha.com/article/230158-google-ceo-discusses-q3-2010-results-earnings-call-transcript?part=qanda) (emphasis added).

discounts.   All mobile apps are part of the Display Network.[23]   The following table was compiled from Woods' online AdWords Display Network click reports.  Before Google began Smart Pricing clicks on mobile apps on or about September 1, 2010, Woods received 464 Display Network mobile apps clicks from absenseformobileapps.com and nextmobileweb.com at an average cost per click (CPC) of $1.06.   However, after September 1, 2010, Woods received 3 clicks from mobile apps at an average CPC of $0.41.[24]

| Time Period | No. of Clicks | Total Cost | Avg. CPC |
|---|---|---|---|
| 9/1/09 to 8/31/10 | 464 | $489.88 | $1.06 |
| 9/1/10 to 3/15/11 | 3 | $1.24 | $0.41 |
| **Total** | **467** | **$491.12** | |

46.     The only plausible explanation for such a significant decrease in the average CPC for mobile apps (61%) after September 1, 2010 is Google's application of the promised Smart Pricing discount as described by Google's Senior Vice President.

47.     Google failed to properly discount other Display Network clicks from mobile devices as well.  Google has unequivocally stated that its Smart Pricing measurement "applies to ads that appear on mobile devices with full Internet browsers[.]"[25]  Nevertheless, on August 4, 2010, Google billed Woods $3.08 for a click originating from the website savysoda.com, which is a Display Network property.[26]  This click originated from a mobile device with a full Internet browser (an iPhone).  Per Google's Senior Vice President's statement, Google did not Smart Price this click.  Therefore, like the above-described clicks from mobile apps, Google did not apply the appropriate Smart Pricing discount to Display Network clicks shown in the Internet browsers of mobile devices.

---

[23] *See* Exhibits I & J.

[24] *See* Exhibit K.  Exhibit K contains screen shots of Woods' online billing records for clicks *originating from the Display Network*.   The clicks identified as originating from "adsenseformobileapps.com" and "nextmobileweb.com" are clicks from mobile apps.   These are unquestionably part of the Display Network according to Google's own representations (*see* Exhibits I & J) and Google's own billing records (*see* Exhibit K).

[25] *See* Exhibit L.  On information and belief, neither Woods' ads nor savysoda.com utilize the WAP mobile ad format.

[26] *See* Exhibit M.

48.     Google keeps conversion rates secret (with the exception of the one discussed recently by Dr. Bucklin).  On information and belief, Google failed to Smart Price clicks from other Special Partners and publishers in addition to IAC.  The Special Partners and additional publishers who were given special non-Smart Pricing deals include, without limitation, Peeplo.com, Conduit, InfoSpace, and Xacti.  These websites and, in general, the websites of all Special Partners, convert at rates lower than google.com because, unlike google.com, they utilize ad implementations which generate accidental and meaningless clicks, such as using clickable backgrounds and ad only pages.  Accordingly, Google should have Smart Priced all charges for clicks arising from these Special Partners' Display Network websites.

49.     Despite representations that it would apply the Smart Pricing measurement to *all* clicks from the Display Network (including clicks from mobile apps and Special Partners' websites), Google failed to Smart Price clicks as promised.

50.     Woods was injured as a result.

51.     The above-described clicks are examples from Woods' account that demonstrate how he was injured by Google's failure to apply the promised Smart Pricing.  These clicks should not be construed as the universe of all clicks in his account that were not Smart Priced, as Woods continues to review his account without the benefit of discovery from Google.

**B.     CLAIMS RELATING TO SMART PRICING**

**COUNT I – Breach of Contract**

**(Failure to Smart Price)**

52.     Woods hereby incorporates by reference all paragraphs of this Complaint as if fully set forth herein.

53.     Woods brings this cause of action on behalf of himself and the Class.

54.     Google and all Class members are or were parties to an Agreement that governs their AdWords advertising relationship.

55.     The Agreement was drafted by Google and is uniform as to every Class member.[27]

56.     In Section 7 of the Agreement, Google expressly agrees that "[c]harges are solely based on Google's *measurements* for the applicable Program, *unless otherwise agreed to in writing.*"[28]

57.     Smart Pricing is one of the *measurements* Google uses to calculate charges for clicks.  *See* Order at 7:26-8:2, 8:16-19.  Indeed, Google represents that "AdWords includes [an] automatic pricing discount feature[]:  Smart pricing – a feature that *automatically reduces* the price advertisers pay for clicks *if our data shows* that a click from a Display Network page is *less likely to result in a conversion.*"[29]

58.     Thus, pursuant to the Agreement, Google had a legal obligation to apply the Smart Pricing discount (its "measurement" of the value of the click) to all Display Network clicks that were less likely to result in a conversion than clicks from google.com.  This is a material term of the Agreement.

59.     To the extent Google disputes this meaning of "measurement," extrinsic evidence demonstrates the Agreement is reasonably susceptible to Woods' reading.[30]  *See* Order at 7-8.  Further, discovery as to the meaning of "measurement" would be appropriate under such circumstances.

60.     Even if the Smart Pricing formula were not a "measurement," Google has "otherwise agreed in writing" to apply Smart Pricing to all clicks in the Display Network such

---

[27] Google presents the Agreement to advertisers at the end of the AdWords sign-up and ad creation process.  Advertisers have no ability to modify the terms of the Agreement.  Advertisers have no bargaining power thereby resulting in a one-sided (in Google's favor) agreement.  Woods had no other alternative but to agree to the terms of the Agreement.  The Agreement is a contract of adhesion.

[28] *See* Exhibit A (emphasis added).

[29] *See* Exhibit B (emphasis added); *see also* Exhibits C-F.

[30] *See, e.g.,* Exhibit B-F & L.  Judge Davila previously concluded these "exhibits, however, do support the interpretation that the contract language, '[c]harges are solely based on Google's measurements for the applicable Program,' means that Google must base the charges for Display Network clicks, at least in part, on the Smart Pricing formula."  Order at 8:16-19.

SECOND AMENDED CLASS ACTION COMPLAINT

that those Display Network clicks that are less likely to result in a conversion than clicks from google.com are discounted.  This is conclusively demonstrated in Exhibits B-F and L.[31]

61.     When Smart Pricing is not applied, Google ignores its "measurements" and, as a result, artificially inflates the price of Display Network clicks.  In other words, Google does not price "solely based on Google's measurements" when it fails to Smart Price Display Network clicks.  This constitutes a breach of contract.

62.     Woods and the Class performed all conditions, covenants, and promises required to be performed by Woods and the Class in accordance with the terms of the Agreement.  All conditions precedent to Google's performance have occurred or been satisfied.

63.     As set forth above, Google breached the Agreement by not applying Smart Pricing discounts to Display Network clicks charged to Woods and the Class.

64.     Google's breach is the direct, proximate, and producing cause of damages to Woods and the Class.

65.     Because of Google's breach of contract alleged herein, Woods and the Class should be made whole for all amounts Google overcharged them by failing to apply the promised, and contracted-for, Smart Pricing discount.

**COUNT II – Breach of the Implied Covenant of Good Faith and Fair Dealing**

**(Failure to Smart Price – Pled in the Alternative)**

66.     Woods hereby incorporates by reference all paragraphs of this Complaint as if fully set forth herein.

67.     Woods brings this cause of action on behalf of himself and the Class.

68.     Woods brings this Count for Breach of the Implied Covenant of Good Faith and Fair Dealing in the alternative to Count I.

69.     The Agreement includes the implied covenant of good faith and fair dealing.

---

[31] *See, e.g.*, Exhibit F ("There are two ways Google *automatically reduces your costs*: the AdWords Discounter and *Smart Pricing*.").

70.     Pursuant to this implied covenant, Google has a duty not to commit acts that would improperly deprive Woods and the Class of the intended benefits of the Agreement.

71.     The principal benefit and purpose for which Woods and the Class contracted was cost-effective, relevant, and targeted cost-per-click advertising.  As it relates to this Count, Woods and the Class specifically contracted for the benefit of being charged for clicks based on the value of those clicks to an advertiser.  As explained above, Smart Pricing is "Google's measurement" of the value of clicks to an advertiser.  The implied covenant imposes a duty on Google to apply these measurements in good faith.

72.     Google acted in bad faith and contrary to fair dealing by failing to apply its Smart Pricing measurements to Display Network clicks appearing in the accounts of Woods and the Class.  This resulted in Woods and the Class being charged more for Display Network clicks than Google's own data revealed the Display Network clicks were worth.   That is, Google charged Woods and the Class an inflated price for Display Network clicks that Google knew had a lesser value.  Google knew the value of these Display Network clicks because it measures and maintains conversion scores for all websites and properties displaying AdWords ads.  Google's conduct deprived Woods and the Class of one of the intended benefits of the Agreement—being charged for Display Network clicks based on the value of the click to an advertiser.

73.     Additionally, the implied covenant prohibits Google from selectively applying Smart Pricing to certain Display Network websites and properties while exempting others from Smart Pricing.  Google cannot, consistent with the implied covenant of good faith and fair dealing, refuse to apply Smart Pricing to Display Network clicks (including clicks from mobile apps, IAC websites, and other Special Partners' websites and properties) because Google knows such Display Network clicks are of lower click quality and less likely than google.com to result in a conversion.  Google has frustrated the rights of Woods and the Class members by entering into secretive, preferential deals with Special Partners.  These furtive deals resulted in Woods and the Class members being overcharged for Display Network clicks that were not

Smart Priced while allowing Google and its Special Partners each to unfairly pocket such overcharges.

74.     Moreover, even if the Agreement does not contain an express pricing term requiring the application of Smart Pricing, which Woods believes it does, California law requires Google to set charges consistent with its duty of good faith and fair dealing.  This requires Google to set objectively reasonable prices.  Smart Pricing is the objectively reasonable price, given that Google represented to advertisers that Smart Pricing is Google's measurement of the value of clicks.

75.     By not applying Smart Pricing to Display Network clicks, Google is disregarding its "measurements" to determine the charges for such clicks thereby resulting in artificially inflated charges.  Certainly, by disregarding Smart Pricing (Google's measurement of the value of clicks), Google is not applying an objectively reasonable price.

76.     Compounding matters, Google is the sole actor in the "ad auction"—the process of determining which ads will be displayed on websites and at what prices.  Google is given complete discretion to determine the charges per click and complete discretion to apply the advertiser's *maximum bid price*.  Thus, advertisers, like Woods and the Class, depend solely on Google to deal with them fairly and honestly.  Google betrayed this trust, acted in bad faith, and did not deal fairly or honestly with Woods and the Class by knowingly charging them more for Display Network clicks than they were worth.

77.     Woods and the Class performed all conditions, covenants, and promises required to be performed by Woods and the Class in accordance with the terms of the Agreement.  All conditions precedent to Google's performance have occurred or been satisfied.

78.     The foregoing facts constitute a violation of the covenant of good faith and fair dealing.

79.     As a result of such conduct, Woods and the Class have been deprived of the intended benefits of the Agreement (cost-effective cost-per-click advertisements based on the value of clicks) and have suffered, and continue to suffer, economic losses.

SECOND AMENDED CLASS ACTION COMPLAINT
11-cv-01263-EJD                                                                                    -17-

80.     Google's breach of the implied covenant is the direct, proximate, and producing cause of damages to Woods and the Class.

81.     Because of Google's breach of the implied covenant, Woods and the Class should be made whole for all amounts Google overcharged them by not applying the promised Smart Pricing discount.

**COUNT III – Violation of Cal. Bus. & Prof. Code §§17200 *et seq*.**

**(Failure to Smart Price)**

82.     Woods hereby incorporates by reference all paragraphs of this Complaint as if fully set forth herein.

83.     Google's acts and business practices, as alleged herein, constitute unlawful, unfair, and fraudulent business practices in violation of California Business & Professions Code §§17200, *et seq*.

84.     Woods brings this cause of action on behalf of himself and the Class of similarly situated advertisers.  Woods has standing to pursue this claim as Woods has suffered injury in fact, relied upon Google's deceptive representations, and lost money or property as a result of Google's actions and/or inactions.

85.     Prior to contracting with Google to join the AdWords program, Woods reviewed and relied upon statements issued by Google to advertise and explain the AdWords program.  Specifically, Woods reviewed and reasonably relied upon, without limitation, the following statements:

- "*AdWords includes two automatic pricing discount features*: Smart Pricing – a feature that *automatically reduces the price advertisers pay for clicks* if our data shows that a click from a Display Network page is less likely to result in a conversion."[32]

- "There are two ways Google *automatically reduces your costs*:  the AdWords Discounter and Smart Pricing."[33]

- "'Smart Pricing' *works all the time to adjust your bids when you advertise keyword-targeted* ads on the Google Network.  Y*ou set your CPC bid, and if your click is less*

---

[32] *See, e.g.,* Exhibit B (emphasis added).

[33] *See* Exhibit F (emphasis added).  Exhibit F is a presentation appearing on Google's website that Woods reviewed and relied upon.  It contains audio and "presenter notes."  Each pertinent screen of the presentation is displayed in Exhibit F, along with the text of the pertinent audio and "presenter notes."

*likely to turn into a conversion, such as a sale or signup, Google automatically reduces your bid for that page.*"[34]

▪ "Using smart pricing, AdWords *automatically adjusts the cost of clicks* for keyword-targeted ads that appear on content network pages.  While you set one CPC bid, *if our data shows that a click from a content page is less likely to turn into actionable business results—such as online sales, registrations, phone calls, or newsletter signups—we reduce that price you pay for that click.*"[35]

▪ "Smart pricing adjustments are automatically reflected in the Average CPC column in your account."[36]

▪ By charging you less per click, Smart Pricing helps "*you maximize your value.*"[37]

▪ "Less likely to convert … *Google reduces price.*"[38]

▪ "Google *keeps your costs down* with … Smart Pricing."[39]

All of the foregoing statements appeared in Google's AdWords Help Center website and were reviewed by Woods prior to Woods advertising with Google.

86.    Similarly, Woods reviewed and reasonably relied upon Google's representation in the Agreement that "*charges are solely based on Google's measurements* for the applicable Program, unless otherwise agreed to in writing."[40]    Woods understood "Google's measurements" upon which charges were based to include the Smart Pricing discount.  Woods also understood from reviewing the information described in Paragraph 85 that Google "agreed … in writing" to apply Smart Pricing to all clicks.

87.    Woods reviewed and reasonably relied upon the foregoing statements in September 2009 prior to choosing to advertise with Google, opening his AdWords account, advertising through the AdWords program, and paying for advertising as charged by Google. The foregoing statements induced Woods to advertise with Google.  Had Woods known these statements were not true, he would not have advertised with Google.

---

[34] *See* Exhibit F (emphasis added).

[35] *See* Exhibit F (emphasis added).

[36] *See* Exhibit F (emphasis added).

[37] *See* Exhibit F (emphasis added).

[38] *See* Exhibit F (emphasis added).

[39] *See* Exhibit F (emphasis added).

[40] *See* Exhibit A (emphasis added).

88.     In fact, prior to September 2009, Woods had a limited presence on the Internet through Yahoo!'s Local Listings.  In September 2009, Woods decided to expand his Internet presence.  He researched both Google and Yahoo! to determine which Internet advertising service would best serve his needs.  While researching Google in September 2009, Woods reviewed the statements set forth above.  He determined from these statements that Google offered cost-effective, cost-per-click advertising because Google promised to discount the costs of his clicks based on their value—*i.e.,* their likelihood to convert into actual business results.  Thus, Woods selected Google as his Internet advertising agent and opened his AdWords account, relying upon—and being deceived and confused by—Google's foregoing statements.

89.     Woods also relied upon each of the foregoing statements in another way.  In reliance on these statements, Woods increased his Internet advertising budget from approximately $8 per month to over $150 per month ($5 per day).  Reasonably relying upon— and being deceived and confused by—Google's foregoing statements, Woods chose to spend approximately an additional $150 per month on Internet advertising with Google.

90.     Given that Google promised Smart Pricing was "automatic" and was "reflected in the Average CPC column in your account,"[41] Woods also reasonably believed that the account statements he received from Google would reflect fees in a manner consistent with Google's stated promise to Smart Price.  Woods remitted funds to Google during the Class Period based on such reasonable reliance, deception, and confusion.  Had Google disclosed the truth (*i.e.*, revealed in its account statements that Smart Pricing was not applied), Woods would not have paid for non-Smart Priced clicks.

91.     The statements upon which Woods relied appeared in Google's AdWords Help Center website—the very place Google expects its advertisers to turn for information about the AdWords Program.  Woods' reliance on such representations was reasonable, as confirmed by Google's statements in *In re AdWords* where Google argued to Judge Davila that the plaintiffs (each AdWords advertisers and at least one of whom is an attorney) could not "ignore the[]

[41] *See* Exhibit F.

SECOND AMENDED CLASS ACTION COMPLAINT
11-cv-01263-EJD                                                                    -20-

disclosures" contained in the "AdWords Help Center (the Google web pages specifically targeted at advertisers to explain the AdWords program)."[42]

92.     The foregoing statements were also accessible during the AdWords sign-up process and ad creation process.  Google made these statements to Woods in an effort to induce his enrollment in AdWords, induce his creation of ads, and induce his payment of ad charges.  Moreover, Google continues to make many of these representations today on its website (the AdWords Help Center) and in Woods' online AdWords account.   Additionally, Woods received emails after his enrollment in AdWords directing him to the AdWords Help Center for answers to any of his questions.   Woods' reliance on such statements was unquestionably reasonable.

93.     Google's representations were fraudulent in violation of §17200 because they were likely to deceive advertisers into believing that Google would, at a minimum, apply Smart Pricing to *all* Display Network clicks such that those Display Network clicks that were less likely to convert than clicks from google.com are discounted.  Moreover, Google failed to disclose throughout the Class Period to advertisers, including Woods and the Class, that:

- Google would overcharge Woods and the Class for Display Network clicks (including clicks from mobile apps, IAC websites and properties, and other websites and properties of the Special Partners who had secretive, preferential deals with Google exempting them from Smart Pricing).
- Google would not apply its "measurements" to all charges appearing in Woods' and the Class's AdWords accounts.   Specifically, Google failed to disclose that it would not apply its Smart Pricing measurement to all Display Network clicks on Woods' and the Class's ads.
- Google exempted certain Display Network websites and properties (including those of its Special Partners) from Smart Pricing.
- Google would artificially inflate charges—by not using its "measurements"—from certain Display Network websites and properties (including those of its Special Partners) displaying Woods' and the Class's ads.

---

[42] *See* Defendant Google Inc.'s Opposition to Plaintiffs' Motion for Class Certification Pursuant to F.R.C.P. Rule 23 filed in *In re Google AdWords Litigation*, in the United States District Court for the Northern District of California, Case No. 5:08-cv-03369, Dkt. No. 272 at 7 (filed May 12, 2011); *see also* Order at 14:23-24 ("Woods reliance upon Google's Smart Pricing statements, however, may have been justified because these statements were used to interpret an ambiguous clause in the Agreement.").

These were material omissions that, if disclosed, would have caused Woods to not advertise (or quit advertising) with Google.

94.   Contrary to its representations, Google failed to properly apply Smart Pricing and did not apply its Smart Pricing measurement to all sites across the Display Network.[43]

95.    As a result of Google's fraudulent conduct, Woods and the Class expended money on advertising with Google that they otherwise would not have spent had Google not made these misrepresentations and omissions.

96.   Google's acts and business practices, as alleged herein, are also unfair in violation of §17200 because they offend established public policy and/or are immoral, unethical, oppressive, unscrupulous and/or are substantially injurious to consumers.  There is no countervailing benefit of these acts and practices to consumers or competition.  These acts and practices caused injuries that Woods and the Class members could not have reasonably avoided because they were not informed that Google does not apply Smart Pricing as represented.

97.   Moreover, Google systematically breached its Agreement with Woods and other Class Members.  *See* ¶¶52-65.  Google's systematic breach of contract and breach of the implied covenant of good faith and fair dealing is unfair under §17200.

98.   Google's breach of contract is also unlawful in violation of §17200.

99.   Google's breach of the implied covenant of good faith and fair dealing is also unlawful in violation of §17200.

100.   Google's acts and business practices, as alleged herein, have caused injury to Woods and the Class.

---

[43] Google breached its legal obligations set forth in Paragraph 56-58 above.  Specifically, Google overcharged Woods by 61% for clicks arising from mobile apps.  *See* ¶¶45-46.  Google also overcharged Woods approximately 10% for clicks arising from IAC Display Network websites.  *See* ¶42.  These overcharges resulted from Google's failure to apply Smart Pricing as it represented it would and was legally obligated to do under the Agreement.

101.   Google maintains its headquarters and principal place of operations in California.   The unfair, unlawful, and fraudulent conduct detailed herein emanates from Google's California headquarters.  As such, Google is subject to §17200.

102.   Because Google violated California Business & Professions Code §§17200, *et seq.*, Woods and the Class should be made whole for all amounts that Google overcharged them by failing to apply the promised Smart Pricing discount.

103.   Woods, on behalf of himself and the Class, seeks an order of this Court awarding restitution, disgorgement, injunctive relief, and all other relief allowed under §17200.

**COUNT IV – Violation of Cal. Bus. & Prof. Code §§17500 *et seq.***

**(Failure to Smart Price)**

104.   Woods hereby incorporates by reference all paragraphs of this Complaint as if fully set forth herein.

105.   As detailed herein, Google engaged in untrue and misleading advertising in violation of California Business & Professions Code §§17500, *et seq.*

106.   Woods brings this cause of action on behalf of himself and the Class of similarly situated advertisers.

107.   Google's advertisements and promotions have the capacity, likelihood and tendency to deceive or confuse the public into believing Google would act consistently with its statements identified in Count III.

108.   In fact, as explained above, Woods reasonably relied upon—and was deceived and confused by—Google's statements.  Based on these statements, among others, Woods opened his AdWords account, advertised with Google, and paid for such advertising.

109.   Google's marketing and advertising materials were generally available to the public on Google's AdWords website throughout the Class Period.

110.   Google's marketing and advertising materials were false, misleading, and deceptive, in that consumers were not informed that Google does not apply Smart Pricing to all

Display Network clicks such that those Display Network clicks that are less likely to convert than a click from google.com are discounted.

111.   At the time Google made and disseminated the marketing and advertising materials alleged herein, Google knew or should have known that the statements were untrue or misleading, and thus in violation of §17500.

112.   Because of Google's violation of California Business & Professions Code §§17500, *et seq*., Woods and the Class should be made whole for all amounts Google overcharged them by failing to apply the promised Smart Pricing discount.

113.   Woods, on behalf of himself and the Class, seeks an order of this Court awarding restitution, disgorgement, injunctive relief, and all other relief allowed under §17500.

## VII.   PART II – LOCATION TARGETING

### A.   FACTUAL BACKGROUND RELATING TO LOCATION TARGETING

114.   During the sign-up and ad creation process, Google provides advertisers with the option to specify the geographic location(s) in which they want their ads to appear.

115.   Specifically, advertisers are presented with the following question in the sign-up and ad creation process:

Locations [help link]      In what geographical locations do you want your ads to appear?[44]

116.   The help link embedded in the foregoing question, when clicked, opens a text box stating:

**Location targeting**
You can target your ads to almost any set of locations, including countries, territories, regions, cities and custom areas.  For example, you could target specific regions within the United States and a few large English-speaking cities in Europe.  You can view or edit your targeting options from the **Settings** tab for your campaign.
Learn more about location targeting options.  [hyperlink][45]

---

[44] *See* Exhibit N.

[45] *See* Exhibit O.

SECOND AMENDED CLASS ACTION COMPLAINT
11-cv-01263-EJD                                                                    -24-

117.   During the sign-up and ad creation process, Woods selected "Metro area: Ft. Smith-Fayetteville-Springdale-Rogers AR, US" in response to this question.

118.   By making this selection, Woods reasonably expected that his ads would be shown only to users in Ft. Smith, Fayetteville, Springdale, and Rogers, Arkansas.

119.   Woods recently discovered that Google distributed his ads to users outside of his designated geographical location.

120.   The following table shows exemplary clicks charged to Woods that occurred outside of his designated geographical location.  Each of the six clicks identified in the table originated from users located far beyond Ft. Smith, Fayetteville, Springdale, and Rogers, Arkansas.  In fact, the click designated in bold with an adjacent asterisk ("*") originated from a user located outside of Woods' designated geographical location clicking on his ad from a Japanese website.

| Date | Location of Person Clicking Ad | Location Reported by Google | Cost |
|------|-------------------------------|------------------------------|------|
| 3/6/2011 | Lubbock TX | Ft. Smith-Fayetteville-Springdale-Rogers AR | $5.00 |
| 2/8/2011 | Dallas TX | [blank] | $2.89 |
| 1/8/2011 | Scranton PA | Ft. Smith-Fayetteville-Springdale-Rogers AR | $3.75 |
| 12/21/2010 | Wichita KS | Ft. Smith-Fayetteville-Springdale-Rogers AR | $3.99 |
| 12/9/2010 | Scranton PA | Ft. Smith-Fayetteville-Springdale-Rogers AR | $3.72 |
| **9/12/2010** | **Kilgore TX** | **Ft. Smith-Fayetteville-Springdale-Rogers AR** | **$3.93*** |

121.   In an apparent attempt to conceal its misconduct, Google *falsely* reported to Woods that these clicks originated from users located in Ft. Smith, Fayetteville, Springdale, and Rogers, Arkansas.

122.   Unaware of Google's misconduct, Woods paid the posted amount of charges for each of these clicks.  Woods was injured by paying for clicks from users outside of his designated geographic location—charges that should not have been applied to his account.

123.   The above-described clicks are examples from Woods' account that demonstrate how he was injured by Google's failure to limit the geographic distribution of

Woods' ads to the locations Woods selected.  These clicks should not be construed as the universe of all clicks in his account that arose from outside Woods' designated geographic locations, as Woods continues to review his account without the benefit of discovery from Google.

**B.      CLAIM RELATING TO LOCATION TARGETING**

**COUNT V - Violation of Cal. Bus. & Prof. Code §§17200 *et seq.***

**(Location Targeting)**

124.    Woods hereby incorporates by reference all paragraphs of this Complaint as if fully set forth herein.

125.    Google's acts and business practices, as alleged herein, constitute unlawful, unfair, and fraudulent business practices in violation of California Business & Professions Code §§17200 *et seq*.

126.    Woods brings this cause of action on behalf of himself and the Class of similarly situated advertisers.  Woods has standing to pursue this claim as Woods has suffered injury in fact, reasonably relied upon Google's deceptive representations, and lost money or property as a result of Google's actions and/or inactions.

127.    During the ad creation process on September 30, 2009, Woods reviewed and reasonably relied upon statements issued by Google to explain the AdWords program. Specifically, Woods reviewed and reasonably relied upon, without limitation, the following statements:

- "Locations [help link] In what geographical locations do you want your ads to appear?"[46]
- "You can target your ads to almost any set of locations, including countries, territories, regions, cities and custom areas.  For example, you could target specific regions within the United States and a few large English-speaking cities in Europe.  You can view or edit your targeting options from the **Settings** tab for your campaign."[47]

---

[46] *See* Exhibit N.

[47] *See* Exhibit O.

Google made, and Woods reviewed, the foregoing statements on the sign-up and ad creation screens at the time Woods signed up for AdWords and created his first ad on September 30, 2009.

128.    Woods understood from reviewing the foregoing statements (and designating his local geographic area in response to the question) that his ads would only appear to users located in Ft. Smith, Fayetteville, Springdale, and Rogers, Arkansas.

129.    Woods reviewed and reasonably relied upon the foregoing statements in September 2009 when placing his ads and subsequently paying for advertising as charged by Google.

130.    The foregoing statements induced Woods to advertise with Google.  Had Woods known these statements were not true, he would not have advertised with Google.

131.    Woods also reasonably relied upon each of the foregoing statements in another way.  In reliance on these statements, Woods increased his Internet advertising budget from approximately $8 per month to over $150 per month ($5 per day).  Relying upon—and being deceived and confused by—the foregoing statements, Woods chose to spend approximately an additional $150 per month on Internet advertising with Google.

132.    Woods also reasonably believed that the account statements he received from Google would reflect charges in an accurate manner.  He did not expect Google to falsely report the geographic origin of clicks.  As a result, Woods remitted funds to Google during the Class Period based on such reasonable reliance, deception, and confusion.  Had Google disclosed the truth (*i.e.*, revealed in its account statements that location targeting was not applied), Woods would not have paid for clicks originating from beyond his designated geographic distribution area.

133.    Woods' reliance was reasonable.  The statements upon which he relied appeared on the AdWords sign-up and ad creation screens.  Google made these statements to Woods in an effort to induce his enrollment in AdWords, induce his creation of ads, and induce his

payment of ad charges.  Moreover, Google continues to make these representations today in Woods' online account.  Reliance on such statements is unquestionably reasonable.

134.    These representations were fraudulent in violation of §17200 because they were likely to deceive advertisers into believing that Google would limit the distribution of ads to users located in the geographic locations designated by advertisers.  Moreover, Google failed to disclose throughout the Class Period to advertisers, including Woods and the Class, that:

- Google would distribute ads to users beyond the geographic locations designated by advertisers.
- Google would charge advertisers for clicks on their ads originating outside the designated geographic locations.
- Google would *falsely* report the geographic location of users in its online reports to advertisers.

135.    Contrary to its representations, Google failed to properly limit the distribution of ads to users in the geographic locations designated by advertisers.

136.    As a result of Google's fraudulent conduct, Woods and the Class expended money on advertising with Google that they otherwise would not have spent had Google not made these misrepresentations and omissions.

137.    Google's acts and business practices, as alleged herein, are also unfair in violation of §17200 because they offend established public policy and/or are immoral, unethical, oppressive, unscrupulous and/or substantially injurious to consumers.  There is no countervailing benefit of these acts and practices to consumers or competition.  These acts and practices caused injuries that Woods and the Class members could not have reasonably avoided because they were not informed that Google does not limit the distribution of ads to users in the geographic locations designated by advertisers as represented.

138.    Google's acts and business practices, as alleged herein, have caused injury to Woods and the Class.

139.    Google maintains its headquarters and principal place of operations in California.  The unfair, unlawful, and fraudulent conduct detailed herein emanates from Google's California headquarters.  As such, Google is subject to §17200.

SECOND AMENDED CLASS ACTION COMPLAINT
11-cv-01263-EJD                                                                          -28-

140.    Because Google violated California Business & Professions Code §§17200 *et seq.*, Woods and the Class should be made whole for all amounts that Google overcharged them by failing to limit the distribution of ads to users in the geographic locations designated by advertisers as represented.

141.    Woods, on behalf of himself and the Class, seeks an order of this Court awarding restitution, disgorgement, injunctive relief, and all other relief allowed under §17200.

## VIII.   CLASS ALLEGATIONS

142.    Woods seeks to recover on behalf of himself and the Class a sum of money that equals the Smart Pricing discounts that Google promised—but failed—to apply to clicks on the Display Network including, without limitation, clicks on mobile apps and Special Partners' websites and properties.

143.    Woods also seeks to recover on behalf of himself and the Class *all* amounts Google charged for clicks originating from users located outside of the geographic location(s) specified by Woods and the Class members.

144.    Finally, Woods seeks an injunction to ensure that the misconduct described above finally ends, without the threat of it reoccurring in the future.

145.    Woods is not seeking to recover charges for clicks occurring in connection with parked domain and error pages, which Woods believes is the subject of *In re Google AdWords Litig.*, No. 08-cv-03369-EJD (N.D. Cal. filed July 11, 2008).

146.    Woods brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a proposed class consisting of the following:

> All persons and entities located within the United States who advertised through Google's AdWords program and paid for clicks on their Google AdWords advertisement(s) at any time between and including April 1, 2004 and the day the Court certifies this action as a class action, where such clicks originated from Google's Display Network and were not Smart Priced, or originated from a geographic location other than the location selected by the advertiser (the "Class"). Excluded from the Class are Google and its affiliates, officers, and directors. Also excluded from the Class are the members of the judiciary and their staff to whom this action is assigned.

147.   Woods reserves the right to amend this class definition and, if deemed appropriate, to subdivide the Class into subclasses.

148.   The members of the Class are so numerous that joinder of all members is impracticable.  Woods believes that hundreds of thousands of people geographically dispersed throughout the United States have been damaged by Google's misconduct alleged herein.  The names and addresses of the members of the Class are readily identifiable through documents maintained by Google.  Members of the Class may be notified of the pendency of this action by published, mailed, and/or electronic notice.

149.   Woods' claims are typical of the claims of all Class members, as all Class members are similarly affected by Google's uniform wrongful conduct and their claims are based on such conduct.  Further, Woods' claims are typical of the claims of all Class members because his claims arise from the same underlying facts and are based on the same factual and legal theories as the claims of all Class members.  Woods is no different in any relevant respect from any other member of the Class.

150.   Woods and his counsel will fairly and adequately protect the interests of the members of the Class.  Woods' interests do not conflict with the interests of the Class he seeks to represent.  Woods has retained counsel competent and experienced in class and complex litigation.  Woods and his counsel have prosecuted, and will continue to prosecute, this action vigorously.

151.   Class certification is warranted because common questions of law and fact exist as to all Class members and predominate over any questions affecting only individual Class members.  The questions of law and fact common to the Class include, without limitation:

- Whether Google's Agreement with Class members expressly or impliedly—through the implied covenant of good faith and fair dealing or otherwise—requires Google to apply Smart Pricing to all clicks on the Display Network including, without limitation, clicks arising from mobile apps and Special Partners' websites and properties.
- Whether Google falsely or deceptively represented it would apply Smart Pricing to all clicks on the Display Network including, without limitation, clicks arising from mobile apps and Special Partners' websites and properties, and not distribute ads to users located outside the geographical location(s) specified by AdWords advertisers.

- Whether, through the acts, omissions, and conduct alleged above, Google violated its express or implied obligations to Class members.

- Whether, through the acts, omissions, and conduct alleged above, Google violated California Business and Professions Code §§17200, *et seq.* and §§17500, *et seq.*

- Whether Woods and the Class have been damaged by the wrongs alleged herein, and if so, the measure of those damages and the nature and extent of other relief that should be afforded.

- Whether Google should be enjoined from engaging in the misconduct and unlawful practices alleged above.

152.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy because joinder of all members is impracticable. Even if individual Class members had the resources to pursue individual litigation, it would be unduly burdensome to the courts in which the individual litigation would proceed.   Individual litigation magnifies the delay and expense to all parties in the court system of resolving the controversies engendered by Google's common course of conduct.   The class action device allows a single court to provide the benefits of unitary adjudication, judicial economy, and the fair and equitable handling of all Class members' claims in a single forum.   The conduct of the action as a class action conserves resources of the parties and of the judicial system, and protects the rights of the Class members.   Furthermore, for many, if not most Class members, a class action is the only feasible mechanism that allows them an opportunity for legal redress and justice.   There will be no difficulty in the management of this action as a class action.

## IX.    DISCOVERY RULE, TOLLING, AND FRAUDULENT CONCEALMENT

153.    The applicable limitations period in this case has been tolled because Google (a) concealed its misconduct such that Woods and other Class members could not discover the misconduct through the exercise of reasonable diligence; and (b) committed the misconduct pursuant to a conspiracy, the last act of which has not yet occurred.

154.    On October 14, 2010, Google disclosed in an earnings call that it had not been applying Smart Pricing discounts to clicks from mobile devices.   However, Google never corrected any of the misrepresentations on its website or otherwise informed Woods of its misconduct.   Thus, while information about Google's misconduct first began to surface in

2010, Woods and the Class could not have discovered the conduct alleged herein through the exercise of reasonable diligence at that time.

155.    Woods did not discover, and could not have discovered through the exercise of reasonable diligence, the existence of Google's conduct alleged herein until after he engaged counsel in February 2011 to investigate suspected fraudulent clicks in his AdWords account and reasons why Woods' account was not generating the advertising results Woods expected. Prior to this time, Woods reasonably trusted Google's representations made to him regarding Smart Pricing and other conduct described in prior complaints.   It was only after Woods engaged counsel that he learned of Google's misconduct regarding Smart Pricing and other conduct described in prior complaints.  Woods filed the Original Complaint within 60 days of learning of Google's misconduct.

156.    Similarly, Woods did not discover, and could not have discovered through the exercise of reasonable diligence, the existence of Google's misconduct regarding location targeting.   Indeed, Google concealed that it displayed ads outside of Woods' selected geographic area(s) by *falsely* reporting the origin of clicks (Google reported clicks came from within the designated area(s) when, in fact, the clicks came from outside such area(s)).  Woods filed the First Amended Complaint within 30 days of learning of this misconduct.

157.    Google carefully concealed its unlawful conduct by, *inter alia*, executing its breaches in a manner that precluded their detection and providing *false* information in reports to its advertisers.   For instance, the reports Google provided to Woods and other Class members did not contain any information revealing Google's misconduct.  Indeed, Google concedes that its advertisers do not possess all relevant information and must exclusively rely on Google's "reporting statistics" to ensure advertisements are properly placed and priced.[48] Similarly, the reports Google provided contained false information about the geographic origin

---

[48] *See* Ad Traffic Quality Resource Center - http://www.google.com/adwords/adtrafficquality/ ("Advertisers rely on the relevance of our ad placement, our reporting statistics, and the quality of the clicks their ads receive.").

In fact, Google represented to its advertisers that the Smart Pricing discount was automatically included in the average CPC (cost per click), as reported in the advertisers' online accounts.  No reasonable person under the circumstances could determine from looking at these reports whether clicks were Smart Priced or not.

of clicks, precluding Woods' detection that he was paying for clicks originating outside of the geographic area(s) he selected for ad distribution.

158.   In short, a reasonable person under the circumstances would not have been alerted to investigate Google's misconduct.  It was not until Woods engaged counsel that he learned of Google's actionable misconduct.

159.   Accordingly, the discovery rule applies and prevents the running of all applicable statutes of limitations.

160.   Further, as a result of Google's fraudulent concealment, the running of any statute of limitations has been tolled with respect to the claims of Woods and the Class.

161.   In addition to fraudulent concealment, the applicable limitations period is tolled because Google's misconduct was committed pursuant to a civil conspiracy with its Special Partners as described above to avoid Smart Pricing.  Therefore, the limitations period does not begin to run until the completion of the last act of the conspiracy.  That last act in furtherance of the conspiracy has yet to occur because Google's conspiracy continues today.

162.   In March 2011 and again in September 2011, Woods made claims against Google for the wrongs alleged herein.  Said claims were made within 60 days of his discovery of such wrongs.  Google has denied owing Woods any obligations.

**X.    JURY DEMAND**

163.   Woods demands a trial by jury as to all issues so triable.

**XI.   PRAYER**

FOR THE FOREGOING REASONS, Woods, individually and on behalf of the Class, respectfully requests that the Court certify this action as a class action, with Woods as class representative and the undersigned counsel as class counsel, and enter an order of judgment against Google in favor of the Class that, *inter alia*:

    a)   declares that Google has breached its contractual obligations to Class members;

    b)   awards actual damages to Class members to fully compensate them for losses sustained as a direct, proximate, and/or producing cause of Google's breaches and unlawful conduct;

c)  awards restitution and disgorgement of all monies Google derived from Class members through the misconduct alleged above;

d)  awards pre-judgment and post-judgment interest at the maximum allowable rates;

e)  awards reasonable attorneys' fees and costs;

f)  temporarily and permanently enjoins Google from engaging in the unlawful practices alleged herein; and

g)  orders any such other and further relief as the Court deems just and proper to correct the wrongs done unto the Class.

Dated: September 21, 2012           Respectfully submitted,

/s/ *Brad E. Seidel*

**NIX, PATTERSON & ROACH, LLP**
Jeffrey J. Angelovich
Brad E. Seidel
3600 N. Capital of Texas Highway
Building B, Suite 350
Austin, TX 78746
Telephone: (512) 328-5333
Facsimile: (512) 328-5335

**KESSLER TOPAZ**
**MELTZER & CHECK, LLP**
Ramzi Abadou
Stacey M. Kaplan
Erik D. Peterson
580 California Street, Suite 1750
San Francisco, CA 94104
Telephone: (415) 400-3000
Facsimile: (415) 400-3001

-and-

Joseph H. Meltzer
Sean M. Handler
Peter H. LeVan, Jr.
Naumon A. Amjed
Ryan T. Degnan
280 King of Prussia Road
Radnor, PA 19087
Telephone: (610) 667-7706
Facsimile: (610) 667-7056

*Interim Co-Class Counsel*

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## CERTIFICATE OF SERVICE

I hereby certify that on September 21, 2012, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to the e-mail addresses denoted on the attached Electronic Mail Notice List.

I certify under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.  Executed on September 21, 2012.

/s/ *Brad E. Seidel*