**MAYER BROWN LLP**
Edward D. Johnson (SBN 189475)
wjohnson@mayerbrown.com
Donald M. Falk (SBN 150256)
dfalk@mayerbrown.com
Eric B. Evans (SBN 232476)
eevans@mayerbrown.com
Dominique-Chantale Alepin (SBN 241648)
dalepin@mayerbrown.com
Two Palo Alto Square, Suite 300
3000 El Camino Real
Palo Alto, CA  94306-2112
Telephone: (650) 331-2000
Facsimile: (650) 331-2060

Matthew H. Marmolejo (SBN 242964)
mmarmolejo@mayerbrown.com
350 S. Grand Avenue, Suite 2500
Los Angeles, CA 90071
Telephone: (213) 229-9500
Facsimile: (213) 625-0248

Sarah E. Reynolds (admitted *pro hac vice*)
sreynolds@mayerbrown.com
71 S. Wacker Drive
Chicago, IL  60606
Telephone: (312) 782-0600
Facsimile: (312) 701-7711

*Attorneys for Defendant Google Inc.*

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

### SAN JOSE DIVISION

| | |
|---|---|
| RICK  WOODS, Individually  and  On  Behalf of Others Similarly Situated<br><br>                     Plaintiff,<br><br>                     v.<br><br>GOOGLE INC.,<br><br>                     Defendant. | CASE NO. 5:11-CV-01263-EJD<br><br>**DEFENDANT GOOGLE INC.'S MOTION FOR SUMMARY JUDGMENT**<br><br>Date:       August 20, 2015<br>Time:       9:00 a.m.<br>Place:      Courtroom 4, 5th Floor<br>Judge:      Hon. Edward J. Davila |

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED

# TABLE OF CONTENTS

**Page**

NOTICE OF MOTION & MOTION FOR SUMMARY JUDGMENT.............................................1

STATEMENT OF ISSUES TO BE DECIDED ............................................................................1

MEMORANDUM OF POINTS AND AUTHORITIES .................................................................1

BACKGROUND ...........................................................................................................................2

    A.    Factual Background .......................................................................................3

        1.    Smart Pricing ....................................................................................4

        2.    Location Targeting............................................................................5

    B.    Procedural Background...................................................................................6

        1.    Woods' Initial Complaint .................................................................6

        2.    First Amended Complaint.................................................................6

        3.    Second Amended Complaint ............................................................6

        4.    Discovery..........................................................................................7

LEGAL STANDARD....................................................................................................................7

ARGUMENT .................................................................................................................................8

I.    Woods Cannot Prevail On His Smart Pricing Claims. ....................................................8

    A.    Woods Cannot Prove His Claim for Breach of Contract........................................9

        1.    Woods' ▉ Non-Smart Priced Clicks Were From Mobile Ads, Which Were Explicitly Excluded From Smart Pricing.............................9

        2.    Google's Contract With Woods Does Not Include A Promise To Smart Price Mobile Ads................................................................10

        3.    The AdWords Terms Of Service Explicitly Disclaimed Any Guarantees Regarding The Price Woods Would Be Charged For Each Click.......................................................................................13

    B.    Woods Cannot Prove That Google Entered Into Secret Agreements With Publishers That Breached Its Implied Covenant Of Good Faith And Fair Dealing With Woods..................................................................................15

    C.    Woods Cannot Show That He Ever Saw And Relied On Any Misrepresentation About Smart Pricing For Mobile Ads. ...............................15

II.    Woods Cannot Prevail On His Location Targeting Claim. ..............................................16

i

1

**TABLE OF CONTENTS - Continued**

2
Page

A.   Woods Has Not Identified Any Misrepresentation About Location
3        Targeting, Much Less One That He Saw And Relied On.......................................17

4   B.   Google Explicitly Disclosed That Location Targeted Ads May Be
         Displayed Based On A User's Geographical Area Of Interest Rather Than
5        The User's Physical Location. ..........................................................................18

6   C.   Woods Cannot Establish That He Was Harmed By Area Of Interest
         Targeting. ..........................................................................................................19

7
    CONCLUSION...........................................................................................................21
8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

DEFENDANT GOOGLE INC.'S MOTION FOR SUMMARY JUDGMENT
CASE NO. 5:11-CV-01263-EJD

1

**TABLE OF AUTHORITIES**

2

**Cases**                                                                                      **Page(s)**

3
*Addisu v. Fred Meyer, Inc.*, 198 F.3d 1130 (9th Cir. 2000) ........................................7

4
*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986) ..................................................5

5
*Backhaut v. Apple, Inc.*, No. 14-cv-02285-LHK, --- F. Supp. 3d ---,
    2014 WL 6601776 (N.D. Cal. Nov. 19, 2014) ..........................................15, 18

6

7
*Berry v. Webloyalty.com, Inc.*, No. 10-cv-1358-H CAB, 2011 WL 1375664
    (S.D. Cal. April 11, 2011), *vacated and remanded on other grounds*,
    517 F. Appx. 581 ...............................................................................18

8
*Casa Herrera, Inc. v. Beydoun*, 32 Cal. 4th 336 (2004) ..............................................11

9
*Celotex v. Catrett*, 477 U.S. 317 (1986) ........................................................8

10
*Cohen v. DIRECTV, Inc.*, 178 Cal. App. 4th 966 (2009)......................................15, 17

11
*In re Facebook PPC Adver. Litig.*, 709 F. Supp. 2d 762 (N.D. Cal. 2010) ......................11, 14

12
*Freeman v. Time, Inc.*, 68 F.3d 285 (9th Cir. 1995) ..................................................18

13
*Gianaculas v. Trans World Airlines, Inc.*, 761 F.2d 1391 (9th Cir. 1985) ....................14

14
*In re Google AdWords Litig.*, No. 5-08-cv-3369-EJD, 2012 WL 28068
    (N.D. Cal. Jan. 5, 2012) ........................................................................3, 4

15

16
*In re iPhone Application Litig.*, 6 F. Supp. 3d 1004 (N.D. Cal. 2013)........................15

17
*Korea Supply Co. v. Lockheed Martin Corp.*, 29 Cal. 4th 1134 (2003) ......................19

18
*Major v. Ocean Spray Cranberries, Inc.*, No. 5-12-cv-03067-EJD,
    2015 WL 859491 (N.D. Cal. Feb. 26, 2015) ........................................7, 8, 13, 16

19

20
*Mazza v. Am. Honda Motor Co.*, 666 F.3d 581 (9th Cir. 2012) ......................15,16, 18

21
*Perkins v. LinkedIn Corp.*, No. 13-cv-04303-LHK, --- F. Supp. 3d ---,
    2014 WL 2751053 (N.D. Cal. Jun. 12, 2014)......................................15, 17, 18

22
*Salehi v. Surfside III Condo. Owners' Ass'n*, 200 Cal. App. 4th 1146 (2011) .............12

23
*Shapiro v. Wells Fargo Realty Advisors*, 152 Cal. App. 3d 467 (1984),
    *disapproved in part on other grounds by Foley v. Interactive Data Corp.*,
    47 Cal. 3d 654 (1988) ..........................................................................14

24

25
*Thornhill Pub'g Co. v. GTE Corp.*, 594 F.2d 730 (9th Cir. 1979) ................................8

26

27

28

iii

1

**TABLE OF AUTHORITIES - Continued**

2

**Statutes and Rules**                                                        **Page(s)**

3      Cal. Bus. & Prof. Code § 17200 *et seq.* ..........................................................................2

4      Cal. Bus. & Prof. Code § 17203 ...................................................................................19

5      Cal. Bus. & Prof. Code § 17500 *et seq.* ..........................................................................2

6      Fed. R. Civ. P. 30(b)(6)................................................................................................7

7      Fed. R. Civ. P. 56(a) ...................................................................................................7

8      Fed. R. Civ. P. 56(c) ...................................................................................................7

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

DEFENDANT GOOGLE INC.'S MOTION FOR SUMMARY JUDGMENT
CASE NO. 5:11-CV-01263-EJD

1

**NOTICE OF MOTION & MOTION FOR SUMMARY JUDGMENT**

2       Please take notice that on August 20, 2015 at 9:30 a.m., before the Honorable Edward J.

3   Davila, Defendant Google Inc. will and hereby does move under Federal Rule of Civil Procedure

4   56 for summary judgment on the Second Amended Complaint ("SAC") (Dkt. 87) (attached as

5   Exhibit ("Ex.") 4 to the Declaration of Dominique-Chantale Alepin in Support of Google's

6   Motion for Summary Judgment ("Alepin Decl.")).  Google's motion is based on this Notice, the

7   accompanying Memorandum of Points and Authorities, the Separate Statement of Undisputed

8   Facts, the Declaration of Ian Harrower in Support of Google's Motion for Summary Judgment

9   and exhibits attached thereto, the Declaration of Dominique-Chantale Alepin in Support of

10  Google's Motion for Summary Judgment and the exhibits attached thereto, the Declaration of Ali

11  Reichenthal in Support of Reply in Support of Motion to Dismiss Second Amended Complaint

12  and the exhibits attached thereto, arguments of counsel, the Second Amended Complaint and

13  exhibits attached thereto, and any other matter that the Court deems appropriate.

14

**STATEMENT OF ISSUES TO BE DECIDED**

15  1.      Whether Google is entitled to summary judgment on Woods' Smart Pricing claims

16  (Counts I-IV).

17  2.      Whether Google is entitled to summary judgment on Woods' Location Targeting claims

18  (Count V).

19

**MEMORANDUM OF POINTS AND AUTHORITIES**

20      Discovery has revealed that Woods has no basis for his complaint.  Despite the breadth of

21  Woods' pleading, his individual claims turn out to be quite narrow.  Woods' SAC alleges that

22  Google failed to apply its Smart Pricing auction-bidding algorithm to hundreds of clicks for

23  which he was billed.  Yet his own account records show that ▮▮▮▮ of the ▮▮ clicks billed

24  to his account were not Smart Priced—and ▮▮▮▮ clicks were on mobile ads, which at the time

25  were specifically and explicitly excluded from Smart Pricing.  Indeed, Woods admitted at his

26  deposition that he cannot recall seeing or relying on any representation by Google that Smart

27  Pricing would apply to mobile ads like these.  On this undisputed evidence, Woods cannot

28  prevail on his Smart Pricing claims, whether styled as breach of contract, breach of the covenant

1

1  of good faith, or misrepresentation in violation of the California Unfair Competition Law (UCL),

2  Cal. Bus. & Prof. Code § 17200 *et seq.*, or False Advertising Law (FAL), *id.* § 17500 *et seq.*

3      Woods fares no better with his UCL claim challenging Google's Location Targeting

4  program for advertisers.  Woods alleges in the SAC that Google "lied about the geographic

5  origin of [certain] clicks" (SAC ¶ 10), yet at his deposition Woods could not say how Google

6  "lied," and he admitted that he has "no recollection" of what representations Google actually

7  made to him.  While Woods alleged that Google promised to serve Location Targeted

8  advertisements only to users physically located in the target location (SAC ¶ 6), he has unearthed

9  no such promise.  Nor can he support his allegations about how he thought Location Targeting

10  might work.  On the contrary, Google disclosed that Location Targeted ads might be served

11  based on the appearance of the relevant geographic terms in a user's query.  Woods cannot

12  recover on his Location Targeting claim in any event because the record shows that he was not

13  harmed by the practice he challenges, but instead benefited from it.

14      The record thus reveals a starkly different story than the one Woods told in his complaint.

15  Because Woods cannot raise triable issues of fact sufficient to present any claim in this case to a

16  jury, Google is entitled to summary judgment.

17                                **BACKGROUND**

18      Plaintiff Rick Woods is an Arkansas attorney who advertised through Google's AdWords

19  program between September 2009 and March 8, 2011.  SAC ¶¶ 3, 7, 26; Defendant Google

20  Inc.'s Separate Statement of Undisputed Facts ("SUF") ¶¶ 2, 3, 32, 33.  Woods testified that he

21  first learned of his claims when he was approached by his counsel (now his employer) in January

22  of 2011.  Alepin Decl. Ex. 1 at 48-49.[1]  He alleges that Google misrepresented two features of

23  AdWords—Smart Pricing and Location Targeting—and seeks to certify a worldwide class of

24  AdWords advertisers based on alleged conduct that dates back to 2004.  SAC ¶¶ 5, 10, 146.

25

26

27  _____

[1] About a year and a half after he commenced this litigation, Woods' initial counsel in the case

28  called him "out of the blue and asked [him] to come in as a partner."  Alepin Decl. Ex. 1 at 43.

### A.      Factual Background

Google's AdWords program allows advertisers such as Woods to create and display advertisements on webpages within Google's advertising networks.  SAC ¶ 1; *see also In re Google AdWords Litig.*, No. 5-08-cv-3369-EJD, 2012 WL 28068, at *1 (N.D. Cal. Jan. 5, 2012) (Davila, J.), on appeal sub nom. *Levitte v. Google, Inc.*, No. 12-16752 (9th Cir. argued December 9, 2014).  In most cases, these advertisements are short snippets of text with hyperlinks that, when clicked, take the user to the advertiser's website.  *AdWords*, 2012 WL 28068, at *1.  To participate in the AdWords program, advertisers must accept the Google Inc. Advertising Program Terms (the "AdWords Agreement"), which is a fully integrated contract that governs the relationship between the advertiser and Google.  SUF ¶ 4.  Advertisers may choose to display their ads on Google's Search Network, which consists of Google's search websites (google.com) and search websites (for example, AOL) that partner with Google to display advertising in response to search queries, or on its Display Network, which consists of thousands of diverse web pages whose owners partner with Google to show ads on those pages.  Declaration of Ian Harrower in Support of Google's Motion for Summary Judgment ("Harrower Decl.") ¶¶ 4-5; SAC ¶ 31 & n.9.

In most cases, when a user performs a search or visits a page in Google's advertising network, Google conducts an auction in which advertisers compete for ad space based on several factors aimed at making the ad relevant to the user.  *See* Harrower Decl. ¶ 6 & Ex. A; *AdWords*, 2012 WL 28068, at *14 (discussing the auction process).  For most advertisers, the cost of AdWords advertising is set on a "cost-per-click" basis, meaning that advertisers are charged only when someone *clicks* on the ads.  SUF ¶ 7.  There is no single, set cost-per-click price, however. SUF ¶ 7.  Instead, the cost-per-click depends on an auction process that generates a separate cost for each advertiser for each ad and for each click, determined by a combination of several factors, including each advertiser's bid, the interplay of the bidding strategies of the participating advertisers in that auction, and the quality of each of the ads in the auction (e.g., the relevance match between the ads and the user's search query or the page where the ad will be displayed). SUF ¶ 8; *see also AdWords*, 2012 WL 28068, at *14-15.  Unlike most auctions, where the winners

1   pay an amount equal to their bids, Google runs a variation of a "second-price" auction.  SUF ¶ 9.

2   Generally speaking, in an auction with two advertisers (A and B), Advertiser A only pays what is

3   minimally necessary (e.g., a penny more) to out-rank Advertiser B.  *Id.*

4                    **1.       Smart Pricing**

5        Google uses Smart Pricing to discount AdWords advertisers' cost-per-click bids when

6   their ads appear on websites in the Search Network or the Display Network.  SUF ¶ 10.   In

7   general, Smart Pricing works by assigning a "conversion score," for each network property,

8   which predicts the likelihood that clicks from that website will result in a business transaction (or

9   conversion) for the advertiser.  Harrower Decl. ¶ 10; SAC ¶ 35 n.15; *see* SUF ¶ 11.   Each

10  advertiser can define a "conversion" however it chooses: as a purchase from a website, a signup

11  for a mailing list, or submission of a contact form, among other possibilities.  Harrower Decl.

12  ¶ 11.  Google compares the predicted conversion rate for any "property" against another property

13  or category of properties that it uses as a benchmark (often google.com or an aggregate of many

14  Display Network properties).  Harrower Decl. ¶ 11; *see* SUF ¶ 12.  If the conversion score for a

15  given property is lower than the benchmark, meaning a typical ad impression is less likely to

16  produce a conversion than it would on the benchmark property, the Smart Pricing score will

17  lower the advertiser's bid.  SUF ¶ 13.  Under many circumstances, this bid discount will translate

18  into a lower cost-per-click for the winning bidder than would have resulted without Smart

19  Pricing, but the actual cost-per-click will depend on the bids and bidding strategies of all

20  participants in each auction.  Harrower Decl. ¶ 11.

21       Not all advertisement types are subject to Smart Pricing.  SUF ¶ 14.  For example, Smart

22  Pricing does not apply when an advertiser targets a particular property or type of property, a

23  particular device platform (such as smartphones), a particular "vertical" (such as properties

24  related to travel), or a particular demographic (such as users who have recently visited the

25  advertiser's website).  SUF ¶ 19.

26       As Google's conversion tracking techniques have improved and the devices users use to

27  view webpages have changed, Google in turn has expanded and improved Smart Pricing.  As

28  relevant here, for example, Google originally could not apply Smart Pricing to advertisements

4

displayed on mobile phones (SUF ¶ 16); but as technology developed, Google later expanded Smart Pricing to some of these mobile ads, starting with ads shown on smartphones and tablets with full Internet browsers (SUF ¶ 17).  Google has also improved its conversion measurements over the years and added new, more granular benchmarks for comparison as the Internet advertising market has developed.  Harrower Decl. ¶ 15.

Woods contends that he was overcharged because Google did not apply Smart Pricing to every single click he was billed for.  *See* SAC ¶¶ 31, 42-113.  According to Woods' AdWords account records, however, Smart Pricing was applied to all but ███ of the ███ clicks billed to his account.  SUF ¶ 23; Harrower Decl. ¶¶ 16, 19 & Ex. C.  ███████ of those clicks were from mobile ads (SUF ¶ 24; Harrower Decl. ¶ 21), a category that was specifically excluded from Smart Pricing when Woods began advertising on AdWords (SUF ¶ 17; Harrower Decl. ¶ 13).

### 2.   Location Targeting

"Location Targeting" is an AdWords tool that allows advertisers to serve ads that are relevant to particular geographic areas.  SAC ¶ 116; *see* SUF ¶ 30.  Advertisers may target their ads to particular countries, territories, cities, or regions (or various combinations thereof).  SAC ¶ 116.  AdWords uses "several factors" to determine when to display a Location Targeted ad, including the user's estimated "physical location" (for example, as derived from the user's IP address), any geographic area of interest indicated by the user's search query, the country code in a website's domain name, and the user's language settings (among other factors), as set forth in Google's publicly available Help Center as of September 2009.  SUF ¶ 31; Declaration of Ali Reichenthal in Support of Reply in Support of Motion to Dismiss Second Amended Complaint ("Reichenthal MTD Decl.") ¶ 5 & Ex. 3 (attached as Ex. 3 to the Alepin Decl.).[2]  "For example, if someone searches for '*New York plumbers*,' [AdWords] may show relevant ads targeted to New York, regardless of the user's physical location."  Reichenthal MTD Decl. Ex. 3.

---

[2] AdWords also may consider a user's device location, as derived from GPS, WiFi, or Google's cell tower database; recent locations determined by a user's past searches; and information reported by the website on which the ad will be displayed.  Reichenthal MTD Decl. Ex. 3.

Woods contends that Google misrepresented the features of Location Targeting because he believed that Location Targeting ads would be displayed only to users who are physically located in the targeted area, when in fact—as Google expressly disclosed (see *id.*)—Location Targeting was sometimes based on the area of interest indicated by a user's search query. *See* SAC ¶¶ 114-141.

## B. Procedural Background

**1. Woods' Initial Complaint.** The Court dismissed Woods' initial complaint, which asserted only Smart Pricing claims. *See* 8/10/11 Order (Dkt. 64). As relevant here, the Court rejected Woods' attempt to "incorporate by reference" dozens of "Help Center" materials into the "short, written AdWords Agreement" and held that "[e]ven if" the language of those Help Center materials was "incorporated into the Agreement, the complaint [did] not allege adequately that Google undertook an obligation to apply the [Smart Pricing] discount." *Id.* at 6-7, 9. The Court also held that Woods failed to allege any fraudulent statements to support UCL or FAL claims with the required particularity. *Id*. at 11-13.

**2. First Amended Complaint.** Woods' First Amended Complaint realleged his Smart Pricing claims and introduced the Location Targeting claim, asserted under the UCL. *See* Dkt. 68. The Court again dismissed Woods' Smart Pricing claims. *See* 8/24/12 Order at 10, 12-15 (Dkt. 85). Among other things, the Court reasoned that the exhibits attached to Woods' First Amended Complaint were not "reasonably susceptible to Woods' interpretation that Smart Pricing applies to all clicks." *See id.* at 8 (Dkt. 85). The Court allowed Woods' Location Targeting claim to proceed because it "identif[ied] the specific statements that he alleges are likely to deceive." *Id.* at 16.

**3. Second Amended Complaint.** Woods' Second Amended Complaint re-alleges his remaining Smart Pricing and Location Targeting claims. SAC (Dkt. 87). On April 9, 2013, the Court granted in part and denied in part Google's motion to dismiss. 4/9/13 Order (Dkt. 122). The Court found that, accepting all of Woods' well-pleaded allegations as true (as the Court was required to do at that stage), Woods' allegations were sufficient to allow him to conduct discovery into whether extrinsic evidence supported his reading of the AdWords Agreement to

6

1   require Google to Smart Price all clicks on its so-called "Display Network." *Id.* at 7-9, 10-14.
2   The Court also held that Woods could proceed with a claim for breach of the implied covenant of
3   good faith and fair dealing based on his Smart Pricing allegations, which pleaded "that Google
4   entered into secret agreements with its Special Partners to … fail[] to apply Smart Pricing." *Id.*
5   at 10.  Finally, the Court incorporated the portion of its prior order allowing Woods to proceed to
6   discovery on his Location Targeting claim. *Id.* at 15.  Woods asserts his Smart Pricing claims
7   under four theories: breach of contract; breach of the implied covenant of good faith and fair
8   dealing; and violation of the UCL and FAL. SAC ¶¶ 52-113.  He challenges Location Targeting
9   only under the UCL. *Id.* ¶¶ 124-141.

10      **4. Discovery.**  The parties have engaged in extensive discovery.  Google has responded
11  to more than 50 document requests and has produced more than 125,000 documents totaling
12  more than 900,000 pages.  Alepin Decl. ¶ 2.  In particular, Google has produced the information
13  related to Woods' clicks from AdEvents, Google's master log of billable AdWords transactions.
14  Google has taken Woods' deposition, while Woods has deposed five Google employees in their
15  individual capacity and has obtained testimony from three other Google employees pursuant to
16  Federal Rule of Civil Procedure 30(b)(6).  Alepin Decl. ¶ 3.  Discovery has revealed a factual
17  record starkly at odds with what Woods alleged in his complaint and demonstrates that Woods is
18  without basis for any of his claims.

19                          **LEGAL STANDARD**

20      "A motion for summary judgment should be granted if 'there is no genuine dispute as to
21  any material fact and the movant is entitled to judgment as a matter of law.'" *Major v. Ocean*
22  *Spray Cranberries, Inc.*, No. 5-12-cv-03067-EJD, 2015 WL 859491, at *2 (N.D. Cal.  Feb. 26,
23  2015) (Davila, J.) (quoting Fed. R. Civ. P. 56(a)); *see, e.g.*, *Addisu v. Fred Meyer, Inc.*, 198 F.3d
24  1130, 1134 (9th Cir. 2000).  Although the moving party bears the initial burden to set forth the
25  basis for summary judgment and to identify the portions of the record showing the absence of a
26  triable issue, the burden then shifts to the opposing party to demonstrate the presence of a
27  genuine dispute.  Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986).

28      "[S]ummary judgment must be granted" if the plaintiff "'fails to make a showing

                                  7

1   sufficient to establish the existence of an element essential to [her] case.'"  *Major*, 2015 WL

2   859491, at *2 (quoting *Celotex*, 477 U.S. at 322).  The plaintiff "cannot meet her burden in

3   opposition simply by raising allegations or theories which are unsupported by any actual

4   evidence." *Id.* at *4.  "[T]he mere suggestion that facts are in controversy, as well as conclusory

5   or speculative testimony in affidavits and moving papers, is not sufficient to defeat summary

6   judgment." *Id.* at *2 (citing *Thornhill Pub'g Co. v. GTE Corp.*, 594 F.2d 730, 738 (9th Cir.

7   1979)).  Rather, to overcome a motion for summary judgment, the plaintiff must "present[]

8   evidence from which a reasonable jury . . . could resolve [the claim] in his or her favor." *Id.*

9   (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248-49 (1986)).

10   **ARGUMENT**

11   **I.   WOODS CANNOT PREVAIL ON HIS SMART PRICING CLAIMS.**

12   Woods' undisputed account records show that the ████ clicks (out of ████) that were not

13   Smart Priced all came from mobile ads, which were specifically excluded from Smart Pricing

14   when he signed up for AdWords.  *See* SUF ¶¶ 22, 16. Woods received a Smart Pricing bid

15   adjustment on every nonexcluded click.

16   Woods likewise cannot show that he was in any way deceived about Smart Pricing.  He

17   has not identified any statement by Google promising to apply Smart Pricing to mobile ads when

18   he signed up for AdWords.  That is because no such statement exists.  The SAC was premised on

19   language appearing on Google's website in 2011, after Google began Smart Pricing mobile ads.

20   SAC Ex. L.  But the record shows that the version of that page *from 2009*, when Woods enrolled

21   in AdWords, in fact stated that Smart Pricing did *not* apply to mobile ads.  *See* Reichenthal MTD

22   Decl. ¶ 3 & Ex. 1; SUF ¶ 15.

23   Nor can Woods claim that, back in 2009, he was misled by the statement in Exhibit B to

24   the SAC that Google would "automatically reduce the price advertisers pay for clicks."  SAC Ex.

25   B.  When Woods signed up for AdWords in September 2009, the Help Center included a clear

26   disclosure that Smart Pricing "automatically reduces maximum cost-per-click (CPC) bids *for*

27   *certain pages* in the Google Network"—not all pages—explaining that, "if [Google's] data

28   shows that a click from a Google Network page is less likely to turn into an actionable business

8

result, . . . [Google] *may* reduce the bid for that site."   Reichenthal MTD Decl. ¶ 4 & Ex. 2 (emphasis added); *see* SUF ¶ 19.

Woods' allegations of "reliance" are insupportable because he cannot say exactly what statements by Google about Smart Pricing he saw in 2009 when he decided to sign up for AdWords.  *See* Alepin Decl. Ex. 1, at 120-121; SUF ¶ 29.  And Woods' AdWords Agreement—which did not even mention Smart Pricing—explicitly disclaimed any guarantees regarding the price Woods would be charged for each click.  SAC Ex. A.  Summary judgment should be entered on these claims.

**A.   Woods Cannot Prove His Claim for Breach of Contract.**

**1.   Woods' ██ Non-Smart Priced Clicks Were From Mobile Ads, Which Were Explicitly Excluded From Smart Pricing.**

Woods cannot maintain an action for breach of contract because Google performed exactly as it promised.  Of the ██ clicks billed to Woods' AdWords account, Smart Pricing was applied to all but ██   *See* SUF ¶ 22.  The SAC thus vastly overstated the case in alleging that "Google failed to Smart Price 464 clicks in Woods' account that originated from mobile apps[.]" SAC ¶ 18; *see also id.* ¶ 47.  On the contrary, the record confirms that ████████████ ████████████████████████████████    ████████████ SUF ¶ 22.  Woods has admitted that he has not done "any independent factual investigation," nor has he ever "ever seen any document," to support his allegation that hundreds of other clicks were not Smart Priced.  Alepin Decl. Ex. 1 at 163; *see* SUF 35.  ████████████████████████████████████ ██   SUF ¶ 24.  And, critically, ████ of those clicks came from mobile ads—that is, ads displayed on smartphones and tablets.  SUF ¶ 23; Harrower Decl. ¶ 22.

Woods cannot state a claim based on those ██ clicks because mobile ads were specifically excluded from Smart Pricing when Woods signed up for AdWords.  Woods' account records show that the ████████████████████ SUF ¶ 24.  In

---

[3] Mobile applications are advertisements displayed on mobile devices (such as smartphones and tablets) in applications that are not dedicated Internet browsers, such as ad-supported versions of "Angry Birds."

9

September 2009, however, the Google AdWords Help Center website specifically stated that Smart Pricing "does not apply" to mobile ads.  Reichenthal MTD Decl. ¶ 3 & Ex. 1 ("Does smart pricing apply to mobile ads? No . . . smart pricing does not apply."); *see* SUF ¶ 15.

For this claim, the SAC relies on a Google AdWords Help Center page from February 2011, long after Woods started advertising.  *See* SAC ¶ 47 and Ex. L.  Woods could not possibly have seen and relied on this document when he signed up for AdWords *in 2009,* which means it could not form a basis for an understanding of a contract formed in 2009 or misrepresent anything on which he could have relied.[4]

Confronted with this inconsistency at his deposition, Woods admitted that he does not know whether that Help Center page appeared on Google's website when he enrolled in AdWords and that he cannot recall seeing it at that time.  *See* SUF ¶ 27; *see also* Alepin Decl. Ex. 1 at 181-185 (similar testimony regarding other SAC exhibits); SUF ¶¶ 29, 36 (Woods does not recall contents of what he reviewed in 2009).  Indeed, Woods admitted that he has "no recollection" of ever having viewed the Google AdWords Help Center at all—either before signing up for AdWords or at any point until he left the program (Alepin Decl. Ex. 1 at 172, 174; SUF ¶ 26)—despite the SAC's allegations that he did rely on Help Center documents (SAC ¶ 5). In any event, no contemporaneous 2009 promise by Google to apply Smart Pricing to mobile ads has surfaced in discovery because mobile ads were excluded from Smart Pricing at that time. *See* SUF ¶ 15.

### 2.  Google's Contract With Woods Does Not Include A Promise to Smart Price Mobile Ads.

Setting aside the explicit exclusion of mobile ads from Smart Pricing, Woods cannot show that the AdWords Agreement imposed any contractual obligation to Smart Price every click or to Smart Price clicks from mobile ads specifically.  The words "Smart Pricing" do not

---

[4]  Woods recently has suggested that he may dispute whether his three non-Smart-Priced clicks fall within the definition of mobile ads.  Yet the very document he relies on makes clear that "mobile ads" encompass both "ads that appear on mobile devices with full Internet browsers" and ads that appear in "the WAP mobile ad format."  See SAC Ex. L.  In 2009, Smart Pricing did not apply to either of these subcategories, although by the time of Exhibit L the first subcategory was Smart Priced.

appear anywhere in the AdWords Agreement.  *See* SUF ¶ 18.  And because the AdWords Agreement is a fully integrated written contract,[5] Woods cannot resort to extrinsic evidence to add to its terms.  *Casa Herrera, Inc. v. Beydoun*, 32 Cal. 4th 336, 343 (2004).

In search of some textual hook for his claim, Woods has invoked the "Measurements Clause" of the AdWords Agreement.  But the Measurements Clause provides simply that Google's AdWords "[c]harges are solely based on Google's measurements for the applicable Program, unless otherwise agreed to in writing."  SAC Ex. A § 7.  This clause did not make any promises to Woods or to any other advertiser.  To the contrary, it reserves to Google the exclusive right to measure and impose AdWords charges; by its plain terms, it does not create any obligations flowing from Google to Woods or any other advertiser.  Certainly nothing in the Measurements Clause commits Google to use any ***particular*** method of measurement, such as Smart Pricing (instead of, for example, charging a flat rate per click).  It is undisputed, moreover, that there was a wide array of advertising that Google does not commit to Smart Pricing— including advertisements targeting a particular property or type of property; a particular device platform (such as smartphones); a particular "vertical" (such as properties related to travel); or a particular demographic (such as users who have recently visited the advertiser's website).  *See* SUF ¶ 19.  And, as explained above (at pp. 9-10), when Woods signed up as an AdWords advertiser, mobile ads were one of the categories specifically excluded from Smart Pricing.

The Court did not dismiss Woods' claims on the pleadings, but instead permitted him to conduct discovery to seek extrinsic evidence that might support his interpretation of the Measurements Clause.  *See* 4/9/13 Order at 8-9 (Dkt. 122); 8/24/12 Order at 8 (Dkt. 85).  But the asserted ambiguity of the Measurements Clause was only enough to open the door to discovery. To prevail in his effort to transform that clause into a firm commitment to Smart Price every click, Woods needed "credible evidence of the parties' intended meaning of those words."  *In re*

---

[5] *See* SAC Ex. A § 9 ("Th[is] Agreement constitutes the entire and exclusive agreement between the parties with respect to the subject matter hereof . . . . No statements or promises have been relied upon in entering into this Agreement except as expressly set forth herein, and any conflicting or additional terms contained in any other documents . . . or oral discussions are void.").

1    *Facebook PPC Adver. Litig.*, 709 F. Supp. 2d 762, 769 (N.D. Cal. 2010).  That is, he needed

2    "credible evidence" that the parties *intended* the Measurements Clause to impose a specific

3    obligation to Smart Price every click.  Discovery has produced nothing that supports Woods's

4    idiosyncratic and atextual reading of the Measurements Clause.  *See, e.g.*, *Salehi v. Surfside III*

5    *Condo. Owners' Ass'n*, 200 Cal. App. 4th 1146, 1159 (2011) ("competent extrinsic evidence" is

6    required to show that contractual "language is 'reasonably susceptible' to the interpretation urged

7    by a party").  Woods did not recall the contents of any representation about AdWords (apart

8    from the AdWords Agreement itself) that he reviewed before entering into that agreement.  SUF

9    ¶¶ 29, 36.[6]   And in any event, broad references to the fact that Smart Pricing operates

10   "automatically," by the operation of complex algorithms without further human intervention,

11   does not provide a basis to construe the agreement to use Google "measurements" as an

12   agreement to use Smart Pricing for every click, including those specifically excluded from that

13   program.  Construing the contract in that way would be particularly insupportable in light of the

14   2009 documents making clear that not all ads were "automatically" Smart Priced and that, in

15   particular, mobile ads were *not* Smart Priced. *See* SUF ¶¶ 15, 20; Reichenthal MTD Decl. Exs. 1-

16   2.

17        Standing alone, Google's agreement to use its own "measurements for the applicable

18   Program" as the sole basis to calculate charges for AdWords "unless otherwise agreed to in

19   writing" (SAC Ex. A § 7) does not commit Google to apply any particular pricing formula or

20   program in any particular way.  In the absence of evidentiary support, the Measurements Clause

21

---

22   [6] Woods testified:  "Everything I read, I don't remember, but in my memory it was a general
     explanation of the program and how it worked."  Alepin Decl. Ex. 1 at 120.  When asked, "And
23   what did it say?," Woods replied, "I don't remember." *Id.* at 120-121.  The documents attached
     to the SAC—which Woods did not recall seeing at any particular time—are dated long after
24   Woods signed up for AdWords.  *See* SAC Ex. B (document dated Aug. 28, 2011); *id.* Ex. C
     (listing a 2011 copyright date); *id.* Ex. D (document dated Dec. 14, 2010); *id.* Ex. G (document
25   dated Feb. 8, 2011); *id.* Ex. I (document dated Feb. 12, 2011); *id.* Ex. L (document dated Feb. 8,
     2011).  Woods cannot recall when he first saw Exhibit B.  He "belie[ves]" that in "August of
26   2011, [he] was looking for . . . information [he] could find on [his] computer related to Google
     and Google AdWords."  Alepin Decl. Ex. 1 at 178.  His lawyers asked Woods "to find what [he]
27   could and this document is a result." *Id.*  Woods does not know how or when the document or a
     link to it came to be on his computer. *Id.* at 177.  Tellingly, it was not attached to his original
28   complaint. (Dkt. 1.)

---

cannot bear the weight that Woods seeks to place on it, and Google is therefore entitled to summary judgment.

Facing the demise of the Smart Pricing claim he pleaded because his clicks were Smart Priced, Woods suggests in the most recent Joint Case Management Statement that he would like to press a new and different claim that Google did not "*properly* Smart Price" hundreds of ads that were, in fact, Smart Priced. *See* Fourth Amended Joint Case Management Statement (Dkt. 202) at 3 (emphasis added). That is, Woods seemingly takes issue with the formula Google used to price some ads, and seeks an interpretation of the Measurements Clause that would require Google to use an unidentified Smart Pricing formula that Woods prefers to the one Google actually used. But the same failure of evidentiary support that defeats his pleaded Smart Pricing claim dooms this novel and extravagant assertion. No parol evidence provides a basis to identify the precise formula to be used for any given click, let alone to make any such undisclosed formula the basis of an agreement between Google and AdWords advertisers. Moreover, the claim that Google was bound to use a particular Smart Pricing formula is not before the Court: The SAC pleads only that Google did not apply Smart Pricing, not that it used the wrong Smart Pricing algorithm. *See* SAC ¶¶ 40, 41, 42, 44, 47-49. Woods has never alleged that Google was required to apply any particular Smart Pricing formula or that it failed to do so, and a plaintiff cannot "amend [his] Complaint 'on the fly' in response to potentially dispositive arguments." *Major*, 2015 WL 859491, at *4. In any event, even assuming (contrary to the evidence) that Google committed to apply *some* form of Smart Pricing, the AdWords Agreement provides that all pricing will be based on Google's measurements and explicitly disclaims any guarantees as to what cost-per-click pricing formula will be used. *See* SUF ¶ 21; SAC Ex. A, §§ 5, 7; pp. 13-14, *infra*.

### 3. The AdWords Terms Of Service Explicitly Disclaimed Any Guarantees Regarding The Price Woods Would Be Charged For Each Click.

Even if Woods could point to some parol evidence in the record to support his effort to turn the contract term "measurements" into a guarantee that all clicks will be Smart Priced, that reading would fail because the AdWords Agreement explicitly "disclaims *all guarantees*

13

regarding . . . cost-per-click."  SUF ¶ 21; SAC Ex. A (AdWords Agreement § 5) (emphasis added); *see Gianaculas v. Trans World Airlines, Inc.*, 761 F.2d 1391, 1394 (9th Cir. 1985) ("express[] state[ment]" in a contract could not be overridden by contrary implied agreement) (citing *Shapiro v. Wells Fargo Realty Advisors*, 152 Cal. App. 3d 467, 482 (1984), *disapproved in part on other grounds by Foley v. Interactive Data Corp.*, 47 Cal. 3d 654, 688 (1988)).  A contract that unambiguously "disclaims all guarantees regarding . . . cost-per-click" precludes any claim—such as Woods' claims here—contending that the plaintiff should have been charged a lower cost for certain clicks (for example, because the clicks should have been discounted via Smart Pricing).  *See*, *e.g.*, *Facebook*, 709 F. Supp. 2d at 769, 772 (unambiguous disclaimer precluded contract and related UCL claims).

No competent evidence would allow a reasonable jury to construe this unambiguous contractual disclaimer to mean something other than what it says.  The disclaimer is written in expansive language, and there is nothing ambiguous about what it means to "disclaim all guarantees."  This disclaimer of price warranties is inevitable because AdWords is a second-price auction advertising program, not a simple pay-for-placement program.  SUF ¶¶ 8, 9.  A disclaimer of warranty for "costs per click" is perfectly fair because, like Sotheby's or eBay, Google doesn't set the prices in the auction—the bidders do, with the second-place bidder determining the amount the winner pays.  *See id.*; SAC Ex. A § 5(i).  Further, an advertiser who sets a very low maximum CPC bid may never win an auction and never get an ad display at all, much less a display in any particular location on a page.  SAC §§ 5(iii), (vii).  Google also is in no position to guarantee that anyone will click on an advertiser's ads or be interested in what they're advertising.  *Id.* §§ 5(ii), (iv), (v).  Finally, Google cannot warrant general statements by website publishers about their audiences.  *Id.* § 5(vi).  Google is no more able to predict or control any of these factors than Sotheby's can tell any particular bidder that she will go home with an artistic masterpiece at a great price.  Because there is no evidence that could overcome this explicit disclaimer, Woods cannot prevail on his Smart Pricing claims.

**B.      Woods Cannot Prove That Google Entered Into Secret Agreements With Publishers That Breached Its Implied Covenant Of Good Faith And Fair Dealing With Woods.**

The Court previously allowed Woods to proceed on a claim for breach of the implied covenant of good faith and fair dealing (Count II) based on "Woods' allegations that Google entered into secret agreements with its Special Partners" to limit the scope of Smart Pricing. 4/9/13 Order at 10.  Discovery has produced nothing to substantiate these allegations.  Having failed to surface any actual evidence of such "secret agreements" through discovery, Woods cannot proceed with this claim.

**C.      Woods Cannot Show That He Ever Saw And Relied On Any Misrepresentation About Smart Pricing For Mobile Ads.**

Woods' Smart Pricing claims now encompass only Smart Pricing of mobile ads, so to prevail on his UCL and FAL claims, Woods must identify misrepresentations about the application of Smart Pricing to mobile ads specifically.  As discussed above (at pp. 9-14), Woods cannot identify any contractual commitment on Google's part to Smart Price mobile ads.  Thus, he cannot support his claim that Google falsely represented that mobile ads would be Smart Priced.

But Woods' UCL and FAL claims fail for a simpler and more fundamental reason. Woods cannot recover based on alleged misrepresentations that he never saw.  *Mazza v. Am. Honda Motor Co.*, 666 F.3d 581, 595 (9th Cir. 2012) (citing *Cohen v. DIRECTV, Inc.*, 178 Cal. App. 4th 966, 980 (2009)); *see, e.g., Backhaut v. Apple, Inc.*, No. 14-cv-02285-LHK, --- F. Supp. 3d ---, 2014 WL 6601776, at *10 (N.D. Cal. Nov. 19, 2014); *Perkins v. LinkedIn Corp.*, No. 13-cv-04303-LHK, --- F. Supp. 3d ---, 2014 WL 2751053, at *19 (N.D. Cal. Jun. 12, 2014) (collecting cases); *In re iPhone Application Litig.*, 6 F. Supp. 3d 1004, 1022-23 (N.D. Cal. 2013). Woods now admits that, apart from the terms of the AdWords Agreement (which he printed), he does not recall what was said in any other materials he viewed before signing up for AdWords. *See* SUF ¶¶ 29, 36.  And he cannot recall any particular misrepresentation by Google that he saw and relied on when he was an AdWords advertiser.  *See* SUF ¶¶ 28, 29, 36; Alepin Decl. Ex. 1 at 168-69, 171-77.  Indeed, Woods specifically admitted that he cannot recall any instance during

1   the time he was an advertiser when he saw and relied on any specific representation by Google

2   that Smart Pricing would be applied to mobile ads.  SUF ¶ 28.  Thus, Woods' own testimony

3   establishes that he could not have relied on any representation that mobile ads would be Smart

4   Priced because he never saw any representation to that effect.  *See Mazza*, 666 F.3d at 595;

5   *Major*, 2015 WL 859491, at *3.  Moreover, as explained above (at pp. 9-10), the statement called

6   out in the SAC did not exist when Woods signed up for AdWords, and the corresponding

7   statement that did exist expressly excluded mobile ads from Smart Pricing.  Simply put, Woods

8   cannot prevail on his Smart Pricing claims by invoking statements that (1) he admits he neither

9   saw nor relied on and (2) did not exist when he enrolled in AdWords.

10  **II.     WOODS CANNOT PREVAIL ON HIS LOCATION TARGETING CLAIM.**

11          Woods' Location Targeting claim is similarly deficient.  Woods contends that he was

12  misled because Google allegedly told him that his advertisements would be shown only to users

13  who were physically located in the locations he selected.  SAC ¶¶ 114-123.  To the contrary, as

14  Woods tells it, Google also showed his ads to users who were located elsewhere but sought

15  information about the targeted locations.  SAC ¶¶ 10, 135.  This is known as area of interest

16  targeting.  (For example, when a user physically located in Seattle runs a Google search for

17  "NYC hotels," Google may show hotel ads targeted to New York City.)  Woods' claim fails for

18  multiple reasons.

19          To begin with, Woods cannot identify any statement by Google promising that Location

20  Targeting would rely entirely on estimates of a user's physical location to the exclusion of a

21  user's expressed geographical area of interest.  SUF ¶ 36.  On the contrary, the Google AdWords

22  Help Center explicitly disclosed that Location Targeting may be based on the area of interest

23  indicated by a user's search query—such as users in eastern Oklahoma who searched for

24  "lawyers in Fayetteville, Arkansas."  *See* SUF ¶ 34.  Woods now admits he has no recollection of

25  anything Google told him that might support his assumptions about how Location Targeting

26  would work.  SUF ¶ 25.  For all of these reasons, no reasonable jury could find in Woods' favor

27  on the Location Targeting claim.

28

**A.      Woods Has Not Identified Any Misrepresentation About Location Targeting, Much Less Any That He Saw And Relied On.**

Woods' UCL claim that address Location Targeting fail for much the same reason his Smart Pricing UCL and FAL claims fail:  Woods cannot identify any misrepresentation about Location Targeting that he saw and relied upon.  Because the existence of a misrepresentation and his reliance on it are both essential elements of Woods's UCL claims, *e.g.*, *Mazza*, 666 F.3d at 595-96; *Cohen*, 178 Cal. App. 4th at 980-81; *Perkins*, 2014 WL 2751053, at *18-19, these deficiencies entitle Google to summary judgment.

Woods alleges that Google "lied about the geographic origin of [certain] clicks" (SAC ¶ 10); but at his deposition Woods could not say how Google "lied" and said that he did not recall any communications he received from Google during the period when he was an advertiser regarding the geographic origin of clicks on his ads.  *See* SUF ¶ 35.  Woods admitted, instead, the only basis for his allegation that he was lied to is that his "counsel investigated it and told me that was the case."  Alepin Decl. Ex. 1 at 165; *see* SUF ¶ 35.  Woods has no recollection of what representations he actually saw on the geographic origin of clicks on his ads, however, and Woods' counsel cannot testify to what Woods saw and relied on.  Further, his only recollection of any "representation" about how his ads might be targeted was that "when I went through the settings Google asked me where I wanted my ads to appear and I set that out."  Alepin Decl. Ex. 1 at 166; *see* SUF ¶ 35.  In fact, Woods repeated this calculatedly vague statement *five* more times. *See also* Alepin Decl. Ex. 1 at 63, 64-65, 77, 79-80, and 193.  Woods remembered what his allegations were—but nothing else.  He could not identify any specific representation on which he might have relied.

The SAC alleges that, because Woods was prompted during the ad creation process to select "what geographic locations . . . you want your ads to appear [in]," he understood that Google would only serve advertisements to users physically located in those locations.  SAC ¶¶ 115-116.  But the prompt itself says nothing of the sort (SAC Exs. N & O), and Woods has identified nothing else substantiating his unsupported assumptions about how Location Targeting would work.   Although  the  Court  previously  ruled  that  whether  Woods  can  "infer  a

17

1    misrepresentation from this question" may turn on outside evidence and thus was "'not

2    appropriate for decision on a motion to dismiss'" (8/24/12 Order at 16), discovery has added no

3    factual support for Woods' position.[7]

4          As with his Smart Pricing claims, the SAC disingenuously attempts to bolster his claim

5    by pointing to the **2011** version of Google's AdWords sign-up page that reflected Google's

6    practices as of then (SAC Exs. N & O (screenshots dated Mar. 18, 2011); *see* SUF ¶ 37)—even

7    though Woods in fact signed up for AdWords in **2009**.   Woods does not know what

8    representations he encountered in 2009, and at his deposition he was unable to recall any false or

9    misleading statement that he saw and relied on when he signed up for AdWords.  *See* SUF ¶¶ 28,

10   29, 36; Alepin Decl. Ex. 1 at 3, 64-65, 77, 79-80, 166 and 193.   Without exposure to a

11   misrepresentation on which he relied, Woods has no UCL claim.  *E.g.*, *Mazza*, 666 F.3d at 595;

12   *Backhaut*, 2014 WL 6601776, at *9; *Perkins*, 2014 WL 2751053, at *18-19.

13        **B.    Google Explicitly Disclosed That Location Targeted Ads May Be Displayed**
              **Based On A User's Geographical Area Of Interest Rather Than The User's**
14            **Physical Location**

15        Google's statements about Location Targeting were not misleading—and Woods'

16   Location Targeting claim also fails—for an additional reason: the record reveals that Google

17   disclosed the exact practice he challenges.  *See, e.g.*, *Freeman v. Time, Inc.*, 68 F.3d 285, 289-90

18   (9th Cir. 1995) (affirming dismissal of UCL claim where the allegedly deceptive meaning of the

19   challenged statements was dispelled by the promotion as a whole); *Berry v. Webloyalty.com,*

20   *Inc.*, No. 10-cv-1358-H CAB, 2011 WL 1375665, at *4 (S.D. Cal. April 11, 2011) (dismissing

21   UCL claim because express "disclosures [on website] are sufficient to place the consumer on

22   notice of the conditions and terms"), *vacated and remanded on other grounds*, 517 F. Appx. 581

23   (9th Cir. 2013).   When Woods signed up for AdWords in 2009, the Google AdWords Help

24   Center stated that Location Targeting is not limited to the user's physical location and that it may

25   be based on the area of interest indicated by a user's search query (SUF ¶¶ 31, 34):

26

27   ───────────────────
     [7] Woods also admits that the prompt was accompanied by a link to "[l]earn more about location
     targeting" (SAC ¶ 116 & Ex. O), but he does not contend that he viewed that information before
28   allegedly coming to his own conclusions about how Location Targeting must work.

1

> When someone enters your keyword on Google, the AdWords system uses several factors to determine where to show your ad: . . .

2

3

4

> We analyze the actual search terms the user submits on Google to determine when to show ads targeted to a specific region or city.  If someone enters a search query that contains a recognizable city or region, we may show appropriate regional or custom-targeted ads.  For example, if someone searches for '*New York plumbers*,' we may show relevant ads targeted to New York, regardless of the user's physical location.

5

Reichenthal MTD Decl. ¶ 5 & Ex. 3 (emphasis omitted).

6

7

8

9

10

11

12

This disclosure defeats the Location Targeting claim.  It states that Google "may show relevant ads targeted to" a particular region "regardless of the user's physical location."  *Id*.  It specifically describes area of interest targeting by explaining that ads may be displayed based on "a search query that contains a recognizable city or region."  *Id.*  It even accompanies this explanation with a specific example of area of interest targeting in action.  *Id.*  And it cautions that, contrary to Woods' unsupported assumption, physical location is just one of "several factors" used to determine when to display a Location Targeted advertisement.  *Id.*

13

14

15

Because the record shows that Google fully disclosed the practice of Location of Interest targeting when Woods enrolled in AdWords, Woods cannot show that he was deceived.  He therefore cannot recover under the UCL.

16

### C.    Woods Cannot Establish That He Was Harmed By Area Of Interest Targeting.

17

18

19

20

21

22

23

24

25

Even if Woods could show that area of interest targeting was inconsistent with some statement that Google made to him, Woods still could not pursue this claim because he cannot show that he was harmed by this practice.  Woods cannot recover under the UCL unless he lost money or property as a result of the alleged misconduct and can establish his entitlement to restitution.  *See* Cal. Bus. & Prof. Code § 17203; *Korea Supply Co. v. Lockheed Martin Corp.*, 29 Cal. 4th 1134, 1152 (2003) (restitution is only pecuniary remedy under UCL).[8]  But he lost nothing.  He did not pay extra for Location Targeting, so his only potential loss of money or property would be payment for clicks by persons outside of Northwest Arkansas who were looking for a Northwest Arkansas lawyer.  *See* SAC ¶¶ 10, 136.

26

27

28

---

[8]  There is no dispute that, by November 2011, Google had disclosed that physical location was not the only method of Location Targeting.  Accordingly, prospective injunctive relief is not at issue on Woods' Location Targeting claim.

19

1   But Woods cannot show any injury from that subset of clicks.  On the contrary, in his
2   promotional activities in channels other than Google AdWords, Woods has marketed to people
3   who were looking for a Northwest Arkansas lawyer, even though they were not physically
4   located in Northwest Arkansas.  *See* SUF ¶ 39.  Those activities reflect his understanding of the
5   benefit of targeting advertising based on geographical areas of interest.  Woods testified at his
6   deposition that the goal of his advertising campaign was to become "more visible" to "people . . .
7   ***looking for*** a personal injury [lawyer] in Northwest Arkansas."  Alepin Decl. Ex. 1 at 134-135
8   (emphasis added).   Woods has clients outside Arkansas (SUF ¶ 38), including "a lot of
9   Oklahomans" (Alepin Decl. Ex. 1 at 116-117), and regularly seeks clients who may be located
10  outside of Arkansas (*id.* at 119-120).   And he has actively targeted potential clients in
11  neighboring states who need counsel in Arkansas (*see* SUF ¶ 39), telling them, for example, "If
12  you live in the three state area of Northwest Arkansas, Southwest Missouri, or Eastern
13  Oklahoma, *or anywhere else* and you need a lawyer, contact Rick Woods today."  Alepin Decl.
14  Ex. 2 (emphasis added).

15  Woods therefore cannot maintain the theory advanced in his complaint—that he
16  necessarily was harmed each time he paid for a click by a user who was physically located
17  outside of Northwest Arkansas.  *See* Alepin Decl. Ex. 1 at 197-198 (acknowledging that he does
18  not know whether any harm resulted).  Nor can he plausibly contend that he would have forgone
19  Location Targeting—or AdWords—altogether had he known that Google would target some ads
20  by the user's expressed geographic area of interest rather than physical location.

21  Far from exposing any deception, the discovery record shows both that Google fully
22  disclosed its practice of targeting ads based on a user's perceived area of interest and that this
23  practice inured to Woods' benefit.  On this record, no reasonable jury could rule in Woods' favor
24  on his Location Targeting claim.

25
26
27
28

1

**CONCLUSION**

2

The motion for summary judgment should be granted and the case dismissed.

3

4   DATED: April 23, 2015                    Respectively submitted,

5                                            **MAYER BROWN LLP**

6                                             /s/ Edward D. Johnson                    .

7                                            EDWARD D. JOHNSON
                                             DONALD FALK
8                                            ERIC B. EVANS
                                             DOMINIQUE-CHANTALE ALEPIN
9

10                                           *Attorneys for Defendant Google Inc.*

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

21