**KESSLER TOPAZ**
**MELTZER & CHECK, LLP**
Stacey M. Kaplan  (Bar No. 241989)
One Sansome Street, Suite 1850
San Francisco, CA 94104
Telephone: (415) 400-3000
Facsimile: (415) 400-3001
skaplan@ktmc.com

-and-

Joseph H. Meltzer (*Pro Hac Vice*)
Matthew L. Mustokoff (*Pro Hac Vice*)
Margaret E. Mazzeo (*Pro Hac Vice*)
280 King of Prussia Road
Radnor, PA 19087
Telephone: (610) 667-7706
Facsimile: (610) 667-7056
jmeltzer@ktmc.com
mmustokoff@ktmc.com
mmazzeo@ktmc.com

**NIX PATTERSON, LLP**
Michael B. Angelovich (*Pro Hac Vice*)
Jeffrey J. Angelovich (*Pro Hac Vice*)
Bradley E. Beckworth (*Pro Hac Vice*)
Andrew G. Pate (*Pro Hac Vice*)
Brad E. Seidel, Of Counsel (*Pro Hac Vice*)
3600 N. Capital of Texas Highway,
Building B, Suite 350
Austin, TX 78746
Telephone: (512) 328-5333
Facsimile: (512) 328-5335
mangelovich@nixlaw.com
jangelovich@nixlaw.com
bbeckworth@nixlaw.com
dpate@nixlaw.com
bseidel@nixlaw.com

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA
## SAN JOSE DIVISION

| | |
|---|---|
| RENE CABRERA and RM CABRERA COMPANY, INC., Individually and On Behalf of All Others Similarly Situated, <br><br> Plaintiffs, <br><br> v. <br><br> GOOGLE LLC, <br><br> Defendant. | Case No. 5:11-cv-01263-EJD <br><br> **FIFTH AMENDED CLASS ACTION COMPLAINT** <br><br> DEMAND FOR JURY TRIAL |

### *PUBLIC REDACTED VERSION*

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# TABLE OF CONTENTS

**Page**

I. INTRODUCTION ...................................................................................................... 1

II. SUMMARY OF ACTION ......................................................................................... 3

III. PARTIES .................................................................................................................... 5

IV. JURISDICTION AND VENUE ................................................................................. 6

V. PART I – SMART PRICING ..................................................................................... 6

    A. FACTUAL BACKGROUND RELATING TO SMART PRICING ............. 6

    B. CLAIM RELATING TO SMART PRICING ............................................. 14

        COUNT I – Breach of Contract (Failure to Smart Price) ........................... 14

VI. PART II – LOCATION TARGETING ..................................................................... 16

    A. FACTUAL BACKGROUND RELATING TO LOCATION TARGETING ................................................................................................ 16

    B. CLAIM RELATING TO LOCATION TARGETING ................................ 18

        COUNT II - Violation of Cal. Bus. & Prof. Code §§ 17200 *et seq.* (Location Targeting) ................................................................................... 18

VII. CLASS ALLEGATIONS ......................................................................................... 21

VIII. DISCOVERY RULE, TOLLING, AND FRAUDULENT CONCEALMENT ....... 24

IX. JURY DEMAND ...................................................................................................... 25

X. PRAYER ................................................................................................................... 25

1        Plaintiffs Rene Cabrera ("Cabrera") and RM Cabrera Company, Inc. (f/k/a Training

2 Options Inc.) ("RMC"), on behalf of themselves and all others similarly situated, file this Fifth

3 Amended Class Action Complaint (the "Complaint") against Defendant Google LLC ("Google"

4 or "Defendant").  For their Complaint, Plaintiffs allege as follows:

5 **I.       INTRODUCTION**

6        1.    Google's AdWords Program ("AdWords") is a cost-per-click advertising

7 program offered by Google to advertisers who wish to have Google display their ads on the

8 Internet.[1]  Through AdWords, advertisers pay only when an Internet user clicks on their ads.

9        2.    Participation in AdWords is governed by the Google Inc. Advertising Program

10 Terms (the "Agreement").[2]

11        3.    During the summer of 2008, Plaintiffs researched AdWords to determine whether

12 to advertise through Google.

13        4.    Based on this research, Plaintiffs learned that Google promotes AdWords as an

14 advertising program designed to provide cost-effective, targeted cost-per-click advertising on

15 high quality websites.

16        5.    Specifically, Plaintiffs learned that Google promises to "Smart Price" *all* clicks

17 on ads originating from the Display Network[3] (described herein as "Smart Pricing").  According

18 to Google, Smart Pricing is a feature that automatically reduces the price advertisers pay for

19 clicks based on the likelihood the click will result in a business result.  Google explains that

20 clicks are automatically discounted where Google's data shows the clicks are less likely to result

21 in a conversion (i.e., a business result) than clicks from google.com, which serves as the

22 benchmark for Smart Pricing discounts.  In other words, if the "conversion rate" for a particular

23

24

[1] Google displays AdWords ads on google.com, certain other Google properties (e.g., YouTube

25 and Gmail), and websites and properties of third parties ("partners") who enroll in Google's

26 AdSense Program ("AdSense").  For clicks on ads from AdSense partner properties, Google and its partners split the revenues generated from such clicks.

27 [2] *See* Exhibit A.

28 [3] The "Display Network" is described below at note 9.

website is lower than the "conversion rate" for google.com, Google automatically reduces the

price of each click from that website according to the following formula:

████████████████████████████████████████

The Smart Pricing measurement is applicable to ads shown on all websites and properties in the

Display Network, including mobile applications ("mobile apps") and Display Network websites

and properties accessed through mobile devices with full Internet browsers.[4]

　　　　6.　　　Plaintiffs also learned that they could limit the geographic distribution of ads.

That is, Google promises to limit the distribution of ads to users located in the specific geographic

location(s) selected by advertisers (described herein as "Location Targeting").  This was

important to Plaintiffs because they wanted to limit advertising for RMC (formerly known as

Training Options, Inc.) to people located in Florida, North Carolina, Georgia and Louisiana—

the people most likely to use RMC's services.

　　　　7.　　　Based on Plaintiffs' research, Cabrera opened an AdWords account to create

advertising for RMC.  Plaintiffs began advertising with Google when Cabrera accepted (by

"clicking through") the Agreement on August 14, 2008.  Plaintiffs continued advertising with

Google until August 2009.

　　　　8.　　　On March 15, 2011, Rick Woods ("Woods") filed a Class Action Complaint

against Google seeking to recover damages, restitution, and other relief relating to Google's

breach of its obligations and deceptive misconduct.

---

[4] In this Complaint, Plaintiffs reference Google's promise and obligation to Smart Price clicks on ads originating from the Display Network.  Where they do so, Plaintiffs allege that Google's Smart Pricing measurement (the measurement of whether a click is less likely than google.com to convert into a business result and should be discounted) automatically applies to all clicks on the Display Network, while the Smart Pricing discount (the actual reduction in the cost of a click that is less likely to convert) automatically applies to reduce the cost of a click when the Smart Pricing measurement reveals a click is less likely to convert.

Thus, Smart Pricing—as alleged herein by Plaintiffs—does not result in each and every Display Network click being discounted.  Rather, Smart Pricing results in a discount for the subset of Display Network clicks that are less likely than google.com to convert into a business result, as determined by Google's measurements.

FIFTH AMENDED CLASS ACTION COMPLAINT
11-cv-01263-EJD                                                                                              -2-

9.      Plaintiffs learned of Woods' class action complaint and determined that Plaintiffs had been overcharged for at least forty (40) clicks as a result of Google's failure to Smart Price Display Network clicks as Google promised.  Plaintiffs also learned that RMC overpaid as a result of Google's failure to Location Target as it represented it would do.

10.     The Display Network includes websites that partner with Google (like reference.com), mobile apps (which Google identifies on its billing reports as adsenseformobileapps.com and nextmobileweb.com), and websites that appear on mobile devices with full Internet browsers (like savysoda.com).

11.     Plaintiffs allege that Google failed to apply Smart Pricing discounts to clicks on ads displayed on Google's partners' websites on the Display Network between August 22, 2006 and February 20, 2013.  Discovery in this action confirms that Google did not apply the Smart Pricing Measurement as calculated by Google's Smart Pricing formula to at least forty (40) clicks on the Display Network in Cabrera's account between August 14, 2008 and August 12, 2009.[5] Had Google Smart Priced these clicks as promised, Plaintiffs would have been charged and paid less than the amounts actually charged to Plaintiffs.

12.     Likewise, Google failed to Smart Price clicks from mobile apps between August 22, 2006 and February 20, 2013.  All mobile apps are part of the Display Network.  Discovery has revealed that Google failed to Smart Price at least nineteen (19) clicks in Cabrera's account that originated from mobile apps between August 14, 2008 and August 12, 2009.

## II.     SUMMARY OF ACTION

13.     Google consummated the prototypical bait and switch:

| Google's Representations: "The Bait" | Reality: "The Switch" |
|---|---|
| Google automatically applies Smart Pricing to *all* clicks on the Display Network, including clicks from mobile apps. | Google did not Smart Price Display Network clicks, including clicks from mobile apps or clicks from its Special Partners' websites on the |

---

[5] "Smart Pricing Measurement" refers to the Smart Pricing score that should have applied to Display Network clicks as calculated by Google's Smart Pricing formula.

| | Display Network. |
|---|---|
| Google displays ads *only* to users located in the geographic location the advertiser selects. | Google displayed ads to users located far beyond advertisers' selected geographic location(s). |

14.    Google's conduct constitutes a breach of the Agreement and violation of California Business and Professions Code §§ 17200, *et seq.* ("UCL").

15.    Cabrera and RMC bring this action seeking relief for Google's misconduct on behalf of themselves and two classes described below (each a "Class" and together, the "Classes"). Cabrera and RMC bring this action on behalf of themselves and the "Smart Pricing Class," which is defined as follows:

> All persons and entities located within the United States who, between August 22, 2006 and February 20, 2013, advertised through Google's AdWords program and paid for clicks on their Google AdWords advertisement(s), where such clicks were not Smart Priced because they (1) originated from a property on Google's Display Network and Google applied no Smart Pricing measurement, *or* (2) were AFMA Clicks, Search Bundled Clicks, or mGDN Clicks.[6]

RMC also brings this action on behalf of itself and the "Location Targeting Class," which is defined as follows:

> All persons and entities located within the United States who, between January 1, 2004 and March 22, 2011, advertised through Google's AdWords program and paid for clicks on their Google AdWords advertisement(s),

---

[6] The terms "AFMA Click," "Search Bundled Click," and "mGDN Click" are defined in § I.A.2 of Plaintiff's Motion for Class Certification; Memorandum of Points and Authorities (ECF No. 424-4) and those definitions are incorporated herein by reference. For ease of reference, these terms are generally defined as follows:

- "AFMA Clicks" are clicks on ads from mobile applications on the Display Network for which a click cost multiplier greater than ███ was applied, between August 22, 2006 and February 20, 2013.
- "Search Bundled Clicks" are clicks on ads on the Display Network where the advertiser's settings allowed its ads to show on both the Search and Display Networks and did not set a Display Network bid different from the Search Network bid, between June 1, 2009 and December 13, 2012.
- "mGDN Clicks" are clicks on ads on properties of a desktop publisher (i.e., desktop websites) on the Display Network from high end mobile devices (e.g., smart phones or tablets), between August 22, 2006 and November 6, 2011.

In each of these instances, Google did not Smart Price clicks as promised because it used artificial measurements rather than its actual Smart Pricing Measurement █████████████

where such clicks did not originate from the location selected by the advertiser.

Excluded from both Classes are Google and its affiliates, officers, and directors, as well as members of the judiciary, their staff and jurors in this case.

16.    Cabrera and RMC, for themselves and the Classes, seek: (a) a declaration that Google breached its contractual obligations to Class members; (b) actual damages to fully compensate for losses sustained as a direct, proximate, and/or producing cause of Google's breaches and unlawful conduct; (c) restitution and disgorgement of all monies Google derived from Class members through the misconduct described herein; (d) pre-judgment and post-judgment interest; (e) attorneys' fees; and (f) any such other and further relief as the Court deems just and proper.

17.    Google's conduct with respect to Smart Pricing is addressed in Part I and Location Targeting is addressed in Part II of this Complaint.

**III.    PARTIES**

18.    Plaintiff Cabrera is an individual who resides in Cape Coral, Lee County, Florida. Cabrera and his wife Cynthia Cabrera are the sole shareholders of a closely-held corporation, RMC (f/k/a/ Training Options, Inc.) incorporated under Florida law.

19.    Plaintiff RMC is a closely-held corporation incorporated under Florida law and solely-owned by Cabrera and his wife Cynthia Cabrera.[7]

20.    Plaintiffs began advertising through Google on or about August 14, 2008. Plaintiffs incurred losses and have been injured by the actions of Google described herein.

21.    Defendant Google is a Delaware limited liability corporation with its principal place of business located at 1600 Amphitheatre Parkway, Mountain View, California 94043. Google has appeared in this action for all purposes.  Additional service is not necessary.

---

[7] On November 12, 2018, Cabrera reinstated Training Options, Inc.  *See* ECF No. 446-2. Under Florida law, an administratively dissolved corporation "may apply to the Department of State for reinstatement at any time after the effective date of dissolution . . . , [and] [w]hen the reinstatement is effective, it relates back to and takes effect as of the effective date of the administrative dissolution and the corporation resumes carrying on its business as if the administrative dissolution had never occurred."  Fl. Bus. Corp. Code § 607.1422.  Cabrera subsequently changed the name of Training Options, Inc. to RMC.

1

## IV.    JURISDICTION AND VENUE

2
3
4
5
6
7
8
9

22.    The Court has jurisdiction over this action pursuant to 28 U.S.C. § 1332(d)(2).  If one or both of the Classes is certified in this action, the amount in controversy will exceed $5,000,000.00, exclusive of interest and costs, and this is a class action in which at least one member of the Classes is a citizen of a state different from any defendant.  Although Google is located in California, the principal injuries resulting from Google's conduct have been incurred throughout the United States where members of the Classes are located.  On information and belief, greater than two-thirds of the members of the proposed Classes are citizens of states other than California.

10
11
12

23.    This Court has general jurisdiction over Google.  Google engages in continuous and systematic activities within the State of California.  Indeed, Google's headquarters are located in Mountain View, California, which is within the jurisdiction of this Court.

13
14
15
16

24.    Venue is proper in this District pursuant to 28 U.S.C. § 1391.  Specifically, as provided by 28 U.S.C. § 1391(c), Google is a corporation that is deemed to reside in this District. Moreover, a substantial part of the events and omissions giving rise to the claims alleged herein occurred in this District.

17

## V.    PART I – SMART PRICING

18

### A.    FACTUAL BACKGROUND RELATING TO SMART PRICING

19
20

25.    Google states that Smart Pricing is an "*automatic* pricing discount feature"[8] that applies to *all* clicks on the Display Network such that those Display Network clicks that are less

21
22

---

23
24
25
26
27

[8] *See* Exhibit B ("AdWords includes *two automatic pricing discount features*: Smart Pricing – a feature that *automatically reduces the price advertisers pay for clicks* if our data shows that a click from a Display Network page is less likely to result in a conversion…." (emphasis added)); *see also* Exhibits C-E; Google AdSense Smart Pricing Video featuring Google's Chief Economist Hal Varian, http://www.youtube.com/watch?v=O1BaOMqcyQY (hereinafter, "Varian Video") ("What Smart Pricing does is allow our system to *auto-adjust the advertiser's bid* across the sites according to the likelihood the click will deliver actual business results.  An advertiser can then *confidently bid the maximum* they are willing to pay across all sites and *leave it to our system to take care of the rest*."(emphasis added)).

28

FIFTH AMENDED CLASS ACTION COMPLAINT
11-cv-01263-EJD                                                                    -6-

likely to convert are discounted.[9]

26.    According to Google, if a click on an ad from a website is less likely to result in a "conversion" than a click from google.com, Google *automatically reduces* the price of that click.  Google defines a conversion as a click resulting in an actual business result (e.g., online sale, registration, phone call, or newsletter sign-up).

27.    Google promotes Smart Pricing as having at least two primary benefits to advertisers.  First, Google represents to advertisers that Smart Pricing will increase their return on investment (ROI) of advertising dollars.[10]  Indeed, Google's Chief Economist describes Smart Pricing as a way to ensure that profitability and value are delivered to advertisers.[11]  And, Google tells advertisers that Smart Pricing "works all the time" to "*automatically reduce your cost*" of clicks and "*maximize your value*."[12]

28.    Second, Google touts Smart Pricing as a way to alleviate burdens on advertisers and avoid "guesswork."[13]  Google actively encourages advertisers to "*confidently bid the maximum they are willing to pay*" and trust Google's Smart Pricing system to downwardly adjust

---

[9] The "Google Network" consists of two components:  the "Search Network" and the "Display Network."  The Search Network consists of websites, like www.google.com or other search sites powered by Google, where users input search terms in a Google search box and ads appear alongside the search results.  In contrast, the Display Network consists of websites that partner with Google (like www.mapquest.com and www.nytimes.com), specific Google properties (like YouTube and Gmail), and mobile apps.  According to Google, Smart Pricing applies, at a minimum, to clicks on ads occurring on the Display Network.  Additionally, according to Google, Smart Pricing applies to ads that appear on mobile devices with full Internet browsers. *See* Exhibit L.

[10] *See* Exhibit C.

[11] *See* Varian Video, http://www.youtube.com/watch?v=O1BaOMqcyQY ("Smart Pricing helps to ensure that profitability and value is delivered to advertisers and they continue to spend on AdSense sites in the long run.").

[12] *See* Exhibit F.

[13] *See* Exhibit G ("As a result [of Smart Pricing], advertisers are saved the guesswork of estimating the value of clicks from different keywords or sites (content vs. search, for example) and adjusting their bids.").

the prices of Display Network clicks based on the likelihood that clicks from the website at issue will convert into a business result.[14]

29.     In other words, Google tells its advertisers not to worry about site-specific bidding (i.e., setting specific bids for specific websites or properties) because Google will reduce the cost of the click based on the conversion score[15] of the website generating the click.

30.     Google measures and maintains conversion scores (also called conversion rates) for all websites and properties in the Google Network that display AdWords ads.

31.     Smart Pricing works as follows. ███████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
███████████████████████████████████████
█████████████████████████████
As the Court previously determined, "the Smart Pricing formula is one of the measurements Google uses to calculate charges for clicks, is included in the AdWords program, and is applied to Display Network clicks." ECF No. 85 at 7:26-8:2, 8:16-19.

32.     ████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████

---

[14] *See* Varian Video, http://www.youtube.com/watch?v=O1BaOMqcyQY.

[15] The conversion score is Google's measurement of the likelihood that clicks from a particular website will result in a business transaction.

[16] ████████████████████████████████████████████████
████████████████████████████████████████████████████

[17] ████████████████████████████████████████████████
████████████████████████████████████████████████████
███████████████████████████

1

2

3

4    33.

5

6

7

8

9

10    34.    Statements of two Internet industry authorities in 2007 confirm that Google has

11    not Smart Priced clicks from IAC websites and properties.  Frank Schilling, President and

12    Founder of Name Administration, Inc. (a domain name management company), reported in 2007

13    that Google and IAC have a special agreement whereby Google does not Smart Price any ads

14    served by IAC.[19]  Similarly, Donny Simonton, President of Parked.com, stated in 2007 that his

15    company received Google ads through IAC that were not Smart Priced.[20]

16    35.    Google keeps conversion rates secret (with the exception of the one discussed by

17    Dr. Bucklin).  On information and belief, Google failed to Smart Price clicks from other Special

18    Partners and publishers in addition to IAC.  The Special Partners and additional publishers who

19    were given special non-Smart Pricing deals include, without limitation, Peeplo.com, Conduit,

20    InfoSpace, and Xacti.  These websites and, in general, the websites of all Special Partners,

21    convert at rates lower than google.com because, unlike google.com, they utilize ad

22    implementations which generate accidental and meaningless clicks, such as using clickable

23    backgrounds and ad only pages.  Accordingly, Google should have Smart Priced all charges for

24    clicks arising from these Special Partners' Display Network websites.

25

26    [18] See Bucklin Rebuttal Report at 32-33 and Exhibit 19.

27    [19] See http://domainnamesales.com/sevenmile/2007-10/pink-houses.

28    [20] See http://www.dnforum.com/f366/parked-better-than-sedo-3-thread-221221.html.

FIFTH AMENDED CLASS ACTION COMPLAINT
11-cv-01263-EJD                                                                    -9-

36.    Discovery in this action confirms that Google did not apply the Smart Pricing Measurement as calculated by Google's Smart Pricing formula to at least forty (40) clicks on the Display Network in Cabrera's account between August 14, 2008 and August 12, 2009.  For example, Google did not Smart Price at least three (3) Display Network clicks on RMC's ads by failing to apply Smart Pricing altogether, resulting in no discount.  By not Smart Pricing these clicks, Google overcharged Plaintiffs for such clicks.  Had Google applied the promised Smart Pricing as it was obligated to do, it would have significantly discounted the cost of each of the above clicks.  These clicks are identified by a "Yes" in the column titled "SP Off Clicks" in ¶ 44 below and in Exhibit P.[21]

37.    In addition, Google failed to Smart Price clicks on the Display Network from mobile devices until the Third Quarter of 2010.  This fact was first disclosed in Google's October 14, 2010 earnings call.  During that call, Google's Senior Vice President for Product Management, Jonathan Rosenberg, revealed that Google had not been Smart Pricing clicks from mobile devices:

> This is Jonathan.  Nikes [Arora] can maybe give you more of a customer base perspective.  I think that some of you know we *recently started smart pricing* on the mobile devices and *it is the case that the CPCs on the mobile devices are a good bit lower*.  It's primarily because there isn't the measurement--that there isn't that--there isn't as much of a consummation of a transaction on the mobile devices.  People don't have their credit cards in them; it's harder to type into them.  So, the mobile rates remain relatively lower.[22]

38.    Google unequivocally stated that its Smart Pricing measurement "applies to ads that appear on mobile devices with full Internet browsers[.]"[23]

39.    Discovery in this action confirms that Plaintiffs were charged for (and paid for) at least nineteen (19) clicks on the Display Network from mobile devices (specifically, mobile

---

[21]    Exhibit P is excerpted from the click data contained in Exhibit E to the Supplemental Expert Report of Saul Solomon, ECF No. 426-75.  Exhibit P reflects the claimed damages per click in Cabrera's account.

[22]    *See* Google CEO Discusses Q3 2010 Results - Earnings Call Transcript (http://seekingalpha.com/article/230158-google-ceo-discusses-q3-2010-results-earnings-call-transcript?part=qanda) (emphasis added).

apps) between August 14, 2008 and August 12, 2009.  These clicks from the Display Network (specifically, mobile apps) were not Smart Priced as promised.  These clicks are identified by a "Yes" in the column titled "AFMA Clicks" in ¶ 44 below and in Exhibit P.

40.    Discovery in this action confirms that Plaintiffs were charged for (and paid for) at least one (1) mGDN click on the Display Network between August 14, 2008 and August 12, 2009.  This click from the Display Network was not Smart Priced as promised.  This click is identified by a "Yes" in the column titled "mGDN Clicks" in ¶ 44 below and in Exhibit P.

41.    Discovery in this action confirms that Google also charged Plaintiffs for at least thirty-seven (37) clicks from the Display Network without Smart Pricing them as promised because Google considered them to be Search Bundled Clicks.  These clicks are identified by a "Yes" in the column titled "SB Clicks" in ¶ 44 below and in Exhibit P.  ██████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████  Google's failure to Smart Price these clicks as promised – i.e., not applying its actual Smart Pricing measurements to these clicks – resulted in Plaintiffs paying a higher price for the clicks than Google promised and suffering damages thereby.

42.    Despite representations that it would apply the Smart Pricing measurement to *all* clicks from the Display Network (including clicks from mobile apps and Special Partners' websites), Google failed to Smart Price such clicks as promised.  ██████████████████

████████████████████████████████████████████████████

██████████████████████████████████████████

43.    Plaintiffs were injured as a result of Google's failure to apply its Smart Pricing measurements to all Display Network clicks.

44.     The below analysis of Cabrera's account identifies clicks that were not Smart Priced as promised[24]:

| Click Date | Click Cost | Applied CCM | Correct CCM | Out-of-Area Clicks | SP Off Clicks | SB Clicks | AFMA Clicks | mGDN Clicks | Damaged Click |
|---|---|---|---|---|---|---|---|---|---|
| ▮ | ▮ | ▮ | | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ |
| ▮ | ▮ | ▮ | | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ |
| ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ |
| ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ |
| ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ |
| ▮ | ▮ | ▮ | | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ |
| ▮ | ▮ | ▮ | | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ |
| ▮ | ▮ | ▮ | | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ |
| ▮ | ▮ | ▮ | | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ |
| ▮ | ▮ | ▮ | | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ |
| ▮ | ▮ | ▮ | | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ |
| ▮ | ▮ | ▮ | | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ |
| ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ |
| ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ |
| ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ |
| ▮ | ▮ | ▮ | | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ |
| ▮ | ▮ | ▮ | | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ |
| ▮ | ▮ | ▮ | | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ |
| ▮ | ▮ | ▮ | | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ |
| ▮ | ▮ | ▮ | | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ |
| ▮ | ▮ | ▮ | | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ |
| ▮ | ▮ | ▮ | | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ |
| ▮ | ▮ | ▮▮ | | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ |
| ▮ | ▮ | ▮ | | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ |
| ▮ | ▮ | ▮ | | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ |

[24] This table, which is excerpted from Exhibit P, also includes clicks for which RMC was overcharged as a result of Google's failure to Location Target.

FIFTH AMENDED CLASS ACTION COMPLAINT
11-cv-01263-EJD                                                                    -12-

| Click Date | Click Cost | Applied CCM | Correct CCM | Out-of-Area Clicks | SP Off Clicks | SB Clicks | AFMA Clicks | mGDN Clicks | Damaged Click |
|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | | |

| Click Date | Click Cost | Applied CCM | Correct CCM | Out-of-Area Clicks | SP Off Clicks | SB Clicks | AFMA Clicks | mGDN Clicks | Damaged Click |
|---|---|---|---|---|---|---|---|---|---|
| ▮ | ▮ | ▮ | | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ |
| ▮ | ▮ | ▮ | | ▮ | | ▮ | ▮ | ▮ | ▮ |
| ▮ | ▮ | ▮ | | ▮ | | ▮ | ▮ | ▮ | ▮ |
| ▮ | ▮ | ▮ | | ▮ | | ▮ | ▮ | ▮ | ▮ |
| ▮ | ▮ | ▮ | | ▮ | | ▮ | ▮ | ▮ | ▮ |
| ▮ | ▮ | ▮ | | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ |

45.     These clicks are examples from Cabrera's account that demonstrate how Plaintiffs were injured by Google's failure to apply the promised Smart Pricing. These clicks should not be construed as the universe of all clicks in his account that were not Smart Priced, as Plaintiffs continue to review Cabrera's account.

**B.     CLAIM RELATING TO SMART PRICING**

**COUNT I – Breach of Contract (Failure to Smart Price)**

**On Behalf of Plaintiffs Cabrera and RMC and the Smart Pricing Class**

46.     Plaintiffs hereby incorporate by reference all paragraphs of this Complaint as if fully set forth herein.

47.     Plaintiffs bring this cause of action on behalf of themselves and the Smart Pricing Class.

48.     Google and all Smart Pricing Class members are or were parties to an Agreement that governs their AdWords advertising relationship.

49.     The Agreement was drafted by Google and is uniform as to every Smart Pricing Class member.[25]

---

[25] Google presents the Agreement to advertisers at the end of the AdWords sign-up and ad creation process. Advertisers have no ability to modify the terms of the Agreement. Advertisers have no bargaining power thereby resulting in a one-sided (in Google's favor) agreement. Cabrera had no other alternative but to agree to the terms of the Agreement. The Agreement is a contract of adhesion.

50.     In Section 7 of the Agreement, Google expressly agrees that "[c]harges are solely based on Google's *measurements* for the applicable Program, *unless otherwise agreed to in writing.*"[26]

51.     Smart Pricing is one of the *measurements* Google uses to calculate charges for clicks.  *See* ECF No. 85 at 7:26-8:2, 8:16-19.  Indeed, Google represents that "AdWords includes [an] automatic pricing discount feature[]:  Smart pricing – a feature that *automatically reduces* the price advertisers pay for clicks *if our data shows* that a click from a Display Network page is *less likely to result in a conversion*."[27]

52.     Thus, pursuant to the Agreement, Google had a legal obligation to apply the Smart Pricing discount (its "measurement" of the value of the click) to all Display Network clicks that were less likely to result in a conversion than clicks from google.com.  This is a material term of the Agreement.

53.     To the extent Google disputes this meaning of "measurement," extrinsic evidence demonstrates the Agreement is reasonably susceptible to Plaintiffs' reading.[28]  *See* ECF No. 85 at 7-8.  Further, discovery as to the meaning of "measurement" would be appropriate under such circumstances.

54.     Even if the Smart Pricing formula were not a "measurement," Google has "otherwise agreed in writing" to apply Smart Pricing to all clicks in the Display Network such that those Display Network clicks that are less likely to result in a conversion than clicks from google.com are discounted.  This is conclusively demonstrated in Exhibits B-F and L.[29]

---

[26] *See* Exhibit A (emphasis added).

[27] *See* Exhibit B (emphasis added); *see also* Exhibits C-F.

[28] *See, e.g.,* Exhibit B-F & L.  This Court previously concluded these "exhibits, however, do support the interpretation that the contract language, '[c]harges are solely based on Google's measurements for the applicable Program,' means that Google must base the charges for Display Network clicks, at least in part, on the Smart Pricing formula."  ECF No. 85 at 8:16-19.

[29] *See, e.g.,* Exhibit F ("There are two ways Google *automatically reduces your costs*: the AdWords Discounter and *Smart Pricing*.").

FIFTH AMENDED CLASS ACTION COMPLAINT
11-cv-01263-EJD                                                                                  -15-

55.     When Smart Pricing is not applied, Google ignores its "measurements" and, as a result, artificially inflates the price of Display Network clicks.  In other words, Google does not price "solely based on Google's measurements" when it fails to Smart Price Display Network clicks.  This constitutes a breach of contract.

56.     Plaintiffs and the Smart Pricing Class performed all conditions, covenants, and promises required to be performed by Plaintiffs and the Smart Pricing Class in accordance with the terms of the Agreement.  All conditions precedent to Google's performance have occurred or been satisfied.

57.     As set forth above, Google breached the Agreement by not applying Smart Pricing discounts to Display Network clicks charged to Plaintiffs and the Smart Pricing Class.

58.     Google's breach is the direct, proximate, and producing cause of damages to Plaintiffs and the Smart Pricing Class.

59.     Because of Google's breach of contract alleged herein, Plaintiffs and the Smart Pricing Class should be made whole for all amounts Google overcharged Plaintiffs and the Smart Pricing Class by failing to apply the promised, and contracted-for, Smart Pricing discount.

## VI.     PART II – LOCATION TARGETING

### A.     FACTUAL BACKGROUND RELATING TO LOCATION TARGETING

60.     During the sign-up and ad creation process, Google provides advertisers with the option to specify the geographic location(s) in which they want their ads to appear.

61.     Specifically, advertisers are presented with the following question in the sign-up and ad creation process:

Locations [help link] In what geographical locations do you want your ads to appear?[30]

62.     The help link embedded in the foregoing question, when clicked, opens a text box stating:

---

[30] *See* Exhibit N.

FIFTH AMENDED CLASS ACTION COMPLAINT
11-cv-01263-EJD                                                                    -16-

**Location targeting**

You can target your ads to almost any set of locations, including countries, territories, regions, cities and custom areas. For example, you could target specific regions within the United States and a few large English-speaking cities in Europe. You can view or edit your targeting options from the **Settings** tab for your campaign.

Learn more about location targeting options. [hyperlink][31]

63.     The language on the Location Targeting settings screen at the time Cabrera enrolled in AdWords on behalf RMC was substantially and materially identical to the language discussed in paragraph 61 above, as confirmed by the testimony of Aileen Tang, a Google product manager responsible for Location Targeting. Advertisers in August 2008 were presented with the following statements in the sign-up and ad creation process:

**Target customer by regions / cities**

Highlight the cities and regions on the left where you'd like your ad to appear, then click "Add." Select as many regions as you like. You may also type city names directly into the box below.

64.     During the sign-up and ad creation process, Plaintiffs selected four states (Florida, North Carolina, Georgia, and Louisiana) in response to and reliance on these statements for RMC's Adobe Training ad campaign. By making this selection, Plaintiffs reasonably expected that RMC's ads would be shown only to users in Florida, North Carolina, Georgia, and Louisiana. This was important to Plaintiffs because they wanted to limit RMC's advertising to people located in these four states—the people most likely to use RMC's services.

65.     Discovery in this action confirms that RMC paid a total of $2,152.19 for its ad campaigns, including $88.73 in charges for thirty-four (34) clicks that were served to internet users located outside of the designated advertising areas. These clicks are identified by a "Yes" in the column titled "Out-of-Area Clicks" in ¶ 44 above and in Exhibit P.

66.     Unaware of Google's misconduct, RMC paid the posted amount of charges for each of these clicks. RMC was injured by paying for clicks from users outside of the designated geographic locations—charges that should not have been applied to Cabrera's account.

---

[31] *See* Exhibit O.

67.     The above-described clicks are examples from Cabrera's account that demonstrate how RMC was injured by Google's failure to limit the geographic distribution of RMC's ads to the locations each selected.  These clicks should not be construed as the universe of all clicks in Cabrera's account that arose from outside the designated geographic locations, as Plaintiffs continue to review Cabrera's AdWords account.

68.     ████████████████████████████████████████

████████████████████████████████████████████████

███████████████████████████████████████

**B.      CLAIM RELATING TO LOCATION TARGETING**

**COUNT II - Violation of Cal. Bus. & Prof. Code §§ 17200 *et seq*. (Location Targeting)**

**On Behalf of Plaintiff RMC and the Location Targeting Class**

69.     RMC hereby incorporates by reference all paragraphs of this Complaint as if fully set forth herein.

70.     Google's acts and business practices, as alleged herein, constitute unlawful, unfair, and fraudulent business practices in violation of California Business & Professions Code §§ 17200 *et seq*.

71.     RMC brings this cause of action on behalf of itself and the Location Targeting Class of similarly situated advertisers.  RMC has standing to pursue this claim as it has suffered injury in fact, reasonably relied upon Google's deceptive representations, and lost money or property as a result of Google's actions and/or inactions.

72.     Google made, and RMC reviewed and relied upon, the following statements on the sign-up and ad creation screen at the time Cabrera signed up for AdWords and created the first ad for RMC on or about August 14, 2008:

**Target customer by regions / cities**

Highlight the cities and regions on the left where you'd like your ad to appear, then click "Add."  Select as many regions as you like.  You may also type city names directly into the box below.

---

FIFTH AMENDED CLASS ACTION COMPLAINT
11-cv-01263-EJD                                                                          -18-

1    73.    RMC understood from reviewing the foregoing described statements (and

2  designating a local geographic area or areas in response to the statements) that its ads would only

3  appear to users located in the designated locations – Florida, North Carolina, Georgia, and

4  Louisiana.

5    74.    RMC reviewed and reasonably relied upon the foregoing statements in August

6  2008 when placing its ads and subsequently paying for advertising as charged by Google.

7    75.    The foregoing statements induced RMC to advertise with Google.  Had RMC

8  known these statements were not true, it would not have advertised with Google.

9    76.    Discovery in this case has revealed that Google misrepresented to advertisers the

10  geographic origin of clicks in account statements.  RMC reasonably believed that the account

11  statements received from Google would reflect charges in an accurate manner.  RMC did not

12  expect Google to falsely report the geographic origin of clicks.  As a result, RMC remitted funds

13  to Google during the Location Targeting Class Period based on such reasonable reliance,

14  deception, and confusion.  Had Google disclosed the truth (i.e., revealed in its account statements

15  that location targeting was not applied), RMC would not have paid for clicks originating from

16  beyond the designated geographic distribution areas.

17    77.    RMC's reliance was reasonable.  The statements upon which it relied appeared

18  on the AdWords sign-up and ad creation screens.  Google made these statements to RMC in an

19  effort to induce its enrollment in AdWords, induce their creation of ads, and induce its payment

20  of ad charges.

21    78.    These representations were fraudulent in violation of § 17200 because they were

22  likely to deceive advertisers into believing that Google would limit the distribution of ads to

23  users located in the geographic locations designated by advertisers.  Moreover, Google failed to

24  disclose throughout the Class Period to advertisers, including RMC and the Location Targeting

25  Class, that:

26    ▪  Google would distribute ads to users beyond the geographic locations designated by
advertisers.

27

28

FIFTH AMENDED CLASS ACTION COMPLAINT
11-cv-01263-EJD                                                                          -19-

- Google would charge advertisers for clicks on their ads originating outside the designated geographic locations.

- Google would *falsely* report the geographic location of users in its online reports to advertisers.

79.     Contrary to its representations, Google failed to properly limit the distribution of ads to users in the geographic locations designated by advertisers.

80.      As a result of Google's fraudulent conduct, RMC and the Location Targeting Class expended money on advertising with Google that they otherwise would not have spent had Google not made these misrepresentations and omissions.

81.     Google's acts and business practices, as alleged herein, are also unfair in violation of § 17200 because they offend established public policy and/or are immoral, unethical, oppressive, unscrupulous and/or substantially injurious to consumers.  There is no countervailing benefit of these acts and practices to consumers or competition.  These acts and practices caused injuries that RMC and the Location Targeting Class members could not have reasonably avoided because they were not informed that Google does not limit the distribution of ads to users in the geographic locations designated by advertisers as represented.

82.     Google's acts and business practices, as alleged herein, have caused injury to RMC and the Class.

83.     Google maintains its headquarters and principal place of operations in California. The unfair, unlawful, and fraudulent conduct detailed herein emanates from Google's California headquarters.  As such, Google is subject to § 17200.

84.     Because Google violated California Business & Professions Code § 17200 *et seq.*, RMC and the Location Targeting Class should be made whole for all amounts that Google overcharged them by failing to limit the distribution of ads to users in the geographic locations designated by advertisers as represented.

85.     RMC, on behalf of itself and the Location Targeting Class, seeks an order of this Court awarding restitution, disgorgement, and all other relief allowed under § 17200.

FIFTH AMENDED CLASS ACTION COMPLAINT
11-cv-01263-EJD                                                                                                    -20-

1

2    **VII.    CLASS ALLEGATIONS**

3          86.    Plaintiffs seek to recover on behalf of themselves and the Smart Pricing Class a

4    sum of money that equals the Smart Pricing discounts that Google promised—but failed—to

5    apply to clicks on the Display Network including, without limitation, clicks on mobile apps and

6    Special Partners' websites and properties.

7          87.    Plaintiff RMC seeks to recover on behalf of itself and the Location Targeting

8    Class *all* amounts Google charged for clicks originating from users located outside of the

9    geographic location(s) specified by RMC and the Location Targeting Class members.

10          88.    Plaintiffs are not seeking to recover charges based on clicks occurring on parked

11    domain and error pages between July 11, 2004 and March 31, 2009, which Plaintiffs understand

12    were the subject of a release in *In re Google AdWords Litig.*, No. 08-cv-03369-EJD (N.D. Cal.

13    filed July 11, 2008).

14          89.    Plaintiffs bring this action as a class action pursuant to Federal Rule of Civil

15    Procedure 23(a) and (b)(3) on behalf of the "Smart Pricing Class," which is defined as follows:

> All persons and entities located within the United States who, between
> August 22, 2006 and February 20**,** 2013, advertised through Google's
> AdWords program and paid for clicks on their Google AdWords
> advertisement(s), where such clicks were not Smart Priced because they (1)
> originated from a property on Google's Display Network and Google applied
> no Smart Pricing measurement, <u>or</u> (2) were AFMA Clicks, Search Bundled
> Clicks, or mGDN Clicks.[32]

Excluded from the Smart Pricing Class are Google and its affiliates, officers, and directors, as

well as members of the judiciary, their staff and jurors in this case.

          90.    Plaintiff RMC brings this action this action as a class action pursuant to Federal

Rule of Civil Procedure 23(a) and (b)(3) on behalf of the "Location Targeting Class," which is

defined as follows:

> All persons and entities located within the United States who, between
> January 1, 2004 and March 22, 2011, advertised through Google's AdWords
> program and paid for clicks on their Google AdWords advertisement(s),

---

[32] The terms "AFMA Click," "Search Bundled Click," and "mGDN Click" are defined in
note 6 above.

1    where such clicks did not originate from the location selected by the
     advertiser.

2    Excluded from the Location Targeting Class are Google and its affiliates, officers, and directors,

3    as well as members of the judiciary, their staff and jurors in this case.

4        91.    Plaintiffs reserve the right to amend the class definitions and, if deemed

5    appropriate, to subdivide the Classes into subclasses.

6        92.    The members of each of the Classes are so numerous that joinder of all members

7    is impracticable.  Plaintiffs believe that hundreds of thousands of people geographically

8    dispersed throughout the United States have been damaged by Google's misconduct alleged

9    herein.  The names and addresses of the members of each of the Classes are readily identifiable

10   through documents maintained by Google.  Members of each of the Classes may be notified of

11   the pendency of this action by published, mailed, and/or electronic notice.

12       93.    Plaintiffs' claims are typical of the claims of all Smart Pricing Class members, as

13   all Smart Pricing Class members are similarly affected by Google's uniform wrongful conduct

14   and their claims are based on such conduct.  Further, Plaintiffs' claims are typical of the claims

15   of all Smart Pricing Class members because their claims arise from the same underlying facts

16   and are based on the same factual and legal theories as the claims of all Smart Pricing Class

17   members. Plaintiffs are no different in any relevant respect from any other member of the Smart

18   Pricing Classes.

19       94.    RMC's claims are typical of the claims of all Location Targeting Class members,

20   as all Location Targeting Class members are similarly affected by Google's uniform wrongful

21   conduct and its claims are based on such conduct.  Further, RMC's claims are typical of the

22   claims of all Location Targeting Class members because its claims arise from the same

23   underlying facts and are based on the same factual and legal theories as the claims of all Location

24   Targeting Class members.  RMC is no different in any relevant respect from any other member

25   of the Location Targeting Classes.

26       95.    Plaintiffs and their counsel will fairly and adequately protect the interests of the

27   members of the Classes.  Plaintiffs' interests do not conflict with the interests of the Classes they

28

FIFTH AMENDED CLASS ACTION COMPLAINT
11-cv-01263-EJD                                                                    -22-

seek to represent.  Plaintiffs have retained counsel competent and experienced in class and complex litigation.  Plaintiffs and their counsel have prosecuted, and will continue to prosecute, this action vigorously.

96.  Class certification is warranted because common questions of law and fact exist as to all Class members and predominate over any questions affecting only individual Class members.  The questions of law and fact common to the Classes include, without limitation:

- Whether Google's Agreement with Class members expressly requires Google to apply Smart Pricing to all clicks on the Display Network including, without limitation, clicks arising from mobile apps and Special Partners' websites and properties.
- Whether Google falsely or deceptively represented it would not distribute ads to users located outside the geographical location(s) specified by AdWords advertisers.
- Whether, through the acts, omissions, and conduct alleged above, Google violated its obligations to Class members.
- Whether, through the acts, omissions, and conduct alleged above, Google violated California Business and Professions Code §§ 17200, *et seq*.
- Whether Plaintiffs and the Classes have been damaged by the wrongs alleged herein, and if so, the measure of those damages and the nature and extent of other relief that should be afforded.

97.  A class action is superior to all other available methods for the fair and efficient adjudication of this controversy because joinder of all members is impracticable.  Even if individual Class members had the resources to pursue individual litigation, it would be unduly burdensome to the courts in which the individual litigation would proceed.  Individual litigation magnifies the delay and expense to all parties in the court system of resolving the controversies engendered by Google's common course of conduct.  The class action device allows a single court to provide the benefits of unitary adjudication, judicial economy, and the fair and equitable handling of all Class members' claims in a single forum.  The conduct of the action as a class action conserves resources of the parties and of the judicial system, and protects the rights of the Class members.  Furthermore, for many, if not most Class members, a class action is the only feasible mechanism that allows them an opportunity for legal redress and justice.  There will be no difficulty in the management of this action as a class action.

VIII.   **DISCOVERY RULE, TOLLING, AND FRAUDULENT CONCEALMENT**

98.     The applicable limitations period in this case has been tolled because Google: (a) concealed its misconduct such that Plaintiffs and other Class members could not discover the misconduct through the exercise of reasonable diligence; and (b) committed the misconduct pursuant to a conspiracy.

99.     On October 14, 2010, Google disclosed in an earnings call that it had not been applying Smart Pricing discounts to clicks from mobile devices.  However, Google never corrected any of the misrepresentations on its website or otherwise informed Plaintiffs of its misconduct.  Thus, while information about Google's misconduct first began to surface in 2010, Plaintiffs and the Classes could not have discovered the conduct alleged herein through the exercise of reasonable diligence at that time.

100.    Google carefully concealed its unlawful conduct by, *inter alia*, executing its breaches in a manner that precluded their detection and providing *false* information in reports to its advertisers.  For instance, the reports Google provided to Plaintiffs and other Class members did not contain any information revealing Google's misconduct.  Indeed, Google concedes that its advertisers do not possess all relevant information and must exclusively rely on Google's "reporting statistics" to ensure advertisements are properly placed and priced.[33]   Similarly, the reports Google provided contained false information about the geographic origin of clicks, precluding Plaintiffs' detection that each was paying for clicks originating outside of the geographic area(s) each selected for ad distribution.

---

[33] *See* Ad Traffic Quality Resource Center - http://www.google.com/adwords/adtrafficquality/ ("Advertisers rely on the relevance of our ad placement, our reporting statistics, and the quality of the clicks their ads receive.").

In fact, Google represented to its advertisers that the Smart Pricing discount was automatically included in the average CPC (cost per click), as reported in the advertisers' online accounts.  No reasonable person under the circumstances could determine from looking at these reports whether clicks were Smart Priced or not.

FIFTH AMENDED CLASS ACTION COMPLAINT
11-cv-01263-EJD                                                                    -24-

101.    In short, a reasonable person under the circumstances would not have been alerted to investigate Google's misconduct.  It was not until Plaintiffs engaged counsel that they learned of Google's actionable misconduct.

102.    Plaintiffs did not discover, and could not have discovered through the exercise of reasonable diligence, the existence of Google's misconduct alleged herein until they reviewed one of Woods' complaints filed in this matter.  In addition to the above, Plaintiffs relied on Woods' class action filing to toll limitations on his claims.

103.    Accordingly, the discovery rule applies and prevents the running of all applicable statutes of limitations.

104.    Further, as a result of Google's fraudulent concealment, the running of any statute of limitations has been tolled with respect to the claims of Plaintiffs and the Classes.

105.    In addition to fraudulent concealment, the applicable limitations period is tolled because Google's misconduct was committed pursuant to a civil conspiracy with its Special Partners as described above to avoid Smart Pricing.  Therefore, the limitations period does not begin to run until the completion of the last act of the conspiracy.

106.    In March 2011 and again in September 2011, Woods made claims against Google for the wrongs similar to those alleged herein.  Said claims were made within 60 days of his discovery of such wrongs.  Google has denied owing Woods any obligations.

## IX.    JURY DEMAND

107.    Plaintiffs demand a trial by jury as to all issues so triable.

## X.    PRAYER

FOR THE FOREGOING REASONS, Plaintiffs, individually and on behalf of the Classes, respectfully request that the Court certify this action as a class action, with Plaintiffs as class representatives and the undersigned counsel as class counsel.  Plaintiffs also request that the Court enter an order of judgment against Google in favor of the Class that, *inter alia*:

    a)    declares that Google has breached its contractual obligations to Class members;

b)  awards actual damages to Class members to fully compensate them for losses sustained as a direct, proximate, and/or producing cause of Google's breaches and unlawful conduct;

c)  awards restitution and disgorgement of all monies Google derived from Class members through the misconduct alleged above;

d)  awards pre-judgment and post-judgment interest at the maximum allowable rates;

e)  awards reasonable attorneys' fees and costs; and

f)  orders any such other and further relief as the Court deems just and proper to correct the wrongs done unto the Class.

Dated: June 17, 2021                    Respectfully submitted,


                                        */s/ Matthew L. Mustokoff*
                                        Matthew L. Mustokoff

                                        **KESSLER TOPAZ**
                                        **MELTZER & CHECK, LLP**
                                        Joseph H. Meltzer (*Pro Hac Vice*)
                                        Matthew L. Mustokoff (*Pro Hac Vice*)
                                        Margaret E. Mazzeo (*Pro Hac Vice*)
                                        280 King of Prussia Road
                                        Radnor, PA 19087
                                        Telephone: (610) 667-7706
                                        Facsimile: (610) 667-7056

                                        -and-

                                        Stacey M. Kaplan (Bar No. 241989)
                                        One Sansome Street, Suite 1850
                                        San Francisco, CA 94104
                                        Telephone: (415) 400-3000
                                        Facsimile: (415) 400-3001

                                        **NIX PATTERSON, LLP**
                                        Jeffrey J. Angelovich (*Pro Hac Vice*)
                                        Michael G. Angelovich (*Pro Hac Vice*)
                                        Bradley E. Beckworth (*Pro Hac Vice*)
                                        Andrew G. Pate (*Pro Hac Vice*)
                                        Brad E. Seidel, Of Counsel (*Pro Hac Vice*)
                                        3600 N. Capital of Texas Highway
                                        Building B, Suite 350
                                        Austin, TX 78746
                                        Telephone: (512) 328-5333
                                        Facsimile: (512) 328-5335

                                        *Interim Co-Class Counsel and Counsel for*
                                        *Plaintiffs Rene Cabrera and RMC*

FIFTH AMENDED CLASS ACTION COMPLAINT
11-cv-01263-EJD                                                          -26-

# EXHIBIT A

# Google Inc. Advertising Program Terms

These Google Inc. Advertising Program Terms ("**Terms**") are entered into by, as applicable, the customer signing these Terms or any document that references these Terms or that accepts these Terms electronically ("**Customer**") and Google Inc. ("**Google**"). These Terms govern Customer's participation in Google's advertising program(s) ("**Program**") and, as applicable,  any insertion orders or service agreements ("**IO**") executed by and between the parties and/or Customer's online management of any advertising campaigns.  These Terms and any applicable IO are collectively referred to as the "**Agreement**." Google and Customer hereby agree and acknowledge:

**1    Policies.** Program use is subject to all applicable Google and Partner policies, including without limitation the Editorial Guidelines (adwords.google.com/select/guidelines.html), Google Privacy Policy (www.google.com/privacy.html) and Trademark Guidelines (www.google.com/permissions/guidelines.html), and Google and Partner ad specification requirements (collectively, "**Policies**"). Policies may be modified at any time.  Customer shall direct only to Google communications regarding Customer ads on Partner Properties. Some Program features are identified as "**Beta,**" "**Ad Experiment,**" or otherwise unsupported ("**Beta Features**"). To the fullest extent permitted by law, Beta Features are provided "**as is**" and at Customer's option and risk. Customer shall not disclose to any third party any information from Beta Features, existence of non-public Beta Features or access to Beta Features. Google may modify ads to comply with any Policies.

**2    The Program**. Customer is solely responsible for all: (a) ad targeting options and keywords (collectively "**Targets**") and all ad content, ad information, and ad URLs ("**Creative**"), whether generated by or for Customer; and (b) web sites, services and landing pages which Creative links or directs viewers to, and advertised services and products (collectively "**Services**"). Customer shall protect any Customer passwords and takes full responsibility for Customer's own, and third party, use of any Customer accounts. Customer understands and agrees that ads may be placed on (y) any content or property provided by Google ("**Google Property**"), and, unless Customer opts out of such placement in the manner specified by Google, (z) any other content or property provided by a third party ("**Partner**") upon which Google places ads ("**Partner Property**").  Customer authorizes and consents to all such placements.  With respect to AdWords online auction-based advertising, Google may send Customer an email notifying Customer it has 72 hours ("**Modification Period**") to modify keywords and settings as posted. The account (as modified by Customer, or if not modified, as initially posted) is deemed approved by Customer in all respects after the Modification Period.  Customer agrees that all placements of Customer's ads shall conclusively be deemed to have been approved by Customer unless Customer produces contemporaneous documentary evidence showing that Customer disapproved such placements in the manner specified by Google. With respect to all other advertising, Customer must provide Google with all relevant Creative by the due date set forth in that Program's applicable frequently asked questions at www.google.com ("FAQ") or as otherwise communicated by Google.  Customer grants Google permission to utilize an automated software program to retrieve and analyze websites associated with the Services for ad quality and serving purposes, unless Customer specifically opts out of the evaluation in a manner specified by Google. Google may modify any of its Programs at any time without liability. Google also may modify these Terms at any time without liability, and Customer's use of the Program after notice that these Terms have changed constitutes Customer's acceptance of the new Terms. Google or Partners may reject or remove any ad or Target for any or no reason.

**3    Cancellation**.  Customer may cancel advertising online through Customer's account if online cancellation functionality is available, or, if not available, with prior written notice to Google, including without limitation electronic mail.  AdWords online auction-based advertising cancelled online will cease serving shortly after cancellation.  The cancellation of all other advertising may be subject to Program policies or Google's ability to re-schedule reserved inventory or cancel ads already in production. Cancelled ads may be published despite cancellation if cancellation of those ads occurs after any applicable commitment date as set forth in advance by the Partner or Google, in which case Customer must pay for those ads.  Google may cancel immediately any IO, any of its Programs, or these Terms at any time with notice, in which case Customer will be responsible for any ads already run.   Sections 1, 2, 3, 5, 6, 7, 8, and 9 will survive any expiration or termination of this Agreement.

**4    Prohibited Uses; License Grant; Representations and Warranties.** Customer shall not, and shall not authorize any party to: (a) generate automated, fraudulent or otherwise invalid impressions, inquiries, conversions, clicks or other actions; (b) use any automated means or form of scraping or data extraction to access, query or otherwise collect Google advertising related information from any Program website or property except as expressly permitted by Google; or (c) advertise anything illegal or engage in any illegal or fraudulent business practice.  Customer represents and warrants that it holds and hereby grants Google and Partners all rights (including without limitation any copyright, trademark, patent, publicity or other rights) in Creative, Services and Targets needed for Google and Partner to operate Programs  (including without limitation any rights needed to host, cache, route, transmit, store, copy, modify, distribute, perform, display, reformat, excerpt, analyze, and create algorithms from and derivative works of Creative or Targets) in connection with this Agreement ("**Use**").  Customer represents and warrants that (y) all Customer information is complete, correct and current; and (z) any Use hereunder and Customer's Creative, Targets, and Customer's Services will not violate or encourage violation of any applicable laws, regulations, code of conduct, or third party rights (including without limitation intellectual property rights).  Violation of the foregoing may result in immediate termination of this Agreement or

customer's account without notice and may subject Customer to legal penalties and consequences.

**5    Disclaimer and Limitation of Liability.** To the fullest extent permitted by law, GOOGLE DISCLAIMS ALL WARRANTIES, EXPRESS OR IMPLIED, INCLUDING WITHOUT LIMITATION FOR NONINFRINGEMENT, SATISFACTORY QUALITY, MERCHANTABILITY AND FITNESS FOR ANY PURPOSE. To the fullest extent permitted by law, Google disclaims all guarantees regarding positioning, levels, quality,  or timing of: (i) costs per click; (ii) click through rates; (iii) availability and delivery of any impressions, Creative, or Targets on any Partner Property, Google Property, or section thereof; (iv) clicks; (v) conversions or other results for any ads or Targets; (vi) the accuracy of Partner data (e.g. reach, size of audience, demographics or other purported characteristics of audience); and (vii) the adjacency or placement of ads within a Program. Customer understands that third parties may generate impressions or clicks on Customer's ads for prohibited or improper purposes, and Customer accepts the risk of any such impressions and clicks.  Customer's exclusive remedy, and Google's exclusive liability, for suspected invalid impressions or clicks is for Customer to make a claim for a refund in the form of advertising credits for Google Properties within the time period required under Section 7 below.  Any refunds for suspected invalid impressions or clicks are within Google's sole discretion. EXCEPT FOR INDEMNIFICATION AMOUNTS PAYABLE TO THIRD PARTIES HEREUNDER AND CUSTOMER'S BREACHES OF SECTION 1, TO THE FULLEST EXTENT PERMITTED BY LAW: (a) NEITHER PARTY WILL BE LIABLE FOR ANY CONSEQUENTIAL, SPECIAL, INDIRECT, EXEMPLARY, OR PUNITIVE DAMAGES (INCLUDING WITHOUT LIMITATION LOSS OF PROFITS, REVENUE, INTEREST, GOODWILL, LOSS OR CORRUPTION OF DATA OR FOR ANY LOSS OR INTERRUPTION TO CUSTOMER'S BUSINESS) WHETHER IN CONTRACT, TORT (INCLUDING WITHOUT LIMITATION NEGLIGENCE) OR ANY OTHER LEGAL THEORY, EVEN IF ADVISED OF THE POSSIBILITY OF SUCH DAMAGES AND NOTWITHSTANDING ANY FAILURE OF ESSENTIAL PURPOSE OF ANY LIMITED REMEDY; AND (b) EACH PARTY'S AGGREGATE LIABILITY TO THE OTHER IS LIMITED TO AMOUNTS PAID OR PAYABLE TO GOOGLE BY CUSTOMER FOR THE AD GIVING RISE TO THE CLAIM. Except for payment obligations, neither party is liable for failure or delay resulting from a condition beyond the reasonable control of the party, including without limitation to acts of God, government, terrorism, natural disaster, labor conditions and power failures.

**6    Agency.** Customer represents and warrants that (a) it is authorized to act on behalf of and has bound to this Agreement any third party for which Customer advertises (a "**Principal**"), (b) as between Principal and Customer, the Principal owns any rights to Program information in connection with those ads, and (c) Customer shall not disclose Principal's Program information to any other party without Principal's consent.

**7    Payment.** Customer shall be responsible for all charges up to the amount of each IO, or as set in an online account, and shall pay all charges in U.S. Dollars or in such other currency as agreed to in writing by the parties.  Unless agreed to by the parties in writing, Customer shall pay all charges in accordance with the payment terms in the applicable IO or Program FAQ.  Late payments bear interest at the rate of 1.5% per month (or the highest rate permitted by law, if less).  Charges are exclusive of taxes. Customer is responsible for paying (y) all taxes, government charges, and (z) reasonable expenses and attorneys fees Google incurs collecting late amounts. To the fullest extent permitted by law, Customer waives all claims relating to charges (including without limitation any claims for charges based on suspected invalid clicks) unless claimed within 60 days after the charge (this does not affect Customer's credit card issuer rights). Charges are solely based on Google's measurements for the applicable Program, unless otherwise agreed to in writing. To the fullest extent permitted by law, refunds (if any) are at the discretion of Google and only in the form of advertising credit for only Google Properties. Nothing in these Terms or an IO may obligate Google to extend credit to any party.  Customer acknowledges and agrees that any credit card and related billing and payment information that Customer provides to Google may be shared by Google with companies who work on Google's behalf, such as payment processors and/or credit agencies, solely for the purposes of checking credit, effecting payment to Google and servicing Customer's account. Google may also provide information in response to valid legal process, such as subpoenas, search warrants and court orders, or to establish or exercise its legal rights or defend against legal claims. Google shall not be liable for any use or disclosure of such information by such third parties.

**8    Indemnification.** Customer shall indemnify and defend Google, its Partners, agents, affiliates, and licensors from any third party claim or liability (collectively, "**Liabilities**"), arising out of Use, Customer's Program use, Targets, Creative and Services and breach of the Agreement.  Partners shall be deemed third party beneficiaries of the above Partner indemnity.

**9    Miscellaneous.** THE AGREEMENT MUST BE CONSTRUED AS IF BOTH PARTIES JOINTLY WROTE IT AND GOVERNED BY CALIFORNIA LAW EXCEPT FOR ITS CONFLICTS OF LAWS PRINCIPLES.  ALL CLAIMS ARISING OUT OF OR RELATING TO THIS AGREEMENT OR THE GOOGLE PROGRAM(S) SHALL BE LITIGATED EXCLUSIVELY IN THE FEDERAL  OR  STATE COURTS OF SANTA CLARA COUNTY, CALIFORNIA, USA, AND GOOGLE AND CUSTOMER CONSENT TO PERSONAL JURISDICTION IN THOSE COURTS. The Agreement constitutes the entire and exclusive agreement between the parties with respect to the subject matter hereof, and supersedes and replaces any other agreements, terms and conditions applicable to the subject matter hereof. No statements or promises have been relied upon in entering into this Agreement except as expressly set forth herein, and any conflicting or additional terms contained in any other documents (e.g. reference to a purchase order number) or oral discussions are void. Each party shall not disclose the terms or conditions of these Terms to any third party, except to its professional advisors under a strict duty of confidentiality or as necessary to comply with a government law, rule or regulation.

Customer may grant approvals, permissions, extensions and consents by email, but any modifications by Customer to the Agreement must be made in a writing executed by both parties. Any notices to Google must be sent to Google Inc., Advertising Programs, 1600 Amphitheatre Parkway, Mountain View, CA 94043, USA, with a copy to Legal Department, via confirmed facsimile, with a copy sent via first class or air mail or overnight courier, and are deemed given upon receipt. A waiver of any default is not a waiver of any subsequent default. Unenforceable provisions will be modified to reflect the parties' intention and only to the extent necessary to make them enforceable, and remaining provisions of the Agreement will remain in full effect. Customer may not assign any of its rights hereunder and any such attempt is void. Google and Customer and Google and Partners are not legal partners or agents, but are independent contractors.  In the event that these Terms or a Program expire or is terminated, Google shall not be obligated to return any materials to Customer. Notice to Customer may be effected by sending an email to the email address specified in Customer's account, or by posting a message to Customer's account interface, and is deemed received when sent (for email) or no more than 15 days after having been posted (for messages in Customer's AdWords interface).

*August 22, 2006*

# EXHIBIT B

 AdWords Help

# AdWords Costs and Payments

## AdWords Costs

There's never a minimum spending commitment for AdWords, and no minimum contract requirements or other "lock-in" rules apply. You have complete control over the maximum amount that you want to spend per click, impression, or day. You can also pause your campaigns or cancel your account at any time.

Use the Account Fees and Payment Options Finder to find out about AdWords costs and payment options. After you select your currency and location, we'll show you exactly what spending requirements you can expect from us (there aren't many) and which payment options you'll have. You'll see that you can pretty much spend as much or as little as you like.

Here are a few basic things to consider when trying to assess the cost of your AdWords campaign.

**Set your budget**

- There's no minimum spending requirement.
- You set the limit on how much you're willing to spend each day -- called a daily budget -- per campaign.
- You specify how much you're willing to pay per click or per impression: this is called your maximum cost-per-click (maximum CPC) or maximum cost-per-thousand-impressions (maximum CPM).

**Pay only for results**

Choose to pay only for clicks on your ads or only for impressions your ads receive.

**Take advantage of automatic discount features**

AdWords includes two automatic pricing discount features:

- Smart pricing -- a feature that automatically reduces the price advertisers pay for clicks if our data shows that a click from a Display Network page is less likely to result in a conversion
- AdWords discounter -- a feature that monitors your competition and automatically reduces your actual cost-per-click so that you pay the lowest price possible for your ad's position on the page. After each auction is run and your ad is ranked, the AdWords discounter adjusts your actual CPC so you pay the minimum amount required to exceed the rank of the next ranked ad

**Avoid the guesswork**

Use the Keyword Tool to explore keyword search traffic and cost estimates and make informed decisions about choosing keywords and maximizing your budget.

After you set your daily budget and maximum CPCs or CPMs, you know you'll stay within your budget. From there, you can access your account at any time to adjust ad text, keywords, placements, campaign settings, CPC and CPM bids, and daily budget to make sure you get the best performance for your money.

## AdWords Payments

Available payment options depend on the country of your billing address and the currency with which you make payments. Select your country and currency on our Payment Options page to see what's available to you.

Google payment options are divided into two types: postpay and prepay. One or both will be available to you depending on your country and currency. Note that you won't be able to switch from a postpay option to a prepay option or vice versa, so be careful when selecting your payment method as you set up your account.

**If you select a postpay option**, you'll make payments only after you accrue advertising costs. You'll be automatically billed either 30 days after your last payment or when your account costs reach your billing threshold, whichever comes first.

**If you select a prepay option**, you'll pay for advertising in advance of receiving any clicks or impressions. You can add funds to your AdWords account whenever you like, and we'll deduct costs from that balance. We'll notify you when your balance is running low. If you do run out of funds, your ads will stop showing until you make another payment.

Learn more in Lesson 7. AdWords Billing & Payments.

---

AdWords - Contacting Us - Help with other Google products -
©2011 Google

# EXHIBIT C

 rickwoodsattorney@gmail.com | My Account | Sign out

 **Google** AdWords

> **Need help?** Call our AdWords support team for free expert help at **(866) 246-6453**. Your customer ID is ▆▆▆▆▆; please have it ready when you call. Hours: **Mon-Fri 9am-8pm EST**

## AdWords Help

**AdWords Help**

Help forum 

Checklist

1 of **19** items (**5%**)

AdWords Small Business Center

Help for Agencies

Seminars for Success

AdWords Online Classroom

Inside AdWords Blog

YouTube Channel

Google for Advertisers

Find an AdWords Certified Partner

Get qualified!

AdWords › Help articles › Pricing

> 💡 **Want help getting started with AdWords?** Use the AdWords Checklist to track your progress towards a successful campaign.      Hide

## Pricing

There are a few ways that Google AdWords has created value for return on investment. Let's see how Google does this through pricing:

- **Cost Per Click Model** - With keyword advertising, the cost-per-click model is one way advertisers have a strong return, since they are only charged when a user clicks on the ad.

- **AdWords Discounter** is a feature built into AdWords that will charge you the lowest possible CPC while still maintaining your position for each keyword. So even if you set an ad group maximum CPC of US$1.00, you won't necessarily be charged this full amount for every click. Your actual CPC (the amount you actually pay per click) is often less than the maximum CPC bid you specify for your ad group or keyword.

- **Smart Pricing** is a feature that automatically reduces the price advertisers pay for clicks if our data shows that a click from a Display Network page is less likely to result in a conversion. This means that if our smart pricing system predicts a particular Display Network page is likely to have a low conversion rate, we will automatically reduce the price advertisers pay for that click.

### Recommended articles

AdWords Terms & Conditions

What's happening to position preference?

What kinds of clicks does Google consider invalid?

Is the first page bid estimate expected to make people bid more?

How long should I wait after doing a test conversion?

Why is my conversion rate more than 100 percent?

### Help resources

 **Beginner's Guide**
Learn the basics of AdWords

 **Known issues**
Learn about AdWords technical issues

 **Optimization Center**
Learn how to improve your AdWords performance

 **Changes to AdWords reporting**
Learn how to run reports on the Campaigns tab

 **AdWords Help Forum**
Learn from other users

AdWords - Contacting Us - Help with other Google products - Change language: English (US)

©2011 Google - Google Home - Privacy Policy - Terms of Service - Advertising Policies

# EXHIBIT D

 AdWords

Ad Traffic Home
Overview
Technical Talk
**Glossary**
Help Center
Contact Us

**Ad Traffic Quality Resource Center**

 **Glossary**

A  B  C  D  E  F  G  H  I  J  K  L  M  N  O  P  Q  R  S  T  U  V  W  X  Y  Z

Search Network

Server logs

Smart pricing

**Smart pricing**

We are constantly analyzing data across our search and Display Network against a variety of factors. If our data shows that a click is less likely to turn into business results (e.g. online sale, registration, phone call, newsletter sign-up), we reduce the price you pay for that click. You may notice a reduction in the cost of clicks from Display Network sites. We take into account many factors such as what keyword lists or concepts triggered the ad as well as the type of site on which the ad was served.

©2010 Google - AdWords Home - Privacy Policy - Help

# EXHIBIT E

rickwoodsattorney@gmail.com | My Account | Sign out

 Google AdWords

**Need help?** Call our AdWords support team for free expert help at **(866) 246-6453**. Your customer ID is ██████████: please have it ready when you call. Hours: **Mon-Fri 9am-8pm EST**

## AdWords Help

**AdWords Help**

Help forum 

Checklist

1 of **19** items (**5%**)

AdWords Small Business Center

Help for Agencies

Seminars for Success

AdWords Online Classroom

Inside AdWords Blog

YouTube Channel

Google for Advertisers

Find an AdWords Certified Partner

Get qualified!

AdWords › Help articles › Frequently asked questions regarding Google AdWords Conversion Data Usage

💡 Want help getting started with AdWords? Use the AdWords Checklist to track your progress towards a successful campaign.     Hide

## Frequently asked questions regarding Google AdWords Conversion Data Usage

At Google, we are aware of the importance and sensitivity of conversion data to our advertisers. As such, we take care to preserve the confidentiality and security of AdWords conversion data, and provide clear information about the limited ways conversion data is used.

**How does Google use conversion data?**
Google uses conversion data for campaign performance reporting in your account, as an input for opt-in features such as Conversion Optimizer, and in aggregate for the benefit of advertisers and their ROI. Google does not share your conversion statistics with other advertisers or your competitors.

When you track conversions, your conversion data will appear in your reports to help you make informed campaign management decisions. Reports containing your conversion data are only accessible by you through your AdWords account and any linked My Client Center accounts.

Google also provides features such as Conversion Optimizer, which uses your historical conversion data to optimize your campaign's performance. Once you have opted in, your bids are automatically optimized based on your AdWords Conversion Tracking data, with the goal of improving your overall ROI. Features like Conversion Optimizer are always opt-in and are ways that Google can improve your advertising performance based on your conversion data, should you choose to use them.

Finally, Google uses conversion data in aggregate for the overall benefit of advertisers and their ROI.

### Recommended articles

What do location extensions look like and where will they appear?

What should I know as an affiliate advertiser?

What is auto-tagging and how will it affect my ads?

Why use visible text for conversion tracking when everyone else uses an invisible image?

How does AdWords Conversion Tracking code work once I've implemented it on to my pages?

How much does AdWords cost?

### Help resources

 Beginner's Guide
Learn the basics of AdWords

 Known issues
Learn about AdWords technical issues

 Optimization Center
Learn how to improve your AdWords performance

 Changes to AdWords reporting
Learn how to run reports on the Campaigns tab

 AdWords Help Forum
Learn from other users

For example, aggregated conversion data is one factor used by our smart pricing feature to improve advertiser ROI. Smart pricing uses conversion data to help determine if Search and Display Network partner sites are likely to convert at different rates and discounts advertiser bids accordingly. This results in better performance and ROI for advertisers on Search and Display Network sites.

**What does Google not do with my conversion data?**
Google does not:

- Share your account's conversion statistics with other advertisers/competitors
- Use your conversion data to increase your costs or cost per click.**
  - For opt-in bid management features like Conversion Optimizer, bids are automatically raised and lowered in order to optimize your campaign's performance.

**Is revenue information required?**
No, sharing revenue information is not a requirement for AdWords conversion tracking; conversion tags can be placed on any page on your site and by default measure distinct conversion events rather than monetary values.

*\*\* Note that features like Conversion Optimizer and smart pricing rely on advertiser conversion data to improve their overall quality and accuracy. As such, if you are tracking conversions and your competitors are benefiting from some of these features, it is possible that your conversion data is indirectly affecting the cost of your clicks.*

# EXHIBIT F

**HOW ADWORDS CONTROLS COSTS**

http://services.google.com/awp/en_us/breeze/3008896/index.html



17. AdWords Discounter & Smart Pricing

**[Text of audio heard while reviewing slide.]**

There are two ways Google automatically reduces your costs: the AdWords Discounter and Smart Pricing.

The AdWords Discounter works all the time so that you pay the lowest price possible for your ad's position on the page. It reduces your cost to the minimum amount needed to win your spot. This is why your Actual Cost Per Click bid or Cost Per Impression bid is lower than your maximum bid.

**[Text of presenter notes seen while reviewing slide.]**

• There are two ways Google automatically reduces your costs: the AdWords Discounter and smart pricing.

• The AdWords Discounter works all the time so that you pay the lowest price possible for your ad's position on the page. It reduces your cost to the minimum amount needed to win your spot. This is why your Actual Cost Per Click bid or Cost Per Impression bid is lower than your maximum bid.

• [REMOVED THIS AUDIO] "Smart Pricing" works all the time to adjust your bids when you advertise keyword-targeted ads on the Google Network. You set your CPC bid, and if your click is less likely to turn into a conversion, such as a sale or signup, Google automatically reduces your bid for that page.



18. Smart Pricing

[Text of audio heard while reviewing slide.]

For example, let's say you sell digital cameras and your ad appears on these two pages—one that that offers photography tips and another that reviews digital cameras. [Animation]

It turns out that users who click on your ad on the digital camera reviews page convert into sales at a very high rate, so Google doesn't discount these ads. [Animation]

On the other hand, Google determines that clicks from the photography tips page convert into sales less frequently and therefore charges you less per click. In this way, you maximize your value.

**[Text of presenter notes seen while reviewing slide.]**

• For example, let's say you sell digital cameras and your ad appears on these two pages—one that offers photography tips and another that reviews digital cameras. [Animation]

• It turns out that users who click on your ad on the digital camera reviews page convert into sales at a very high rate, so Google doesn't discount these ads. [Animation]

• On the other hand, Google determines that clicks from the photography tips page convert into sales less frequently and therefore lowers your bids. In this way, you maximize your value.

• [REMOVED THIS AUDIO] Smart pricing adjustments are automatically reflected in the Average CPC column in your account.

• [REMOVED THIS AUDIO] Content clicks may be priced differently than search clicks. Using smart pricing, AdWords automatically adjusts the cost of clicks for keyword-targeted ads that appear on content network pages. While you set one CPC bid, if our data shows that a click from a content page is less likely to turn into actionable business results—such as online sales, registrations, phone calls, or newsletter signups—we reduce that price you pay for that click.

• [REMOVED THIS AUDIO] For example, let's say that you advertise digital cameras. Your ad appears on two different pages—one that reviews digital cameras and another that offers photography tips. Since users are more likely to click on your ad for digital camera reviews (and thus convert into more sales), Google doesn't discount these ads. However, Google determines that clicks from the photography tips page convert into sales less frequently and therefore charges you less per click.

• [REMOVED THIS AUDIO] Smart pricing adjustments are automatically reflected in the Avg. CPC bid column on your Campaign Summary page.



## 19. Summary

**[Text of audio heard while reviewing slide.]**

After reviewing this lesson, you should now be able to:

- Set an appropriate campaign budget
- Set appropriate bids
- Use preferred cost bidding
- Set content bids
- Find Google Analytics and AdWords conversion tracking; and
- Explain how Google keeps your costs down with the AdWords Discounter and smart pricing.

**[Text of presenter notes seen while reviewing slide.]**

After reviewing this lesson, you should now be able to:

- Set an appropriate campaign budget
- Set appropriate bids
- Use preferred cost bidding
- Set content bids
- Find Google Analytics and AdWords conversion tracking
- Explain how Google keeps your costs down with the AdWords Discounter and smart pricing.

# EXHIBIT G

As we continue to expand advertisers' inventory options, we're commited to ensure that the return on all of the new clicks meets expectations.

**Smart Pricing** We analyze all of our data across our network, and if our data shows that a click is less likely to convert–less likely, that is, to turn into a desired business result–we reduce the price an advertiser pays for the click. As a result, advertisers are saved the guesswork of estimating the value of clicks from different keywords or sites (content vs. search, for example) and adjusting their bids.

**Better Ad Targeting** We're always tweaking our systems to improve the likelihood of ads getting clicked on. Some notable recent ads quality improvements have included quality filter improvements and advertiser-specific serving customization, both of which increased the number of targeted leads we send our advertisers.

# Less guesswork.

more inventory | less guesswork | more control | less hassle | more global | tips



# EXHIBIT H















# EXHIBIT I

 **AdWords Help**

# Where will my ads appear?

[Ads with keywords](#)

Ads from ad groups with keywords can appear on Google and the Google Network:

- Google search results pages: Alongside or above the search results.

- The Google Network: Search and Display Network websites. The Google Network is the largest advertising network available online, reaching over 86% of Internet users worldwide. You can be certain that your ads reach your target audience with Google AdWords.

**The Search Network**

Your ads may appear alongside or above search results, as part of a results page as a user navigates through a site's directory, or on other relevant search pages. Our global Search Network includes Google Maps, Google Product Search and Google Groups along with entities such as Virgin Media and Amazon.com.

**The Display Network partners**

Our extensive Display Network includes these partners (among many others):



The Display Network may also include sites from [DoubleClick Ad Exchange](#).

**Ads on the Display Network**

AdWords ads on [Display Network sites](#) are targeted to the content and URL of each page.



Google's Gmail service, which is part of the Display Network, also displays AdWords ads. Gmail ads are placed by Google computers using the same automated process that matches relevant AdWords ads to webpages and newsletters. If our automatic filters detect that the topic of the email is sensitive, no ads are shown. Here you can see how the ads relate to the discussion in the email:



## Ads with placements

Placements are an optional addition to, or an alternative to, keyword targeting. You can select individual websites or other placements in the Google Display Network where you'd like your ads to appear, and those placements can help determine where your ad appears on the Display Network. (Placements don't affect the Search Network.)

AdWords technology ensures that your ads appear in the most relevant locations across the Web so that customers find you. Learn more about advertising publishers within your industry.

**Ads with mobile device targeting**

If your campaign is targeting full-browser mobile devices, your ads will be eligible to show when users perform a Google web search or access our Display Network from iPhones, T-Mobile G1s, and similar mobile devices. You'll also be eligible to show on mobile apps, which are considered part of our Display Network.

Keep in mind that your ad will be matched to pages on the Display Network using the same contextual targeting factors, regardless of whether you've chosen to show your ads on computers or on iPhones and similar mobile devices. Learn more about mobile device targeting.

Ready to create your account? Watch this short, online course now and get step-by-step instructions on how to create an AdWords account.

---

AdWords - Contacting Us - Help with other Google products -

©2011 Google

# EXHIBIT J

Case 5:11-cv-01263-EJD    Document 567    Filed 06/17/21    Page 64 of 79

 **AdWords Help**

## My reports tell me that my ad is appearing on adsenseformobileapps.com or admobapplicationnetwork.com. What does this mean?

The adsenseformobileapps.com or admobapplicationnetwork.com domains refer to downloadable applications on mobile devices like the iPhone and Android devices that are part of the Google Display Network. If your campaign is both set to show on the Display Network and targeting full-browser mobile devices, then your ads will be eligible to show on mobile apps. Your ad will be matched to mobile apps on the Display Network using the same contextual targeting factors that are used to show your ads on computers.

Advertising on mobile applications can be a valuable way to engage with your target audience. Mobile Internet users are often close to the point of sale, and users of high-end devices are some of the most engaged targets. In addition, ad placements are all above the fold, so advertisers have steady interactions with users in the apps they use every day.

You can learn more about ads on mobile applications at: http://www.google.com/ads/mobileapps/index.html

---

AdWords - Contacting Us - Help with other Google products -

©2011 Google

# EXHIBIT K







# EXHIBIT L

Google AdWords **AdWords Help**

## Does smart pricing apply to mobile ads?

Smart pricing applies to ads that appear on mobile devices with full Internet browsers if the campaign is also targeted to desktop and laptop computers. Smart pricing does not apply to the WAP mobile ad format. Learn more about smart pricing.

AdWords - Contacting Us - Help with other Google products -
©2011 Google

# EXHIBIT M



# EXHIBIT N



# EXHIBIT O



# EXHIBIT P

Exhibit P

| No. | Click Date[1] | Click Cost[2] | Applied CCM[3] | Correct CCM[4] | Search/ Display[5] | Out-of-Area Clicks[6] | SP Off Clicks[7] | SB Clicks[8] | AFMA Clicks[9] | mGDN Clicks[10] | Out-of-Area Clicks | SP Off Clicks Overcharge | SB Clicks Overcharge | AFMA Clicks Overcharge | mGDN Clicks Overcharge | Smart Pricing Overcharge | Overlap | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | **Click Identification** | | | | | | **Damages/Restitution** | | | | | | | |



Exhibit P